**FILED IN CLERK'S OFFICE**
U.S.D.C - Atlanta

AUG 15 2003

LUTHER D. Ⓣ........, Clerk

By J. Ong Deputy Clerk



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**ORIGINAL**

LAWRENCE JOSEPH JEFFERSON,      :
                                :
            Petitioner,         :        CIVIL ACTION
v.                              :        NO. 1:96-CV-989-CC
                                :
                                :
FREDERICK J. HEAD, Warden,      :
    Georgia Diagnostic          :
    Prison,                     :
                                :
            Respondent.         :
                                :

## PETITIONER'S REPLY TO RESPONDENT'S FINAL EVIDENTIARY BRIEF ON BEHALF OF RESPONDENT

### I. INTRODUCTION.

Petitioner hereby files his Petitioner's Reply to Respondent's Final Evidentiary Brief on Behalf of Respondent in response to specific factual and legal contentions advanced by Respondent in his Final Evidentiary Brief on Behalf of Respondent (the "Respondent's Brief"). Petitioner relies primarily upon the legal and factual contentions advanced in his previously filed Final Evidentiary Brief and Proposed Findings of Fact and Conclusions of Law (the "Petitioner's Brief"). A response is not necessary as to all claims because Petitioner's Brief adequately covers the issues on those claims. Instead, Petitioner will respond only to specific points made by Respondent in the Respondent's Brief as to certain

1

claims where a response is necessary or appropriate.

## II. **THE SENTENCING DECISION IN PETITIONER'S CASE WAS IMPROPERLY DETERMINED BY REFERENCE TO A BIBLICAL PASSAGE**

### A. **Respondent's Contentions**

Respondent asserts four arguments as to why Petitioner's claims regarding Juror West's consulting a Bible in determining her sentencing decision was not a constitutional violation sufficient to require vacating the Petitioner's death sentence. (1) Petitioner first argues that Petitioner's claims regarding Juror West's reliance upon a randomly chosen passage from the Bible in deciding sentence should be considered procedurally defaulted, because they were not raised during state proceedings, despite the fact that Petitioner first learned of this event during the federal habeas corpus proceedings and would not now be barred from raising this claim under Georgia or federal procedural default law. (Respondent's Brief, pp. 60-65). (2) Respondent's second contends that the Court should not consider the testimony now before it from Juror Berry about Juror West's consulting a Bible in making her sentencing decision, because of Respondent's claim that this evidence should not properly have been received in these proceedings under Rule 606(b) of the Federal Rules of Evidence as evidence impeaching the jury's verdict, despite the fact that Petitioner's evidence regards "extraneous and prejudicial

2

information" and/or an "outside influence" which was "brought to bear" upon the sentencing decision of Juror West, and possibly other jurors, evidence which is specifically allowed under Rule 606(b). (Respondent's Brief, pp. 65-74). (3) Respondent next argues that even if Petitioner's claims are not procedurally defaulted and Petitioner's evidence is admissible under Rule 606(b), Petitioner has nevertheless not "proven" his case, because Juror West has not been "definitively identified" as the juror who read from her Bible during sentencing deliberations and, even if she were this juror, Petitioner's counsel has not been able to prove conclusively that Juror West is unavailable as a witness. (Respondent's Brief, pp. 74-75). (4) Finally, Respondent argues that even if Juror West consulted a Bible in determining her sentencing decision, this circumstance does not amount to a constitutional violation requiring the setting aside of Petitioner's death sentence. (Respondent's Brief, pp. 75-77). Petitioner will respond to Respondent's arguments in the order that they were made by Respondent.

**B.  Petitioner's Claims Regarding Juror West's Consulting a Bible in Reaching Her Sentencing Decision Are Not Procedurally Defaulted Because They Are Based on Newly Discovered Evidence**

It is somewhat unclear precisely what procedural default claim

3

Respondent asserts with regard to Petitioner's constitutional grounds for vacating his sentence because of Juror West's consulting a Bible in reaching her sentencing verdict. Indeed, the primary authority that Petitioner appears to rely upon is <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 112 S.Ct. 1715 (1992), which involved not procedural default but the entitlement of a petitioner to an evidentiary hearing on a specific constitutional claim, an issue which this Court resolved against Respondent in its Order granting Petitioner a limited evidentiary hearing on certain of Petitioner's constitutional claims (August 31, 1999 Order, p. 3)(Document 58), which Order this Court refused to reconsider despite Respondent's request. (October 22, 1999 Order)(Document 61) . Nevertheless, Petitioner will attempt to clarify the procedural default issues that may affect his claims regarding Juror West's consultation of a Bible in order to show why those claims are not barred from consideration on their merits by this Court.

Typically a procedural default occurs barring review of a constitutional claim on federal habeas corpus occurs "if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." <u>Hill v. Jones</u>, 81 F.3d 1015, 1022 (11th Cir. 1996)(citing <u>Harris v. Reed</u>, 489 U.S. 255, 260-261, 263, 109 S.Ct. 1038, 1042-1043 (1989).

4

Petitioner's claims regarding Juror West's consulting a Bible in deciding sentence does not fit this typical framework, because the claim was not raised during the state court proceedings since it was then unknown to Petitioner. Accordingly, no state court has considered the claim and as a consequence there has been no occasion for a clear statement by a state court expressing a state procedural bar as an independent and adequate state ground for denying relief.

Although it is not explicitly so stated by Respondent, Respondent's procedural default argument appears to be based not on the typical procedural bar based upon a state procedural ruling but instead upon the contention that if Petitioner now raised his juror claims in state habeas corpus they would be dismissed as successive under O.C.G.A. §9-14-51. E.g., Hunter v. Brown, 236 Ga. 168, 223 S.E.2d 145 (1976). If this were so, Petitioner's juror claims would now be barred in federal habeas corpus. See, Coleman v. Thompson, 501 U.S. 722, 735, n. 1, 111 S.Ct. 2546, 2557, n. 1 (1991)(Holding that the rule requiring that the last state court to review the claim to have clearly and expressly found a procedural bar as an independent and adequate state ground for denying relief "does not apply if the petitioner failed to exhaust state remedies and the court to which the Petitioner would be required to present his claims in order to meet the exhaustion requirement would now

find the claims procedurally barred."); <u>Castille v. Peoples</u>, 489
U.S. 346, 351, 109 S.Ct. 1056, 1060 (1989). The rule, as stated by
the Eleventh Circuit in <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1327
(11th Cir. 1998), is that O.C.G.A. §9-14-51, disallowing the
presentation of claims not previously presented in earlier state
habeas corpus petitions in Georgia, "can and should be enforced in
federal habeas corpus proceedings against claims never presented in
state court, unless there is some indication that a state court
judge would find the claims in question 'could not reasonably have
been raised in the original or amended (state habeas) petition.'"

Accordingly, the initial question with regard to any claimed
procedural bar here is simply whether Petitioner's claims regarding
Juror West's consultation of a Bible would unquestionably be found
to have been procedurally defaulted as a successive claim under
O.C.G.A. §9-14-51, if brought in a new state habeas corpus
petition, or whether "there is some indication" that a Georgia
court would not find the claim barred under O.C.G.A. §19-14-51,
because "it could not reasonably have been raised in the original
or amended petition." <u>Chambers v. Thompson</u>, 150 F.3d at 1327. The
answer to this question can be found in the decision in <u>Turpin v.
Todd</u>, 268 Ga. 820, 827, 293 S.E.2d 900, 907 (1997), where the
Georgia Supreme Court held that the new discovery of improper
outside influences upon a jury, when there had been no previous

6

reason to suspect this outside influence, constitutes "cause", which when combined with the required "prejudice" is sufficient to excuse any bar to presenting claims based upon this newly discovered evidence in a successive habeas corpus petition under O.C.G.A. §9-14-51.[1] Therefore, there is not merely "some indication", <u>Chambers v. Thompson</u>, 150 F.3d at 1327, that the Georgia courts would not find Petitioner's juror claims barred by O.C.G.A.§9-14-51. There is clear Georgia Supreme Court authority for the proposition that his claims would not be found barred under O.C.G.A. §19-14-51, because they "could not reasonably have been raised in the original or amended (state) petition." Accordingly, there is no procedural bar to this Court's consideration of Petitioner's juror claims on their merits under the <u>Chambers</u> rule.

An important aspect of the decision in <u>Turpin v. Todd</u> was the Georgia Supreme Court's rejection of an argument that the petitioner there should have learned of the improper outside influence on the jurors—there a bailiff's answering questions posed by the jury regarding the meaning of a life sentence and the possibility of parole—by questioning the jurors following trial

---

[1]The Georgia Supreme Court remanded the case for further consideration on the issues of prejudice. The Superior Court found the requisite prejudice and the Supreme Court later affirmed this finding. <u>Turpin v. Todd</u>, 271 Ga. 386, 389-391, 519 S.E.2d 678, 681-683 (1999).

7

regarding this possible outside influence. Respondent here, similarly chides Petitioner's state counsel for not learning of Juror West's reading of a Bible even though attempts were made during the state habeas corpus proceedings to interview all jurors who would talk with a representative of Petitioner, because "the interviewers did not succeed in asking the right questions to learn of the alleged reading of a juror's personal Bible." (Respondent's Brief, p. 64, fn. 15). In Turpin v. Todd, the Georgia Supreme Court rejected this argument and cited the ABA Standards for Criminal Justice and the Commentary thereto for the proposition that a lawyer should not be expected to interview jurors as to every possible type of misconduct which might have occurred, absent evidence of such misconduct. Turpin v. Todd, 268 Ga. at 827, 493 S.E.2d at 907; ABA Standards of Criminal Justice, Standard 4-7.3(2d Ed. 1980); Commentary at p. 4.85.

During the trial, neither Petitioner nor his counsel had any reason to believe that any juror would be consulting a Bible in determining sentence. The Court did not provide the jurors with a Bible during their deliberations. Instead, the Court instructed the jurors to decide the case based solely upon the law and the evidence. (E.g., Trial Transcript, pp. 167, 1405). Neither Petitioner nor its counsel would have had any reason to believe that all the jurors had not faithfully followed these instructions.

8

See, E.g. <u>United States v. Phelps</u>, 733 F.2d 1464, 1473 (11th Cir. 1984)("The law presumes that the jury will follow the court's instructions.").

Thus, contrary to Respondent's claims, there was no duty upon Petitioner or his counsel to inquire of the jurors as to every possible type of misconduct which might have occurred during deliberations absent some indication that there may have been such juror misconduct. A petitioner is entitled to presume the regularity of the proceedings and that misconduct had not occurred unless given reason to believe otherwise. Moreover, if a petitioner's counsel goes the extra mile of attempting to interview those jurors who will talk with him, counsel is not expected to go down a list of all possible misconduct lest he be later accused of defaulting his client's valid constitutional claims when he failed to ask the "right questions", as Respondent now claims. (Respondent's Brief, p. 64, fn. 15). Indeed, such an inquiry of jurors might involve the type of "harassment" which the Commentary to the ABA Standards for Criminal Justice prohibits. Commentary, at p. 4.85. Just as the lawyers in <u>Todd v. Turpin</u> could not be expected or required to ask the jurors there whether the bailiff had answered legal questions, absent some reason to believe this had occurred, Petitioner's counsel here should not be expected or required to have asked the jurors during state habeas corpus

proceedings whether anyone had consulted a Bible when deciding sentence, unless they were on notice that such an irregularity had occurred.

Indeed, the requirement that the Respondent would place upon Petitioner of conducting adversarial juror interviews reflects a fundamental misunderstanding of juror interviews. Jurors are typically reluctant to speak with counsel about their deliberations, especially to the attorneys representing the person whom they have found guilty of a serious crime and sentenced to death. For counsel to learn anything, the interview must be low key and non-confrontational. Jurors will speak openly only when they feel comfortable with the interviewer. They will not respond candidly to an adversarial interview framed around a list of questions regarding every possible type of juror misconduct.

Here, Juror Berry revealed that Juror West consulted her Bible in making her sentencing decision only after he became friendly with the interviewing attorney, Megan Devorsey, when they discussed their common interests in dogs. (February 21, 2001 Transcript, pp. 12-13). Juror Berry disclosed what had happened with Juror West not when asked what Respondent would contend is the "right question" (presumably "Did any of the jurors violate their oath by basing their decision on a randomly selected verse from a Bible they brought into the jury room?"), but when Ms. Devorsey merely

asked him to talk about some of the women jurors on the jury panel, because Mr. Berry had previously spoken only about the male jurors. It was in response to this open ended inquiry that Juror Berry revealed the critical information regarding the juror misconduct in this case. (February 21, 2001 Transcript, p. 14, 16).

In short, despite the diligent efforts of Petitioner's post-conviction counsel during the state proceedings in interviewing jurors who would agree to speak with them and despite the fact that Petitioner had no reason to suspect such misconduct, it is only by happenstance that this misconduct was finally learned by Ms. Devorsey and it was only through the power of the Court that this information was obtained from Juror Berry.[2] The evidence involved here is the quintessential type of newly discovered evidence sufficient to satisfy the "cause" requirement, which along with sufficient "prejudice" can excuse a procedural default. Raising this claim now would not be barred by O.C.G.A. §9-14-51, because this ground for relief "could not have been reasonably raised"

---

[2]The reluctance of jurors to reveal what happened during the jury deliberations is evidenced in this case by Juror Berry's refusal to sign an affidavit about what he told Ms. Devorsey about Juror West's consulting a Bible when he learned that it might be a critical issue in then case. (Berry Deposition, p. 16). Juror Berry attempted to avoid being a witness in the matter and refused to honor a subpoena to an evidentiary hearing before the Court, given that he lived more than a hundred miles from the courthouse. His testimony had to be taken through a deposition pursuant to a Court Order. (Order of March 19, 2001)(Document 78).

earlier. <u>Turpin v. Todd</u>, makes this clear. Respondent is simply wrong in contending otherwise.

Finally, even if there were a likely state procedural default not excused by "cause" and "prejudice", something Petitioner strongly contests, the fact that the intrusion of an improper outside influence on the decisionmaking of at least one juror was newly discovered during the federal habeas corpus proceedings is an independent federal basis for excusing any state procedural default. <u>Reed v. Ross</u>, 468 U.S. 1, 13, 104 S.Ct. 2901, 2910 (1984)("[T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the (cause) requirement is met."); <u>Amadeo v. Zant</u>, 486 U.S. 214, 222-229, 108 S.Ct. 1771, 1776-1780 (1988)(Finding a "cause" and "prejudice" excuse for not raising a jury challenge claim in state court when unbeknownst to petitioner's counsel the prosecutor had rigged the jury rolls so as to underrepresent black jurors.); <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986)(One of the "objective impediments to compliance with a procedural rule" sufficient to constitute "cause" to excuse a procedural default occurs when "the <u>factual</u> or legal basis for a claim was not reasonably available to counsel.")(Emphasis added); <u>Strickler v. Greene</u>, 527 U.S. 263, 283 & fn. 24, 119 S.Ct. 1936, 1949 & fn. 24 (1999); <u>Williams v. Taylor</u>, 529 U.S. 420, 440-444, 120 S.Ct. 1479,

1492-1494 (2000)(Petitioner was entitled to rely upon the regularity of the proceedings and that the prosecutor would disclose during voir dire that he had represented a juror in her divorce. The Petitioner's counsel was not required to inquire of the jurors as to every possible bias resulting from a possible relationship between the prosecutor and the jurors.); Porter v. Singletary, 49 F.3d 1483, 1487-1490 (11th Cir. 1995)(Given "the presumption of regularity" that the judge in a criminal case will comply with the Canons of Ethics, a habeas corpus petitioner could not be expected to uncover his trial judge's bias against him such that the late discovery of this fact is "cause" sufficient to excuse a procedural default.); Perkins v. LeCureux, 58 F.3d 214, 218 (6th Cir. 1995) (same); Dyas v. Lockhart, 71 F.2d 1144, 1147-1148 (no waiver of right to recusal because bias of judge unknown); Gayle v. Mann, 966 F.2d 81, 84 (2nd Cir. 1992)(No default of claims based on newly discovered prison records); Julius v. Jones, 875 F.2d 1520, 1525 (11th Cir. 1989)(Cause shown where prosecutor failed to disclose Brady material although counsel did not "ferret out the violation", because "counsel should be able to rely on a belief that prosecutors will comply with the Constitution and will produce Brady material on request.). Petitioner was entitled to assume that the jurors had faithfully followed their oaths during deliberations, absent reasons to believe otherwise. Therefore, he

13

should not now be barred from raising juror misconduct claims when he later learns by happenstance that misconduct had occurred.

In sum, the evidence now before the Court regarding Juror West's reliance on a randomly chosen Bible passage in reaching her sentencing verdict qualifies as newly discovered evidence constituting "cause" to excuse the failure to raise constitutional claims based on these circumstances during earlier state court proceedings under both Georgia and federal law. This "cause", when combined with the "prejudice" suffered by Petitioner when the sentencing decision of at least one of the jurors necessary to the death sentence verdict in this case was arbitrarily based upon extrajudicial material, is sufficient to excuse any claimed procedural default. Petitioner's claims should be decided on their merits.

C.   **Rule 606(b) Does Not Exclude Juror Berry's Testimony Regarding Juror West's Consultation of a Bible in Reaching Her Sentencing Decision**

In contending that Petitioner's evidence regarding Juror West's consulting a Bible in making her sentencing decision is inadmissible under Rule 606(b) of the Federal Rules of Evidence, Respondent ignores the exception in Rule 606(b) permitting a juror to "testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or

14

whether any outside influence was improperly brought to bear upon any juror."[3]  Indeed, the cases cited by Respondent specifically recognize this exception. E.g., United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990)("There are two exceptions: jurors may testify to extraneous information brought to their attention and to outside influences brought to bear upon a juror. Fed.R.Evid. 606(b)"); United States v. Bondolato, 710 F.2d 1509, 1515 (11th Cir. 1983)("Fed.R.Evid. 606(b) forbids a juror to testify, or the court to receive his affidavit, on matters occuring during the course of deliberations, except that a juror may testify with respect to whether extraneous prejudicial information has been brought to the jury's attention or outside influence brought to bear.")[4]

The reading of a Bible, not part of the evidence nor of the Court's instructions to the jury regarding the applicable law, is a classic example of "extraneous prejudicial information" and an

---

[3]This is also the Georgia rule. Gardiner v. State, 264 Ga. 329, 332, 444 S.E.2d 300, 303 (1994)(Juror testimony allowed "where extrajudicial and prejudicial information has been brought to the jury's attention improperly; or where non-jurors have interfered with the jury's deliberations.").

[4]Respondent's counsel concedes this exception when she chides Petitioner's counsel for not pursuing his juror claims in state court, because, as she observes, "both state and federal law provide for an exception (to rules prohibiting impeachment of a jury's verdict) if it can be established that the jury considered extraneous evidence in making its decision." (Respondent's Brief, p. 63).

15

"outside influence" being "improperly brought to bear upon any juror", evidence which Rule 606(b) specifically permits. Thus, testimony by a juror regarding such an external influence, here the reading of a Bible, is not barred by Rule 606(b) or the common-law rule against impeaching jury verdicts, even though the reading occurred within the jury room. It is similar to a juror's reading from a newspaper inside the jury room, which is obviously understood to be "an external influence about which juror testimony is admissible." Tanner v. United States, 483 U.S. 107, 117-118, 107 S.Ct. 2739, 2746 (1987)(citing with approval United States v. Thomas, 463 F.2d 1061 (7th Cir. 1971), for the proposition that jurors reading of a newspaper inside the jury room is an example of "an external influence about which juror testimony is admissible."); Mattox v. United States, 146 U.S. 140, 149-151, 13 S.Ct. 50, 53 (1892)(Holding that it would reverse a capital case where the jury was exposed to a prejudicial newspaper article and that juror testimony was admissible to prove this circumstance.); United States v. Herring, 568 F.2d 1099, 1103 (Appellate presumption of prejudice occurs when a jury has been exposed during deliberations to a prejudicial newspaper article, requiring further inquiry).

Indeed, it is only with receipt of testimony regarding extraneous information that it can be determined whether the jury's

16

exposure to extra-judicial material violated a criminal defendant's rights to an impartial jury considering only admissible evidence tested by the adversary process. In a capital case such evidence is necessary to determine whether a juror's consideration of extraneous material with regard to sentence violates a capital defendant's due process and cruel and unusual punishment protections against an unreliable sentencing procedure. <u>Patterson v. Colorado</u>, 205 U.S. 454, 462, 27 S.Ct. 556, 558 (1907)("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."); <u>Turner v. Murray</u>, 379 U.S. 466, 472, 85 S.Ct. 546, 549 (1965)("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); <u>United States v. Perkins</u>, 748 F.2d 1519, 1533 (11th Cir. 1984)("The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on evidence produced at trial.").

This is not a case where a petitioner offered juror testimony challenging the rough and tumble of jury deliberations, such as in <u>United States v. Bondolato</u>, 710 F.2d at 1515 or <u>United States v. Cuthel</u>, 903 F.2d at 1383, cited by Respondent. Rule 606(b) clearly

17

prohibits juror testimony regarding these circumstances. Nor is it a case like United States v. Bashov, 733 F.2d 842, 851-852 (11th Cir. 1984), also relied upon by Respondent, where there was only conjecture about the possibility of the jury's exposure to extraneous, extra-judicial information or influence. This is a case where there is uncontradicted testimony that "towards the end of our sentencing when we were deciding what the sentence would be" (Berry Deposition, p. 23) and the foreman was directing each juror to "have their say about the subject" (Berry Deposition, pp. 7-8), one juror, contrary to the trial court's instructions, read a passage from the Bible, obviously extra-judicial and extraneous material not part of the evidence or the court's instructions, prefacing her reading by stating that "she was looking for justification for what we were doing or what she was doing, coming to her or reaching her opinion on the situation." (Berry Deposition, p. 10, 19-20). Rule 606(b) specifically permits consideration of this type of evidence.

When there is evidence, as here, of the jury or a juror considering extra-judicial material in deciding the verdict, a petitioner has the initial burden of showing that the intrusion of extraneous information during jury deliberations posed "a reasonable possibility of prejudice to the defendant." United States v. Perkins, 748 F.2d at 543, United States v. Rowe, 906 F.2d

654, 656 (11th Cir. 1990)("When jurors consider extrinsic evidence we require a new trial if the evidence poses a <u>reasonable possibility of prejudice</u> to the defendant.")(Emphasis in original). Once that showing has been made "[p]rejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the (prosecutor) bears the burden of demonstrating that the consideration of the evidence was harmless."); <u>United States v. Perkins</u>, 748 F.2d at 1533; <u>United States v. Jobe</u>, 101 F.3d 1046, 1058 (5th Cir. 1996)("Hence, when extrinsic evidence is introduced into the jury room, the defendant enjoys a rebuttable presumption of prejudice and 'the government has the burden of proving the harmlessness of the breach.'"); <u>United States v. Howard</u>, 506 F.2d 865, 869 (5th Cir. 1975)("[P]rejudice will be assumed in the form of a rebuttable presumption, and the burden is on the Government to demonstrate the harmlessness of any breach to the defendant."); <u>Farese v. United States</u>, 428 F.2d 178, 180 (5th Cir. 1970); <u>Remmer v. United States</u>, 347 U.S. 227, 229, 74 S.Ct. 450, 451 (1954)("In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the court is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."); <u>United</u>

19

States v. Sea Hawk Seafoods, Inc., 206 F.3d 900, 906 (9th Cir. 2000)("Where extraneous information is imparted, as when papers bearing on the facts get into the jury room without having been admitted as exhibits, or when a juror looks things up in a dictionary or directory, the burden is generally on the party opposing a new trial to demonstrate the absence of prejudice, and a new trial is ordinarily granted if there is a reasonable possibility that the material could have affected the verdict."); United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996).

This rule should be enforced with even greater care in a capital case where there is a "heightened standard of reliability." (Petitioner's Brief, pp. 23-25). As the United States Supreme Court observed more than a century ago in Mattox v. United States, 146 U.S. 140, 150, 50 S.Ct. 50, 53 (1892)("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment."). Moreover, because a unanimous verdict is necessary for a death sentence in Georgia, Hill v. State, 250 Ga. 821, 301 S.E.2d 269 (1983), even if it is reasonable to conclude that the extraneous information here, Juror West's reading from her Bible, affected only Juror West's death verdict, a new sentencing nevertheless must be ordered. Lawson v. Borg, 60 F.3d 608, 613 (10th Cir. 1995)("The number of jurors affected by the misconduct does

20

not weigh heavily in the prejudice calculus for even a single juror's improperly influenced vote deprives a defendant of an unprejudiced, unanimous verdict."); Parker v. Gladden, 385 U.S. 363, 366, 87 S.Ct. 468, 471 (1966)("In any event, petitioner was entitled to be tried by 12, not 9, or even 10, impartial and unprejudiced jurors."); Wiggins v. Smith, ___ U.S. ___, 123 S.Ct. 2527, 2543 (2003)(Observing that a factor to be included in the analysis of the prejudice resulting from deficient performance by counsel is that the decision of only one juror not to impose the death penalty would have prevented its imposition.).

Here, the evidence is uncontradicted that extraneous information was interjected into the sentencing deliberations when near the end of those deliberations Juror West referred to, read from, and indicated her reliance upon a randomly selected Bible verse in reaching her sentencing verdict when each juror was asked to "have their say about the subject." (Berry Deposition, pp. 7-8, 10, 19-20, 23). Rule 606(b) perhaps prohibits the jurors, including Juror Berry, from stating what specific effect this intrusion of extraneous information had upon Juror Berry's, Juror West's or any of the other juror's determination of their individual sentencing verdicts. Mattox v. United States, 146 U.S. at 149, 13 S.Ct. at 53 ("[A] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence although not as to how

21

far that influence operated upon his mind."); <u>United States v. Horton</u>, 646 F.2d 181, 188, fn. 3 (5th Cir. 1981); <u>United States v. Howard</u>, 506 F.2d at 868; <u>United States v. Sassounian</u>, 230 F.3d 1097, 1108, 1110 (9th Cir. 2000).[5]  But given the circumstances (1) that the Biblical passage was brought into the deliberations toward their conclusion when each juror was being asked to state their personal reasons for reaching their individual verdicts (Berry Deposition, pp. 7-8, 23) and (2) that at least Juror West orally indicated her reliance, at least in part, on this passage in making her decision (Berry Deposition, pp. 10, 19-20), there is clearly at least a "reasonable possibility" that the extraneous information from a Biblical passage affected the verdict of at least one juror. If nothing else, the totality of the circumstances indicate a more than "reasonable possibility" that this reading of a Biblical passage prejudiced the sentencing verdict of Juror West, whose vote for death was essential to a death sentence.  In this situation there is a presumption of prejudice which Respondent has not even attempted to rebut.  As a consequence, a new sentencing should be

---

[5]This rule has been criticized as creating an "Alice in Wonderland quality" to the determination of the impact of extraneous material during jury deliberations, because the "most direct evidence of prejudice—the juror's own recollection of how the introduction of this inadmissable evidence impacted on her personal decision-making—cannot even be considered by this Court." <u>People v. Sassounian</u>, 226 Cal. Rptr. 880, 914-915 (Cal.App. 1986).

ordered.

**D.** **Petitioner has Correctly Identified Juror West as the
Juror Who Read From Her Bible and Has Shown That She is
Unavailable as a Witness**

The record presently before the Court, as well as evidence
that Petitioner is prepared now to present at the August 25, 2003
hearing, clearly indicates that Juror West is the juror who
consulted her Bible in reaching her sentencing decision. Moreover,
Petitioner is prepared to show why he previously believed that
Juror West might be deceased. Petitioner is also prepared to show
that his counsel have recently learned that Juror West is still
alive but unable to provide any competent evidence on the issue
before the Court. Juror West is 85 years old, living in a nursing
home, suffering from dementia, and according to her daughter,
unable to provide any evidentiary assistance to the Court.

Attached hereto as Exhibits "A", "B", "C", "D" and "E" are the
juror information slips filled in by each of the female jurors in
the case. Those juror slips reveal that each and every one of the
female jurors, other than Juror West, was at the time of
Petitioner's trial in her 30's or younger. Juror West, on the other
hand, at the time of the jury deliberations was 67. Accordingly,
Juror West is obviously the only juror who fits Juror Berry's
description of the Bible consulting juror as "a little old lady

23

with a Bible." (Berry Deposition, p. 21).

As evidenced by the Declaration of V. J. Henville, attached hereto as Exhibit "F" and made a part hereof, Petitioner's counsel attempted to locate Juror West earlier during these proceedings, using all the computer or other locator sources then available to the Federal Defender Program, Inc.. Unfortunately, she could not be found and it was believed that due to her age she was likely deceased. In short, although counsel made a diligent effort to try to locate Ms. West, counsel could not find her.

After Respondent made the claims that were made in Respondent's Response, Petitioner's counsel renewed efforts to locate Ms. West or determine for sure whether she was deceased, as counsel believed. Fortunately counsel were able to find a new address associated with Ms. West. This address was traced to a telephone number, which counsel called. A Ms. Linda Lindsey answered. She identified herself as Ms. West's daughter. Ms. Lindsey said that her mother was elderly, 85 years old, living in a nursing home, and unable mentally to provide any meaningful information. She stated that her mother had suffered two strokes and was suffering from a type of dementia. Although counsel attempted to secure from Ms. Lindsey a Declaration setting out these facts, she refused to do so because she avidly believes in the death penalty and did not want to do anything to assist Mr.

24

Jefferson in avoiding execution. <u>See</u>, Declaration of John R. Martin attached hereto as Exhibit "G" and made a part hereof.

In sum, Petitioner has definitively identified Ms. West as the juror who consulted her Bible in making her sentencing decision.[6] We have also shown that she is unavailable as a competent witness. Thus, the testimony of Juror Berry is the evidence that the Court must rely upon in deciding this case. Respondent has offered no contrary evidence. Moreover, even if Juror West were available as a witness, she would be prevented under Rule 606(b) from giving testimony one way or the other regarding how her consultation with a Bible affected her sentencing decision. <u>E.g.</u>, <u>United States v. Horton</u>, 646 F.2d 181, 183, fn. 3 (5th Cir. 1981).

_____

[6]That Juror West would be the juror reading from a Bible is consistent with her voir dire inquiry. Ms. West appeared to be a religious person. She stated during voir dire, "I am an adult Sunday school teacher at the First Baptist Church in Smyrna and I am actively involved in the Senior Citizen's Group. I am a secretary and I am involved in the Church visitation program on the continuing witness training." (Trial Transcript, p. 228-229). In responding to questions as to what she read, she stated, "Most anything I can get my hands on. I do a lot of reading in preparation for Sunday school lessons. That's Biblical material, and I subscribe to several magazines." Therefore, it does not appear unusual that she would have carried a Bible with her during her jury service and that she would have consulted this Bible in making her sentencing decision. At least it is consistent with her voir dire answers.

**E.   Juror West's Consultation with a Bible in Deciding her Sentencing Decision Violated Petitioner's Constitutional Rights**

Respondent gives short shrift in Respondent's Brief to the fundamental issue before the Court, namely whether a juror's reliance on a randomly chosen Bible passage in determining a death sentence violates a capital defendant's due process and cruel and unusual punishment rights to a reliable sentencing determination when a unanimous verdict is necessary for a death sentence. Respondent merely points to factual distinctions between this case and Jones v. Kemp, 706 F.Supp. 1534 (N.D.Ga. 1989), conceded to by Petitioner (Petitioner's Brief, p. 29; Respondent's Brief, pp. 73-74), and cites to two state decisions, both of which are distinguishable from this case and neither of which supports Respondent's position. Respondent offers no response to the other case authority and legal argument presented by Petitioner.

Respondent notes the factual distinction between Jones v. Kemp and this case—in Jones the judge authorized the jury to have a Bible—but ignores the fundamental reasoning of Judge Moye as to why the death sentence in Jones had to be set aside. (Respondent's Brief, pp. 73-75). Judge Moye emphasized that the presence of a Bible in the jury room for consideration by the jurors in determining sentence constituted the interjection of extraneous materials, not part of the evidence nor the Court's instructions,

26

which could drive the jury's sentencing decision. As Judge Moye observed, "[a] situation in which a jury, unsupervised by the Court and unobserved by counsel, could reach a conclusion by consulting sources other than the legal charge of the court and the evidence actually received by the court is not permitted." 706 F.Supp. at 1560. Indeed, this case in some respects is even stronger than Jones, because here the evidence is clear that at least one of the jurors specifically consulted the Bible in guiding her in reaching her sentencing decision. In Jones, the evidence did not indicate exactly how the Bible had been used, only that "the jury intended to use the Bible in some way or for some purposes", perhaps merely "as a silent monitor witnessing that the jurors approached their solemn task in the proper attitude," Id. at 1559, rather than as any specific guidance in determining their verdict. Here, we know from her actions and words during the deliberations that at least one juror directly consulted the Bible in deciding her sentencing verdict.

The decision in Beighler v. State, 690 N.E.2d 188 (Ind. 1997), cited by Respondent (Respondent's Brief, p. 75), is similarly unavailing for Respondent's position. The evidence in Beighler was confusing and the Court specifically stated that the petitioner there had "failed to prove a Bible was present in the jury room" during deliberations. Instead, the evidence indicated that it "was

27

not consulted as an extra-legal source of authority during deliberations." 690 N.E.2d at 203. Moreover, the only discussions that occurred regarding "the biblical propriety of the death penalty occurred about the time of the deliberations on guilt and not during the penalty-phase." Id. All Beighler countenanced was jurors relying upon their "religious scruples" in making a life or death decision. Id. The decision in no way endorses a juror's direct reliance upon an arbitrarily chosen passage in the Bible to make that decision.

The final case relied upon by Respondent, McNair v. State, 706 So.2d 828 (Ala.Crim.App. 1997), is also clearly distinguishable on the facts. First, the Bible in that case was only read during the guilt phase of the trial and was never read or referred to during sentencing, as here. Perhaps even more important, the evidence there was clear that the reading from the Bible and praying that occurred in McNair during the guilt phase deliberations was of a general nature and directed solely at "encouraging the jurors to take their obligations seriously and to decide the question of guilt or innocence based only on the evidence presented from the witness stand in open court." 706 So.2d at 838. The Bible reading in no respect "unlawfully influenced the jury in reaching its verdict and did not encourage its members to consider anything other than the evidence presented in the court in arriving at a

28

verdict." Id. It was these circumstances which caused the Alabama Court of Criminal Appeals to conclude there that there was no evidence "that the prayers and readings were prejudicial or that they might have unlawfully affected the verdict." Id.

Here, contrary to McNair, the evidence is clear that Juror West's consultation of the Bible was not merely to evidence the solemnity of the occasion or to ensure that the case was decided solely on the law and the evidence. Quite to the contrary, she randomly picked a passage from the Bible for the purpose of deciding her sentencing verdict, or at least there is more than a "reasonable possibility" that this was her purpose, which the Respondent has not rebutted.

Earlier Alabama cases, cited in McNair, evidence the distinction. For example, in Troha v. State, 462 So.2d 953, 954 (Ala. 1984), the Supreme Court of Alabama reversed a rape conviction when a single juror consulted with his brother, a minister, during his jury service and "asked him for guidance and scripture references, so as to enable me to make a proper and just decision." Id. The Alabama Supreme Court noted that it did not know the "extent of the conversation between the juror and his brother, the minister, nor the scripture references that were recommended to him to help him make his decision." Id. Nevertheless, because "the Bible portrays god as vengeful, as well as merciful and forgiving,"

29

and "[i]t is a well settled principle of law, and, further, it is fundamental to a fair trial, that jurors should consider only the evidence presented at trial," the Court reversed the defendant's conviction, noting that a conviction cannot stand "whenever the misconduct might have unlawfully influenced the jury." This is so even when the evidence is "ambiguous." Id.

Here, the evidence is not even "ambiguous." Although, as in Troha, we do not know the precise biblical passage upon which Juror West relied, we know that it was extrajudicial information which at least "might have unlawfully influenced (her) verdict." 462 So.2d at 954. This denied Petitioner his constitutional rights to a fair, non-arbitrary and reliable sentencing determination based solely on the law and the evidence. Petitioner's sentence should be vacated. The cases cited by Respondent do not hold otherwise.

**F.** **Additional Authority in Support of Petitioner's Claims That His Death Sentence Should Be Set Aside Because Juror West Consulted a Bible in Determining Sentence**

As an additional authority in support of Petitioner's position, the Petitioner relies upon the decision of the District Court for the Seventeenth Judicial District in Brighton, Colorado in People of the State of Colorado v. Robert Elliott Harlan, Case No. 94-CR-187, which was decided on May 22, 2003, one day before Petitioner filed Petitioner's Brief on May 23, 2003. A copy of the

decision is attached hereto as Exhibit "H" and made a part hereof. The decision in the Harlan case fully supports the positions advanced by Petitioner herein.

## III. **PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE BECAUSE THERE IS AN UNACCEPTABLE RISK THAT THE PROSECUTOR'S DECISION TO SEEK THE DEATH PENALTY IN THIS CASE WAS BASED UPON RACE**

### A. Introduction

Respondent filed a lengthy response to Petitioner's claims regarding the unacceptable risk that race played a part in the decision of the prosecutor to seek the death penalty in this case. (Respondent's Brief, pp. 15-59). The response, however, is unfocused and fails to respond to the specific evidence upon which Petitioner is now relying or to meet the legal arguments advanced by Petitioner. Respondent also attempts to relitigate an issue already determined by the Court, specifically whether there is a procedural bar to this Court's considering Petitioner's claims on their merits. (Respondent's Brief, pp. 15-23).

### B. The Relitigation of Procedural Default Claims

Respondent concedes that in it's Order of August 31, 1999 (pp. 1-2)(Document 58), this Court ruled that Petitioner's claims regarding racial bias in the decision of the prosecutor in this case to seek the death penalty were not procedurally barred, or, if so, these claims nevertheless merited federal review under the

31

miscarriage of justice exception. Respondent previously requested reconsideration of this decision, which was denied in this Court's Order of October 22, 1999 (Document 61). Respondent now asks the Court again to reconsider a decision that it has already made twice. (Respondent's Brief, pp. 16-23).

Petitioner has previously addressed Respondent's procedural default contentions in the Petitioner's Brief, (pp. 46-47, fn. 8), the Petitioner's Brief in Support of Request for Discovery (Document 41)(pp. 15-22), and in Petitioner's Reply to Respondent's Response in Opposition to Petitioner's Motion for Evidentiary Hearing (Document 51)(pp. 5-10). Petitioner relies on this previously presented argument and will not merely repeat it here.

One comment, however, is probably worth mentioning. Although Respondent never explicitly so states, it appears that Respondent believes that the miscarriage of justice exception should be limited to an actual innocence claim and should not extend to a claim, as here, that racial bias infected the process by which a death sentence was rendered. Although Respondent concedes "that racial discrimination in legal proceedings can be invidious," (Respondent's Brief, p. 22), Respondent implicitly argues that racial bias alone should nevertheless never be sufficient to allow a petitioner to pursue such a claim under the miscarriage of justice exception in federal habeas corpus if there is an arguable

32

state procedural default.

If Respondent is correct in this position, then a federal habeas corpus petitioner would be prohibited from a racial bias claim in federal habeas corpus under the miscarriage of justice exception no matter how egregious the evidence might be that race infected the determination of his case. Such a position is especially troubling when a death sentence is at stake. According to Respondent, a federal habeas corpus petitioner would be barred from seeking relief in federal habeas corpus even if the prosecutor or judge in his case admitted that their decisions in rendering a death penalty verdict were motivated by racial considerations. Cf. United States v. Brown, 539 F.2d 467, 468-469 (5th Cir. 1976)(Habeas corpus petition under §2254 granted when a lawyer disclosed to the defense post-trial that the trial judge had stated to him during a bar function prior to trial that "he was going to get that, as I recall nigger.").

In short, Respondent's position proves too much. If the decision to seek the death penalty in this case was motivated by race, its imposition here would be "a gross miscarriage of justice", as this Court held in its August 31, 1999 Order (p. 2). Accordingly, the Petitioner's racial bias claims should not be barred from consideration by this Court. The Court should decide the claims on their merit.

## C.  **Petitioner's Proof of Racial Discrimination**

Curiously, Respondent's spends much of his argument regarding Petitioner's racial bias claim challenging statistics upon which Petitioner no longer relies. Respondent never addresses the specific cases and statistical analysis set out by Petitioner at pages 37 through 38 of Petitioner's Brief, which are the relevant cases and analysis upon which Petitioner actually relies.

As recounted in Petitioner's Brief (pp. 36-38), the compiling of specific and accurate statistics regarding former Cobb County District Attorney Thomas Charron's decisions to seek the death penalty in death eligible cases during the relevant time period (1976-1986) has been a process with some "give and take", as the parties refined which cases actually were prosecuted by Mr. Charron during the relevant years and which cases were actually death eligible under the Georgia statutory scheme, that is a murder or felony murder prosecution which included the required statutory aggravating circumstances of O.C.G.A. §17-10-30(b).[7] Petitioner started with a list of eighty-four cases which possibly fit this criteria (Petitioner's Exhibit 7; April 29, 2002 evidentiary

---

[7]Respondent is simply wrong in claiming that Petitioner's analysis includes cases which preceded Mr. Charron's term of office or were not "death eligible." (Respondent's Brief, pp. 30, 37, 47). Respondent is referring to the original 84 cases not the present 32 cases and all of these cases are clearly "death-eligible" prosecutions during the relevant time frame.

hearing.). When Respondent pointed out reasons why certain of these cases should not have been included, such as when the case pre-dated Mr. Charron's term of office, Petitioner refined his statistical analysis, giving the benefit of the doubt to Respondent, to a list of thirty-two cases which were unquestionably cases that were prosecuted during the relevant time period (1976-1986) and were death eligible under the Georgia statutory scheme. This list and the statistical analysis related thereto were presented in an Affidavit by Petitioner's expert Jeffrey O'Neal Martin, which was part of the Submission in Reply to Final Report of Dr. Katz, filed by Petitioner on February 26, 2003. (Document 96). It is set out verbatim in Petitioner's Brief. (pp. 37-39).

Instead of responding to the case list and statistical analysis upon which Petitioner actually relies, involving thirty-two cases which were unquestionably death eligible cases during the relevant time period, Respondent devotes his analysis in Respondent's Brief to criticisms of Petitioner's preliminary case list of 84 cases and the statistical analysis related thereto, a list and statistical analysis upon which Petitioner no longer relies. (E.g. Respondent's Brief, pp. 30-31). Respondent, however, asserts no claims that any of the thirty-two specific cases included in Petitioner's current analysis was not a death eligible case prosecuted by Mr. Charron during the relevant time period.

35

Respondent also makes no challenge to Petitioner's statistical analysis regarding the race of the Defendant and victim in each of these cases. Nor does Respondent offer any alternative statistical analysis.[8]

Whether a statistical analysis is appropriate in examining the issue of racial bias is obviously a legal issue between the parties. Petitioner believes that there is a sound legal framework for a statistical examination to determine the likelihood of racial bias, because you can never expect a state actor to admit racial discrimination or the state actor may not even recognize his or her own subconscious racial bias. Respondent, on the other hand, believes that statistics should not be used in this arena and that the Court should accept Mr. Charron's protestations of non-discrimination at face value, because a prosecutor should not be required to "defend" his death penalty decisions whatever the racial pattern of his decisions. (Respondent's Brief, pp. 27, 37). How the Court resolves this dispute between the parties is, of course, crucial to the ultimate determination of Petitioner's racial bias claims.

However, the relevant cases and the statistical analysis of

_____

[8]Respondent contends that his own analysis is unnecessary because of his position that a statistical case of discrimination can never be proved. (Respondent's Brief, p. 51, fn. 12).

those cases, as set out in pages 35 and 37 of Petitioner's Brief, is the only reliable statistical evidence in this case. Respondent has presented no argument that any case listed by Petitioner should not be included or that other cases not listed by Petitioner should have been included. Respondent further makes no specific challenge to Petitioner's statistical analysis. After all, the figures and percentages are what they are. Therefore, if a statistical analysis is appropriate in examining whether Mr. Charron's decisions to seek the death penalty were, at least in part, based upon race, then the statistics set out by Petitioner are those upon which the Court should rely.

### D. **Petitioner's Statistical Evidence is Case Specific**

Petitioner readily concedes Respondent's position (Respondent's Brief, pp. 23-26) that <u>McCleskey v. Zant</u>, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987), requires that Petitioner prove that racial discrimination infected his particular case, by showing that the "decisionmakers in <u>his</u> case acted with discriminatory purpose." (Emphasis added). There is nothing unusual about this observation. All racial discrimination cases, such as jury challenges under <u>Batson v. Kentucky</u>, 476 U.S. 79, 95, 106 S.Ct. 1712, 1722 (1986), require a showing that racial discrimination occurred in a particular defendant's case. The issue is not whether there must be a showing of discrimination in

a particular case. The issue is how can a petitioner or a defendant reasonably prove the existence of such racial bias.

Respondent contends that a petitioner on federal habeas corpus would be able to satisfy the burden of showing racial discrimination in a particular case only by "direct" proof of discrimination (Respondent's Brief, p. 40), presumably an admission by the district attorney or other state actor that he or she discriminated in the case. If this were the law, a petitioner would virtually never be able to prove a racial discrimination case, no matter how persistent, obnoxious and obvious the discrimination may be. After all, no district attorney nor other state actor is likely to admit to racial discrimination. Moreover, racial bias may often be unconscious.

Because of this dilemma, the case law has recognized that an inference of racial discrimination can be shown when a distinct decisionmaker, as here, with the opportunity to discriminate, as here,[9] makes decisions which resulted in a statistical pattern over

_____

[9]Mr. Charron testified that he personally selected cases for death penalty prosecution and did not prosecute every death-eligible case as a death penalty case. (Charron Deposition, pp. 22-23). Moreover, contrary to Respondent's claims, his discretion to select cases for death penalty prosecution when they were death-eligible under O.C.G.A. §17-10-30(b), was in fact "unfettered." (Respondent's Brief, pp. 28-29, 40). Petitioner's analysis does not include any cases not eligible for the death penalty under Georgia's statutory framework and these provisions place no restraint on Mr. Charron's discretion in choosing among these cases. Once the case qualified

38

a significant period of time reflecting a disparity between how cases are treated based upon race, as here.[10] This inference is sufficient to shift the burden to the State to explain the discrepancy based upon race neutral criteria. This type of analysis, sometimes referred to as the "rule of exclusion", is settled case law in the area of jury selection. E.g., Castaneda v. Partida, 430 U.S. 482, 494-495, 97 S.Ct. 1272, 1280 (1977); Alexander v. Louisiana, 405 U.S. 625, 630-632, 92 S.Ct. 1221, 1225-1226 (1972); Swain v. Alabama, 380 U.S. 202, 223, 85 S.Ct. 824, 837 (1965); Batson v. Kentucky, 476 U.S. 79, 93-94, 106 S.Ct. 1712, 1721-1722 (1986). There is no reason why a similar legal framework would not be applicable to raising a rebuttable inference of discrimination from a disparity in discretionary decisionmaking by a single prosecutor with respect to a discrete number of cases.

Satisfying the "rule of exclusion" does not end the day. It merely raises an inference of discrimination which can be rebutted by a prosecutor's explanation of race-neutral reasons for his

---

for death penalty prosecution the law placed no limits on the prosecutor's discretion.

[10]The fact that juries did not always impose the death penalty in every case authorized by Mr. Charron is of no moment. (Respondent's Brief, pp. 32, 40). The question here is whether the decisions to pursue a death case by Mr. Charron, a decision which is essential to a Georgia death penalty prosecution, was affected by racial bias.

decisionmaking, just as occurs in the context of a typical Batson challenge. But, to hold that a statistical pattern would never be sufficient to raise at least an inference of discrimination sufficient to require a rebuttal from the state would mean as a practical matter that the actions of prosecutors could never be challenged based upon race no matter how striking and otherwise unexplainable the statistical pattern might be, because a prosecutor, especially one willing to discriminate, would never admit his own racial bias.

Here, based upon the unchallenged case listing and statistical analysis shown by Petitioner (Petitioner's Brief, pp. 37-39), there is clearly a significant disparity based upon race in the death penalty prosecution decisions of Mr. Charron during the relevant time period. These statistics are sufficient to shift the burden to Respondent to offer race neutral reasons for the decisions Mr. Charron made in seeking the death penalty in Cobb County during the relevant time period. As explained in the section below, Respondent has failed to offer an adequate rebuttal case. Accordingly, sentencing relief should be ordered.

**E.** **Protestations of Non-Discrimination are Not a Sufficient Rebuttal Case**

For whatever reason, Respondent has never attempted to offer organized, complete, case-specific and race-neutral explanations

for the decisions by Mr. Charron during the relevant time period as to each and every case for which he sought the death penalty. Instead, Respondent has offered specifics as to a few, but far from all cases, and appears to rely primarily upon the affirmations of Mr. Charron and his assistants that race did not play a part in his decisionmaking[11], a claimed presumption of the regularity of their decisionmaking and generalizations from Respondent's expert not specifically tied to the cases in Petitioner's statistical analysis. (<u>E.g.</u>, Respondent's Brief, pp. 35-36, 39-40). The case law, however, is absolutely clear that the state cannot rebut the inference of racial discrimination resulting from a statistical pattern by non-case specific generalizations, simple protestations of the actors involved that race played no part in their decisionmaking or by a presumption that state actors performed their duties consistent with constitutional requirements. <u>Alexander v. Louisiana</u>, 405 U.S. at 632, 92 S.Ct. at 226 ("The Court has squarely held, however, that affirmations of good faith in making individual selections are insufficient to dispel a <u>prima facie</u> case of systematic exclusion."); <u>Jones v. Georgia</u>, 389 U.S. 24, 25, 38

---

[11]In that Mr. Charron testified that he personally made the decision to seek the death penalty in every case (Charron Deposition, pp. 21, 23-24, 141, 155), the statements of his assistants, even if they were more than affirmations of good faith, should not be sufficient to carry Respondent's burden.

S.Ct. 4, 5 (1967); <u>Batson v. Kentucky</u>, 476 U.S. 79, 94, 106 S.Ct. 1712, 1721 (1986)("The State cannot meet this burden on mere general assertions that its official did not discriminate or that they properly performed their duties."); <u>Castaneda v. Partida</u>, 430 U.S. 482, 498, fn. 19, 97 S.Ct. 1272, 1282, fn. 19 (1977)("This is not to say, of course, that a simple protestation from a commissioner that racial considerations played no part in the selection would be enough. This kind of testimony has been found insufficient on several occasions. Neither is the state entitled to rely on a presumption that the officials discharged their sworn duties to rebut the case of discrimination.")(Citations omitted); <u>Gibson v. Zant</u>, 705 F.2d 1543, 1549 (11th Cir. 1983). Instead, the state must offer affirmative, objective and race-neutral reasons to explain the disparities. Respondent has failed to do so.

Accordingly, Respondent has provided an insufficient response to the inference of discrimination from the statistical pattern shown by Petitioner. Respondent presented no systematic rebuttal to Petitioner's statistical case. Respondent has not provided the type of information necessary for the Court to determine if the stated explanations for the racial disparities were race-neutral, objective and consistently and fairly applied so that the Court can be assured that they are not pre-textual. <u>Batson v. Kentucky</u>, 476 U.S. at 97-98, fn. 20, 106 S.Ct. 1723-1724, fn. 20. As a

consequence, the Court should find that given the pattern of discrimination in Mr. Charron's decisions to seek the death penalty in Cobb County during the relevant time period and the failure of the Respondent to offer a sufficient response to this pattern, that this evidence leaves an unrebutted inference that race played a part in the decision to seek the death penalty against Petitioner. In this circumstance, under the authority of McCleskey and other cases previously cited by Petitioner, Petitioner's death sentence cannot stand. Accordingly, the Court should order that his death sentence be vacated.

## IV. **PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING**

Petitioner relies upon his detailed legal and factual argument regarding the constitutional ineffectiveness of his counsel during his sentencing set out in Petitioner's Brief (pp. 48-80). There is no purpose to repeat that argument here. It is important, however, to discuss and emphasize the United States Supreme Court's most recent holding regarding the ineffectiveness of trial counsel during the sentencing phase of a capital case. That case, Wiggins v. Smith, ___ U.S. ___, 123 S.Ct. 2527 (2003), was decided June 26, 2003, a month after the filing of Petitioner's Brief on May 23, 2003, and Petitioner obviously has not had an occasion to discuss this case previously.

The _Wiggins_ decision is dramatic and persuasive additional United States Supreme Court authority in support of Petitioner's ineffective assistance of counsel claims during sentencing. The gravamen of the ineffective assistance of counsel complaint in _Wiggins_ was the same as that here, namely that trial counsel there was ineffective because they failed to conduct a reasonable investigation of all potentially useful mitigation evidence so that an informed decision could be made regarding the mitigation case to be presented at the sentencing phase of the trial. Although ineffective assistance of counsel law recognizes that deference should be given to the informed strategic decisions of a trial attorney because of the "distorting effects of hindsight", _Strickland v. Washington_, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065 (1984), the _Wiggins_ court emphasized that this deference to strategic choices depends upon counsel's conducting a reasonable investigation so that those choices are informed. 123 S.Ct. at 2535, citing to _Strickland v. Washington_, 466 U.S. at 690-691, 104 S.Ct. at 2066. _See also_, _Williams v. Taylor_, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515 (2000), holding that ineffective assistance of counsel occurred there when counsel did not "fulfill their obligation to conduct a thorough investigation of the defendant's background."

In reaching its decision that counsel in _Wiggins_ was

ineffective, the Supreme Court noted and relied upon the standards articulated by the American Bar Association regarding the performance of counsel in death penalty cases. <u>Wiggins</u>, 123 S.Ct. at 2536-2537. These guidelines provide that the investigation into mitigating evidence in a capital case "should comprise efforts to discover <u>all reasonably available</u> mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutors" and that such an "[i]nvestigation is essential to fulfullment" of counsel's duty "in raising mitigating factors both to the prosecutor initially and to the court at sentencing." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(C), p. 93)(1989); 1 ABA Standards for Criminal Justice 4-4.1, Commentary, p. 4-55. (Emphasis added).

In <u>Wiggins</u>, trial counsel was alerted to significant mitigating evidence which could be possibly marshaled for a sentencing hearing from a presentence investigation report and social services records. Counsel, nevertheless, failed to follow up on this information, which would have revealed substantial mitigating evidence. Instead counsel presented a lackluster and scattershot sentencing presentation, described by the Maryland Court of Appeals as a "shotgun" approach, <u>Wiggins v. State</u>, 724 A.2d 1, 15 (1999), based in part on claims that Wiggins did not have direct responsibility for the murder involved, in part on a

limited amount of information about Wiggins' life history, and in part on the testimony of a criminologist about the adjustment of inmates serving life sentences, but nothing compared to what could have been presented based upon a full investigation. Wiggins, 123 S.Ct. 2538.

The United States Supreme Court found that the "cursory investigation" conducted by counsel in Wiggins and their decision to "abandon their investigation at an unreasonable juncture" made "a fully informed decision with respect to sentencing strategy impossible." Id. at 2538. Accordingly, the Court concluded that counsel's investigation into the defendant's background "did not reflect reasonable professional judgment" and the decision of the Maryland Court of Appeals finding counsel constitutional effective "unreasonably applied Strickland" to the facts of the case. Applying the strict standard of review of 28 U.S.C. §2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), which does not apply to this case, because the Petition here was filed prior to the effective date of that act,[12] the Supreme Court in Wiggins found not merely that counsel there had been ineffective under the standards of Strickland, but that any finding otherwise would have been an unreasonable application of

[12]Lindh v. Murphy, 521 U.S. 320, 325-327, 117 S.Ct. 2059, 2062-2063 (1997).

46

the standards of Strickland.

The circumstances of counsel's investigation here are similar to those in Wiggins, where the Supreme Court found not merely a violation of defendant's ineffective assistance of counsel rights under Strickland, the standard that the Court should apply here, but that any finding otherwise would be an unreasonable application of Strickland under the strict standards of review of the AEDPA. Just as in Wiggins, sentencing counsel here were alerted to the possibility of significant mitigation evidence—that the defendant suffered from mental deficiencies related to an organic brain injury—but neglected to pursue this lead and unreasonably "abandon[ed] their investigation at an unreasonable juncture." Wiggins, 123 S.Ct. at 538. As a consequence, compelling mitigation evidence, though perhaps not sufficient to sustain a legal defense to the charges under Georgia insanity law, but substantialy mitigating of sentence nevertheless, was never discovered so that an informed decision could be made as to whether it should be presented at sentencing.

Thus, trial counsel here failed to satisfy their duty to investigate fully "all reasonably available mitigating evidence", just as counsel in Wiggins failed in this duty. Instead of presenting the substantial mental deficiencies/brain injury mitigation case which could have been presented, which would not

47

have been inconsistent with Petitioner's own testimony and would have been an important rebuttal to the state case in aggravation which focused on Petitioner's prior criminal history (Petitioner's Breif, pp. 67-68), counsel here presented an unfocused and unpersuasive case for a life sentence, similar to the "shotgun" type of sentencing case presented by ineffective counsel in Wiggins. If counsel were constitutionally ineffective in Wiggins or for that matter if no court could reasonably find them to be other than ineffective, the AEDPA standard, as the Supreme Court held, then counsel were also ineffective here. Id. at 2537.

Thus, under the authority of Wiggins, the performance of counsel in this case fell beneath reasonable professional norms and, as explained in detail in Petitioner's Brief, Petitioner was substantially prejudiced as a consequence. (Petitioner's Brief, pp. 71-80). The state habeas corpus court and Georgia Supreme Court decisions to the contrary were rendered before and without the benefit of the United States Supreme Court decisions in Williams v. Taylor and Wiggins v. State. The holdings of the Georgia courts were wrongly decided in light of Williams and Wiggins. Accordingly, this Court should vacate Petitioner's death sentence and order that a new sentencing occur.

Petitioner's racial bias claim challenging statistics upon which Petitioner no longer relies. Respondent never addresses the specific cases and statistical analysis set out by Petitioner at pages 37 through 38 of Petitioner's Brief, which are the relevant cases and analysis upon which Petitioner actually relies.

As recounted in Petitioner's Brief (pp. 36-38), the compiling of specific and accurate statistics regarding former Cobb County District Attorney Thomas Charron's decisions to seek the death penalty in death eligible cases during the relevant time period (1976-1986) has been a process with some "give and take", as the parties refined which cases actually were prosecuted by Mr. Charron during the relevant years and which cases were actually death eligible under the Georgia statutory scheme, that is a murder or felony murder prosecution which included the required statutory aggravating circumstances of O.C.G.A. §17-10-30(b).[7] Petitioner started with a list of eighty-four cases which possibly fit this criteria (Petitioner's Exhibit 7; April 29, 2002 evidentiary hearing.). When Respondent pointed out reasons why certain of these cases should not have been included, such as when the case

_____

[7]Respondent is simply wrong in claiming that Petitioner's analysis includes cases which preceded Mr. Charron's term of office or were not "death eligible." (Respondent's Brief, pp. 30, 37, 47). Respondent is referring to the original 84 cases not the present 32 cases and all of these cases are clearly "death-eligible" prosecutions during the relevant time frame.

pre-dated Mr. Charron's term of office, Petitioner refined his statistical analysis, giving the benefit of the doubt to Respondent, to a list of thirty-two cases which were unquestionably cases that were prosecuted during the relevant time period (1976-1986) and were death eligible under the Georgia statutory scheme. This list and the statistical analysis related thereto were presented in an Affidavit by Petitioner's expert Jeffrey O'Neal Martin, which was part of the Submission in Reply to Final Report of Dr. Katz, filed by Petitioner on February 26, 2003. (Document 96). It is set out verbatim in Petitioner's Brief. (pp. 37-39).

Instead of responding to the case list and statistical analysis upon which Petitioner actually relies, involving thirty-two cases which were unquestionably death eligible cases during the relevant time period, Respondent devotes his analysis in Respondent's Brief to criticisms of Petitioner's preliminary case list of 84 cases and the statistical analysis related thereto, a list and statistical analysis upon which Petitioner no longer relies. (E.g. Respondent's Brief, pp. 30-31). Respondent, however, asserts no claims that any of the thirty-two specific cases included in Petitioner's current analysis was not a death eligible case prosecuted by Mr. Charron during the relevant time period. Respondent also makes no challenge to Petitioner's statistical analysis regarding the race of the Defendant and victim in each of

35

these cases. Nor does Respondent offer any alternative statistical analysis.[8]

Whether a statistical analysis is appropriate in examining the issue of racial bias is obviously a legal issue between the parties. Petitioner believes that there is a sound legal framework for a statistical examination to determine the likelihood of racial bias, because you can never expect a state actor to admit racial discrimination or the state actor may not even recognize his or her own subconscious racial bias. Respondent, on the other hand, believes that statistics should not be used in this arena and that the Court should accept Mr. Charron's protestations of non-discrimination at face value, because a prosecutor should not be required to "defend" his death penalty decisions whatever the racial pattern of his decisions. (Respondent's Brief, pp. 27, 37). How the Court resolves this dispute between the parties is, of course, crucial to the ultimate determination of Petitioner's racial bias claims.

However, the relevant cases and the statistical analysis of those cases, as set out in pages 35 and 37 of Petitioner's Brief, is the only reliable statistical evidence in this case. Respondent

---

[8]Respondent contends that his own analysis is unnecessary because of his position that a statistical case of discrimination can never be proved. (Respondent's Brief, p. 51, fn. 12).

has presented no argument that any case listed by Petitioner should not be included or that other cases not listed by Petitioner should have been included. Respondent further makes no specific challenge to Petitioner's statistical analysis. After all, the figures and percentages are what they are. Therefore, if a statistical analysis is appropriate in examining whether Mr. Charron's decisions to seek the death penalty were, at least in part, based upon race, then the statistics set out by Petitioner are those upon which the Court should rely.

## D. **Petitioner's Statistical Evidence is Case Specific**

Petitioner readily concedes Respondent's position (Respondent's Brief, pp. 23-26) that McCleskey v. Zant, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987), requires that Petitioner prove that racial discrimination infected his particular case, by showing that the "decisionmakers in his case acted with discriminatory purpose." (Emphasis added). There is nothing unusual about this observation. All racial discrimination cases, such as jury challenges under Batson v. Kentucky, 476 U.S. 79, 95, 106 S.Ct. 1712, 1722 (1986), require a showing that racial discrimination occurred in a particular defendant's case. The issue is not whether there must be a showing of discrimination in a particular case. The issue is how can a petitioner or a defendant reasonably prove the existence of such racial bias.

Respondent contends that a petitioner on federal habeas corpus would be able to satisfy the burden of showing racial discrimination in a particular case only by "direct" proof of discrimination (Respondent's Brief, p. 40), presumably an admission by the district attorney or other state actor that he or she discriminated in the case. If this were the law, a petitioner would virtually never be able to prove a racial discrimination case, no matter how persistent, obnoxious and obvious the discrimination may be. After all, no district attorney nor other state actor is likely to admit to racial discrimination. Moreover, racial bias may often be unconscious.

Because of this dilemma, the case law has recognized that an inference of racial discrimination can be shown when a distinct decisionmaker, as here, with the opportunity to discriminate, as here,[9] makes decisions which resulted in a statistical pattern over

---

[9]Mr. Charron testified that he personally selected cases for death penalty prosecution and did not prosecute every death-eligible case as a death penalty case. (Charron Deposition, pp. 22-23). Moreover, contrary to Respondent's claims, his discretion to select cases for death penalty prosecution when they were death-eligible under O.C.G.A. §17-10-30(b), was in fact "unfettered." (Respondent's Brief, pp. 28-29, 40). Petitioner's analysis does not include any cases not eligible for the death penalty under Georgia's statutory framework and these provisions place no restraint on Mr. Charron's discretion in choosing among these cases. Once the case qualified for death penalty prosecution the law placed no limits on the prosecutor's discretion.

38

a significant period of time reflecting a disparity between how cases are treated based upon race, as here.[10] This inference is sufficient to shift the burden to the State to explain the discrepancy based upon race neutral criteria. This type of analysis, sometimes referred to as the "rule of exclusion", is settled case law in the area of jury selection. E.g., Castaneda v. Partida, 430 U.S. 482, 494-495, 97 S.Ct. 1272, 1280 (1977); Alexander v. Louisiana, 405 U.S. 625, 630-632, 92 S.Ct. 1221, 1225-1226 (1972); Swain v. Alabama, 380 U.S. 202, 223, 85 S.Ct. 824, 837 (1965); Batson v. Kentucky, 476 U.S. 79, 93-94, 106 S.Ct. 1712, 1721-1722 (1986). There is no reason why a similar legal framework would not be applicable to raising a rebuttable inference of discrimination from a disparity in discretionary decisionmaking by a single prosecutor with respect to a discrete number of cases.

Satisfying the "rule of exclusion" does not end the day. It merely raises an inference of discrimination which can be rebutted by a prosecutor's explanation of race-neutral reasons for his decisionmaking, just as occurs in the context of a typical Batson challenge. But, to hold that a statistical pattern would never be

---

[10]The fact that juries did not always impose the death penalty in every case authorized by Mr. Charron is of no moment. (Respondent's Brief, pp. 32, 40). The question here is whether the decisions to pursue a death case by Mr. Charron, a decision which is essential to a Georgia death penalty prosecution, was affected by racial bias.

sufficient to raise at least an inference of discrimination sufficient to require a rebuttal from the state would mean as a practical matter that the actions of prosecutors could never be challenged based upon race no matter how striking and otherwise unexplainable the statistical pattern might be, because a prosecutor, especially one willing to discriminate, would never admit his own racial bias.

Here, based upon the unchallenged case listing and statistical analysis shown by Petitioner (Petitioner's Brief, pp. 37-39), there is clearly a significant disparity based upon race in the death penalty prosecution decisions of Mr. Charron during the relevant time period. These statistics are sufficient to shift the burden to Respondent to offer race neutral reasons for the decisions Mr. Charron made in seeking the death penalty in Cobb County during the relevant time period. As explained in the section below, Respondent has failed to offer an adequate rebuttal case. Accordingly, sentencing relief should be ordered.

**E.** **Protestations of Non-Discrimination are Not a Sufficient Rebuttal Case**

For whatever reason, Respondent has never attempted to offer organized, complete, case-specific and race-neutral explanations for the decisions by Mr. Charron during the relevant time period as to each and every case for which he sought the death penalty.

Instead, Respondent has offered specifics as to a few, but far from all cases, and appears to rely primarily upon the affirmations of Mr. Charron and his assistants that race did not play a part in his decisionmaking[11], a claimed presumption of the regularity of their decisionmaking and generalizations from Respondent's expert not specifically tied to the cases in Petitioner's statistical analysis. (E.g., Respondent's Brief, pp. 35-36, 39-40). The case law, however, is absolutely clear that the state cannot rebut the inference of racial discrimination resulting from a statistical pattern by non-case specific generalizations, simple protestations of the actors involved that race played no part in their decisionmaking or by a presumption that state actors performed their duties consistent with constitutional requirements. Alexander v. Louisiana, 405 U.S. at 632, 92 S.Ct. at 226 ("The Court has squarely held, however, that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion."); Jones v. Georgia, 389 U.S. 24, 25, 38 S.Ct. 4, 5 (1967); Batson v. Kentucky, 476 U.S. 79, 94, 106 S.Ct. 1712, 1721 (1986)("The State cannot meet this burden on mere

---

[11]In that Mr. Charron testified that he personally made the decision to seek the death penalty in every case (Charron Deposition, pp. 21, 23-24, 141, 155), the statements of his assistants, even if they were more than affirmations of good faith, should not be sufficient to carry Respondent's burden.

41

general assertions that its official did not discriminate or that they properly performed their duties."); Castaneda v. Partida, 430 U.S. 482, 498, fn. 19, 97 S.Ct. 1272, 1282, fn. 19 (1977)("This is not to say, of course, that a simple protestation from a commissioner that racial considerations played no part in the selection would be enough. This kind of testimony has been found insufficient on several occasions. Neither is the state entitled to rely on a presumption that the officials discharged their sworn duties to rebut the case of discrimination.")(Citations omitted); Gibson v. Zant, 705 F.2d 1543, 1549 (11th Cir. 1983). Instead, the state must offer affirmative, objective and race-neutral reasons to explain the disparities. Respondent has failed to do so.

Accordingly, Respondent has provided an insufficient response to the inference of discrimination from the statistical pattern shown by Petitioner. Respondent presented no systematic rebuttal to Petitioner's statistical case. Respondent has not provided the type of information necessary for the Court to determine if the stated explanations for the racial disparities were race-neutral, objective and consistently and fairly applied so that the Court can be assured that they are not pre-textual. Batson v. Kentucky, 476 U.S. at 97-98, fn. 20, 106 S.Ct. 1723-1724, fn. 20. As a consequence, the Court should find that given the pattern of discrimination in Mr. Charron's decisions to seek the death penalty

in Cobb County during the relevant time period and the failure of the Respondent to offer a sufficient response to this pattern, that this evidence leaves an unrebutted inference that race played a part in the decision to seek the death penalty against Petitioner. In this circumstance, under the authority of McCleskey and other cases previously cited by Petitioner, Petitioner's death sentence cannot stand. Accordingly, the Court should order that his death sentence be vacated.

## IV. **PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING**

Petitioner relies upon his detailed legal and factual argument regarding the constitutional ineffectiveness of his counsel during his sentencing set out in Petitioner's Brief (pp. 48-80). There is no purpose to repeat that argument here. It is important, however, to discuss and emphasize the United States Supreme Court's most recent holding regarding the ineffectiveness of trial counsel during the sentencing phase of a capital case. That case, Wiggins v. Smith, ___ U.S. ___, 123 S.Ct. 2527 (2003), was decided June 26, 2003, a month after the filing of Petitioner's Brief on May 23, 2003, and Petitioner obviously has not had an occasion to discuss this case previously.

The Wiggins decision is dramatic and persuasive additional United States Supreme Court authority in support of Petitioner's

ineffective assistance of counsel claims during sentencing. The gravamen of the ineffective assistance of counsel complaint in Wiggins was the same as that here, namely that trial counsel there was ineffective because they failed to conduct a reasonable investigation of all potentially useful mitigation evidence so that an informed decision could be made regarding the mitigation case to be presented at the sentencing phase of the trial. Although ineffective assistance of counsel law recognizes that deference should be given to the informed strategic decisions of a trial attorney because of the "distorting effects of hindsight", Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065 (1984), the Wiggins court emphasized that this deference to strategic choices depends upon counsel's conducting a reasonable investigation so that those choices are informed. 123 S.Ct. at 2535, citing to Strickland v. Washington, 466 U.S. at 690-691, 104 S.Ct. at 2066. See also, Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515 (2000), holding that ineffective assistance of counsel occurred there when counsel did not "fulfill their obligation to conduct a thorough investigation of the defendant's background."

In reaching its decision that counsel in Wiggins was ineffective, the Supreme Court noted and relied upon the standards articulated by the American Bar Association regarding the

44

performance of counsel in death penalty cases. _Wiggins_, 123 S.Ct. at 2536-2537. These guidelines provide that the investigation into mitigating evidence in a capital case "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutors" and that such an "[i]nvestigation is essential to fulfullment" of counsel's duty "in raising mitigating factors both to the prosecutor initially and to the court at sentencing." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(C), p. 93)(1989); 1 ABA Standards for Criminal Justice 4-4.1, Commentary, p. 4-55. (Emphasis added).

In _Wiggins_, trial counsel was alerted to significant mitigating evidence which could be possibly marshaled for a sentencing hearing from a presentence investigation report and social services records. Counsel, nevertheless, failed to follow up on this information, which would have revealed substantial mitigating evidence. Instead counsel presented a lackluster and scattershot sentencing presentation, described by the Maryland Court of Appeals as a "shotgun" approach, _Wiggins v. State_, 724 A.2d 1, 15 (1999), based in part on claims that Wiggins did not have direct responsibility for the murder involved, in part on a limited amount of information about Wiggins' life history, and in part on the testimony of a criminologist about the adjustment of

inmates serving life sentences, but nothing compared to what could have been presented based upon a full investigation. Wiggins, 123 S.Ct. 2538.

The United States Supreme Court found that the "cursory investigation" conducted by counsel in Wiggins and their decision to "abandon their investigation at an unreasonable juncture" made "a fully informed decision with respect to sentencing strategy impossible." Id. at 2538. Accordingly, the Court concluded that counsel's investigation into the defendant's background "did not reflect reasonable professional judgment" and the decision of the Maryland Court of Appeals finding counsel constitutional effective "unreasonably applied Strickland" to the facts of the case. Applying the strict standard of review of 28 U.S.C. §2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), which does not apply to this case, because the Petition here was filed prior to the effective date of that act,[12] the Supreme Court in Wiggins found not merely that counsel there had been ineffective under the standards of Strickland, but that any finding otherwise would have been an unreasonable application of the standards of Strickland.

The circumstances of counsel's investigation here are similar

_____

[12]Lindh v. Murphy, 521 U.S. 320, 325-327, 117 S.Ct. 2059, 2062-2063 (1997).

46

to those in <u>Wiggins</u>, where the Supreme Court found not merely a violation of defendant's ineffective assistance of counsel rights under <u>Strickland</u>, the standard that the Court should apply here, but that any finding otherwise would be an unreasonable application of <u>Strickland</u> under the strict standards of review of the AEDPA. Just as in <u>Wiggins</u>, sentencing counsel here were alerted to the possibility of significant mitigation evidence—that the defendant suffered from mental deficiencies related to an organic brain injury—but neglected to pursue this lead and unreasonably "abandon[ed] their investigation at an unreasonable juncture." <u>Wiggins</u>, 123 S.Ct. at 538. As a consequence, compelling mitigation evidence, though perhaps not sufficient to sustain a legal defense to the charges under Georgia insanity law, but substantialy mitigating of sentence nevertheless, was never discovered so that an informed decision could be made as to whether it should be presented at sentencing.

Thus, trial counsel here failed to satisfy their duty to investigate fully "all reasonably available mitigating evidence", just as counsel in <u>Wiggins</u> failed in this duty. Instead of presenting the substantial mental deficiencies/brain injury mitigation case which could have been presented, which would not have been inconsistent with Petitioner's own testimony and would have been an important rebuttal to the state case in aggravation

47

which focused on Petitioner's prior criminal history (Petitioner's Breif, pp. 67-68), counsel here presented an unfocused and unpersuasive case for a life sentence, similar to the "shotgun" type of sentencing case presented by ineffective counsel in Wiggins. If counsel were constitutionally ineffective in Wiggins or for that matter if no court could reasonably find them to be other than ineffective, the AEDPA standard, as the Supreme Court held, then counsel were also ineffective here. Id. at 2537.

Thus, under the authority of Wiggins, the performance of counsel in this case fell beneath reasonable professional norms and, as explained in detail in Petitioner's Brief, Petitioner was substantially prejudiced as a consequence. (Petitioner's Brief, pp. 71-80). The state habeas corpus court and Georgia Supreme Court decisions to the contrary were rendered before and without the benefit of the United States Supreme Court decisions in Williams v. Taylor and Wiggins v. State. The holdings of the Georgia courts were wrongly decided in light of Williams and Wiggins. Accordingly, this Court should vacate Petitioner's death sentence and order that a new sentencing occur.

## V.   CONCLUSION

As explained in the Introduction hereto, counsel is responding only as to those claims where a response was deemed necessary or appropriate. As to other claims Petitioner relies upon his factual and legal argument set out in the Petitioner's Brief and has nothing new to add. Moreover, counsel will of course be available to answer any questions the Court may have at the August 25, 2003 hearing. Based upon the legal and factual argument contained in the Petitioner's Brief and herein, Petitioner submits that the Court should grant Petitioner the relief he has requested.

This 15th day of August, 2003.

Respectfully submitted,

MARTIN BROTHERS, P.C.
44 Broad St., N.W.
Suite 500
Atlanta, GA   30303
(404) 522-0400

JOHN R. MARTIN

FEDERAL DEFENDER PROGRAM, INC.
200 The Equitable Building
100 Peachtree Street, N.W.
Atlanta, GA   30303
(404) 688-7530

Jeffrey Ertel

FEDERAL DEFENDER PROGRAM, INC.
200 The Equitable Building
100 Peachtree Street, N.W.
Atlanta, GA   30303
(404) 688-7530

Suzanne Hashimi

Counsel for Petitioner
Lawrence Jefferson

49

# JUROR INFORMATION FORM

A86619SC53

PLEASE TYPE OR PRINT IN BLACK INK

**PLEASE PROVIDE THE FOLLOWING INFORMATION AND RETURN TO COURT IN THE ENCLOSED STAMPED ENVELOPE. THE INFORMATION REQUESTED IS THAT GENERALLY ASKED BY ATTORNEYS IN SELECTING A JURY. YOU CAN HELP US SAVE TIME IN SELECTING JURIES BY FURNISHING THE INFORMATION TO THE COURT IN ADVANCE. THANK YOU FOR YOUR HELP IN THIS REGARD.**

Place of Birth: Andrews S.C.

Marital Status: ☐ Single ☐ Separated ☐ Divorced ☐ Widow(er)   ☑ Married

Name of Spouse or Wife Maiden Name: Eileen A. Schultz

Your Age: 43   Spouse's Age: 41

Your Present Employer: _____   No. of years worked there: 5   What is your type of work? _____

Spouse's Employer: Self Employed   No. of years worked there: 2   What is your spouse's type of work? Self Employed Orange Business

How long you've lived in present county? 2 years   Number of children: 3

(DATE SUMMONED): 0224

NAME: SCHROTTER SHIPLEY
ADDRESS: 3159 BUCHARD WAY
MARIETTA   GA 30066

Are you a resident of Cobb County? ☑ yes ☐ no
Have you ever served as a juror? ☐ yes ☑ no
Have you or any member of your immediate family been a party to a law suit? ☐ yes ☑ no
If yes, when and in what court? _____
Has a claim of personal injury ever been made against you? ☐ yes ☑ no
Are you related by blood or marriage to any person in law enforcement? ☐ yes ☑ no
Have you ever been a victim of a crime? ☐ yes ☑ no
If yes, what was it? _____

Phone Number   Home: 973-3505   Business: 448-5944



# JUROR INFORMATION FORM    AR6118312

## PLEASE TYPE OR PRINT IN BLACK INK

**PLEASE PROVIDE THE FOLLOWING INFORMATION AND RETURN TO COURT IN THE ENCLOSED STAMPED ENVELOPE. THE INFORMATION REQUESTED IS THAT GENERALLY ASKED BY ATTORNEYS IN SELECTING A JURY. YOU CAN HELP US SAVE TIME IN SELECTING JURIES BY FURNISHING THE INFORMATION TO THE COURT IN ADVANCE. THANK YOU FOR YOUR HELP IN THIS REGARD.**

Place of Birth: _Atlanta, Fulton, Georgia_

| | Your Age | Your Present Employer _retired_ |
|---|---|---|
| Marital Status: ☐ Married | 67 | No. of years worked there: _secretarial_ | What is your type of work? _secretarial_ |

Name of Spouse or Wife's Maiden Name: _____ | Spouse's Age | Spouse's Employer

☐ Single   ☐ Separated   ☐ Divorced   ☒ Widow(er)

| How long you've lived in present county? _32 years_ | Number of children _5_ | No. of years worked there: | What is spouse's type of work? |

### DATE SUMMONED:

NAME: _WEST MARJORIE M_
ADDRESS: _3510 NORTH COOPER LAKE RD_
_SMYRNA    CA 30080_                    G224

Are you a resident of Cobb County? ☒ yes ☐ no
Have you ever served as a juror? ☐ yes ☒ no
Have you or any member of your immediate
  family been a party to a law suit? ☐ yes ☒ no
If yes, when and in what court? ☐ yes ☒ no
Has a claim of personal injury ever been made against
  you? ☐ yes ☒ no
Are you related by blood or marriage to any person in
  law enforcement? ☐ yes ☒ no
Have you ever been a victim of a crime? ☐ yes ☒ no
If yes, what was it? _____

Phone Number   Home _436-8115_   Business _____

# JUROR INFORMATION FORM

2280132074

PLEASE TYPE OR PRINT IN BLACK INK

PLEASE PROVIDE THE FOLLOWING INFORMATION AND RETURN TO COURT IN THE ENCLOSED STAMPED ENVELOPE. THE INFORMATION REQUESTED IS THAT GENERALLY ASKED BY ATTORNEYS IN SELECTING A JURY. YOU CAN HELP US SAVE TIME IN SELECTING JURIES BY FURNISHING THE INFORMATION TO THE COURT IN ADVANCE. THANK YOU FOR YOUR HELP IN THIS REGARD.

**Place of Birth** Ben Hill County Georgia

| | | Your Age 33 |
|---|---|---|

**Marital Status:** ☐ Single ☑ Married

**Your Present Employer** Cobb Co. Public Schools

| No. of years worked there: 6 months | What is your type of work? Physical Ed. Aide |
|---|---|

**Name of Spouse or Wife's Maiden Name** Ennis Mobley

| | Spouse's Age 33 |
|---|---|

**Spouse's Employer** Corn Brothers Inc.

☐ Single  ☐ Separated  ☐ Divorced  ☐ Widow(er)

| No. of years worked there: 5 yrs | What is spouse's type of work? Vice President Sales |
|---|---|

**How long you've lived in present county?** 2 yrs

**Number of children** 2

**DATE SUMMONED:**

**NAME:** MOBLEY GLORIA JEAN

**ADDRESS:** 1110 NEVA DR
NAPITTA         GA  70060

0224

Are you a resident of Cobb County? ☑ yes ☐ no
Have you ever served as a juror? ☐ yes ☑ no
Have you or any member of your immediate family been a party to a law suit? ☐ yes ☑ no
If yes, when and in what court? _____
Has a claim of personal injury ever been made against you? ☐ yes ☑ no
Are you related by blood or marriage to any person in law enforcement? ☐ yes ☑ no
Have you ever been a victim of a crime? ☐ yes ☑ no
If yes, what was it? _____

| Phone Number | Home 432-2548 | Business 432-0781 |
|---|---|---|

# JUROR INFORMATION FORM

A 0 6 0 1 0 3 0 0 5

**PLEASE TYPE OR PRINT IN BLACK INK**

PLEASE PROVIDE THE FOLLOWING INFORMATION AND RETURN TO COURT IN THE ENCLOSED STAMPED ENVELOPE. THE INFORMATION REQUESTED IS THAT GENERALLY ASKED BY ATTORNEYS IN SELECTING A JURY. YOU CAN HELP US SAVE TIME IN SELECTING JURIES BY FURNISHING THE INFORMATION TO THE COURT IN ADVANCE. THANK YOU FOR YOUR HELP IN THIS REGARD.

| | | | |
|---|---|---|---|
| **Place of Birth** Hagerstown, Md. | **Your Age** 29 | **Your Present Employer** Joseph T. Walker | |
| **Marital Status:** ☑ Married | **Spouse's Age** 32 | **No. of years worked there:** 2 | **What is your type of work?** teacher |
| **Name of Spouse or Wife's Maiden Name:** Wm Mark Blackwell | | **Spouse's Employer** American Aerolist | |
| ☐ Single   ☐ Separated   ☐ Divorced   ☐ Widow(er) | | **No. of years worked there:** 2 | **What is spouse's type of work?** salesman |
| **How long you've lived in present county?** 5 years | **Number of children** O | | |

**DATE SUMMONED:**

**NAME:** BLACKWELL MARY ANNE
**ADDRESS:** 747 PARKWOOD DR
KENNESAW    GA   30144

0224

Are you a resident of Cobb County? ☑ yes ☐ no
Have you ever served as a juror? ☐ yes ☑ no
Have you or any member of your immediate family
been a party to a law suit?  ☐ yes ☑ no
If yes, when and in what court? _____
Has a claim of personal injury ever been made against
you? ☐ yes ☑ no
Are you related by blood or marriage to any person in
law enforcement? ☐ yes ☑ no
Have you ever been a victim of a crime? ☐ yes ☑ no
If yes, what was it? _____

**Phone Number**    **Home** 926-0990    **Business** 928-C740



# JUROR INFORMATION FORM

PLEASE TYPE OR PRINT IN BLACK INK

**PLEASE PROVIDE THE FOLLOWING INFORMATION AND RETURN TO COURT IN THE ENCLOSED STAMPED ENVELOPE. THE INFORMATION REQUESTED IS THAT GENERALLY ASKED BY ATTORNEYS IN SELECTING A JURY. YOU CAN HELP US SAVE TIME IN SELECTING JURIES BY FURNISHING THE INFORMATION TO THE COURT IN ADVANCE. THANK YOU FOR YOUR HELP IN THIS REGARD.**

Place of Birth: _Rockdale Calif_

| | Your Age | Your Present Employer |
|---|---|---|
| | 38 | None |

Marital Status: ☐ Single  ☑ Married

Name of Spouse or Wife's Maiden Name: _Chris Alexandra Abernathy_

| | Spouse's Age | No. of years worked there: | What is your type of work? |
|---|---|---|---|
| | 39 | N/A | N/A |

☐ Single  ☐ Separated  ☐ Divorced  ☐ Widow(er)

Spouse's Employer: _Brydon_

How long you've lived in present county? _3yrs_

| Number of children | No. of years worked there: | What is spouse's type of work? |
|---|---|---|
| 1 | 8? | Marketing |

DATE SUMMONED:

Are you a resident of Cobb County? ☑ yes ☐ no
Have you ever served as a juror? ☐ yes ☑ no
Have you or any member of your immediate family been a party to a law suit? ☐ yes ☑ no
If yes, when and in what court?
Has a claim of personal injury ever been made against you? ☐ yes ☑ no
Are you related by blood or marriage to any person in law enforcement? ☐ yes ☑ no
Have you ever been a victim of a crime? ☑ yes ☐ no
If yes, what was it? _Burglary_

NAME: _ABERNATHY JANNETTE T_
ADDRESS: _31 FOXRIDGE CT_
_MARIETTA         GA  7006?_    6224

Phone Number | Home _973-3232_ | Business _None_

County of Fulton

State of Georgia

## Affidavit of V.J. Henville

Comes now the affiant, V.J. Henville, who after being duly sworn by an officer authorized by law to administer oaths, swears and states the following:

1.   My name is V.J. Henville.  I am over eighteen years of age.  This affidavit is made upon my personal knowledge, and I am competent to testify to the matters set forth herein.

2.   I am employed as an investigator for the Federal Defender Program, Inc.  In 2001, I attempted to locate juror Marjorie West using all resources available to the Federal Defender Program, Inc. including locator software, databases, and search engines. Unfortunately, I was unable to locate Ms. West and believed there was a distinct possibility she was deceased, due to her age.

3.   I made a diligent effort to locate Ms. West but was unsuccessful in my attempt to do so.

FURTHER AFFIANT SAITH NOT.

V.J. Henville

Sworn to and subscribed before me
this _14_ day of _August_, 2003.

Notary Public

Notary Public, Fayette County, Georgia
My Commission Expires Sept. 18, 2005



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LAWRENCE JOSEPH JEFFERSON　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:　　CIVIL ACTION
v.　　　　　　　　　　　　　　　:　　NO. 1:96-CV-989-CC
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
FRED HEAD, Warden　　　　　　　:

### DECLARATION OF JOHN R. MARTIN

I, John R. Martin, due hereby state under oath and to my personal knowledge as follows:

-1-

I am one of the attorneys of record for Petitioner Lawrence Jefferson in this matter.

-2-

After receipt of Respondent's most recent pleading in which counsel for Respondent questioned whether in fact Marjorie M. West, one of the jurors in Mr. Jefferson's case, was now deceased, counsel for Petitioner renewed their efforts to determine for certain whether Ms. West was or was not deceased.

-3-

Based upon this new attempt to determine if in fact Ms. West was deceased and, if not, to locate Ms. West, we checked at an address and telephone number associated with Ms. West. We called the number and a Linda Lindsey answered. She said that she was Marjorie West's daughter.



-4-

In a telephone conversation on August 1, 2003, Ms. Lindsey told Jeff Ertel, one of Petitioner's attorneys, that her mother was now very elderly, 85 years old, and living in a nursing home. Ms. Lindsey further explained that due to her mental state, Ms. West would not likely be able to provide us any useful information about her jury service.

-5-

On August 4, and 6, 2003, I spoke with Ms. Lindsey by telephone. Ms. Lindsey told me that her mother had suffered two strokes and due to her current mental condition could not give reliable testimony.

-6-

I asked Ms. Lindsey whether she would be willing to sign an affidavit regarding her mother's condition. Ms. Lindsey asked me the purpose for the affidavit. I told her that we would present the affidavit to the Court in connection with litigation regarding Mr. Jefferson's death sentence. She asked me whether I was trying to get the death sentence set aside. I told her that we were.

-7-

When I told Ms. Lindsey that we were attempting to set aside Mr. Jefferson's death sentence, Ms. Lindsey told me that she would be unwilling to execute an affidavit which could in any way assist us in helping Mr. Jefferson.

-8-

Ms. Lindsey also told me that years ago attorneys for Mr. Jefferson had attempted to talk with her mother about the case. Her mother had called the district attorney and had been told that such contact was improper. As a result, Ms. West had refused to talk with the attorneys for Mr. Jefferson.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED THIS 15th DAY OF AUGUST, 2003.

_____
JOHN R. MARTIN

| | |
|---|---|
| ❏ District Court<br>Court Address:<br>17th Judicial District<br>Adams County Justice Center<br>1100 Judicial Center Drive<br>Brighton, CO 80601 | |
| THE PEOPLE OF THE STATE OF COLORADO<br><br>vs<br><br>ROBERT ELLIOT HARLAN<br>Defendant | ▲ COURT USE ONLY ▲ |
| Attorney or Party Without Attorney (Name and Address):<br><br>Kathleen A. Lord<br>Deputy State Public Defender<br>110 16th Street, Suite 800<br>Denver, CO 80202<br><br>Phone Number: (303) 620-4888<br>E-mail:<br>FAX Number:            Atty. Reg.#: 14190 | Case Number: 94 CR<br>187 |
| | Division  E     Courtroom<br>401 |
| **ORDER** ||

# PROCEDURAL POSTURE

This is before the Court for the entry of an Order resolving Defendant's Motion To Vacate Death Sentence Due To Juror's Use Of The Bible During Penalty Phase Deliberations [244] and Defendant's Crim. P. 35 (a) Motion To Correct Sentence. The evidentiary hearing on the motions commenced on April14, 2003 and was concluded on April 18, 2003. Written closing argument and memorandum briefs setting forth the positions of the parties were subsequently filed.

Jury verdicts convicting the Defendant of the substantive charges were returned on June 20, 1995 and, later that day, the penalty phase of the trial began. Three days into the

1

penalty phase, the trial court ordered the jury sequestered over concerns that the jury might be exposed to prejudicial media accounts about the case. The trial court staff supervising the jury engaged in efforts to prevent sequestered jurors from being exposed to television and print media information about the case. Bibles in hotel rooms, however were not removed and jurors had unrestricted access to them.

At the conclusion of the evidence in the death penalty phase of the trial, the trial court gave the jury several Instructions of Law, which were to be the controlling framework for the jury's death penalty phase deliberations. Instruction No. 1 informed the jury that they were required to "follow all of the rules as [the court] explained them to you. Even if you disagree with some of the rules, you must follow them..." Another instruction informed the jury that "Colorado law requires that you carefully follow the legal guidelines the court will give you in making your decisions..." (Instruction No. 5).

Instruction No. 6 pertained to the first step of the four- step process in which the jury had to consider whether the prosecution had proved beyond a reasonable doubt the existence of any aggravating factors. Other Instructions set out the second step of the process, where the jury was to determine the existence of any mitigating factors. (Instructions Nos. 12 and 16). The third step of the process, where jurors were to weigh the aggravating factors against the mitigating factors, was explained in Instructions Nos. 17A and 20.

The fourth step of the process was explained in Instruction No. 18, which informed the jury that,

> "You[r] decision as to the appropriate penalty in this case should be based upon the considerations you have previously made during the first three steps of your deliberations as outlined in these instructions. Before imposing a death sentence, you must be unanimously convinced, beyond a reasonable doubt, that death, rather than life, is the appropriate penalty for the defendant. This consideration involves a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or the imposition of the death penalty..."

Instruction No. 14 informed the jury that they could "consider mercy or sympathy" for the Defendant and told them that "[t]he law requires that your decisions not be the result of passion, prejudice, or any other irrational or arbitrary emotional response..." Instruction No. 26 told the jury that they should not be "influenced by prejudice or bias" against the Defendant or by "sympathy or sentiment" for the victims. Finally, Instruction No. 19 informed the jury that "[e]ven if you unanimously decide that you have each been convinced beyond a reasonable doubt that the mitigating factors do not outweigh the proven aggravating factor or factors, you must still all make a further individual moral assessment of whether you have been convinced...that the death penalty...is the appropriate penalty..."

The penalty phase deliberations began on Friday, June 30, 1995. No verdict was reached that day, an evening recess was declared and the jurors were returned to their hotel rooms for the night. The jury deliberations resumed on Saturday morning, July 1, 1995 and a verdict imposing the death sentence was reached later that day

Interviews of jurors were conducted by Rae Lee Knapp, an investigator for the Public Defender, in September, October and November of 1995. Alleging that several jurors who sentenced him to death improperly researched and read from the bible during their sequestration and penalty phase deliberations, the Defendant filed the Motion To Vacate Death Sentence Due To Juror's Use Of The Bible During Penalty Phase Deliberations [244] ("Bible Motion") on October 25, 1995 and the Crim. P. 35 (a) Motion To Correct Sentence on August 20, 2001.

## ISSUES PRESENTED

Relying on <u>Wiser</u> v. <u>People</u>, 732 P.2d 1139 (Colo. 1987), the Defendant's principal argument in support of his position that his death sentence should be vacated is that certain jurors impermissibly researched, read and discussed biblical passages or verses during their sequestered deliberations, and that this exposure to extraneous information or outside influences may have influenced their decisions to impose the death sentence.

The Prosecution requests that the Court first determine whether the issues raised by the Defendant are legally before the Court pursuant to the "Bible Motion" filed in 1995 or the Crim. P.35 (a) motion filed in 2001. The Prosecution takes the position that the

3

Court only has jurisdiction to consider the Crim. P.35 (a) motion and not the "Bible Motion".

Next, the Prosecution presents several arguments in opposition to the relief sought by the Defendant. The Prosecution first argues than no juror misconduct occurred. Alternatively, the Prosecution argues that if bibles were consulted by certain jurors, the death verdict could not have been influenced by their actions because bibles, and or, passages were read only for "comfort and inspiration", the biblical passages involved are commonly known and therefore, any reference to them was "benign" and the reference to biblical passages consumed only a minimal amount of time. The Prosecution further contends that, if jurors consulted biblical passages to assist them in deciding the appropriate penalty, this conduct was not improper because it occurred during the fourth step of the deliberative process, when jurors are called upon to perform a "profoundly moral evaluation.

The Prosecution also argues that the Defendant is not entitled to any relief because any error that occurred as a result of alleged juror misconduct was invited, when his counsel made biblical and religious references during the trial. Finally, the Prosecution contends that no relief is warranted because the evidence of guilt and the evidence in support of the death penalty was overwhelming and any juror misconduct which occurred was harmless error.

# THE RELIEF REQUESTED IS PROPERLY BEFORE THE COURT PURSUANT TO BOTH THE "BIBLE MOTION" AND THE CRIM. P. 35 (a) MOTION TO CORRECT SENTENCE.

The jury sentenced the Defendant to death on July 1, 1995 and the trial court conducted a sentencing hearing on September 5, 1995 to impose sentences for the other guilty verdicts the jury returned. The record indicates that the trial court forwarded a "Judgment and Warrant of Conviction" to the Colorado Supreme Court on September 7, 1995. Pending mistrial motions were heard on September 15 and 29, 1995. These motions were denied by the trial court and judgment of conviction was entered against the defendant on October 18, 1995. The "Bible Motion" was filed on October 25, 1995. Although the Prosecution objected to the setting of a hearing on the "Bible Motion" on

4

jurisdictional grounds, the trial court, on November 8, 1995, scheduled the hearing for February 2, 1996. The Defendant objected to setting the hearing beyond December 2, 1995, the date by which the Notice of Appeal was due. On November 16, 1995, the Defendant filed a motion to extend the Notice of Appeal deadline in the Colorado Court of Appeals. The Prosecution filed an objection and the Court of Appeals, on November 20, 1995, denied the motion, but indicated instead, that it would grant a limited remand for a hearing on the "Bible Motion". The Notice of Appeal was filed in the Court of Appeals on December 1, 1995 and on December 1,1995, the appeal was transferred to the Colorado Supreme Court. On December 8, 1995, the trial court vacated the February 2, 1996 hearing scheduled on the "Bible Motion" because it determined that it lacked jurisdiction to conduct the hearing. On August 15, 1996, the Defendant filed a Motion for Limited Remand in the Colorado Supreme Court so that a hearing on the "Bible Motion" could be conducted. The Prosecution objected and on August 20, 1996, the Motion for Limited Remand was denied. No hearing on the "Bible Motion" was ever conducted.

The Prosecution and the Defendant both agree that the substantive issues raised by the "Bible Motion" and the Crim. P. 35 (a) Motion To Correct Sentence are the same. The relief requested by the Defendant is also the same. However, relying on People v. Campbell, 738 P.2d 1179 (Colo.1987), the Prosecution, takes the position that this Court does not have jurisdiction to consider the "Bible Motion". The Prosecution contends that the trial court lost jurisdiction over the Defendant when, in a written order entered October 18, 1995, the trial court denied the Defendant's then pending motions and entered judgment of conviction. According to the Prosecution, once the Defendant was sentenced, there was no jurisdiction to address pending issues, even though the Notice of Appeal had not yet been filed. The Prosecution maintains that the Court should treat the "Bible Motion" "as if it had never been filed and as if the issues within it had never been raised." This Court disagrees.

The substantive issues are properly before the Court pursuant to each motion. The Crim. Pro. 35 (a) Motion To Correct Sentence is ripe because the Defendant's direct appeal has been resolved and it raises post-conviction matters which this Court has jurisdiction to address. The "Bible Motion" was timely even though it was filed after judgment of conviction entered because it was filed before the time for filing the Notice

5

of Appeal had expired. Defense interviews of certain jurors had taken place and the Defendant was in possession of information that would have enabled him to legitimately file the "Bible Motion" prior to the date it was actually filed. However, the defense had not completed all of the interviews it wanted to conduct. Under these circumstances, it cannot be said that the decision to wait to file the motion until the investigation had been completed was unreasonable.

The holding in People v. Campbell, supra, is not as expansive as the Prosecution suggests. In fact, the Colorado Supreme Court said as much when it framed the issue it was considering: "The issue presented is narrow: Once a defendant's motion for new trial has been denied and sentence imposed, does the sentencing court retain jurisdiction to enter rulings on subsequent motions? We hold that it does not." Campbell, supra at 1180. To adopt the Prosecution's position and hold that the filing of the "Bible Motion" was a nullity would, as the Defendant persuasively argues, create quite an anomaly: No court would have jurisdiction over a defendant's case between the time of sentencing and the filing of the Notice of Appeal. That is not a practical result and the reality is that trial courts frequently and routinely address motions filed subsequent to sentencing and prior to the filing of the Notice of Appeal. This Court has jurisdiction to consider the issues presented in the two motions.

## EXTRANEOUS INFORMATION OR OUTSIDE INFLUENCE

The Colorado Supreme Court, in Wiser v. People, 732 P.2d 1139 (Colo. 1987), adopted an objective test to determine whether a jury's exposure to extraneous information or outside influences requires that a verdict must be set aside. The Wiser court reviewed the requirements of CRE 606 (b), which limits inquiry into jury deliberations. CRE 606 (b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question

6

whether extraneous prejudicial information was improperly brought to the jurors'
attention or whether any outside influence was improperly brought to bear upon
any juror. Nor may his affidavit or evidence of any statement by him concerning
a matter about which he would be precluded from testifying be received for these
purposes.

The Wiser court then stated, "[w]e believe that the objective test of whether there is a
reasonable possibility that extraneous information or influence affected the verdict should
be used to determine if a new trial is required..." Wiser v. People, supra, 732 P.2d at
1142.

At the commencement of the hearing on the Defendant's motions, this Court adopted
the Prosecution's position and made an evidentiary ruling that, pursuant to CRE 606 (b),
only limited inquiry about what occurred in the jury deliberation room could be made of
jurors called to testify. Jurors in the Defendant's trial who were called as witnesses could
be asked only if there was a bible in the jury deliberation room and if so, when it was
brought in, what biblical passages, if any, were read or discussed and at what point during
the four- step penalty phase process this occurred. The Court also made evidentiary
rulings during the hearing which allowed certain evidence to come in for a limited
purpose, even though such evidence would otherwise be excludable under CRE 606 (b).

Several witnesses, including the twelve jurors who returned the death verdict testified
at the hearing. Differing versions about what transpired during their deliberations were
presented by the jurors. In order to apply the Wiser test to address the substantive issues
set forth in the Defendant's motions, this Court must first make credibility of witness
determinations and resolve the factual disputes in the evidence presented at the hearing.

## A) Did jurors read, research or review bibles and take notes from bibles in their hotel rooms during the Friday evening recess?

The jury began its death penalty deliberations on Friday, June 30, 1995. A verdict
was not reached that day and an evening recess was declared. The sequestered jury was
returned to their hotel rooms for the evening break. Some jurors indicated that they had

access to bibles in the hotel rooms and read and researched certain biblical passages. Other jurors aren't so certain, can't remember or deny this claim.

**Juror Lana Eaton-Ochoa**

Ms. Lana Eaton-Ochoa shared a hotel room with Ridawn Yantis Cummings during the period of time that the jury was sequestered in the penalty phase of the Defendant's trial. Ms. Eaton-Ochoa and the other jurors went back to their hotel rooms at the end of the first day of deliberations, June 30, 1995. Ms. Eaton-Ochoa testified that, while in her hotel room, during the Friday evening recess, she saw Ms. Yantis-Cummings reading her bible. Ms. Eaton-Ochoa said she can't remember this now, as her memory about the events has faded, but she told Ms. Knapp in the 1995 interview that Ms. Yantis Cummings had brought a bible with her, that Ms. Eaton-Ochoa was researching the bible on Friday evening and used a bible index while doing the research. Ms. Eaton-Ochoa also told Ms. Knapp during that interview that both she and Ms. Yantis Cummings were writing down biblical passages or verses as they read and researched the bible.

Ms. Eaton-Ochoa testified that she reads the bible for comfort, wisdom and inspiration and considers it to be her "moral compass". She testified that she borrowed Ms. Yantis Cummings' personal bible and was reading it that evening for reference, because "there was a gentleman (juror Jesus Cordova) who couldn't make a decision because he said that his faith was standing in the way and I knew that there was scripture in the bible that let us—that we are to obey the government, we are to obey the laws of the land and as a Christian you are to obey and this is what the law says, so this is what you should—so I was looking that up." (sic). Ms. Eaton-Ochoa testified that she did this for the benefit of "[the] juror who believed that the law by his faith, he was not wanting to give that vote because he was told what the result would be." (sic).

Ms. Eaton-Ochoa testified that she used Ms. Yantis Cummings bible to "clarif[y] the thoughts I was having" and that as she researched the bible using the bible index, she was taking notes. Romans 13:1 ("let every soul be subject to the governing authorities for there is no authority except from God" and "the authorities that exist are appointed by God") was similar to one of the scriptures Ms. Eaton-Ochoa looked up and wrote down on Friday evening.

8

There were other scriptures that Ms. Eaton-Ochoa researched that evening. She testified that she also researched and wrote down a scripture similar to Leviticus 24:20 ("fracture for fracture, eye for eye, tooth for tooth, as he has caused disfigurement of a man, so shall it be done to him") and Leviticus 24:21 ("and whoever kills an animal shall restore it, but whoever kills a man shall be put to death"). Ms. Eaton-Ochoa told Ms. Knapp in the 1995 interview that she remembered looking up a biblical passage that said, "I will use you as a tool, and if a man takes a life, then his life should be taken."

### Juror Marietta Nowakowski

Ms Marietta Nowakowski testified that no verdict had been reached when the jury took the Friday evening recess. She went back to her hotel room, took the bible that was in her room and read it "to see what the bible says about death." In a March 13, 2003 interview with the Prosecution, she indicated that she looked up biblical references to see what God had to say about death. She testified that she reads the bible for comfort and inspiration.

### Juror Steven Wright

Mr. Steven Wright was also interviewed by Ms. Knapp in 1995. During the hearing, he had difficulty recalling precisely what transpired during the penalty phase of the trial and recalled some of what he told Ms. Knapp during his interview in 1995. During the interview, he told Ms. Knapp that some jurors had read the bible during the Friday recess and "they had looked it up and it says throughout the bible, I guess, there was like ten different spots, you know, 'if you kill you shall be put to death' and it was two no's and one maybe or maybe three no's and one maybe. And those people were turned around."

### Juror Ann Trujillo

Ms. Ann Trujillo testified that she reviewed a bible that was in her hotel room on Friday evening. She testified that she was trying to look up specific passages related to

9

the punishment for murder. In a 1995 interview, she told Ms. Knapp that one of the passages she remembered reading provided that, if two or more people witness a murder, that person (the murderer) should be put to death. Ms. Trujillo testified that she may have written down on a piece of paper at least one of the biblical passages she had read.

**Juror Lorrie Salter**

In her testimony, Ms. Lorrie Salter was able to recall few details about her jury service. She attributes this to the fact that eight years have lapsed and her memory has faded. She did remember being interviewed by Ms. Knapp in 1995 and acknowledged that her memory back than was much clearer. In that interview, she said that one of the jurors had stayed up most of the night going through biblical passages. She also told Ms. Knapp that, "it was, I guess, the lifers that really held onto that and researched that." During her testimony, she complained about the contact Ms. Knapp initiated with her in 1995. Ms. Salter testified that she spoke to Ms. Knapp because she felt "hounded" and that she told Ms. Knapp certain things just to get rid of her and because she was stressed. However, Ms. Salter acknowledged that the first and only time Ms. Knapp spoke to her, she agreed to give a taped interview. The taped interview does not reveal that Ms. Knapp was in any way overbearing. Ms. Knapp used a conversational tone of voice and Ms. Salter's tone of voice and her responses to questions do not reveal that Ms. Salter was in any way stressed to the degree claimed.

**Juror Ridawn Yantis Cummings**

Ms Ridawn Yantis Cummings shared a hotel room with Ms. Eaton-Ochoa during the time the jury was sequestered. She testified that during the penalty phase, her parents brought her personal bible to her hotel room. Ms. Yantis Cummings testified that during the Friday evening recess, following the first day of deliberations, she read her bible and took notes as she read passages. Her bible has an index or a study reference. Ms. Yantis Cummings was interviewed by the Prosecution in March, 2003 and at that time said that she had gone through the bible, had a sheet of paper with her for notes and looked up biblical passages regarding "what to do and obeying the government and things like that

in this case." In that interview, she described her notes as being a reference sheet and shared it with her roommate, Ms. Eaton-Ochoa. Ms. Yantis Cummings declined to be interviewed by Ms. Knapp in 1995. In an interview with the Public Defender in April, 2003, Ms. Yantis Cummings testified that she was researching the bible, "regarding the whole jury process, in toto, because of the fact that it was pretty emotionally trying." She also stated that perhaps one of the pages of her notes related to following the government's laws.

### Juror Jason Dockter

Mr. Jason Dockter shared a hotel room with Jesus Cordova during the time the jury was sequestered. Mr. Dockter testified that he didn't recall a bible in the hotel room and indicated that he believes that neither he nor his roommate read a bible during the Friday evening recess. Mr. Dockter was contacted by Ms. Knapp in 1995 and refused to be interviewed. He did tell Ms. Knapp that he felt strongly about his decision in the case and didn't want it overturned.

### Juror Jesus Cordova

Mr. Jesus Cordova denied that he shared a hotel room with anyone else during the time the jury was sequestered. He testified that he did not consult a bible during the Friday evening recess and that his hotel room did not have a bible. Mr. Cordova was interviewed in 2003 by Robin Folland, an investigator for the defense, and told her that he could not recall specific details about his jury service because he has had several surgeries, high blood pressure and diabetes since 1995. Mr. Cordova had difficulty remembering who interviewed him, whether it was in 1995 or 2003 or what, besides questions about bibles, was asked.

### Juror Braulio Elizalde

Mr. Braulio Elizalde testified that he did not read a bible in his hotel room during the Friday evening recess. He also indicated that he did not see his roommate with a bible at

11

anytime. He acknowledged that his memory about his jury service was better in 1995 and that his memory today is faded. He declined to be interviewed in 1995 by Ms. Knapp.

**Juror Barbara Smith**

Ms. Barbara Smith shared a hotel room with Hazel Taylor during the time the jury was sequestered. She testified that she did not see a bible in her hotel room and did not see Ms. Taylor with a bible at any time. She testified that Jesus Cordova had mentioned that he had been reading the Bible during the Friday evening recess. Ms. Smith declined to be interviewed by Ms. Knapp in 1995.

**Juror Hazel Taylor**

Ms. Hazel Taylor's roommate during her sequestration was Barbara Smith. Ms. Taylor testified that she did not see a bible in her hotel room at any time.

## B) Did jurors take a bible and a bible index or notes with biblical passages into the jury deliberation room?

The jury returned to the jury deliberation room on Saturday morning, July 1, 1995, to continue their death penalty phase deliberations. A verdict imposing the death penalty was returned later that day. Some jurors have indicated that a bible or bibles, a bible index and notes were in the jury deliberation room and that biblical passages were read and discussed. Other jurors have said otherwise.

**Juror Lana Eaton-Ochoa**

Ms. Eaton-Ochoa testified that on Saturday morning, July 1, 1995, she took a bible into the jury deliberation room to show juror Jesus Cordova the biblical scriptures she had looked up the night before. She testified that a bible index was also in the jury

12

deliberation room and that biblical passages were shown to juror Jesus Cordova because "he was reluctant to obey the laws of the land and come back with a death sentence."

**Juror Marietta Nowakowski**

Ms. Nowakowski testified that one of the jurors brought a bible into the jury deliberation room on Saturday when jury deliberations resumed. She described it as a "study bible" with an index where one could look up a word and find a passage. She testified that she remembers that the bible was opened up and that passages were read from the bible. She told Ms. Knapp in the 1995 interview that jurors used the bible in the jury deliberation room and that, although there were a few jurors who were initially in favor of a life sentence for the Defendant, a unanimous verdict was reached once the bible was used. Ms. Nowakowski indicated that some of the jurors were interested in looking up passages in the bible concerning what God felt the government's position was when it came to judging people who murder other people. Although she could not recall the specific passages that were read in the jury deliberation room, she testified that the passages "had to do with the right of judgment by the government in murder situations."

**Juror Steven Wright**

Mr. Wright did not remember whether a bible was in the jury deliberation room. He did, however, tell Ms. Knapp during the 1995 interview that he thought that some jurors had some notes in the jury room and that once it was pointed out to certain jurors what the bible said they were able to reach a verdict.

**Juror Ann Trujillo**

Ms. Trujillo testified that she may have brought whatever notes she had prepared the night before while reading the bible into the jury deliberation room on Saturday morning when deliberations resumed. She indicated that several jurors had also brought notes from bibles they had reviewed the previous night. In a March, 2003 interview with the Prosecution, she indicated that she was not "familiar with [biblical] passages and where

13

to go, so I know someone in the jury was familiar with the passages and where to go and where...it said an eye for an eye." She testified that she does not now remember if there was a bible in the jury room. However, in the March, 2003 interview with the Prosecution, Ms Trujillo indicated that a bible may have been on the table in the jury deliberation room and when the Prosecution asked her during the interview if she had read from it or if anyone had opened it and read it to the group, she replied, "I believe we did. I think some of us took notes as well and read what our notes had said." She testified that she remembers that the jurors had a discussion about their notes, that they read their notes and that their notes contained biblical passages, including "an eye for an eye".

### Juror Lorrie Salter

Ms. Salter was unable to recall in her testimony whether there was a bible in the jury deliberation room on either Friday or Saturday. She attributes this to the passage of time and a fading memory. She does remember some reference to "an eye for an eye and a tooth for a tooth" and "you take someone's life, your life is over." She recalled being interviewed by Ms. Knapp in 1995. She told Ms. Knapp that "the ones that had the bibles were the weaker of the bunch-emotional wise, strength."(sic). She stated in the interview that there were several people in the jury deliberation room who were very religious and they were the ones who had taken the bibles into the deliberation room. According to Ms. Salter two or three jurors brought bibles on Saturday. She also indicated that Jesus (Cordova) had taken a bible index into the jury room. Ms. Salter also said in that interview that she remembered biblical passages being looked up in the jury deliberation room: "Specifically, there was two. One I can't remember the passage but we had—they had read it where an eye for an eye, tooth for a tooth. The one that if you kill somebody that your—automatically your life is given up because you've taken another."(sic). At another point in the interview, Ms. Salter stated, "One individual stayed up most of the night and went through the passages of the bible to help. The ones that came up the most were the ones where in the Bible if you had taken one of God's creatures, or man, that you're automatically—the sentence for that is death. There was no: You're going to be in life for prison, or whatever it was, automatically for death."(sic).

**Juror Roxie McCullough**

Ms. McCullough testified that because eight years have lapsed since her jury service, she is unable to state whether bibles were in the jury deliberation room. She does remember reference to the biblical passage, "if a person takes a life, their life must be taken" but doesn't remember if this was read or whether it came out during deliberations on Friday or Saturday. Ms. McCullough declined to be interviewed by Ms. Knapp in 1995. She did grant an interview to the Prosecution in March, 2003. During that interview, she indicated that the biblical passage may have been read off of a piece of paper. Ms. McCullough was also interviewed by Rick Salinger, a Channel 4 reporter in 2001. She told Mr. Salinger that biblical passages were read in the jury deliberation room and that jurors brought bibles into the deliberation room.

**Juror Ridawn Yantis Cummings**

Ms. Yantis Cummings was able to recall little about the notes she took while reading and researching the bible during the Friday recess. She refused to be interviewed in 1995. She did acknowledge in interviews in 2003 that she prepared a reference sheet with biblical passages and shared it with her roommate, Lana Eaton-Ochoa. She indicated that she could not say whether or not she took the reference sheet with her into the jury deliberation room.

**Juror Jason Dockter**

Mr. Dockter testified that he has no recollection of a bible ever being in the jury deliberation room. He also indicated that he does not recall biblical passages being discussed at any time during deliberations. On cross examination, he testified that he could not state that a bible was not brought into the jury deliberation room or that biblical passages were not discussed.

**Juror Jesus Cordova**

Mr. Cordova testified that no one brought a bible into the jury deliberation room at any time. He also indicated that no one discussed religion or biblical passages during jury deliberations.

**Juror Braulio Elizalde**

Mr. Elizalde testified that he did not see a bible in the jury room on either the first or second day of deliberations. He also indicated that there were no discussions about biblical passages. When he was interviewed by the Prosecution in March of 2003, he indicated that he could not remember whether there was a bible in the jury deliberation room. He testified that he simply has no memory of that and is unable to say that it didn't occur.

**Juror Barbara Smith**

Ms. Smith testified that she did not see any bibles in the jury deliberation room and did not hear any discussions about biblical passages on Friday. She did indicate that someone tried to bring up something about the bible during deliberations on Saturday morning, but it was stopped immediately. Ms. Smith indicated that this discussion lasted less than five minutes. She testified that she remembers that Jesus Cordova had a binder and recalls that someone was flipping through pages, but the binder was not shown to anyone. Ms. Smith indicated that Jesus Cordova had told her that he had been reading the bible the night before. She acknowledged that it would be difficult to remember everything that happened in 1995 and that she had refused to be interviewed at that time.

**Juror Hazel Taylor**

Ms Taylor testified that she did not see a bible in the jury room at any time. She indicated that on Saturday morning, Jesus Cordova attempted to discuss religion but was stopped by other jurors. Ms. Taylor granted the Prosecution an interview in March, 2003

but refused to be interviewed by defense investigators in 1995 and 2003. She testified that she was informed in 2003 that there were some issues about bible usage during deliberations and that this might result in the Defendant's sentence being overturned. She indicated that she did not want this to occur

## C) Did juror use of the bible, bible index or notes with biblical passages occur when jurors were in the Fourth Step of their deliberations?

### Juror Lana Eaton-Ochoa

During cross examination, Ms Eaton-Ochoa testified that when she consulted the bible, she had already made decisions about mitigation and aggravation. She testified that when she researched the bible in her hotel room on Friday evening, she was considering the fourth step—whether the imposition of the death penalty was appropriate. She seemed quite clear about this. However, during her direct examination she testified that her memory at the time of the hearing had faded and her memory about her service as a juror was better in 1995.

### Juror Marietta Nowakowski

Ms. Nowakowski testified, during cross examination, that she had already made up her mind about the three steps in the penalty phase process when she consulted the bible. However, on redirect examination, she acknowledged that she does not remember what the three steps were and did not remember what they were when she was interviewed by the Prosecution in March of 2003. She also testified that she read the bible on Friday evening because "I wanted to make the right decision.

### Juror Steven Wright

During cross examination, Mr. Wright testified that he was already in the fourth step of the penalty phase deliberations when the references to biblical scriptures were made,

However, on redirect examination, Mr. Wright acknowledged that he was not now able to say at what specific point on either Friday or Saturday aggravating circumstances were being discussed. Mr. Wright also testified that he is aware that bible use by jurors is an issue the Defendant is raising to try to get his death sentence overturned.

**Juror Ann Trujillo**

Ms. Trujillo testified on cross examination that she recalls that she had already made decisions concerning the three step penalty phase process when she researched biblical passages at her hotel room on Friday evening. However, at several points in her testimony she was unable to recall other details concerning her service as a juror.

**Juror Lorrie Salter**

Ms. Salter had difficulty remembering much about her jury service. During cross examination, Ms. Salter testified that she couldn't remember whether biblical passages were discussed on Friday or Saturday during deliberations, but that she had already made up her mind on steps one, two and three and was in the fourth step when biblical passages were mentioned. On redirect examination, however, she testified that she had no idea when the biblical passages were discussed, acknowledged that they were discussed during deliberations and indicated that her decision about how she was going to vote on the death penalty was made before the penalty phase began.

**Juror Roxie McCullough**

Ms. McCullough testified that because of the lapse of time, she could not remember whether biblical passages were read from a book, notes or spoken. During cross examination, Ms. McCullough testified that she had completed steps one, two and three and was in the fourth step of the death penalty deliberations when biblical passages were mentioned. On redirect examination, however, she testified that she couldn't remember if the biblical passages were discussed on Friday or Saturday and that her decision about the death penalty was made before the penalty phase began.

18

### Juror Ridawn Yantis Cummings

Ms. Yantis Cumming testified that she could not recall or remember details regarding her research of biblical passages. Ms. Yantis Cummings was able to state, however, that when she went back to her hotel room after the first day of deliberations, she was already in the fourth step of the penalty phase deliberation process.

### Juror Barbara Smith

Ms. Smith testified that one of the jurors brought up biblical passages in the jury deliberation room on Saturday morning. She indicated that this discussion was short, lasting less than five minutes. She testified that when the discussion occurred, she had already completed step three and was in step four of the penalty phase deliberations.

## Findings of Fact

None of the jurors who testified was eager or happy to testify. Some jurors, Lorrie Salter, Ann Trujillo, Steven Wright, Barbara Smith and Jesus Cordova, appeared defensive and at times resentful. A few of jurors, Hazel Taylor, Steven Wright and Jason Dockter, indicated that they had knowledge prior to the hearing that issues around bible usage might have significant consequences and their concerns about this were apparent in nonverbal expressions as they testified. They all appeared nervous. The ability to observe their manner and demeanor as they testified was critical. It was clear that the significant lapse of time since the trial had taken a toll on their abilities to recall or remember what transpired during their jury service in 1995. Some of the jurors freely and willingly granted interviews about their service in 1995. Others refused to grant interviews. All of these circumstances are of considerable importance and significantly weighty in assessing the credibility of the witnesses who testified at the hearing and in resolving the factual disputes presented by the evidence.

## A) Several jurors read, researched and reviewed bibles and took notes from bibles in their hotel rooms during the Friday evening recess.

Four jurors, Lana Eaton-Ochoa and her roommate Ridawn Yantis Cummings, Marietta Nowakowski and Ann Trujillo read, reviewed or researched the bible to find biblical passages concerning God's position on the death penalty and government authorities on Friday evening, while sequestered, during the death penalty deliberations. Although Ms. Eaton-Ochoa's memory has faded because of the passage of time, she agreed to be interviewed by Ms. Knapp in 1995, when the events concerning her jury service were still fresh. Ms. Trujillo and Ms. Nowakowski also agreed to be interviewed in 1995. Ms. Cummings refused to be interviewed in 1995.

Ms. Eaton-Ochoa and her roommate, Ms.Yantis Cummings used Ms. Cummings' personal bible, which has a bible index, to locate biblical passages during the Friday evening recess. They searched for passages pertaining to the penalty for murder and the role of government and government authorities. Ms. Yantis Cummings was also searching for passages about "what to do and obeying the government in this case." As they located passages, the passages were written down on a sheet of paper, called a reference sheet. The reference sheet was prepared so that it could be presented the next day, when deliberations resumed, to at least one of the jurors, Jesus Cordova. The biblical passages they located included those that state, "fracture for fracture, eye for eye, tooth for tooth, as he has caused disfigurement of a man, so shall it be done to him" and "whoever kills a man shall be put to death" and "I will use you as a tool and if a man take a life, then his life shall be taken."

Ms. Trujillo read the hotel bible during the Friday evening recess. She researched specific passages related to punishment for murder. She found one passage that provided that if two or more people witness a murder, then the person responsible should be put to death. It is more likely than not that Ms. Trujillo wrote down the biblical passages she located on a piece of paper. She did this for the express purpose of taking her notes to the jury deliberation room to share with other jurors on Saturday morning when jury deliberations resumed.

Ms. Nowakowski also read her hotel bible during the Friday evening recess. She was searching for biblical passages about death. She wanted to see what God had to say about the penalty for murder.

Two other jurors, Steven Wright and Lorrie Salter, confirmed that some of the jurors had researched biblical passages about the penalty for murder during the Friday evening recess. Steven Wright claimed that he had difficulty remembering details of his jury service, but his inability to remember was more related to what seemed to be his concern that bible usage by jurors could result in the reversal of the Defendant's sentence. His manner and demeanor demonstrated this concern. The same can be said about Lorrie Salter. She remembered few details and claimed that she was "hounded" by the defense investigator in 1995 and told her what she wanted to hear. This claim, however, finds no support in the evidence.

Mr. Wright learned during the deliberations on Saturday morning that some jurors had read bibles Friday evening and had located several biblical passages that provide, "if you kill, you shall be put to death". Similarly, Ms. Salter learned on Saturday morning during deliberations that one juror had stayed up most of the night researching the bible.

Five jurors, Hazel Taylor and the woman with whom she shared a hotel room, Barbara Smith, Braulio Elizalde, Jesus Cordova and Jason Dockter, testified that they did not see a bible in their hotel rooms during the death penalty deliberations in this case and indicated that they neither consulted, researched nor read the bible during the Friday evening recess.

Four of these jurors, Hazel Taylor, Barbara Smith, Braulio Elizalde and Jason Dockter refused to be interviewed in 1995, when events surrounding their jury service would have been fresh in their memories. Hazel Taylor refused a defense interview in 2003. Two jurors, Barbara Smith and Braulio Elizalde acknowledged that the passage of eight years affected their ability to remember events surrounding their 1995 jury service.

One juror, Jesus Cordova was adamant about his claim that he did not consult a bible, despite the fact that at least two other jurors, Barbara Smith and Lorrie Salter, indicated that he had told them he had stayed up the night before researching the bible. There were other problems with Mr. Cordova's credibility. He denied having a roommate during the time the jury was sequestered, yet clearly he had a roommate for at least a good portion of the time—Jason Dockter.

At least two of the five jurors who indicated that they did not consult bibles in their hotel rooms, Hazel Taylor and Jason Dockter, became aware prior to the hearing that the Defendant was alleging that bibles were being consulted and that this might have legal significance. They indicated that they did not want their verdicts overturned.

Jesus Cordova consulted, read and researched the bible during the Friday evening recess. Given what other jurors, Lana Eaton-Ochoa, Steven Wright and Lorrie Salter have indicated, it is more likely than not that Mr. Cordova was looking for and located biblical passages about God's view of the death penalty. The remaining jurors did not research or consult bibles during the Friday evening recess.

**Several jurors researched and reviewed bibles on Friday evening, June 30, 1995, to locate biblical passages pertaining to the penalty for murder. Some of the jurors wrote down the biblical passages they located so that they could take them to the jury deliberation room to share with other jurors on Saturday morning, July 1, 1995, when the jury reconvened to continue their deliberations.**

## B) Some jurors took a bible, bible index or notes with biblical passages into the jury deliberation room.

Five jurors, Lana Eaton-Ochoa, Marietta Nowakowski, Ann Trujillo, Lorrie Salter and Roxie McCullough, saw bibles in the jury deliberation room on Saturday morning, July 1, 1995, the second day of deliberations in the death penalty phase of Defendant's trial. These same jurors observed biblical scriptures read from the bibles and observed, and participated in, discussions about these scriptures in the jury deliberation room Saturday morning. Two jurors, Marietta Nowakowski and Lorrie Salter, also saw bible indexes or study bibles in the jury deliberation room that Saturday morning.

Ms. Eaton-Ochoa granted a defense interview in 1995, when events were fresh in her mind and before she was aware that using a bible in the jury deliberation room might have legal significance. She took a bible into the jury deliberation room on Saturday morning to show juror Jesus Cordova the biblical scriptures she had researched and located on Friday evening.

Ms. Eaton-Ochoa showed those scriptures to Mr. Cordova. She also saw a bible index in the jury deliberation room on Saturday morning.

Ms. Nowakowski was interviewed in 1995, when her memory about the events concerning her jury service was better than it is today. She too saw a juror bring a bible into the jury deliberation room on Saturday morning. The bible was a study bible, which contained an index and enabled the user to locate biblical passages by looking up specific words. She saw the bible opened up and heard someone reading biblical passages. She observed that some of the jurors that morning were interested in looking up passages in the bible concerning what God felt the government's position was when it comes to judging people who murder other individuals.

Ms. Trujillo also granted Ms. Knapp an interview in 1995, when she could best remember the events concerning her jury service. It is more likely than not that Ms Trujillo saw a bible in the jury room on Saturday morning when the jury deliberations resumed and observed the bible opened up and read to other jurors. Ms. Trujillo observed biblical passages being read and jurors "going back and forth" with what they had copied from the bible the night before. Ms Trujillo said that she may have brought her notes with biblical passages into the jury room. In fact, it is also more likely than not that Ms. Trujillo took her notes prepared the evening before and shared them with other jurors. It is also more likely than not that Ms. Trujillo saw other jurors bring notes with biblical passages on Saturday morning and observed them being shared with other jurors. The biblical passages she heard discussed included, "eye for an eye, tooth for a tooth."

Ms. Salter had difficulty, during her testimony, remembering whether she saw a bible in the jury room. She did grant the defense an interview in 1995. Although she claims that she was "hounded" into giving an interview and gave responses the investigator wanted to hear, she willingly cooperated and was not pressured to give anything but an accurate account of what had transpired. She saw two and perhaps as many as three jurors take bibles into the jury deliberation room on Saturday morning. At one point during jury deliberations, she saw Juror Jesus Cordova with a bible index. She observed biblical passages being discussed on Saturday morning. Ms. Salter remembers at least two biblical passages were looked up in the bible and discussed as the jury deliberated. One of the passages was "eye for an eye, tooth for a tooth" and the other was, "if you kill somebody, automatically your life is given up because you've taken another".

Ms. McCullough was unable to recall that a bible was in the jury room during jury deliberations in the death penalty phase. She attributes this to poor memory caused by a lapse of time. However, she was interviewed by a television news reporter in 2001 and spoke to him about bibles and biblical passages in the jury deliberation room. Her statements to the reporter were credible. Ms. McCullough too saw bibles in the jury room and observed biblical passages read to other jurors. One of the biblical references she heard was "if a person takes a life, their life must be taken."

One juror, Steven Wright indicated that he believed that notes with biblical passages were present and discussed in the jury deliberation room on Saturday morning. Mr. Wright doesn't remember a bible being present but believes that some jurors had notes with biblical passages in the jury deliberation and discussed them. Mr. Wright learned that some jurors had studied the bible the night before and found "about ten different places in the bible" where it says "if you kill, you shall be put to death". It is more likely than not that Mr. Wright observed notes with biblical passages being discussed in the jury deliberation room on Saturday morning.

Three jurors, Ridawn Yantis Cummings, Jason Dockter and Braulio Elizalde, cannot remember or recall whether bibles or notes with biblical passages were in the jury deliberation room at anytime during the penalty phase deliberations. All three jurors refused to be interviewed in 1995, when events about their jury service would have been fresh in their memories. Throughout her testimony, Ms. Yantis Cummings indicated she could not remember or recall events about which she was questioned. She shared her bible, her notes containing biblical passages about "what to do and obeying the government in this case" and discussed her notes with her roommate, Ms. Eaton-Ochoa on Friday evening. She doesn't remember, however, whether she took her bible or her notes to the jury deliberation room the next day. Mr. Dockter and Mr. Elizalde can't say, one way or the other, whether bibles were in the jury deliberation room or whether biblical passages were discussed.

Three jurors, Jesus Cordova, Barbara Smith and Hazel Taylor claim that no bibles were present in the jury room and that no significant discussions about biblical passages occurred. However, at least one juror, Ms. Salter, saw Mr. Cordova with a bible index in

24

the jury room. Ms. Smith saw Mr. Cordova with a binder, more likely than not filled with biblical passages written down the evening before as he researched the bible.

The testimony of jurors Cordova, Smith and Tayler was not persuasive for several reasons. First, their testimony is contradicted by other more credible evidence. Second, Jesus Cordova's testimony was impeached by evidence that directly contradicts his claims that he did not have a roommate, that he did not consult or research a bible on Friday evening and that he does not have severe memory problems due to significant medical conditions. Third, Barbara Smith and Hazel Taylor refused to grant interviews to defense investigators at a time when events would have been more fresh in their memories. Finally, at least one of the jurors, Hazel Taylor, learned, prior to the hearing, that claims were being made that bibles had been used by jurors and that this might result in the Defendant's sentence being reversed.

**Jurors took bibles and notes with biblical passages concerning the penalty for murder into the jury deliberation room on Saturday morning, July 1, 1995. These materials were read and discussed among and between jurors prior to a verdict being reached.**

## C) The evidence did not show that juror use of the bible, bible index or notes with biblical passages occurred only when jurors were in the fourth step of their deliberations.

Prior to the hearing, this Court determined that jurors could be asked to indicate at what step in the four step process of the penalty phase deliberations each was at when they were exposed to extraneous information or outside influences and that this inquiry would not violate CRE 606 (b).The Defendant contends that the Court's ruling was erroneous in that permitting testimony that a juror had decided the first, second or third step before the jury misconduct occurred requires implicit disclosure of "matter...occurring" during deliberations and as such, violates CRE 606 (b). According to the Defendant, allowing this line of questioning requires jurors to reveal what they were thinking at the time the extraneous information was introduced. Alternatively, the Defendant argues that whether or not jurors were in the fourth step of the process is not

significant because the four-step process is not an irreversible one. At any point in time before signing the verdict form, jurors may change their minds. The Defendant's arguments, though persuasive, are academic. The evidence that certain jurors were in the fourth step of the process when extraneous information or outside influences was introduced is not credible and therefore, of no legal significance.

Two jurors, Lorrie Salter and Roxie McCullough indicated that they had completed step three and were in step four of the penalty phase process when bibles and bible passages were introduced into the jury deliberation room. However, neither could remember whether the biblical passages were introduced or discussed on Friday or on Saturday. They simply had no idea when in the process the extraneous information was introduced. Incredibly, each indicated that they had made their penalty phase decisions even before the penalty phase began. Their testimony is not persuasive or credible.

Two jurors, Barbara Smith and Ridawn Yantis Cummings also testified that they had completed step three and were in the fourth step of the penalty phase process when bibles or biblical passages were introduced into the jury deliberation room. Both jurors refused interviews in 1995, when events were fresh in their memories and before anyone had any indication that issues about bibles in the jury room would be raised. Ms.Yantis Cummings had difficulty during her testimony recalling important details about her jury service. Ms. Smith's testimony about bible and biblical passages in the jury room was contradicted by other weighty and credible evidence. The manner and demeanor of these jurors as they presented their testimony, coupled with the factors noted above leads to the conclusion that their testimony is not credible on this important point.

Two other jurors, Marietta Nowakowski and Steven Wright, testified that they were in the fourth step of the penalty phase process when bibles or bible passages were discussed in the jury deliberation room. However, both jurors had difficulty recalling other significant points during their testimony. Ms Nowakowski couldn't remember what the different steps of the process were during her testimony and couldn't remember what they were when the Prosecution interviewed her in March, 2003. Mr. Wright couldn't state when aggravating circumstances were discussed. Moreover, Mr. Wright was aware that juror use of bibles could result in reversal of the death penalty at the time of the hearing. Under these circumstances, the testimony of these two jurors that they were in the fourth step of the penalty phase process was not persuasive or credible.

26

Finally, two jurors, Ann Trujillo and Lana Eaton-Ochoa, indicated that they had completed the third step of the four-step process in the penalty phase deliberations when biblical passages were researched and bibles consulted. However, during their testimony each had difficulty remembering other important details. Ms. Eaton-Ocho acknowledged that her memory has faded over time. Ms.Trujillo had concerns about testifying and was aware that her presence at the hearing was required by the Defendant. Her displeasure was apparent in her demeanor and mannerisms on the stand. The manner and demeanor of each juror, together with the factors noted above compels the conclusion that these two jurors' assertions that they had completed step three of the process at the time they were exposed to extraneous information lack credibility.

**Jurors were exposed to bibles and bible passages concerning God's view on punishment for murder while they were sequestered during their deliberations on the penalty phase of the Defendant's trial. This occurred when they took the evening recess on Friday, June 30, 1995 and when they resumed their deliberation on Saturday, July 1, 1995. The biblical passages were read and discussed in the jury room. This occurred prior to the jury reaching a unanimous verdict. The credible evidence does not indicate that jurors were at a particular step in the four step process. What is certain is that a verdict imposing the death sentence had not been reached at the time the extraneous materials were considered.**

## Conclusions of Law

### A) The death penalty verdict must be vacated under the <u>Wiser</u> test because jurors were exposed to extraneous biblical code during their sequestration and penalty phase deliberations.

As noted above, the Colorado Supreme Court adopted an objective test to determine whether jury exposure to extraneous information or outside influence requires that a verdict be overturned or vacated in <u>Wiser v. People, supra.</u> A defendant's conviction

must be reversed "where there is a reasonable possibility that the verdict was tainted by the introduction of outside information or influences into the jury deliberations." Wiser v. People, supra, 732 P.2d at 1143; Wadle v. People,__P.3d__ (Colo.App Jan.30,2003).

The Defendant, in alleging jury misconduct, is permitted to introduce evidence to establish that extraneous matters improperly influenced the verdict, but how the improperly received information was used by the jury in their deliberative process is not a proper subject of inquiry. Wadle v. People, supra; Vento v. Colo. Nat'l Bank-Pueblo, 907 P.2d 642 (Colo. App.1995).

To meet his burden under Wiser, the Defendant is not required to show that the entire jury was exposed to the extraneous information or outside influence. If only one juror has been exposed to extrinsic material, that juror's "improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." Lawson v. Borg, 60 F.3d 608,613 (9th Cir. 1995). The unanimity of jury verdicts is of paramount importance in death penalty cases in Colorado, where each juror has the power to veto a death sentence if he or she is not convinced beyond a reasonable doubt that death, rather than life in prison, is the appropriate penalty and where the death penalty cannot be considered by the jury unless and until all twelve individual jurors are convinced that the mitigating factors do not outweigh proven statutory aggravating factors. See, People v.Dunlap, 975 P.2d 723 (Colo. 2000); Tenneson v. People, 788 P.2d (1990).

If there is a reasonable possibility that juror exposure to biblical passages requiring that death be the punishment whenever an individual takes another person's life and commanding jurors to follow government authorities affected any one or more juror's decision to return a death verdict in this case, then under Wiser, the death sentence must be vacated. Here, several jurors researched and reviewed bibles on Friday evening, June 30, 1995, to locate biblical passages pertaining to the penalty for murder. Some of the jurors wrote down the biblical passages they located so that they could take them to the jury deliberation room to share with other jurors on Saturday morning, July 1, 1995, when the jury reconvened to deliberate on a verdict. Jurors took bibles and notes with biblical passages concerning the penalty for murder into the jury deliberation room on Saturday morning, July 1, 1995. These materials were read and discussed among and between jurors prior to a verdict being reached. Jurors were exposed to bibles and bible passages concerning God's view on punishment for murder, while they were sequestered,

28

during their deliberations on the penalty phase of the Defendant's trial and when the jury resumed their deliberations the next day.

The biblical passages involved not only encouraged the death penalty but required that it be imposed when another life is taken. The passages also directed jurors to take guidance from and obey the government. They left jurors with no discretion. Given the nature of the biblical passages jurors read and discussed, the Wiser standard has been met since there is a reasonable possibility that the jurors' exposure to these biblical passages affected one or more juror's decision to return the death penalty verdict.

Colorado appellate courts have reversed convictions where jurors have improperly reviewed reference material or conducted independent research. See, Alvarez v. People, 653 P.2d 1127 (Colo. 1982) (reversal required where juror used a dictionary); People v. Wadle, supra (reversal required where juror downloaded internet description of Paxil, which was prescribed for the defendant, and juror brought this description into the jury room); T.S. v. G.G., 679 P.2d 118 (Colo. App. 1984 (reversal required in paternity case where juror read "pre-med text book describing the accuracy of Human Leukocyte Antigen test); Niemand v. District Court, 684 P.2d 931 (Colo. 1984)(reversal required where juror resorted to Black's Law Dictionary to look up terms). No Colorado appellate decision has been cited which has considered the prejudicial impact of a bible on jury deliberations.

Case law submitted by the parties in this indicates that several courts in various jurisdictions have considered the prejudicial impact of biblical passages on jury verdicts. A prosecutor's invocation of a biblical "higher law or extra-judicial authority" in closing argument was determined to be unconstitutional in Sandoval v. Calderone, 241 F.3d 765, 777 (9ᵗʰ Cir. 2001). Another prosecutor's argument drawing on his reading of biblical law to justify the morality of the death penalty was determined to be improper in Bennett v. Angelone, 92 F.3d 1336 (4ᵗʰ Cir. 1996). The presence of a bible and other religious documents during jury deliberations denied the defendant a fair and impartial sentencing hearing and required reversal in Scott v. Kennedy, 216 F.3d 1088 (10ᵗʰ Cir. 2000). A judge's decision to honor a jury's request to send a bible into the jury room was reversible error because the judge had "permitted the jury to deliberate with the aid of a specific, extra-judicial code of conduct, a code which mandates death for numerous offenses…" Jones v. Kemp, 706 F. Supp. 1534, 1558 (D.C.Ga. 1989) Other courts have

also disapproved of the use of bibles and biblical law in death penalty cases. See, Glossip v. State, 29 P.3d. 597 (Okla. Crim. App. 2001); State v. Harrington, 627 S.W.2d 345 (Tenn. 1981).

The biblical passages considered and used by several jurors is contrary to Colorado death penalty law. In Colorado, whenever the death penalty is sought, life in prison is always a permissive penalty for first degree murder. In fact, it is mandated unless all twelve jurors are convinced beyond a reasonable doubt that mitigating factors do not outweigh proven statutory aggravating factors and that death, rather than life, is the appropriate penalty. The biblical passages involved require that death be the punishment whenever an individual takes another person's life. They mandate death as a penalty whenever there is more than one witness to the murder or whenever the government seeks to the death penalty. These biblical passages are in conflict with Colorado law and had the capacity to influence the jurors who were exposed to them. The use of these biblical passages violated the Defendant's right to have his sentence decided on the basis of the evidence and the law set forth in the trial court's Instructions of Law. See. Alvarez v. People, supra and Wadle v. People, supra.

Several jurors took it upon themselves to research biblical code to determine God's view of the penalty for murder and shared the information with other jurors during their deliberations. Contrary to the argument of the Prosecution, the biblical research and reading that occurred here was not done for comfort or inspiration. It was for the purpose of guiding and directing certain jurors to a particular verdict. Those jurors brought the fruit of their research into the jury room and shared it with other jurors. Once this occurred, a unanimous verdict imposing the death sentence was reached. Under these circumstances, there is at the very least, a "reasonable possibility" that the extraneous materials improperly influenced several jurors into rejecting a life sentence for the Defendant.

The juror's reliance on the specific biblical passages cannot be considered "benign" as the Prosecution contends. Ms. Eaton-Ochoa read and wrote down the cite to Romans 13:1, which requires that one look at government authorities as God's representative on earth and follow their lead as agents of 'wrath to bring punishment to the wrongdoer." This and other passages the jurors considered do more than simply encourage jurors to

also disapproved of the use of bibles and biblical law in death penalty cases. See, Glossip v. State, 29 P.3d. 597 (Okla. Crim. App. 2001); State v. Harrington, 627 S.W.2d 345 (Tenn. 1981).

The biblical passages considered and used by several jurors is contrary to Colorado death penalty law. In Colorado, whenever the death penalty is sought, life in prison is always a permissive penalty for first degree murder. In fact, it is mandated unless all twelve jurors are convinced beyond a reasonable doubt that mitigating factors do not outweigh proven statutory aggravating factors and that death, rather than life, is the appropriate penalty. The biblical passages involved require that death be the punishment whenever an individual takes another person's life. They mandate death as a penalty whenever there is more than one witness to the murder or whenever the government seeks to the death penalty. These biblical passages are in conflict with Colorado law and had the capacity to influence the jurors who were exposed to them. The use of these biblical passages violated the Defendant's right to have his sentence decided on the basis of the evidence and the law set forth in the trial court's Instructions of Law. See. Alvarez v. People, supra and Wadle v. People, supra.

Several jurors took it upon themselves to research biblical code to determine God's view of the penalty for murder and shared the information with other jurors during their deliberations. Contrary to the argument of the Prosecution, the biblical research and reading that occurred here was not done for comfort or inspiration. It was for the purpose of guiding and directing certain jurors to a particular verdict. Those jurors brought the fruit of their research into the jury room and shared it with other jurors. Once this occurred, a unanimous verdict imposing the death sentence was reached. Under these circumstances, there is at the very least, a "reasonable possibility" that the extraneous materials improperly influenced several jurors into rejecting a life sentence for the Defendant.

The juror's reliance on the specific biblical passages cannot be considered "benign" as the Prosecution contends. Ms. Eaton-Ochoa read and wrote down the cite to Romans 13:1, which requires that one look at government authorities as God's representative on earth and follow their lead as agents of 'wrath to bring punishment to the wrongdoer." This and other passages the jurors considered do more than simply encourage jurors to

follow the instructions of the court. The passages mandate that death be the penalty for murder.

Contrary to the Prosecution's argument, the length of time spent by jurors discussing biblical passages has no legal significance. The jurors involved not only discussed biblical passages in the jury room, they spent the evening before researching and reading biblical passages dealing with the punishment for murder. Further, even if a brief period of time was spent on the biblical passages in question, the specific passages involved presented a reasonable possibility of improperly influencing several jurors into voting for the death penalty.

## B.) Resort to biblical law cannot be deemed harmless error nor invited error.

One of the Prosecution's alternative arguments is that even if jurors used biblical passages in reaching their verdict, the Defendant's sentence does not have to be overturned because the use of biblical passages could not have influenced the verdict. According to the Prosecution, the trial court took appropriate steps during the voir dire process to conduct a fair jury selection process, the Instructions of Law were clear and comprehensive. This and the "overwhelming evidence of guilt", the Prosecution contends, renders any error that occurred harmless. This Court was not the trial court and the entire record is not available to the Court for review. It would not be possible to do the "harmless error" analysis proposed. Further, this Court agrees with the Defendant's position that under CRS 16-11-103 (6) (b), harmless error analysis is not applicable to a death sentence. That statute requires that the Court vacate a death sentence if imposed under "the influence of passion or prejudice or any other arbitrary factor." The introduction of biblical law into the death penalty deliberations is such an impermissible factor.

Another argument advanced by the Prosecution that counsel for the Defendant introduced religion and biblical references in closing argument in such a way as to invite or even encourage jurors to refer to biblical passages in their deliberations. The doctrine of invited error has no application here.

A party may be precluded from complaining about an error "that he has invited or injected into the case." Horton v. Suthers, 43 P.2d 611 (Colo. 2002). No Colorado case has been cited which applies the doctrine to bar a claim that undermines the reliability of a death sentence and no case has been cited which holds that jury misconduct can be invited by a closing argument delivered by counsel. Moreover, the Defendant's counsel did not ask jurors to open bibles to assist them in determining the appropriate sentence. The closing argument made by the Defendant's attorney was in all respects appropriate and cannot be fairly characterized as one which invited error.

## CONCLUSION

The jury supervision performed in this case was extremely negligent and appallingly lax. While jurors were appropriately sequestered and efforts at preventing exposure to prejudicial media were engaged in, no steps were taken to insure that jurors were not exposed to the extraneous information and outside influences that they were exposed to here.

Although not the trial court who presided over the Defendant's trial, this Court has reviewed a sufficient amount of the record to enable it to say that the descriptions of the crimes the Defendant committed were among the most grievous, heinous and reprehensible this Court in its 18-year judicial career has ever had occasion to review.

And if any case merits the death penalty, there cannot be serious debate about this case being that case. The death penalty, however, must be imposed in a constitutional manner. Jury resort to biblical code has no place in a constitutional death penalty proceeding. See, Sandoval v. Calderone, supra; Jones v. Kemp, supra and Bennett v. Angelone, supra. The death sentence imposed here must therefore be vacated and set aside.

32

IT IS THEREFORE ORDERED that the death sentence imposed against the Defendant Robert Eliot Harlan is hereby vacated and set aside. It is further ordered that the Defendant shall be returned to and appear before this Court as promptly as is possible so that he may be resentenced, pursuant to, and consistent with, Colorado law.

Dated this May 22, 2003.

 

 

_____

John J. Vigil District Court Judge
17th Judicial District
Adams County, Colorado

CERTIFICATE OF SERVICE

This is to certify that I have this day served Susan Boleyn, 40 Capitol Square, S.W., Atlanta, GA 30334 with a copy of the within and foregoing **Petitioner's Reply To Respondent's Final Evidentiary Brief On Behalf Of Respondent** by depositing in the U.S. Mail in a properly addressed envelope with sufficient postage affixed thereon to assure delivery.

This $15^{\underline{th}}$ day of August, 2003.

John R. Martin