IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LAWRENCE JEFFERSON,          :
                             :
                Petitioner,  :        CIVIL ACTION NO.
                             :
vs.                          :        1:96-CV-0989-CC
                             :
WILLIAM TERRY,[1]            :
                             :
                Respondent.  :

## ORDER

Lawrence Jefferson, a Georgia prisoner who was convicted of the felony murder and armed robbery of Edward Taulbee and sentenced to death, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth herein, the Corrected Amended Petition for Writ of Habeas Corpus by a Person in State Custody is hereby granted in part and denied in part.

## I.    BACKGROUND

On August 8, 1985, Petitioner Lawrence Jefferson ("Petitioner" or "Jefferson") was indicted in the Superior Court of Cobb County, Georgia, for the offenses of malice murder and armed robbery. (Respondent's Ex. ("R. Ex.") 1 at 3-5.) Petitioner was tried before a jury on February 24 through March 9, 1986, and was found guilty of committing the offenses of armed robbery and felony murder in the commission of an armed robbery. (R. Ex. 2 at 327.) During the sentencing phase of the bifurcated trial, the jury sentenced Jefferson to death, after finding the existence of two statutory aggravating circumstances. (Id. at 328.)

The evidence presented at Jefferson's trial revealed the following facts: Jefferson and the victim, Edward Taulbee, were both employed by the Zenith

---

[1]     William Terry is now the Warden of the Georgia Diagnostic and Classification Prison. The Clerk of Court is **DIRECTED** to change the Respondent to William Terry.

Construction Company. (R. Ex. 21 at 320.) Taulbee was Jefferson's immediate supervisor. (Id. at 321.) Some time after Taulbee purchased an automobile, Taulbee would take Jefferson home, and Taulbee would sometimes bring Jefferson to work in the morning. (Id.)

On the day that Taulbee was murdered, May 1, 1985, the employees at Zenith Construction Company got paid. (Id. at 325.) Brad Stewart, the construction superintendent at Zenith, personally distributed the paychecks to the employees, and he testified that both Taulbee and Jefferson were paid on that day. (Id. at 326.) Stewart also testified that he had assigned Taulbee and Jefferson to a specific work task that afternoon. (Id. at 324.) Stewart left the job site at about 4:00 p.m. (Id. at 324-25.) When Stewart left, he saw Taulbee and Jefferson working together. (Id. at 325.) Stewart did not know when Taulbee and Jefferson left the job site. (Id.)

Taulbee was killed some time after he left work on May 1, 1985. His body, which was lying in the woods off of Highway 41 in Cobb County, was spotted by two construction inspectors from Cobb County who were passing by in an automobile the next morning. (R. Ex. 20 at 216-17, 226-27.) The two inspectors then notified the Cobb County Police, who immediately went to the crime scene and preserved the area. (Id. at 218, 234-35, 238-39.)

Taulbee's body was found face down in kudzu, and Taulbee was dressed in a yellow shirt, overalls, and boots. (Id. at 235-36.) The body was wet and some "lividity" remained in one of his hands. (Id.) A large log was laying across Taulbee's head, and the log had blood on it. (Id. at 220, 235; R. Ex. 21 at 268.) The police also found near Taulbee's body two sticks or clubs, and one of the sticks appeared to have been shattered in several places. (R. Ex. 21 at 270-71.) On the stick was some blood and hair. (Id.) The police observed that Taulbee's head had been driven into the ground, apparently by the log. (Id. at 268-74.) No wallet was found on Taulbee's body. (Id. at p. 277.) However, the authorities did find on Taulbee a still-ticking Timex watch, a pocket knife, and a small amount of cash. (R. Ex. 23 at 820-21, 840.)

Cobb County Police Lt. Carlton Morris was sent to investigate the body further following its removal to the county Medical Examiner's office. (R. Ex. 21 at 357.) He and the medical examiner found in Taulbee's belongings a pay stub from Zenith Construction Company. (Id.) Morris telephoned Zenith Construction Company and ascertained that the pay stub number corresponded to Taulbee. (Id. at 358.) Morris then talked to Stewart, who informed Morris that Jefferson worked with Taulbee. (Id.) Morris requested that Stewart and Jefferson come down to police headquarters to identify the victim. (Id.) Both Stewart and Jefferson identified Taulbee from the pictures of the body that Morris showed them. (Id. at 374-75.)

During Morris' interview of Jefferson, Jefferson informed Morris that he was originally from Louisville, Kentucky, and that he worked at Zenith with Taulbee. (Id. at 375-76.) He also told Morris that he had been down in Georgia for about six months and that he had worked with and had known Taulbee about that long. (Id. at 376.) With respect to the day of the murder, Jefferson told Morris that he had seen Taulbee leave the Zenith construction site alone around 5:30 p.m. and head north in his automobile to go fishing. (Id. at 376-78.) Jefferson stated that he knew Taulbee was going fishing because Taulbee, around 3:00 p.m. that day, had dug up some worms in order to use them for fishing at Lake Allatoona. (Id. at 376.) Jefferson also told Morris that he did not go fishing with Taulbee because "he didn't have the patience to fish." (Id. at 377.) Jefferson stated that when Taulbee left the Zenith construction site, he got on his bicycle and rode home. (Id. at 378.) Jefferson, who lived alone, stated that he watched television, drank beer, and stayed home that afternoon and night. (Id. at 378-79.)

Jefferson told the police that Taulbee had loaned him $120 and that it was due on Thursday, May 2, 1985. (Id. at 380.) He further stated that he had not paid Taulbee but that he had not gotten his paycheck from Stewart at lunch on payday, the day of the killing. (Id.) Stewart informed Morris that Taulbee and Jefferson had never had any money problems. (Id. at 383.)

During the course of the interview, Jefferson became more nervous. (Id. at 381.) Nevertheless, Jefferson consented to a search of his apartment. (Id. at 381, 386.) Jefferson cooperated with the police, and this included opening drawers and closet doors while the police searched the apartment. (Id. at 385, 388.) Morris did not find anything connecting Jefferson to the murder of Taulbee. (Id. at 388-90.) Morris also did not find any signs of struggle on Jefferson. (Id. at 389.)

Rhonda Glade, one of Jefferson's neighbors, testified that she saw Jefferson, Taulbee, and Dwayne Mitchell, one of her roommates, talking outside of Jefferson's apartment at approximately 4:15 p.m. on the day of Taulbee's murder. (Id. at 395, 398-400.) She testified that she had seen Jefferson and Taulbee leave from Jefferson's apartment to go fishing. (Id. at 401-03.) Rhonda Glade also testified that later on the night of the killing she saw Jefferson return to his apartment on foot and heard no car arrive.[2] (Id. at 408.) Ms. Glade further testified that Jefferson came to her apartment on May 2, 1985, and gave her an automated teller bank card (referred to herein as an "ATM card") and asked her to get rid of the card. (Id. at 412.) Jefferson also gave her a fishing tackle box. (Id.)

Ronald Glade, Rhonda Glade's brother and another neighbor of Jefferson's, testified that on May 1, 1985, he had gone to Jefferson's apartment around 6:00 p.m. (Id. at 452-53.) He testified that Jefferson had locked the door to his apartment, although Jefferson was inside, which Ronald stated was unusual. (Id. at 453-54.) Ronald Glade further testified that Jefferson was acting funny and that his chest appeared to be red. (Id. at 456, 459.) He testified that Jefferson had, prior to the

---

[2]    In her pretrial statement, however, Rhonda Glade said she heard a car arrive and two doors slam when Jefferson returned home that evening. (R. Ex. 21 at 427.) Moreover, in her pretrial statement, she said she was "sure" Ronald Glade and Dwayne Mitchell had not gone to the lake that night because they spent the evening of May 1, 1985, with her. (Id. at 434-36.) To the contrary, at trial, Rhonda Glade testified that both Ronald Glade and Dwayne Mitchell had left the apartment during the course of the evening. (Id. at 436.)

murder of Taulbee, made a statement about hitting his boss on the head and that, after the murder, had informed him that his "little fat buddy was dead." (<u>Id.</u> at 463-64.)  Ronald Glade further testified that on the evening of May 1, 1985, Jefferson stated he had lost his wallet and went out with Dwayne Mitchell to look for it, although Ronald later found the wallet in Jefferson's apartment with approximately $100.00 in cash in the wallet. (<u>Id.</u> at 465-67.)

Dwayne Mitchell testified that he took Jefferson to buy marijuana and liquor on the night of May 1, 1985. (<u>Id.</u> at 500.) He further testified that Jefferson asked him to drive him to Lake Allatoona the night of the murder to find his wallet, which Jefferson claimed was missing. (<u>Id.</u> at 500-01.) Mitchell stated that when they arrived at Lake Allatoona, Jefferson left the car for 5 to 10 minutes and returned with a fishing pole and a tackle box. (<u>Id.</u> at 502, 504-05.)  According to Mitchell, Jefferson discarded the fishing pole and gave the tackle box to him. (<u>Id.</u> at 505-06.)  Mitchell further testified that, on the way back from the lake, Jefferson asked him to take him to a bank with an automated teller machine, where Jefferson disguised himself with a straw hat and sunglasses and attempted unsuccessfully to make a cash withdrawal. (<u>Id.</u> at 506-07.)  Prior to going to the automated teller, Jefferson asked Mitchell if the automated teller machine took pictures of those people who used the machines. (<u>Id.</u> at 507.)

On May 7, 1985, Taulbee's car was located in the parking lot of a food store in Cobb County. (R. Ex. 22 at 586.) The parking lot where the car was located was close to Jefferson's residence. (<u>Id.</u> at 589.)  The authorities also found the keys to the car inside the automobile. (<u>Id.</u> at 591.)  Also found in the glove compartment of the car was a twenty-four hour automatic teller transaction receipt, and the authorities determined that the receipt was dated May 2, 1985, at approximately 1:07 a.m. (<u>Id.</u> at 634.)

The bank card that had earlier been given to Rhonda Glade was subsequently recovered. (<u>Id.</u> at 594.)  Taulbee's name was on the card. (<u>Id.</u> at 598-99.)  The

authorities also located other fishing items that had belonged to Taulbee and of which Jefferson had apparently attempted to dispose.  (Id. at 656, 663.)

The authorities arrested Jefferson on May 7, 1985.  (Id. at 665-66.)  A smoking marijuana cigarette was found on the coffee table in Jefferson's living room at the time of his arrest.  (Id. at 665, 682, 694, 701-03.)  Jefferson was given the Miranda warnings and was taken to the police headquarters where he was again given the Miranda warnings before he was interrogated without counsel beginning at 10:45 p.m.  (Id. at 667-74, 695-96.)  When asked why he had killed Taulbee, Jefferson, according to the testimony of Detective B.J. Banks, stated that "he didn't need to be around other people, that he wanted to be executed, and that he wanted to be put to sleep."  (Id. at 678.)  Lieutenant Morris likewise testified that Jefferson stated the following during the interrogation:

> I don't need to be around people ....  I talk to myself.  I ain't crazy.  I don't know nothing.  I got hit by an auto when I was a kid.  I had another dream and saw the man in my dream.  I call myself Tony.  I don't think I am two people.  How quick can I be put to sleep?  I don't feel anything about this.  Do you believe in Heaven and Hell? .... I want to be put to sleep .... I want to be executed.

(Id. at 699-700.)  During the penalty phase of the trial, Jefferson testified that he was threatened with the death penalty during the interrogation.  (R. Ex. 25 at 1306.) Jefferson stated that he replied: "Well, yeah, man, do what up [sic] want to do, if you want to execute me.  Let me go over to the jail and go to sleep."  (Id. at 1306.)

The authorities later determined that Taulbee had cashed his paycheck on May 1, 1985, and had received $223.15.  (R. Ex. 22 at 717-18.)  It further appeared that Jefferson, who was paid on May 1, 1985, did not cash his paycheck until May 3, 1985. (Id. at 685-86, 718-19.)  At that time, Jefferson received approximately $136.21.  (Id. at 686, 719.)  The authorities also determined that in the early morning hours of May 2, 1985, someone attempted to use Taulbee's ATM card to make a withdrawal.  (Id. at 728-34.)

An autopsy was conducted on the body of Taulbee on the day following its

discovery. (R. Ex. 23 at 819.) The medical examiner testified at Petitioner's trial that the back of Taulbee's shirt collar was soaked with blood, but there were no blood splatters on the clothes of Taulbee. (<u>Id.</u> at 821.) The examination of the body disclosed that Taulbee suffered approximately two lacerations above his left eyebrow, one laceration right above his forehead, one laceration above his right ear, and five lacerations on the back of his scalp. (<u>Id.</u> at 822.) The autopsy also disclosed that Taulbee suffered four fractured teeth, an abrasion across his face, an abrasion across his back, skull fractures, brain bruises, and brain hemorrhaging. (<u>Id.</u> at 823-24.)

It was the opinion of the medical examiner that the lacerations had been caused by a rough object and that the injuries were consistent with those caused by the wooden sticks or clubs found near the body of Taulbee. (<u>Id.</u> at 822, 828.) The examination of the clubs disclosed that Caucasian hair fibers, consistent with hair fibers of Taulbee, were found on the clubs. (<u>Id.</u> at 802-03.) The medical examiner further testified that the cause of death was the head and brain injuries to Taulbee, and that Taulbee's death was some time on May 1, 1985, between the hours of 5:00 p.m. and 11:00 p.m., subject to error of a couple of hours on either end. (<u>Id.</u> at 833-35.) The medical examiner also testified that it was his opinion that Taulbee was probably knocked to the ground by the blows to the head, and that the log was then dropped on the Taulbee's head, driving his face into the ground. (<u>Id.</u> at 831-32.)

On March 8, 1986, the jury found Jefferson guilty of felony murder, in violation of O.C.G.A. § 16-5-1, and of armed robbery, in violation of O.C.G.A. § 16-8-41. (R. Ex. 2 at 327.) During the sentencing phase, the State introduced Jefferson's guilty plea from Kentucky to one count of robbery and the testimony of two Kentucky police officers and two armed robbery victims in Kentucky regarding unadjudicated crimes involving Jefferson. (R. Ex. 24 at 1185, 1192, 1210, 1218.) In mitigation, Jefferson presented the testimony of two Cobb County deputies, his mother, one of his sisters, the mother of his two children, and his own testimony. (<u>Id.</u> at 1253, 1258, 1262, 1267,

1273, 1289.) The jury found the existence of two aggravating circumstances: (1) the offense of murder was committed while defendant was engaged in another capitol felony (i.e., armed robbery); and (2) the offense of murder was "outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim." (R. Ex. 26 at 1435; R. Ex. 2 at 328.) Following the verdict, the trial court merged Petitioner's armed robbery conviction into the felony murder count as a lesser-included offense. (Id. at 1446.) On March 9, 1986, Jefferson was sentenced to death by electrocution for the crime of felony murder. (Id. at 1447-48; R. Ex. 2 at 332-34.) Petitioner filed a motion for a new trial and an amendment thereto, which were denied on June 20, 1986. (R. Ex. 2 at 351, 357-62.)

Petitioner then appealed his convictions and sentence of death to the Supreme Court of Georgia. (R. Ex. 1 at 1-2.) The Supreme Court of Georgia affirmed Petitioner's conviction and sentence of death on March 3, 1987. Jefferson v. State, 256 Ga. 821, 353 S.E.2d 468 (1987). On March 24, 1987, the Supreme Court of Georgia denied a motion for rehearing brought by Petitioner. Id. at 821. Petitioner then filed a petition for writ of certiorari in the United States Supreme Court. (R. Ex. 34). The Supreme Court denied certiorari review on October 5, 1987. Jefferson v. Georgia, 484 U.S. 872, 108 S. Ct. 203, 98 L. Ed. 2d 154 (1987). A petition for rehearing was denied on November 3, 1987. Jefferson v. Georgia, 484 U.S. 971, 108 S. Ct. 471, 98 L. Ed. 2d 410 (1987).

On December 23, 1987, Petitioner sought state post-conviction relief in the Superior Court of Butts County, Georgia. (R. Ex. 37 at 1-23.) Petitioner filed an amended state habeas corpus petition on September 1, 1989 (R. Ex. 37 at 150-277), and a second amended petition on April 21, 1991 (R. Ex. 38 at 378-456). After a two-day evidentiary hearing, the state habeas corpus court denied the petition on September 30, 1992. (R. Ex. 38 at 877-921.)

The Supreme Court of Georgia affirmed the state habeas corpus court's denial of state post-conviction relief. Jefferson v. Zant, 263 Ga. 316, 431 S.E.2d 110 (1993).

Petitioner then filed a motion for reconsideration, which was denied by the Georgia Supreme Court on July 27, 1993. Id. at 316. The United States Supreme Court denied certiorari review on April 18, 1994. Jefferson v. Zant, 511 U.S. 1046, 114 S. Ct. 1577, 128 L. Ed. 2d 220 (1994).

Petitioner filed his Petition for Writ of Habeas Corpus in this Court on April 23, 1996. (Doc. No. 1.) Petitioner filed an Amended Petition for Writ of Habeas Corpus on January 30, 1998. (Doc. No. 23.) On August 27, 1998, this Court entered an Order granting Petitioner leave to file a Corrected Amended Petition for Writ of Habeas Corpus. (Doc. No. 47.) Accordingly, the Corrected Amended Petition for Writ of Habeas Corpus, which was attached to Petitioner's Motion for Leave to File Corrected Amended Petition for Writ of Habeas Corpus by a Person in State Custody (Doc. No. 40), sets forth the constitutional claims presented by Petitioner in this case.

## II.    GROUNDS FOR RELIEF

In the Corrected Amended Petition for Writ of Habeas Corpus, Petitioner asserts the following grounds for relief:

*Claim I* - Petitioner was afforded constitutionally ineffective assistance of counsel by the errors, both individually, and when considered in total, of his trial attorneys in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

      a.      Petitioner's trial attorneys failed to present evidence in support of the challenge to the grand and petit juries.

      b.      Petitioner's trial attorneys failed to ensure that jurors were disabused of their erroneous notion that Petitioner would be released on parole.

      c.      Petitioner's trial attorneys failed to rehabilitate juror Beck.

      d.      During his closing argument, trial counsel committed numerous errors that prejudiced Petitioner.

      e.      Petitioner's trial attorneys failed to object, as void for vagueness,

to the instructions relating to the (b)(7) aggravating circumstance.

f.    Petitioner's trial attorneys failed to request an instruction on voluntary manslaughter as a lesser included offense.

g.    Petitioner's trial attorneys failed to object to improper instruction by trial court.

h.    Petitioner's trial attorneys failed to ensure the jury's discretion was guided and channeled.

i.    Petitioner's trial attorneys failed to object to improper evidence admitted in sentencing.

j.    Petitioner's trial attorneys failed to object to improper prosecutorial argument.

k.    Petitioner's trial attorneys failed to conduct a reasonable investigation.

l.    Petitioner's trial attorneys failed to present expert testimony in support of the motion to suppress.

m.    The cumulative effect of the trial attorneys' errors undermines confidence in the outcome of Petitioner's conviction and sentence of death.

*Claim II* - Petitioner was denied effective assistance on appeal in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim III* - Petitioner was denied a fair sentencing proceeding when the trial court gave inadequate instructions regarding mitigation in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

*Claim IV* - Petitioner's sentence of death was unconstitutionally obtained under Georgia's capital sentencing scheme which fails to narrow the class of death eligible defendants in instances where the state relies on O.C.G.A. § 17-10-30(b)(2) to support a death sentence on a felony murder conviction. Utilizing this

unconstitutional scheme in Petitioner's case violated the Eighth and Fourteenth Amendments and <u>Zant v. Stephens</u>, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).

*Claim V* - Petitioner's sentence of death is being exacted pursuant to a pattern and practice of Georgia prosecuting authorities, courts and juries to discriminate on grounds of race, sex, and poverty in the administration of rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution and corresponding provisions of the Georgia Constitution.

*Claim VI* - The death penalty constitutes cruel and unusual punishment in the State of Georgia in that it is applied in an arbitrary and capricious fashion.

*Claim VII* - Petitioner was deprived of due process and a fair capital sentencing proceeding when the trial court submitted an erroneous (b)(7) instruction to the jury which expanded the proof of the statutory aggravating circumstance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

*Claim VIII* - Petitioner's death sentence was unconstitutionally imposed because the definition of aggravated battery as it applied to the (b)(7) aggravating circumstances failed adequately to direct the jury's discretion and was void for vagueness in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim IX* - Petitioner's death sentence was unconstitutionally obtained when the trial court failed to instruct the jury on what constituted armed robbery as it applied to the (b)(7) statutory aggravating circumstance in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim X* - Petitioner's sentence of death was unconstitutionally obtained when the trial court instructed the jury that their verdict must be unanimous in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and <u>Mills v. Maryland</u>, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384

(1988).

*Claim XI* - Petitioner's death sentence was imposed unconstitutionally based on an impermissibly vague (b)(7) statutory aggravating circumstance in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XII* - Petitioner was denied due process and a fundamentally fair capital trial and sentencing when the court failed to instruct the jury on the lesser included offense of voluntary manslaughter in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XIII* - Petitioner was denied a fundamentally fair trial and capital sentencing proceeding when the trial court failed to instruct the jury on residual doubt in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XIV* - Petitioner's death sentence was unconstitutionally obtained based on an incomplete and factually inaccurate definition of aggravated battery as it applied to the (b)(7) statutory aggravating circumstance in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XV* - Petitioner was denied due process and a fair capital trial by improper prosecutorial comments and admission of evidence which implicated Petitioner's right to silence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XVI* - Petitioner was deprived of a fundamentally fair capital trial and sentencing by improper prosecutorial argument that shifted the burden of proof to the defendant in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XVII* - Petitioner's death sentence was unconstitutionally imposed based on consideration of improper and inadmissible evidence at the sentencing phase of his capital trial.

*Claim XVIII* - Petitioner's death sentence was improperly imposed based on improper prosecutorial argument at the sentencing phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments if the United States Constitution.

*Claim XIX* - The State failed to disclose favorable evidence known to it relevant to sentencing and the State knowingly presented at sentencing false or substantially misleading evidence.

*Claim XX* - Petitioner was denied due process and a fair capital trial and sentencing proceeding by the admission of involuntary statements in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXI* - Petitioner was denied due process and a fair capital trial and sentencing proceeding when the trial court gave an erroneous and misleading instruction that directed the jury to disregard exculpatory portions of Petitioner's custodial statements in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXII* - Petitioner's death sentence was unconstitutionally imposed because there was insufficient evidence to establish the murder occurred during the commission of an armed robbery. Thus, Petitioner's sentence of death violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXIII* - Petitioner was denied a reliable sentencing proceeding when the trial judge failed to instruct the jury on the sentence that was to be imposed upon a verdict of life in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXIV* - Petitioner was denied due process and a fair capital trial and sentencing proceeding because the grand and petit jury pools systematically eliminated cognizable groups in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXV* - Petitioner's death sentence was unconstitutionally imposed because the jury that sentenced him was under the misconception regarding parole in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXVI* - There is insufficient evidence to support a conviction for felony murder and armed robbery and sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Petitioner is innocent and his execution would violate the Eighth and Fourteenth Amendments.

*Claim XXVII* - Petitioner's death sentence was unconstitutionally obtained because he was sentenced by a death prone jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXVIII* - Petitioner was denied due process and a fair and reliable capital sentencing proceeding when the trial court instructed the jury that it should not ask questions during their deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXIX* - Petitioner was denied due process and a reliable capital proceeding by the introduction of prejudicially gruesome photographs in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXX* - Petitioner was denied due process and a reliable sentencing proceeding when the trial court excused jurors whose views about the death penalty would not have substantially impaired their ability to perform their duty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXI* - The Unified Appeal Procedure, as applied in all Georgia death penalty cases, is unconstitutional in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXII* - Petitioner was denied a fundamentally fair and reliable capital

trial and sentencing proceeding when key state witnesses violated the rule of sequestration and fabricated their testimony so that it was consistent in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXIII* - Petitioner's rights to due process and a fair trial were violated by the trial court's failure to provide adequate funds with which to obtain the assistance of competent mental health experts in violation of the Sixth, Eighth, and Fourteenth Amendments.

*Claim XXXIV* - Petitioner was denied a fundamentally fair trial and a reliable sentencing proceeding when the jury contained a juror who was incompetent to serve in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXV* - Petitioner was denied a reliable sentencing proceeding by the unconstitutional consideration of victim impact testimony during his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXVI* - Petitioner was denied his right to confront the witnesses against him when the trial court allowed the state to introduce prior out-of-court statements of key state witnesses in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXVII* - Petitioner was denied a fair trial and reliable sentencing proceeding by the trial court's improper instruction on reasonable doubt in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXVIII*[3] - Petitioner was denied a fundamentally fair trial and reliable

---

[3] The Corrected Amended Petition contains two claims labeled "Claim XXXIV," one of which is the instant claim. The first Claim XXXIV appears on page 160 of the Corrected Amended Petition and pertains to Juror Abernathy serving on the jury. The

capital sentencing proceeding when there was improper contact between jurors and the bailiffs in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XXXIX* - Petitioner was denied a fundamentally fair trial and reliable sentencing proceeding when jurors impermissibly considered extra-judicial evidence during their deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

*Claim XL*[4] - Petitioner was denied a fundamentally fair trial and reliable sentencing proceeding by the systematic exclusion of African-Americans in Cobb County from jury service in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## III.  STANDARD FOR HABEAS CORPUS RELIEF

A district court must resolve all claims for relief raised in a petition for writ of habeas corpus. Clisby v. Jones, 960 F.2d 925, 936 (11th Cir. 1992). Insofar as Petitioner filed the instant habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (the "AEDPA"), this Court must review Petitioner's claims under the standards of the pre-AEDPA statute. Bradshaw v. Stumpf, 545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005); Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).

Under the standards of the pre-AEDPA statute, the factual findings of state courts are presumed to be correct unless one of the eight enumerated exceptions in

---

second claim referred to as "Claim XXXIV" appears on page 166 of the Corrected Amended Petition and obviously was meant to be Claim XXXVIIII.

[4]        The Corrected Amended Petition contains no claim labeled as "Claim XL." However, the claim labeled "Claim XXXXI" immediately follows Claim XXXIX and clearly was meant to be Claim XL.

§ 2254(d) applies.[5]   Where one of the eight exceptions applies, the state court's

[5]      Unless otherwise noted, all references herein to § 2254 refer to the pre-AEDPA version of the statute.  Section 2254(d), as it applies to this case, provides as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit-

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such

factfinding is not presumed correct, and the petitioner must establish "the facts necessary to support his claim by only a preponderance of the evidence." <u>Kelley v. Secretary for Dep't of Corrections</u>, 377 F.3d 1317, 1335 (11th Cir. 2004) (citations omitted). Questions of law and mixed questions of law and fact are reviewed <u>de novo</u>. <u>Freund v. Butterworth</u>, 165 F.3d 839, 861 (11th Cir. 1999). When a mixed question of law and fact turns on a fact found by the state court, the finding of the state court deserves deference. <u>See, e.g.</u>, <u>Arizona v. Fulminate</u>, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

## IV. ANALYSIS OF PETITIONER'S CLAIMS

In his Corrected Amended Petition, Petitioner asserts the forty claims set forth <u>infra</u>. The Court has organized and will review Petitioner's claims as follows: (1) claims rejected on the merits on direct appeal by the Supreme Court of Georgia; (2) claims rejected on the merits by the state habeas corpus court and the Supreme Court of Georgia; (3) claims found to be procedurally defaulted by the state habeas corpus court and the Supreme Court of Georgia; (4) unexhausted claims that are due to be deemed procedurally defaulted; and (5) claims of which this Court allowed evidentiary development.

---

factual determination is not fairly supported by the record:

> And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the
> State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C.A. § 2254.

A.    <u>Claims Rejected on the Merits on Direct Appeal by the Supreme Court of Georgia</u>

Georgia law provides that issues decided on direct appeal are precluded from relitigation in habeas corpus proceedings in Georgia state courts. <u>Elrod v. Ault</u>, 231 Ga. 750, 750, 204 S.E.2d 176 (1974). Therefore, in Petitioner's state habeas corpus proceeding, several of Petitioner's claims were dismissed by the state habeas corpus court on the basis that the claims had been determined on the merits adversely to Petitioner by the Supreme Court of Georgia on direct appeal. (R. Ex. 38 at 879-80.) In reviewing the rulings of the state habeas corpus court, the Supreme Court of Georgia affirmed the dismissal of these claims in a summary fashion. <u>Jefferson</u>, 263 Ga. at 320 ("The judgment denying habeas relief is affirmed for reasons contained in the court's final order...."). Petitioner has raised some of these claims in this federal habeas corpus proceeding, and the Court addresses them in turn below, as they are not insulated from federal review. <u>See</u> <u>Crowe v. Head</u>, 356 F. Supp. 2d 1339, 1348 (N.D. Ga. 2005).

1.    *Claim XXIV*

In Claim XXIV of the Corrected Amended Petition, Petitioner contends he was denied due process and a fair capital trial and sentencing proceeding because the grand and petit jury pools systematically eliminated cognizable groups. Specifically, Petitioner argues that blacks were under-represented in the grand and petit jury pools and that young adults were under-represented in the petit jury pool. Petitioner also argues that the trial court erred in failing to correct the fact that the Cobb County Board of Jury Commissioners systematically excluded from the jury list all persons over the age of 80 years old. Petitioner finally argues that his constitutional rights were violated by Cobb County's systematic exclusion of poor people from the grand and traverse jury venires.

On direct appeal, the Georgia Supreme Court rejected Petitioner's arguments as to the under-representation of blacks and young adults. <u>Jefferson</u>, 256 Ga. at 822-

23.    The Georgia Supreme Court found that the Cobb County jury lists met constitutional standards as to race and found that Jefferson failed to establish the cognizability of any group of young persons. Id.  The Georgia Supreme Court did not explicitly address the merits of Petitioner's claim that persons over the age of 80 years old were systematically excluded, although Petitioner explicitly raised the issue in his appellate brief (R. Ex. 31 at 21).  The Georgia Supreme Court likewise did not address the merits of Petitioner's claim regarding the systematic exclusion of poor people, but Petitioner did not raise that claim on appeal.  This portion of the claim concerning poor people consequently was deemed procedurally defaulted by the state habeas corpus court (R. Ex. 38 at 882), and this Court similarly finds that this portion of the claim is procedurally defaulted and that no exception to the procedural default rule has been shown by Petitioner to apply.  Therefore, the Court addresses below only those portions of Claim XXIV that Petitioner has preserved for review, and these portions regard the alleged under-representation of blacks and young adults and the alleged systematic exclusion of persons over the age of 80.

The Supreme Court of the United States has long held that a criminal defendant has a Sixth Amendment right to have a jury venire represent a fair cross-section of the community. Taylor v. Louisiana, 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).  To establish a prima facie violation of this Sixth Amendment guarantee, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

A defendant may also challenge the discriminatory selection of state court juries under the Equal Protection Clause. Castaneda v. Partida, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977).  The Eleventh Circuit has noted in several cases

that the <u>prima</u> <u>facie</u> analysis of a challenge under the Equal Protection Clause is virtually identical to the <u>prima</u> <u>facie</u> analysis employed in examining a challenge under the Sixth Amendment. <u>Bowen v. Kemp</u>, 769 F.2d 672, 683 (11th Cir. 1985); <u>United States v. Tuttle</u>, 729 F.2d 1325, 1327 n.2 (11th Cir. 1984); <u>Davis v. Zant</u>, 721 F.2d 1478, 1482 (11th Cir. 1983); <u>Gibson v. Zant</u>, 705 F.2d 1543, 1546 (11th Cir. 1983).[6] The three elements that must be proved to establish a <u>prima</u> <u>facie</u> case of discrimination in jury selection in violation of the Equal Protection Clause are the following: (1) the group alleged to be discriminated against is a recognizable, distinct class; (2) the degree of under-representation must be proved over a significant period of time; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. <u>Bowen</u>, 769 F.2d at 684.

In the case at bar, the Court finds for the reasons articulated below that Petitioner's various challenges to the grand and petit jury venires in Cobb County fail.

        a.     Blacks

With respect to Petitioner's claim that blacks were under-represented on the grand and petit juries in Cobb County, Petitioner easily satisfies the first element of both the Sixth Amendment and Equal Protection analyses, as blacks unquestionably constitute a cognizable group. <u>See</u> <u>Cunningham v. Zant</u>, 928 F.2d 1006, 1013 (11th Cir. 1991). Petitioner has not, however, demonstrated that the representation of blacks was not fair and reasonable in relation to their representation in Cobb County or that blacks were under-represented over a significant period of time. Therefore, the Court need not and does not address the third element of either the Sixth Amendment challenge or the Equal Protection challenge. <u>See</u> <u>United States v. Pepe</u>, 747 F.2d 632, 649 (11th Cir. 1984) (stating that failure on any element of the <u>prima</u>

---

      [6]     The analyses under the Sixth Amendment and the Equal Protection Clause differ in the manner in which the <u>prima</u> <u>facie</u> case is rebutted. <u>E.g.</u>, <u>Gibson</u>, 705 F.2d at 1546 n.4.

<u>facie</u> case ends the analysis of the challenge).

In determining whether a group has been substantially under-represented for purposes of a Sixth Amendment or Equal Protection challenge, the Eleventh Circuit Court of Appeals and the former Fifth Circuit Court of Appeals have held that the relevant comparison is the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the qualified wheel. <u>See, e.g.</u>, <u>United States v. Grisham</u>, 63 F.3d 1074, 1078 (11th Cir. 1995); <u>United States v. Rodriguez</u>, 776 F.2d 1509, 1511 (11th Cir. 1985); <u>Pepe</u>, 747 F.2d at 649; <u>United States v. Butler</u>, 611 F.2d 1066, 1069-70 (5th Cir. 1980); <u>United States v. Maskeny</u>, 609 F.2d 183, 190 (5th Cir. 1980). This comparison is commonly referred to as the "absolute disparity" and is calculated by subtracting the percentage of a group in the jury wheel from the percentage of that same group in the general population. The Eleventh Circuit consistently has required an "absolute disparity" of 10% or greater in order to satisfy the second element. <u>Grisham</u>, 63 F.3d at 1079; <u>Tuttle</u>, 729 F.2d at 1327; <u>see also</u> <u>Cook v. State</u>, 255 Ga. 565, 571, 340 S.E.2d 843 (1986) ("As a general proposition, absolute disparities under 10% usually are sufficient to satisfy constitutional requirements.").[7] Further, this threshold disparity requirement applies to both the Sixth Amendment and Equal Protection challenges. <u>Tuttle</u>, 729 F.2d at 1327 n.2.

Petitioner urges the Court to part from the absolute disparity test and to find in this case that the grand jury and petit jury selection processes were constitutionally flawed based on comparative disparities, which measure the decreased likelihood that members of a distinct and under-represented group will be called for jury

---

[7]    In <u>Parks v. State</u>, 254 Ga. 403, 330 S.E.2d 686 (1985), the Supreme Court of Georgia recognized as a prophylactic rule Rule II(A)(B) of the Unified Appeal Procedure, which requires correction of absolute disparities exceeding 5%. 254 Ga. at 409 n.4. The trial court applied <u>Parks</u> in denying Petitioner's jury challenges.

service.[8]  However, Petitioner cites no authority supporting use of the comparative disparity analysis.  The Supreme Court has not explicitly endorsed either the absolute disparity approach or the comparative disparity approach as the proper measurement, but the Supreme Court did use an absolute disparity statistical analysis in <u>Duren</u>.  Moreover, the Eleventh Circuit and Georgia state courts have heavily criticized use of comparative disparities because, when the alleged under-represented group is small, a small change in the jury pool distorts the proportional representation.  <u>See</u> <u>Pepe</u>, 747 F.2d at 649 n.18; <u>Cook</u>, 255 Ga. at 572.

Notwithstanding the issues typically associated with use of comparative disparities, in this case, rigid application of the absolute disparity test also presents a fundamental problem.  That is, Petitioner presented evidence at the pre-trial hearing before the trial court that blacks constituted only 4.03% of the population of Cobb County eligible for jury service.  (R. Ex. 11 at 180.)  Given this small population of jury-eligible blacks, even if blacks were completely excluded from the prospective jury pools, the absolute disparity would only be 4.03%, which is less than the Eleventh Circuit's 10% threshold.  The fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause therefore would offer no redress, even if blacks were entirely excluded from the jury pools.

In contrast to the instant case, in all of the Eleventh Circuit cases applying the 10% absolute disparity requirement, the groups allegedly under-represented always represented more than 10% of the jury-eligible population.  <u>See, e.g.</u>, <u>Grisham</u>, 63 F.3d at 1079 (proportion of jury-eligible African-Americans was 18.31%); <u>Rodriguez</u>, 776 F.2d at 1511 (proportion of blacks eligible for jury service was 18.82% and proportion of Hispanics eligible for jury service was 24.45%); <u>Pepe</u>, 747 F.2d at 649 (proportion of blacks was 11.3%); <u>Tuttle</u>, 729 F.2d at 1327 (proportion of blacks was

---

[8]        The comparative disparity is determined by dividing the absolute disparity of a group by the percentage of that group eligible for jury duty.  <u>U.S. v. Haley</u>, 521 F. Supp. 290, 292 (N.D. Ga. 1981).

25% of general population); <u>Machetti v. Linahan</u>, 679 F.2d 236, 241 (11th Cir. 1982) (percentage of women in the general adult population was 54%). As a consequence, the Eleventh Circuit has not had occasion to address the problem presented here and has found it unnecessary to consider other statistical methods. <u>See</u> <u>Rodriguez</u>, 776 F.2d at 1511 n.4 ("Although the absolute disparity method is not the sole means of establishing unlawful jury discrimination, where small absolute disparities are proven, as in this instance, and the minority group involved exceeds ten percent of the population, which is also the case in this challenge, it is not necessary to consider other statistical methods."); <u>Maskeny</u>, 609 F.2d at 190 ("We need not ... speculate here on how we would treat such a situation for all the groups analyzed in appellant's statistics comprise more than ten percent of the community.").

In the absence of specific direction from the Eleventh Circuit as to what statistical method of analysis should be employed when the jury-eligible population at issue is less than 10%, the Court finds that this case warrants considering the results of both the absolute disparity test and the comparative disparity test. In fact, in recent history, the Fifth Circuit has explicitly recognized that use of the comparative disparity analysis may be appropriate when the distinctive group at issue makes up less than 10% of the population. <u>See</u> <u>Mosley v. Dretke</u>, 370 F.3d 467, 479 n.5 (5th Cir. 2004) ("We leave open the possibility that if the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used.").

Applying the absolute disparity test to the evidence presented by Petitioner, the absolute disparity percentages for blacks do not rise to a level that is constitutionally impermissible based on Eleventh Circuit precedent. Petitioner presented evidence that 2.1% of the grand jury pool and 2.8% of the traverse jury pool was black. (R. Ex. 11 at 179, 185.) Comparing these figures with the percentage of jury-eligible blacks in Cobb County at the time, 4.03%, the absolute disparity for the grand jury pool was 1.93% and the absolute disparity for the traverse jury pool

was 1.23%.  (Id. at 179-80, 186, 188.)  These absolute disparity percentages are significantly less than the 10% absolute difference necessary under Eleventh Circuit law.

More importantly in this case, the comparative disparity percentages likewise do not rise to the level of a constitutional violation under either the Sixth Amendment or the Equal Protection Clause.  Petitioner's evidence demonstrates comparative disparity percentages of 47.89% for the grand jury venire and 30.9% on the traverse jury venire.  (Id. at 181, 189.)  These percentages are well within the range of percentages accepted by courts that have employed the comparative disparity statistical analysis in examining similar claims.  See, e.g., United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000) (finding that where African-Americans accounted for 7.9% of population, and Hispanics, 2.74%, comparative disparities of 40.89% and 58.39%, respectively, did not establish prima facie violation under the Sixth Amendment); United States v. Shinault, 147 F.3d 1266, 1273 (10th Cir. 1998) (upholding jury selection procedure that resulted in comparative disparities of 59.84%, 50.09%, and 48.63%, with group populations comprising 1.27%, 5.11%, and 2.92% of the total community, respectively); United States v. Clifford, 640 F.2d 150, 155 (8th Cir. 1981) (finding that 46% comparative disparity was insufficient under-representation to make out fair cross-section claim under the Sixth Amendment, where group comprised 15.6% of the population); United States v. Yazzie, 660 F.2d 422, 427 (10th Cir. 1981) (holding that comparative disparity of 46.3% did not violate either Sixth Amendment or the Equal Protection Clause); cf. United States v. Weaver, 267 F.3d 231, 243 (3d Cir. 2001) (finding that comparative disparities of 40.01% and 72.98% were of questionable probative value, where group populations comprised only 1.84% and .97% of the population, respectively).  But see United States v. Rogers, 73 F.3d 774, 776 (8th Cir. 1996) (treating .579% actual and 30.96% comparative disparity as sufficient).

Accordingly, having considered both the absolute and comparative disparity

percentages in context, the Court concludes that Petitioner has not established a prima facie violation of the Sixth Amendment's fair cross-section requirement or a violation of the Equal Protection Clause. The Court therefore finds no constitutional error with respect to the alleged under-representation of blacks.

b.    Young Adults

As to Petitioner's claim that young adults were under-represented on the petit jury, Petitioner has not satisfied the Court that these young adults constitute a cognizable group. "Whether or not a class of persons is a [sic] sufficiently distinct and cognizable for sixth amendment fair cross-section analysis is a question of fact." Willis v. Zant, 720 F.2d 1212, 1216 (11th Cir. 1983) (citation omitted). In Willis, the Eleventh Circuit set forth the following standard for showing that a group is distinct or cognizable:

> To show that a group is distinct or cognizable under the sixth amendment, a defendant must show: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

720 F.2d at 1216. In Wysinger v. Davis, 886 F.2d 295 (11th Cir. 1989), the Eleventh Circuit specifically stated that "age alone does not identify an identifiable group for Sixth Amendment purposes." Id. at 296.

At the pre-trial hearing in this case, Petitioner elicited testimony regarding studies that have analyzed the attitudes and similarities of young people between the ages of 18 and 30. Most of these studies were national studies or pertained to young people in other areas of the country, such as Queens County, New York. (R. Ex. 11 at 193-94, 257-58). The testifying expert, Bartley Hale, had, however, conducted a few studies relative to young people between the ages of 18 and 30 in Cobb County specifically. (Id. at 191-92, 260-62). These studies did not explicitly look at age difference but were studies examining political opinions with age being one of the

variables included in the study. (Id. at 191-92.) Based on his own research, his knowledge of studies by others, and his familiarity with court decisions, Dr. Hale testified that it was his professional opinion that "the age of 18 to 30 is a separate and distinct group that shares similar attitudes, that differs from people who are 31 and over." (Id. at 222.) He further testified, "We find that the 18 to 30-year-old age groups in terms of what's referred to as a stratification system are clearly very different than people of other ages. (Id. at 223.) In his professional opinion, Dr. Hale likewise testified that under-representation of young people would deprive the traverse jury list of a community of interest or attitudes which would not be brought to the list from other age groups. (Id. at 198.)

While the above-mentioned evidence largely pertains to young people between the ages of 18 and 30, Petitioner's statistical evidence in this case pertains to young adults between the ages of 18 and 24 and 25 and 34. Specifically, Petitioner presented evidence at the pre-trial hearing establishing that the absolute disparity between the number of young adults ages 18 and 24 in the community and their representation of the traverse jury list was 7.5% and that the absolute disparity between the number of young adults ages 25 and 34 in the community and their representation of the traverse jury list was 4.7%.[9] (R. Ex. 11 at 287-90). Although requested by the trial court, the absolute disparity for the age group between 18 and 30 was not established. (Id. at 289.)

Petitioner's presentation of evidence with respect to young adults was and is extremely problematic. As the above discussion indicates and the Georgia Supreme Court observed, "His evidentiary presentation was somewhat vague as to what group of young persons might constitute a cognizable, underrepresented class, and

---

[9]     In his Corrected Amended Petition, Petitioner represents that these absolute disparity percentages are 8.3% and 5.6%, respectively. However, the percentages cited by Petitioner were derived from the 1982 traverse jury list, not the traverse jury list applicable to Petitioner's case. (R. Ex. 11, pp. 196-97, 280-82.)

his evidence related, variously, to persons between the ages of 18 and 30, 18 and 24, and 25 and 34." <u>Jefferson</u>, 256 Ga. at 823. The trial court found after the pre-trial hearing, and the Georgia Supreme Court agreed, that Jefferson failed to establish the cognizability of any group of young persons as a matter of fact. <u>Id.</u>

The trial court and the Georgia Supreme Court did not err in rejecting Petitioner's claims as to young adults. As an initial matter, the Court finds that the testimony of Dr. Hale in no way established that persons between the ages of 18 and 24 and 25 and 34 represent a cognizable group, as Dr. Hale's testimony focused exclusively on the commonalities or similarities in attitude among persons between the ages of 18 and 30. Even with respect to the evidence presented regarding persons between the ages of 18 and 30, the evidence did not adequately establish that people at the age of 18 share a common thread or similar attitudes with people at the age of 30. As Petitioner's own expert testified, "[t]he age of 30 ... is somewhat arbitrarily selected." (R. Ex. 11 at 216.) With respect to the studies about which Dr. Hale did testify, these studies, for the most part, were national studies or studies of young adults living outside of Cobb County. Yet, Dr. Hale even acknowledged that "when you start talking about age groups, you have to look at age in terms of what a particular local population is going to consider differences in age." (<u>Id.</u>) Thus, the studies not specific to Cobb County are not persuasive evidence that the group of young adults in Cobb County constitute a cognizable group. Dr. Hale did testify, as mentioned <u>supra</u>, about his political research analyzing the attitudes of young adults ages 18 to 30 in Cobb County regarding the Metropolitan Atlanta Rapid Transit Authority, a state lottery, horse racing, and consolidating services in Cobb County, but the limited evidence about the young adults' attitudes regarding these miscellaneous matters is not sufficient to establish that "a common thread or basic similarity in attitude, ideas, or experience runs through [young adults in Cobb County between the ages of 18 and 30]" or "that there is a community of interest among members of the group such that the group's interests cannot be adequately

represented if the group is excluded from the jury selection process." <u>Willis</u>, 720 F.2d at 1216; <u>see also</u> <u>Willis v. Kemp</u>, 838 F.2d 1510, 1516-17 (11th Cir. 1988) (holding that adults between the ages of 18 and 29 are not a distinctive group because the group had not been defined and limited with respect to the community, had not been shown to be internally cohesive, and had not been shown to have views that could not be represented by other members of the community); <u>Cox v. Montgomery</u>, 718 F.2d 1036, 1038 (11th Cir. 1983) (holding that adults between the ages of 18 and 30 are not a distinctive group for purposes of jury venire). As Petitioner has failed to establish a cognizable or recognizable, distinct class of young adults in Cobb County, Petitioner's constitutional challenges to the purported under-representation of young adults fail.[10]

c. Persons over Eighty Years of Age

Petitioner finally claims that his constitutional rights were violated by the systematic exclusion of persons over eighty years of age by the Cobb County Board of Jury Commissioners. Petitioner's sole support for his claim that persons over eighty years of age were systematically excluded from Cobb County's grand jury and traverse jury pools is the testimony of Willie Dobbins, who was, during the relevant time period, Chairman of the Board of Jury Commissioners. Dobbins testified that he eliminated from the grand jury lists those persons he knew to be eighty and over. (R. Ex. 10 at 20, 25-26.) With the exception of Commissioner Harry W. Livingston, who testified that he eliminated one person he knew to be 94 years old, no other commissioner engaged in Dobbin's practices. (<u>Id.</u> at 42, 53-54, 58-59, 79-80, 89, 96-97.) While the exclusion of anyone solely on the basis of their age is not a practice to be condoned or repeated, absent law authorizing such a practice, Petitioner's

---

[10] Even if this Court were convinced that persons between the ages of 18 and 30 represent a cognizable group, Petitioner's challenges would still fail because of the absence of evidence regarding the under-representation of persons between the ages of 18 and 30. As mentioned <u>supra</u>, the under-representation evidence focused on persons between the ages of 18 and 24 and 25 and 34.

constitutional claims fail because there is no evidence in the record to establish that persons age eighty and over are a cognizable class. Nor did Petitioner present any statistical evidence to establish that the representation of persons aged eighty and over was not fair and reasonable or that this group of persons was under-represented to an unconstitutional degree for a significant period of time. As such, this portion of Claim XXIV also fails.

2.    *Claim XXX*

In Claim XXX of the Corrected Amended Petition, Petitioner contends that he was denied due process and a reliable sentencing proceeding when the court excused jurors whose views about the death penalty would not have substantially impaired their ability to perform their duty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner specifically challenges the trial court's excusal of venire members Mary Ann Newkirk, Relda Williamson, and Milton Beck. The Supreme Court of Georgia concluded on direct appeal that all three venire members were properly excused. Jefferson, 256 Ga. at 823-24.

In Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), the Supreme Court concluded that if a trial court excuses potential jurors for cause simply because they "expressed qualms about capital punishment," 391 U.S. at 513, the jury obtained would not be the impartial jury required by the Sixth Amendment, but rather one "uncommonly willing to condemn a man to die," id. at 521. The Court held in Witherspoon that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty...." Id. at 522.

The Supreme Court has since held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841

(1985) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)). Determining when a juror's views would substantially impair the performance of his or her duties as a juror is not an easy task, but the standard articulated in <u>Wainwright</u> "does not require that a juror's bias be proved with 'unmistakable clarity.'" <u>Wainwright</u>, 469 U.S. at 424. "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," <u>id.</u> at 425-26, and "deference must be paid to the trial judge who sees and hears the juror," <u>id.</u> at 426. Indeed, a determination by a trial court to exclude a juror for "cause" based on their views on capital punishment is a finding of fact to be accorded a presumption of correctness on habeas review under 28 U.S.C. § 2254(d). <u>Id.</u> at 428.

a.    Mary Ann Newkirk

During voir dire by the trial court, venire member Newkirk initially testified that she did not know whether she was conscientiously opposed to the death penalty. (R. Ex. 15 at 162.) She indicated that she "couldn't say a frank yes or no," and she guessed she would have to base her view on capital punishment as to what the evidence was in the case. (<u>Id.</u> at 162-63.) Upon further questioning, Ms. Newkirk testified that she guessed she was conscientiously opposed to capital punishment, but she nevertheless maintained that she would not automatically vote against the imposition of the death penalty without regard to the evidence developed during the trial. (<u>Id.</u> at 163.) She stated that she was generally opposed to the death penalty but that she hoped she could and would try to accept the instructions of the trial court and weigh the evidence in the case and be fair and impartial. (<u>Id.</u> at 163-64.)

When questioned by the prosecutor, Ms. Newkirk testified that she would hate to consider the death penalty as punishment. (<u>Id.</u> at 167.) The following exchange then took place between the prosecutor and Ms. Newkirk:

Q:    Well, let me ask you this question, is your answer such that you feel your feelings about the death penalty would prevent or substantially impair your performance in your duties as a juror in this

case?

A.    Maybe they would.  You know, just because I – I just would hate to sit in judgment – for me to be the one to sit in judgment on another human being.

Q.    Sure.

A.    I have never been asked to do this before.

Q.    I dare say probably there haven't been too many jurors that have, and I understand your feelings.  We, of course, have to be – have to have definitive answers so we can make a determination.

Let me ask you that again, because it is kind of a tough question.

Do you feel that your feelings about capital punishment are such that it would prevent you or substantially impair you in your duties as a juror in accordance with the instructions and oath of the Court?

A.    Yes.

(Id. at 167-68.)  District Attorney Charron then made a challenge for cause.

Petitioner's trial counsel, Marc Cella, attempted to rehabilitate Ms. Newkirk by giving her an example of a murder case and asking her whether she could return a death verdict in that case.  Ms. Newkirk responded that "[she] would hate to give ... a yes or no answer."  (Id. at 170.)  When pressed further to give a yes or no answer, she responded, "No."  (Id.)  She testified, "I would say maybe – you know, do something else for the rest of his life, but I just don't know if I could say yes."  (Id.)  Mr. Cella then asked her whether she would automatically vote for a life sentence as opposed to death or whether she would listen to the evidence first and then make up her mind.  She responded, "I guess I would say life."  (Id.)  The final colloquy between Mr. Cella and Ms. Newkirk regarding this issue was the following:

Q:    If the judge was to tell you that under Georgia law under certain sections you would be authorized to return a death verdict, would you be able to follow those laws and that instruction from the Judge?

A:    By law, nothing to do with morality or anything like that?

Q:    Right?

A:    Probably conscientiously, no, but I mean I wouldn't – you know, I am not stupid.  If somebody said you do this or you will go to jail, I probably would do it.

(Id. at 171.)

District Attorney Charron again raised the State's challenge for cause, and the trial court granted the State's motion based on Ms. Newkirk's statement that she believed her views on capital punishment would prevent or substantially impair her performance of her duties as a juror in accordance with the instructions of the court and with her oath.  (Id. at 171-72.)

Having reviewed the voir dire transcript of Ms. Newkirk in its entirety, the Court agrees with the Supreme Court of Georgia that the trial court did not err in excusing Ms. Newkirk for cause.  While Ms. Newkirk's answers to the questions posed were at times contradictory, she was ultimately rather clear in stating that she was opposed to the death penalty, that she would not vote for a death sentence but would vote for life, that her views would substantially impair her in the performance of her duties as a juror, and that she could not conscientiously follow the laws and instructions of the court. Given this testimony, and according the trial court's finding the deference it is due, the Court finds that Petitioner's rights were not violated when the trial court, over his objection, excused Ms. Newkirk for cause.

b.    Relda Williamson

The next juror whose excusal Petitioner challenges is Relda Williamson.  When asked by the trial court whether she was conscientiously opposed to capital punishment, she stated, "Well, yes, in a way.  I think I am." (R. Ex. 17 at 647.)  She testified that she was against capital punishment most of the time but that maybe sometimes capital punishment was necessary.  (Id. at 648.)  The record reveals that Ms. Williamson experienced great difficulty understanding the trial court's questions, (id. at 649), but she eventually responded affirmatively to a question posed by the trial court regarding whether her general state of mind with reference to the death penalty was such that no matter what the evidence was in the case she would vote against the death penalty, (id. at 650).  She stated that was the way she was feeling

at the time but that she "could change [her] mind." (<u>Id.</u> at 651.) She then testified that she did not think she could follow the instructions of the court and consider death as a possible punishment in the case along with any other possible punishments. (<u>Id.</u>) District Attorney Charron, without asking any questions, then brought a challenge for cause. (<u>Id.</u>)

Petitioner's trial attorney, Stephen Schuster, attempted to rehabilitate Ms. Williamson:

> Q:    One of the questions we have to ask you is, could you follow – if you are chosen as a juror, if you are sworn in and given an oath as a juror and the Court told you in its instructions that you must, after you found guilt or innocence – let's assume you found him guilty, for purposes of this. Could you consider a death sentence; not whether you would impose it or not, but could you consider it and follow the law and make a decision based on the law, this country's law?
>
> A:    I don't think so.
>
> Q:    So, what you are saying is that under no circumstances could you consider a death sentence?
>
> A:    I don't think so.
>
> Q:    Could you think of any circumstances where you would consider one?
>
> A:    Not at this time, unless there was something that happened to my family or something that I was – you know, loved very deeply, I might under that condition, but as of now I don't think so.
>
> Q:    So, if something happened to your family or somebody or something you loved deeply, then, you could consider a death sentence?
>
> A:    I don't know. I might. I am not saying I could. I am just saying I don't know. At this time I don't know.
>
> Q:    Let me make it clear. I wish nobody could consider it, but it's something we have to consider and ask about and I just want to know whether or not you would think about it if you were back in that jury room and if the facts were presented with the 11 other people as opposed to categorically ruling it out, would you think about it, would you listen to the State's arguments, would you listen to our argument and make a rational decision based on the argument?
>
> A:    I don't think I could make a good decision.
>
> Q:    But you are not going to categorically rule it out?

A:     (No response by the witness.)

Q:     I don't want to put words in your mouth.

A:     I don't know how to answer that question.

Q:     Okay.

A:     I don't think I would want – I wouldn't want him to have the death penalty. I don't think I could live with it if I sentenced somebody to the death penalty. I don't think I – I wouldn't want to make that decision.

(Id. at 653-54.)

District Attorney Charron then renewed his challenge for cause. The trial court, over the objection of Petitioner, excused Ms. Williamson for cause, finding that "it [was] clear that the juror's views on capital punishment would prevent her from performing her duties as a juror in accordance with her oath and the instructions of the Court." (Id. at p. 655.)

Having considered the foregoing, the Court finds that Ms. Williamson was properly excused for cause, particularly since a venire member's bias does not have to be proved with "unmistakable clarity." Wainwright, 469 U.S. at 424. Although Ms. Williamson equivocated about whether she might be able to consider imposing the death penalty in a case involving her family or a person or thing that she loved deeply, Ms. Williamson's testimony made it sufficiently clear that her views about capital punishment would substantially impair her performance of her duties as a juror. Accordingly, the trial court did not violate Petitioner's constitutional rights by excusing Ms. Williamson for cause.

c.     Milton Beck

Petitioner finally challenges the trial court's excusal of venire member Milton Beck, who Petitioner contends gave an unclear response as to whether he would automatically vote against imposition of the death penalty in any case.[11] The record

---

[11]     As will be discussed in the Court's analysis of whether trial counsel was ineffective for not attempting to rehabilitate Mr. Beck, infra, the Court disagrees with

reflects the following colloquy between the trial court and Mr. Beck:

Q:     Are you conscientiously opposed to capital punishment?

A:     I would say yes, sir.  I would say I was, yes, sir.

Q:     All right.

You understand the question that I am asking seeks to find out a general state of mind, not a state of mind you might have with respect to any particular factual circumstances, and when I say are you conscientiously opposed to capital punishment, what I am seeking to find out is whether as a matter of conscience you are opposed to capital punishment in general.  So, several jurors have not clearly understood the question.  I don't mean to insult your intelligence, but I want you to understand the question.  Let me repeat it with the explanation.

Are you conscientiously opposed to capital punishment?

A:     Yes, sir, I am.

Q:     Would you automatically vote against imposition of the death penalty in any case without regard to any evidence that might be developed during the trial?

A:     Yes, sir, I believe I would.

(R. Ex. 18 at 941.)  Following this exchange, neither the prosecution nor the defense posed any questions to venire member Beck.  The State brought a challenge for cause, and the trial court granted the State's challenge.

Petitioner argues that the trial court should have asked Mr. Beck an additional question concerning whether he would be able to follow the court's instructions and his oath as a juror despite his views about capital punishment.  The Eleventh Circuit has recently noted, however, that a "trial judge has substantial discretion in conducting [the death-qualification] process, and there are no set questions that must

---

Petitioner that Mr. Beck's response evinced equivocation as to whether he would automatically vote against imposition of the death penalty.  See Castell v. State, 250 Ga. 776, 788, 301 S.E.2d 234 (1983) ("Use of phrases such as 'I think so' or 'I don't think so' do not, when considered in the context of the entire voir dire of the juror, necessarily indicate an equivocation with regard to an unwillingness to impose a death penalty."); see also Williams v. Collins, 16 F.3d 626, 632-33 (5th Cir. 1994) (holding that counsel's decision not to rehabilitate venire members who stated that they did not "think" they could impose the death penalty could not be considered deficient performance).

be asked." <u>United States v. Brown</u>, 441 F.3d 1330, 1356 n.11 (11th Cir. 2006) (citing <u>Wainwright</u>, 469 U.S. at 424). In <u>Wainwright</u>, the Supreme Court also opined that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." 469 U.S. at 424. Petitioner argues that asking a venireman whether he is conscientiously opposed to the death penalty does not satisfy the standard set forth in <u>Wainwright</u>, but this is not the only question that the trial court asked of Mr. Beck. As reflected above, the trial court also asked Mr. Beck whether he would "automatically vote against imposition of the death penalty in any case without regard to any evidence that might be developed during the trial." (R. Ex. 18 at 941.) Thus, Mr. Beck's testimony revealed not only that he was conscientiously opposed to the death penalty, but also that he would not vote for imposition of the death penalty in any case, regardless of the evidence presented. A venire member taking such a position is not prepared to follow the law or would be substantially impaired in doing so, as he has already indicated that he is unwilling to set aside his personal beliefs about capital punishment in order to follow the law, which requires that jurors consider evidence presented at trial. <u>See</u> <u>Morgan v. Illinois</u>, 504 U.S. 719, 735, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992) ("such jurors – whether they be unalterably in favor of, or opposed to, the death penalty in every case – by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding"). The trial court's determination that Mr. Beck was due to be excluded is thus fairly supported by the record. Further, as mentioned <u>supra</u>, the trial court's views on this matter are entitled to a presumption of correctness and must be given deference. Petitioner has not successfully rebutted this presumption. As such, based on the standard articulated in <u>Wainwright</u>, which is an even less stringent standard than that mentioned in

footnote 21 of <u>Witherspoon</u>,[12] the Court finds that the trial court properly excused venire member Beck and that Petitioner's constitutional rights were not violated as a consequence of Mr. Beck's excusal.

    *3. Claim XXXII*

    Petitioner alleges in Claim XXXII that he was denied a fundamentally fair and reliable capital trial and sentencing proceeding when key state witnesses violated the rule of sequestration and fabricated their testimony so that it was consistent. The Court rejects the first portion of Petitioner's claim, as did the Supreme Court of Georgia on direct appeal, <u>Jefferson</u>, 256 Ga. at 825, and finds that the second portion of the claim regarding fabricated testimony is procedurally barred.

    With respect to the alleged violation of the rule of sequestration, the record reveals that Dwayne Mitchell testified during trial that, prior to his being called to testify, he spoke with Ronald Glade and Rhonda Glade regarding the questions that they were asked when examined by the attorneys. (R. Ex. 22 at 518.) When questioned about whether he had spoken with the Glades about their testimony, Mr. Mitchell responded that he had not. (<u>Id.</u>) However, when subsequently asked how long he talked to the Glades about their testimony, he responded, "No longer than a couple of minutes." (<u>Id.</u>) Mr. Mitchell's testimony regarding whether he spoke with the Glades about their testimony is obviously contradictory and therefore the extent to which Mr. Mitchell violated the rule of sequestration is questionable. Nonetheless, even assuming that Mr. Mitchell spoke with the Glades regarding their testimony "[n]o longer than a couple of minutes," the Court finds that no constitutional error resulted from the trial court's refusals to give an instruction

---

    [12] The <u>Witherspoon</u> standard permitted excusing only those jurors who made it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." <u>Witherspoon</u>, 391 U.S. at 522 n.21 (emphasis in original).

regarding a violation of the rule of sequestration immediately after Mr. Mitchell testified, to strike the testimony of Mr. Mitchell as tainted, or to grant a mistrial.

"Allowing the sequestration of witnesses is imparted to the discretion of the trial judge. It is equally within his discretion to determine whether the separation mandate has been violated and, if so, what sanctions, if any, should be imposed." McKee v. McDonnell Douglas Tech. Servs. Co., 700 F.2d 260, 262 (5th Cir. 1983) (citing United States v. Berry, 670 F.2d 583, 606 (5th Cir. 1982) (en banc) and United States v. Brooks, 303 F.2d 851, 853 (6th Cir. 1962)). Georgia state law similarly gives trial courts broad discretion in enforcing the rule of sequestration. Watts v. State, 239 Ga. 725, 730, 238 S.E.2d 894 (1977) ("the violation of a sequestration order does not alone disqualify the witness, and the decision as to whether or not the witness should be disqualified rests in the sound discretion of the trial court").

In the case at bar, the trial court determined it most appropriate to give an instruction regarding the rule of sequestration and the inferences that may be drawn from a violation thereof at the conclusion of the liability phase of the trial. The trial court instructed the jury in this regard as follows:

> In all cases, either party shall have the right to have witnesses for the other party examined out of the hearing of each other. The Court shall take proper care to effect this object as far as practicable and convenient, but no mere irregularity shall exclude the witness.

> This rule is referred to as the Rule of Sequestration. Any violation of the Rule of Sequestration should be considered in determining the weight and credit to be given to the testimony of the witness or witnesses who violate this rule.

> Whether or not a witness has violated the Rule of Sequestration is a a [sic] question for you the jury to decide.

(R. Ex. 24 at 1076.) By means of defense counsel's cross-examination of Mr. Mitchell, the jurors were informed of the conversation that Mr. Mitchell had with the Glades prior to Mr. Mitchell being called to testify. Additionally, prior to the trial court giving its instructions to the jury, defense counsel argued at length about the Rule of Sequestration, as it applied to Petitioner's case, during closing argument. Defense

counsel argued, in part, as follows:

> Lastly, while I'm on this subject of credibility and impeachment of the state's witnesses, I'd like to talk to you about the Rule of Sequestration. Ya'll remember when we first started this case the Rule of Sequestration was invoked.
>
> Everyone, whenever they go into a trial, whether it be in a civil or a criminal case, has the right to have the witnesses against them sequestered. That means they have to testify out of the presence of each other, so that their testimony will not be influenced by what they hear and see in the courtroom.
>
> It is especially important in a case of this magnitude. Lawrence Jefferson had the right to have the state's witnesses sequestered, not to be influenced by any knowledge that they have beforehand, before they come into the court.
>
> Now, you have heard evidence which would authorize you to conclude that that Rule of Sequestration, a very important right, was violated in this case. You have heard Ronald Glade and Dwayne Mitchell both admit that Rhonda told them what questions we were asking in here before they took the stand. That's a violation of the Rule of Sequestration.
>
> Any violation, the judge is going to tell you this, should be considered by you in determining what weight to be given to the testimony of Ronald Glade and Dwayne Mitchell.

(Id. at pp. 953-54.) Given defense counsel's detailed argument and the trial court's instruction, the jury had the ability to weigh the credibility of Mr. Mitchell's testimony and to accord it the proper amount of weight.

Petitioner argues that the trial court's failure to give an instruction contemporaneously with the discovery of the purported violation resulted in the jury not being "able to connect the instruction at the conclusion of trial with the testimony of Mr. Mitchell." (Petitioner's Br. at p. 161.) Petitioner's argument is not persuasive. The argument might have been more convincing if Petitioner's trial had been a long one or if there had been a substantial lapse of time between the discovery of the purported violation and the time that the trial court gave the instruction. To the contrary, however, the liability phase of Petitioner's trial lasted only four days, and there was a difference of only two days between the time that Mr. Mitchell testified and the time that the trial court gave the instruction on the rule of sequestration.

Accordingly, the Court finds that the trial court's instruction was given sufficiently close in time to Mr. Mitchell's testimony such that the rule of sequestration was not vitiated, as Petitioner contends.

Petitioner next argues that "the trial court ignored established precedent that certain violations of the rule are so egregious that permitting the witnesses involved in the violation to testify, over objections of the opposing party, necessitates a new trial." (Petitioner's Br. at pp. 161-62.) Notably, however, Petitioner fails to cite this "established precedent." As the Supreme Court stated long ago in <u>Holder v. United States</u>, 150 U.S. 91, 14 S. Ct. 10, 37 L. Ed. 1010 (1893):

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.

<u>Id.</u> at 92; <u>see also</u> <u>Blanchard v. State</u>, 247 Ga. 415, 417, 276 S.E.2d 593 (1981) ("In criminal cases, the violation of the rule of sequestration by any witness either for the defense or for the prosecution goes to the credibility rather than to the admissibility of the witness' testimony."); <u>Graves v. State</u>, 167 Ga. App. 246, 250, 305 S.E.2d 913 (1983) ("Disobedience of a sequestration order may subject the offender to punishment for contempt or may affect his credit, but does not render the witness incompetent to testify, or disqualify his testimony."). Here, the trial court, in the exercise of its discretion, appropriately determined that neither exclusion of Mr. Mitchell's testimony nor a mistrial was warranted. Therefore, the Court finds no violation of Petitioner's constitutional rights.

Bolstering the Court's conclusion that Petitioner has suffered no constitutional violation is Petitioner's failure to demonstrate prejudice warranting habeas relief. While Petitioner generally argues that the stories of Mr. Mitchell and the Glades "miraculously corresponded with little or no divergence," (Petitioner's Br. at p. 160), Petitioner has not pointed to any particular portions of Mr. Mitchell's testimony

demonstrating his testimony was tainted by the conversation he had with the Glades prior to taking the stand. Significantly, during cross-examination of Mr. Mitchell, Petitioner's trial counsel actually pointed out discrepancies between Mr. Mitchell's testimony and the testimony of the Glades, and these discrepancies concerned such key matters as whether Mr. Mitchell had a conversation with Jefferson and Taulbee immediately before they left to go fishing. (R. Ex. at 526-27, 529.) Further, given that Mr. Mitchell testified that his conversation with the Glades was no more than a couple of minutes long, the Court finds that the trial was not rendered fundamentally unfair by any violation of the rule of sequestration.

As to any claim by Petitioner that the Glades violated the rule of sequestration or that the testimony of the Glades and Mr. Mitchell was fabricated, the Court finds that these claims are procedurally barred under O.C.G.A. § 9-14-51, discussed in detail infra, as Petitioner did not raise these claims on direct appeal or in his state habeas corpus petition. Rather, Petitioner alleged only that Mr. Mitchell violated the rule of sequestration.

       *4.    Claim XXXIV*

In Claim XXXIV of the Corrected Amended Petition, Petitioner contends he was denied a fundamentally fair trial and a reliable sentencing proceeding when the jury contained a juror, Janette T. Abernathy, who allegedly was incompetent to serve. Petitioner argues that Ms. Abernathy should have been stricken for cause both because she exhibited prejudice and bias and because she was mentally and emotionally unstable. On direct appeal, the Georgia Supreme Court rejected the first part of Petitioner's claim regarding prejudice and bias, Jefferson, 256 Ga. at 824, and did not address the merits of the second part of the claim regarding Ms. Abernathy's instability, although a review of Petitioner's appellate brief reveals that Petitioner briefly mentioned in his enumerations of error that Ms. Abernathy's illness also was a reason that the trial court should have excused her for cause, (R. Ex. 31 at 15). As

Petitioner presented both parts of the claim to the state courts,[13] the Court finds that the entire claim was preserved and may be considered on the merits by this Court.

In the instant federal petition, Petitioner's primary focus in Claim XXXIV is on Ms. Abernathy's purported mental incompetency, but he also mentions that Ms. Abernathy testified that she did not like his appearance. Ms. Abernathy did make this statement, (R. Ex. 15 at 94.), but she also stated that she had not, for any reason, formed or expressed any opinion regarding the guilt or innocence of Jefferson, (id. at 95). She further testified that she did not have any prejudice or bias resting on her mind either for or against Jefferson. (Id.) Ms. Abernathy testified that her mind was perfectly impartial between the State and Jefferson. (Id.) Although she observed that Jefferson appeared to have a smirk on his face, she stated that that observation did not prejudice her with respect to Jefferson's guilt or innocence. (Id. at 100.) Therefore, to the extent that Petitioner contends that Ms. Abernathy should have been excused for cause due to prejudice or bias, the Court disagrees and finds, as did the Supreme Court of Georgia, see Jefferson, 256 Ga. at 824, that the trial court did not err in not excusing Ms. Abernathy on this ground, particularly since trial counsel did not even object on this ground to Ms. Abernathy serving as a juror.

The main issue Petitioner raises here concerns Ms. Abernathy's testimony that she was manic-depressive and on medication. The law is well-established that a defendant is entitled to mentally competent jurors. Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S. Ct. 651, 652, 56 L. Ed. 1038 (1912) (due process implies a mentally competent tribunal). Petitioner has not cited, and the Court has not been able to locate, any Supreme Court or Eleventh Circuit authority addressing the requirements a defendant must meet to enforce this right. However, the First and Second Circuits have stated that a defendant must present "clear evidence of a juror's incompetence

---

[13]     Petitioner also presented this claim to the state habeas corpus court. (R. Ex. 38 at 63-65.)

to understand the issues and to deliberate at the time of his service" in order to have a jury verdict set aside.  <u>United States v. Hall</u>, 989 F.2d 711, 714 (2d Cir. 1993) (quoting <u>United States v. Dioguardi</u>, 492 F.2d 70, 78 (2d Cir. 1974)); <u>United States v. Vargas</u>, 606 F.2d 341, 345-46 (1st Cir. 1979).

In the case at bar, when questioned by District Attorney Charron, Ms. Abernathy testified that she preferred not to be chosen for the jury and that she was a manic depressive person on medication.  (R. Ex. 15 at 98.)  She felt that she might become very upset during the trial, (<u>id.</u>), and further testified as follows:

> My concern is not so much for me, because I think that I would know when I was reaching the point of stress that would affect me.  I don't know at what point, but I would be honest and totally honest at what point it might affect the person being tried because there would be times that maybe it was affecting me so that I couldn't think straight; and by that I mean – I am talking about mental confusion and that would not be fair to him.

(<u>Id.</u> at 98-99.)  Ms. Abernathy indicated that she had been excused from jury service twice, but when questioned further by defense counsel regarding those jury service experiences, she stated that she was very weak at the time of those cases and that she had become a stronger person mentally and physically.  (<u>Id.</u> at 98, 105.)  Ms. Abernathy stated that her condition was a physical illness that affected her mentally, resulting at one particular time in hallucinations[14] and at other times in anxiety attacks, when she was under a lot of stress.  (<u>Id.</u> at 99, 101, 103.)  However, she testified that she had always been able to control her condition with medication, and she also stated that taking medication did not impair her ability to listen or hear evidence.  (<u>Id.</u> at p. 99.)  Although she indicated that there were times in the past when she had trouble concentrating, she testified that she did not experience mental confusion or have trouble concentrating constantly.  (<u>Id.</u> at 101.)  Significantly, Ms. Abernathy testified that, if she started to have hallucinations, she "would ask that

---

[14]    Ms. Abernathy testified that she experienced hallucinations when her father was dying.  (R. Ex. 15 at 103.)

[she] be withdrawn for [her] health and for the case itself because it wouldn't be fair." (Id. at 104.)

When Petitioner's trial counsel initially moved to strike Ms. Abernathy for cause, the trial court overruled the motion, noting it had "no reason to believe that she will not be able to appropriately deal with the physical malady by appropriate doses of medication." (Id. at 103.) When Petitioner's trial counsel renewed the motion to strike, the trial court again overruled the motion, stating the following:

> I can't deal with the probabilities, Counsel. I have to deal with the realities, if and when she suffers from hallucinations or mentally induced side effects as a result of her physical condition and when and if her medication cannot deal with it, an appropriate physician will be summoned to examine her and to give the Court an expert opinion on whether or not she is capable physically and emotionally for continuing as a juror in the case. Otherwise we may be speculating what the future may or may not be. At this point I don't have any indication that she will be unable to function as a juror or be unable to accept the evidence and accept the instructions of the Court and apply one to the other appropriately. I would overrule your motion.

(Id. at 105.) Petitioner later accepted Ms. Abernathy as a juror. (R. Ex. 20 at 117.)

Ms. Abernathy's condition certainly warranted the serious inquiry to which Ms. Abernathy was subjected during voir dire, but there was no constitutional error resulting from the trial court's refusal to strike Ms. Abernathy for cause or from Ms. Abernathy actually serving on the jury. Ms. Abernathy did not have an uncontrollable condition. To the contrary, she testified that the condition could be controlled through medication. There is no evidence that Ms. Abernathy did not successfully control her condition through medication during Petitioner's trial. There is no evidence, for example, that Ms. Abernathy had anxiety attacks or hallucinations, experienced mental confusion, or had trouble concentrating during the trial. There is likewise no evidence that Ms. Abernathy brought any issues concerning her condition to the attention of the trial court during the trial, even though she testified during voir dire that she would be totally honest about when her condition might affect the person being tried and that she would ask to be withdrawn if she began to have hallucinations. Assuming the other jurors became aware of Ms. Abernathy's

condition, there is also no evidence that any of the other jurors raised any concerns or complaints with the trial court about Ms. Abernathy's behavior or her condition. Without citing to any evidence in the record, Petitioner mentions that Ms. Abernathy "frequently broke down and cried upon viewing ... gruesome pictures." (Petitioner's Br. at p. 170.) However, even assuming the truth of Petitioner's recollection, Ms. Abernathy's crying falls far short of demonstrating that she was incompetent to serve or that she did not fulfill her duties and oath as a juror.

Insofar as Petitioner has not successfully shown that Ms. Abernathy was prejudiced or biased against him and insofar as Petitioner has not presented any evidence, much less clear evidence, of Ms. Abernathy's actual incompetence during trial, the Court finds no constitutional error and no basis to set aside the jury verdict or the sentence imposed in this case.

> B. Claims Rejected on the Merits by the State Habeas Corpus Court and the Supreme Court of Georgia

> 1. Claim I

Petitioner argues that he received ineffective assistance of counsel first at the trial level. Applying the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the state habeas corpus court rejected all of Petitioner's claims of ineffective assistance of counsel. (R. Ex. 38 at 885-920.) The Supreme Court of Georgia affirmed the rulings of the state habeas corpus court. Jefferson, 263 Ga. at 318-20.

A state court's determination of ineffective assistance of counsel is a mixed question of law and fact and, accordingly, is not entitled to a presumption of correctness under the pre-AEDPA § 2254 statute. Hardwick v. Crosby, 320 F.3d 1127, 1159 n.142 (11th Cir. 2003) (citations omitted). However, unless one of the § 2254(d) exemptions applies, the court must "accord a presumption of correctness to the trial court's findings of historical facts underlying the claim." Id. "The separate determination of whether counsel's representation was effective or ineffective is a

question of law." Id.

To show that his right to effective assistance of counsel was violated, Petitioner must satisfy two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.

To establish that counsel was deficient, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id at 688. An ineffective assistance of counsel claim is reviewed from the perspective of defense counsel based on facts "as they were known to counsel *at the time of the representation*." United States v. Teague, 953 F.2d 1525, 1535 (11th Cir. 1992) (emphasis in original). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (quoting Strickland, 466 U.S. at 689). To show deficient performance, Petitioner must establish that no competent lawyer would have taken the action that his lawyer did take. Chandler, 218 F.3d at 1315. Failure to raise non-meritorious issues is not considered ineffective assistance of counsel. Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990).

To establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In making a determination with respect to this prejudice prong, the court must "consider the totality of the evidence before the judge or jury." Id. at 695.

With these standards in mind, the Court now addresses Petitioner's claims that

his trial counsel were ineffective, which are raised as Claim I of the Corrected Amended Petition.

        a.      Failure to Present Evidence in Support of the Challenge to the Grand and Petit Juries

Petitioner contends that his trial counsel rendered ineffective assistance by failing to present evidence in support of a challenge to the grand and petit juries as excluding poor people. The state habeas corpus court rejected this claim, finding that Petitioner had not shown attorney error or prejudice. (R. Ex. 38 at 901-02.) At the evidentiary hearing held before the state habeas corpus court, one of Petitioner's trial attorneys, Marc Cella, testified that he "was unable to find any evidence either to show the cognizability of the group in Cobb County or to show that there was systematic exclusion." (R. Ex. 39 at 94-95.) He further testified, "We just didn't have any evidence available to us to support that allegation." (Id. at 95.) Petitioner still has not demonstrated the availability of any evidence supporting his contentions that there was a systematic exclusion of poor people from grand and petit juries in Cobb County or that poor people are a cognizable group. Therefore, Petitioner has failed to show that his trial counsel's performance in this regard was deficient, and the Court need not and does not address the prejudice prong of the Strickland test.

        b.      Failure to Ensure that Jurors were Disabused of Their Erroneous Notion that Petitioner Would be Released on Parole

Petitioner next argues that his trial counsel were ineffective based on their failure to make any inquiry into the juror's concepts of parole eligibility. The Court disagrees. The record reveals that Petitioner's trial counsel did consider seeking to question jurors on the parole issue but made a strategic decision not to do so because they thought it best for the jury to believe that "a life sentence meant life" and did not want to inject a contrary belief into any potential juror's mind. (R. Ex. 39 at 95, 185-86.) Giving great deference to trial counsel's sound strategic choice, see Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994), the Court finds that Petitioner has failed to

show that his trial counsel performed deficiently. The Court also notes that, at the time of Petitioner's trial, Georgia law did not permit jurors to consider the possibility of parole during their deliberations. See O.C.G.A. § 17-8-76(a). In Horton v. State, 249 Ga. 871, 873, 295 S.E.2d 281 (1982), the Supreme Court of Georgia unequivocally stated: "The policy of this state is not to allow argument or charge on matters concerning parole. This policy forbids comment with regard to a defendant's *inability* to make parole, as well as his *ability* to do so." 249 Ga. at 873 (citations omitted); see also Isaacs v. State, 259 Ga. 717, 732, 386 S.E.2d 316 (1989) (finding no improper restriction on questions concerning parole during voir dire). In light of counsel's sound strategic decision and the state of Georgia law at the time,[15] the Court finds that it was not an error in the professional judgment of Petitioner's trial counsel not to seek to ask the jury questions about their perceptions of parole eligibility. The Court again does not reach the prejudice prong of Strickland.

c.     Failure to Rehabilitate Juror Beck

Petitioner contends that his trial counsel were ineffective because they failed to rehabilitate venire member Milton Beck, who, as mentioned supra, was excused for cause by the trial court after he expressed that he believed he would automatically vote against the death penalty. Petitioner argues that Mr. Beck's statement, "Yes, sir, I believe I would," was ambiguous because of Mr. Beck's use of the word "believe" and that the ambiguity should have prompted Petitioner's trial counsel to ask follow-up questions. Petitioner contends that if his trial counsel had asked further questions, it is likely that he would have been able to show that Mr. Beck's feelings

---

[15]     Pursuant to O.C.G.A. § 17-10-31.1(d), enacted in 1993, counsel for the state and the accused may now present argument and the trial court may instruct, during the sentencing phase before the jury, that "life without parole" means that the defendant will be incarcerated for the remainder of his or her natural life and shall not be eligible for parole and that "life imprisonment" means that the defendant will be incarcerated for the remainder of his or her natural life but will be eligible for parole during the term of such sentence.

about the death penalty were not so fixed as to interfere substantially with his ability to follow his oath as a juror.

In arguing that his trial counsel should be deemed ineffective, Petitioner relies on the Eleventh Circuit's decision in <u>Goodwin v. Balkcom</u>, 684 F.2d 794 (11th Cir. 1982). However, the factual circumstances in the case at bar are distinguishable from those present in <u>Goodwin</u>, a pre-<u>Strickland</u> case. In <u>Goodwin</u>, the venire members were asked collectively whether they conscientiously opposed capital punishment and were told to stand up if they did. Four individuals stood up, and the district attorney then posed the question to the four, "Are your reservations about capital punishment such that you could not vote truly and fairly and impartially on the issue of whether or not a person charged is guilty or not guilty of the crime charged? If so, raise your hand." <u>Id.</u> at 814. One of the venire members responded that he could not vote, and the district attorney then moved the trial court to excuse that venire member along with one other venire member (the "second venire member") who apparently had raised her hand in response to the district attorney's question. The trial court disqualified the two venire members and then denied a request by the defendant's attorney to ask additional questions of the two venire members. Defendant's trial counsel inquired of the court whether the two venire members had stated that "they were unalterably opposed to capital punishment," <u>id.</u>, and the trial court responded affirmatively. At that point, defendant's trial counsel did not seek to ask any further questions and did not lodge any objections to the disqualification of the two venire members, although the second venire member disqualified had never been asked to explain her position. At a state habeas corpus hearing, defendant's trial counsel testified that it was his legal opinion that he did not think he had the right to attempt to rehabilitate the venire members after they made the statement that they were unalterably opposed to the death penalty. He testified that he did not actually know whether the second venire member had actually stated whether she was unalterably opposed to the death penalty but after the trial judge

stated that she did make that statement, he did not want to ask her any questions because he did not see a need to do so. The Eleventh Circuit indicated that the defendant's trial counsel was ineffective due to, <u>inter alia</u>, his failure to pay attention during voir dire and due to his ignorance of his right to question a venire member, "particularly where the venireman has stated nothing." <u>Id.</u> at 816. The Eleventh Circuit's prejudice analysis focused on other errors made by defendant's trial counsel unrelated to voir dire. <u>See id.</u> at 817-20.

While <u>Goodwin</u> indicates that an attorney's inattention during voir dire and his ignorance of his right to rehabilitate venire members is evidence of ineffectiveness, there has been no showing in this case that Petitioner's trial counsel did not pay attention during voir dire or were ignorant of the right to rehabilitate venire members. To the contrary, a review of the entire voir dire transcript reveals that Petitioner's trial counsel attempted to rehabilitate venire members in several instances. By way of example, Mr. Cella attempted to rehabilitate Mary Newkirk, although she had responded affirmatively to the district attorney's question concerning whether her feelings about capital punishment were such that they would prevent her or substantially impair her in her duties as a juror in accordance with the instructions and oath of the court. (R. Ex. 15 at 168-71.) Petitioner's other trial attorney, Stephen Schuster, successfully rehabilitated Toni L. Spicer after she stated to the district attorney that there was no circumstance under which she would consider the death penalty as punishment in Petitioner's case, even if the State were able to prove beyond a reasonable doubt that he was guilty of the murder of Taulbee. (R. Ex. 16 at 392-95, 403-04.) Mr. Schuster also attempted to rehabilitate Relda F. Williamson, who initially stated to the trial court that she would not vote for the death penalty no matter what the evidence. (R. Ex. 17 at 651-55.) Later in voir dire, Mr. Cella successfully rehabilitated a venire member, John Edmonds, Jr., after he stated to the district attorney that he did not know of any circumstances, at that time, under which he would vote for the death penalty. (R. Ex. 18 at 1011-15.) Having

reviewed the entire voir dire transcript, there is nothing in the transcript indicating that Petitioner's trial counsel were not paying careful attention during voir dire or that they were not aware of the right to rehabilitate venire members. Therefore, the main concerns of the Eleventh Circuit in Goodwin are not concerns in the instant case.

That said, however, the Court does find defense counsel's failure to ask venire member Beck any questions at all worthy of scrutiny, especially since Mr. Cella and Mr. Schuster so prudently attempted to rehabilitate other venire members who expressed reservations about imposing the death penalty. Further, the Court gives this issue raised by Petitioner serious consideration because the Court is aware that the improper exclusion of even one venire member in violation of Witherspoon warrants habeas relief. See Gray v. Mississippi, 481 U.S. 648, 657-58, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987). The Court is also mindful, however, that juror bias need not be proved with "unmistakable clarity." Wainwright, 469 U.S. at 424. Here, a close review of the voir dire transcript may reveal the use of a word suggesting a lack of clarity in venire member Beck's answer, but the trial judge and the attorneys were present to hear Mr. Beck's tone of voice and to witness his demeanor and obviously had the definite impression that Mr. Beck's "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright, 469 U.S. at 424. As the Supreme Court of Georgia stated in the case of Castell v. State, 250 Ga. 776, 301 S.E.2d 234 (1983), which the Supreme Court of Georgia relied upon in upholding the excusal of Mr. Beck, Jefferson, 256 Ga. at 824, "[u]se of phrases such as 'I think so' or 'I don't think so' do not, when considered in the context of the entire voir dire of the juror, necessarily indicate an equivocation with regard to an unwillingness to impose a death penalty." Castell, 250 Ga. at 788; see also Williams v. Collins, 16 F.3d 626, 632-33 (5th Cir. 1994) (holding that counsel's decision not to rehabilitate venire members who stated that they did not "think" they could impose the death penalty could not be considered

deficient performance).  Having considered the entire voir dire of venire member Beck, and indulging the strong presumption that counsel's performance was reasonable, the Court finds no attorney error in Petitioner's trial counsel's failure not to attempt to rehabilitate venire member Beck.

Even if Petitioner's trial counsel's failure to attempt to rehabilitate venire member Beck were considered deficient performance, Petitioner has failed to show that he was prejudiced by their performance.  The Eleventh Circuit has held that it cannot be assumed that rehabilitation efforts would persuade a venire member opposed to the death penalty to change his position such that he could fulfill his oath as a juror.  See White v. Singletary, 972 F.2d 1218, 1222 (11th Cir. 1992); Straight v. Wainwright, 772 F.2d 674, 680 (11th Cir. 1985).  There is no evidence that an attempt by Petitioner's trial counsel to rehabilitate venire member Beck would have been successful.  Therefore, the Court finds that Petitioner has not satisfied the prejudice prong of Strickland.

d.      Errors During Closing Argument

Petitioner maintains that his trial counsel made several errors during closing argument of the penalty phase, which rendered their representation of him ineffective.  Specifically, Petitioner contends that his trial counsel improperly (1) conceded Petitioner' guilt; (2) referred to the crime as unnecessary and the victim as defenseless; (3) contended that Petitioner had an attitude problem; (4) supported capital punishment; (5) complained that Petitioner should have stayed away from black people; (6) conceded that Petitioner was responsible for his actions; and (7) argued that all black teenage males have lengthy criminal records.

Petitioner contends that Marc Cella conceded his guilt and referred to the crime as unnecessary and the victim as defenseless when Mr. Cella argued as follows:

You know, Lawrence's background, his life experience has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity, and y'all found that.

But aren't we as a society better than that?  Don't we expect more

of ourselves?  You folks are better people than Lawrence is right now.
We trust you to be more just than he was.

(R. Ex. 25 at 1396.)  During the penalty phase of a trial, however, defense attorneys often strategically attempt to concede to what the jurors are likely already thinking in an effort to establish or maintain credibility with the jury.  That is, it is common for defense attorneys to express respect for a jury's guilty verdict in hopes that they will be able to persuade the jurors to impose a more lenient sentence.  <u>See</u> <u>Carter v. Johnson</u>, 131 F.3d 452, 466 (5th Cir. 1997) ("counsel may make strategic decisions to acknowledge the defendant's culpability ... in order to establish credibility with the jury").  Notably, at the time that trial counsel made the above-referenced argument, the jury already was not disposed in Petitioner's favor, as they had already found him guilty of felony murder and armed robbery beyond a reasonable doubt.  Counsel therefore employed a legitimate strategy to acknowledge what the jury had already found and to then focus their efforts on persuading the jury to spare Jefferson's life.  As Petitioner cannot show that no other competent attorney would have employed this strategy, Petitioner has not shown that counsel were deficient in this regard.  <u>See</u> <u>Chandler</u>, 218 F.3d at 1315.

With respect to Petitioner's argument that his counsel erred during closing argument in contending that Petitioner had an attitude problem, a review of the trial transcript reveals that counsel argued as follows:

> People and their attitudes change overtime [sic].  I am the first to admit, as Mr. Charron told you, Lawrence Jefferson has an attitude problem.  He has a problem accepting responsibility for the stupid things he has done in his life.  And he will certainly have time if [sic] jail to give it some thought and to think about it, if you people decide and see fit to give him that time.

(R. Ex. 25 at 1384-85.)  Counsel further argued:

> Mr. Charron told you that he was being vague and evasive about Mr. Charron's questions.  Well, I'd like to respond to that by saying two things about that.

> First off, he was questioning him about 1979, folks.  I mean, I can't remember 1979.  And I am sure that I wasn't drinking and doing as many drugs as Mr. Jefferson was in 1979.

So that's why he was vague and evasive, because he doesn't remember it all that well.

And the second reason is because he is not proud of it.

And the third reason is what I have already mentioned, he has an attitude problem. He is prone to make excuses instead of accepting responsibility.

(Id. at 393.) Viewing these arguments of counsel in context, the Court does not agree with Petitioner that counsel rendered ineffective assistance. The defense's characterization of Jefferson, while not positive, was again part of an attempt by defense counsel to engage the thought processes of the jurors and to establish or maintain credibility. Additionally, as the state habeas corpus court correctly found, "it is clear that Mr. Cella was urging the jury simply to let Petitioner think about his attitude while serving a life sentence rather than imposing a death sentence." (R. Ex. 38 at 905.) The Court finds no attorney error because counsel's argument fell within "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Petitioner next complains that counsel rendered ineffective assistance by expressing support for capital punishment, but Petitioner provides no citations to the record or examples to establish how his trial counsel expressed support for the death penalty during closing argument, thereby rendering counsel ineffective. The state habeas corpus court made the factual finding in its decision that Petitioner's "[c]ounsel acknowledged the 'need' in general for the death penalty but vigorously asserted it was not warranted in this case." (R. Ex. 38 at 905.) This factual finding is presumed to be correct, and Petitioner has done nothing to overcome the presumption. As such, the Court concludes that trial counsel's argument in this regard did not constitute ineffective assistance.

Petitioner next argues that his trial counsel rendered ineffective assistance by improperly arguing that Petitioner should have stayed away from black people and improperly arguing that all black teenagers have lengthy criminal records. The trial transcript reveals that counsel argued as follows:

You know, Mr. Charron went through a recitation of what he called a 15-minute case history. Basically what it proved is that Lawrence Jefferson was a poor Black kid who didn't have anywhere to go, had very few positive influences in their lives.

And he didn't follow his mamma's advice. "Son, don't hang around with your own kind. There is only trouble there."

His mamma was very perceptive. She gave him good advice. But I hope y'all will ask yourselves whether he really had a chance.

And consider the environment he was living in. It's hard to say don't hang around with the people that you live around. Lawrence tried. He made efforts.

But he always came back. He always reverted to that place. He always came back to those people.

That guy named Steve. I don't remember what his last name is. Every time he went anywhere with this guy, Stephenson, and Greg Clayton, he ended up getting arrested.

We could go down into Atlanta and pick out at random any Black 17-year-old we wanted to, and we'd get an arrest record very similar to Lawrence Jefferson's as it was in Louisville, Kentucky.

(R. Ex. 25 at 1388-89.) It can be said without question that counsel's argument negatively played on stereotypes and was generally unfavorable to blacks, particularly low-income blacks. However, counsel's apparent strategy was to attempt to gain the jury's sympathy by focusing their attention on Petitioner's challenging, disadvantageous background and the troubled environment in which he was raised. Although counsel might have considered the particulars of his argument more carefully, given that counsel largely only expounded on what Petitioner's mother had already stated during her testimony, (R. Ex. 25 at 1266), the Court cannot say that counsel's argument in this regard amounts to objectively unreasonable representation. As counsel simply sought to explain to the jury reasons why Petitioner was entitled to mercy, Petitioner's argument that counsel performed deficiently is without merit.

Petitioner finally argues that counsel was ineffective because he conceded that Petitioner was responsible for his actions. In this regard, counsel argued as follows:

I am not going to come before you and say because he grew up

among roaches and rodents he is not responsible for his acts. Lawrence Jefferson is responsible for his acts.

But Lawrence Jefferson is not responsible for that person as much as that person who grew up in East Cobb or Dunwoody or West Cobb.

We, or you, because you are a final arbiter of this case, have to decide whether or not to show mercy. You have to show it, decide sitting there, knowing that when this is all over you are going back to your nice home and your families, whether to show mercy.

(R. Ex. 25 at 1403.) Again, viewing counsel's argument in context, the Court finds no attorney error, as Petitioner's trial counsel employed the reasonable strategy of making certain concessions to maintain credibility with the jury such that he could more effectively argue for a life sentence for Jefferson rather than the death penalty. Although counsel's strategy ultimately was not successful, the strategy was not unreasonable.

   e.  Failure to Object to the (b)(7) Aggravating Circumstance

Petitioner next argues that trial counsel rendered ineffective assistance by failing to object on vagueness grounds to the "aggravated battery" charge given by the trial court to the jury at the conclusion of the penalty phase of the trial. Petitioner contends that trial counsel were also ineffective for failing to request that the prosecution and the trial court furnish the jury with adequate examples of what homicide cases in the past involved "depravity of mind" and a homicide that was "outrageously or wantonly vile, horrible or human." Petitioner essentially contends that, as a result of trial counsel's errors, the discretion of the jury was not properly channeled.

Contrary to Petitioner's contention that the charge on "aggravated battery" was vague, the trial court limited the definition of "aggravated battery" by instructing the jury on the statutory definition of aggravated battery, which provides, in pertinent part, that an aggravated battery occurs when "[a] person ... maliciously causes bodily harm to another ... by seriously disfiguring his ... body or a member thereof." O.C.G.A. § 16-5-24(a). The trial court further correctly instructed the jury

that it must find that the bodily harm to the victim occurred before death. See Hance v. State, 245 Ga. 856, 861, 268 S.E.2d 339 (1980) ("In order to constitute aggravated battery, the bodily harm to the victim must occur before death."). Petitioner argues in Claim VIII that the trial court was required to instruct the jury further that it was required to find that the victim was conscious of the blows, but Petitioner cites no law to support his position. The Court finds that the instructions given by the trial court were constitutionally adequate to guide the jury in its decision to recommend the death penalty. Petitioner's trial counsel committed no error in not objecting to the charge, and Petitioner has failed to show that he suffered prejudice.

With respect to Petitioner's argument that trial counsel rendered ineffective assistance by failing to request that the prosecution and the trial court furnish the jury with adequate examples of what homicide cases in the past involved "depravity of mind" and a homicide that was "outrageously or wantonly vile, horrible or human," the Court first notes, as did the state habeas corpus court, (R. Ex. 38 at 907), that there is no such requirement under Georgia law. Petitioner has not cited one case requiring the trial court to furnish such examples or a case where an attorney was found to be ineffective for failing to make the requests that Petitioner urges his trial counsel should have made. Further, the trial court in this case channeled the discretion of the jury by providing a narrowing construction of the phrase "outrageously or wantonly vile, horrible, or inhuman." The trial court specifically instructed the jury that it could find a statutory aggravating circumstance "[w]here the offense of murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved depravity of mind, or that it involved an aggravated battery to the victim prior to the death of the victim." (R. Ex. 25 at 1406). The trial court proceeded to give the following narrowing instructions to the jury regarding "depravity of mind," in addition to the narrowing instructions regarding "aggravated battery," mentioned supra:

Depravity of mind is a reflection of an utterly corrupt, perverted,

or immoral state of mind.  In determining whether or not the offense of murder in this case involved depravity of mind on the part of the defendant, you may consider the age and physical characteristics of the victim, and you may consider the actions of the defendant prior to and after the commission of the murder.

In order to find the offense of murder involved depravity of mind, you must find that the defendant as a result of his utter corruption, perversion, or immorality committed an aggravated battery upon a living person.

(Id. at 1407-08.)  The trial court's charge to the jury was constitutional and tracked the charge recommended by the Supreme Court of Georgia in West v. State, 252 Ga. 156, 161-62, 313 S.E.2d 67 (1984).  Applying this charge, the jury ultimately found that the "murder was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim."  (R. Ex. 25 at 1435.)  In affirming Petitioner's sentence, the Supreme Court of Georgia found that the evidence supported the jury's finding under O.C.G.A. § 17-10-30(b)(7) because "the evidence show[ed] that the defendant severely beat the victim in the face with a heavy stick, and then finished him off by crushing his skull with a log after he had fallen to the ground."  Jefferson v. State, 256 Ga. at 828.  This Court agrees.  Therefore, the Court concludes that Petitioner has not only failed to show deficient performance on the part of his trial counsel, but Petitioner has also failed to show prejudice.

> f.  Failure to Request an Instruction on Voluntary Manslaughter as a Lesser Included Offense

Petitioner contends that his trial counsel performed inadequately by failing to request that a voluntary manslaughter instruction be given to the jury during the liability phase of the trial.  "[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  Hopper v. Evans, 456 U.S. 605, 611, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982) (emphasis in original); see also Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980) (holding that the Constitution requires that a defendant in a capital case receive a lesser included offense instruction if the facts support it).  Here, Petitioner has not identified any evidence that would have entitled him to an instruction on

voluntary manslaughter, and Marc Cella specifically testified at the state habeas corpus hearing that they did not have evidence to support a voluntary manslaughter instruction. (R. Ex. 39 at 98.) In the absence of a reasonable evidentiary basis to support a voluntary manslaughter instruction, Petitioner's trial counsel did not perform deficiently in not requesting such an instruction. Thus, this claim under Strickland likewise fails.

        g.     Failure to Object to Improper Instruction by Trial Court

Petitioner next highlights as alleged ineffective assistance his trial counsel's failure to object to the purported intimidation of the jury by the trial court. Petitioner contends that the trial court intimidated the jury when it instructed that asking a question during deliberations might "open a Pandora's Box that will cause you to sit here for several days while you got an answer to one question ..." (R. Ex. 24 at 1102.) Before determining whether trial counsel should have objected, the trial court's comment should be put in context. The trial court instructed, in pertinent part, as follows:

> Jurors, with respect to questions, any question that, any questions that come up during the course of your proceedings should first be resolved among yourselves, if practicable. You have received a full charge of the law. Several of you have taken notes on it.
>
> If you can't resolve the question internally, then write it out in ink, have your foreperson sign it and date it, and give it to the bailiffs who will be stationed near the jury room in the corridor outside the jury room.
>
> They will bring the question to me. I will review it with both sides to this case, and I will bring you into the courtroom, and I will endeavor to answer your question.
>
> There are at times juries that become curious about things that are irrelevant. And I respectfully reserve the right to tell you that your question has nothing to do with the case, and that I won't answer it.
>
> In other words, I won't answer anything for you that isn't logically pertinent to the issues under investigation. But if your question is pertinent, it will be answered.
>
> Now, questions dealing with law are simple to answer, because the questions are, the answers are finite, short, can be given in a manner of moments, once they are framed by the court with the input

of the lawyers.

Questions about the facts and the evidence, now, that's a different matter. You may ask questions about the testimony and the evidence and ask for portions of it to be repeated. However, I caution you to try to resolve it internally before you ask the question.

And I'm going to tell you why. There have been jury questions asked on evidence in this state where precisely that question is answered by reading back from the court reporter's notes.

There have been jury questions answered in this state by reading back the entire testimony of a witness from the court reporter's notes.

There have been jury questions answered in other states that required the rereading of the entire trial to the jury.

You may think that you only want to hear one witness' answer to one question by one attorney. You must remember that the court, however, cannot answer your question in a vacuum. It must be given contextually to you as it came from the witness originally.

I am not telling you this to chill your right to ask these questions. But I'm telling you this so you will think long and hard about it before you ask it. Because you may open up a Pandora's Box that will cause you to sit here for several days while you got an answer to one question, or it might take 30 seconds.

(Id. at 1100-02.)

While Petitioner maintains that the trial court violated his right to a trial by a fair and impartial jury free from bias, intimidation, or prejudice, (Petitioner's Br. at p. 89), the trial court's comment to the jury, considered in context, did not warrant an objection by Petitioner's trial counsel. The trial court did not tell the jury not to ask questions. To the contrary, the judge specifically told the jury that they had a right to ask questions and that he would endeavor to answer those questions, if the questions pertained to relevant matters. The trial court did make the jury aware of the delay that often accompanies questions, and the trial court therefore encouraged the jury to attempt first to resolve questions internally. However, the trial court's instructions primarily served to inform the jury that they could ask questions and to advise them of the procedure for doing so. While Petitioner characterizes the instructions as intimidating, the Court finds that the instructions were proper and that trial counsel's performance did not fall below an objective standard of

reasonableness when trial counsel did not object to the instructions. In addition, as there is no evidence that the trial court's instructions frustrated the jury's ability to ask questions or that the outcome of the proceeding would have been different had trial counsel objected, the Court likewise finds that Petitioner has failed to show prejudice emanating from trial counsel's failure to object to the comment at issue.

> h.  Failure to Ensure the Jury's Discretion was Guided and Channeled

Petitioner argues next that trial counsel erred in not requesting that the trial court provide a written jury instruction on mitigation in light of the trial court's provision to the jury of a written instruction on aggravating circumstances. Petitioner argues that trial counsel also erred in not objecting to the portions of the trial court's charge that, according to Petitioner, failed to adequately define mitigating circumstances. Petitioner generally contends that trial counsel failed to ensure that the jury was adequately guided in its deliberations. The Court disagrees.

Here, the trial court's instructions on mitigation were as follows: "Mitigating or extenuating facts or circumstances are those which do not constitute justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame." (R. Ex. 25 at 1405.) The trial court later charged:

> You may set the penalty to be imposed at life imprisonment based upon any mitigating or extenuating facts or circumstances. However, it is not required and it is not necessary that you find any extenuating or mitigating fact or circumstance in order for you to return a verdict setting the penalty to be imposed at life imprisonment.
> ...
>
> In other words, whether or not you find any extenuating or mitigating circumstances, facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment.

(Id. at 1410.) These instructions were sufficient and consistent with Georgia law.

In Collier v. State, 244 Ga. 553, 261 S.E.2d 364 (1979), overruled on other grounds, Thompson v. State, 263 Ga. 23, 426 S.E.22 895 (1993), the Supreme Court of Georgia squarely rejected the notion that giving written instructions to the jury on

aggravating circumstances without also giving written instructions on mitigating circumstances prejudices the jury in favor of finding aggravating circumstances. 244 Ga. at 569; see also Tucker v. State, 244 Ga. 721, 729, 261 S.E.2d 635 (1979) (rejecting same challenge), overruled on other grounds, Woodard v. State, 269 Ga. 317, 496 S.E.2d 896 (1998). The Collier court further concluded, contrary to the position Petitioner advances here, that examples of mitigating circumstances need not be included in a trial court's instructions to the jury. 244 Ga. at 569. The Collier court reasoned:

> It is not required that specific mitigating circumstances be singled out by the court in giving its instructions to the jury. To influence the jury by use of examples may limit their discretion to consider other matters in addition to the examples given.... Under our statute the jury may recommend a life sentence even though no mitigating circumstances are found. All the mitigating circumstances which the accused has introduced and wishes to be considered may be argued to the jury, and a nonspecific charge, free of examples, allows the jury to consider anything it finds proper.

Id. (internal citations omitted). This Court agrees with the reasoning articulated in Collier, and Petitioner has not shown that federal constitutional law requires a different result.

Petitioner also urges that trial counsel should have requested that the trial court instruct the jury that unanimity was not required to find mitigating circumstances. This Court is aware that the Supreme Court has ruled in two decisions, Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990), that it is error for a trial court to instruct juries to disregard mitigating factors not found unanimously in capital sentencing cases. However, neither Mills nor McKoy applies retroactively to Petitioner's case. Beard v. Banks, 542 U.S. 406, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004) (rejecting retroactivity for Mills); Thomas v. Jones, 742 F. Supp. 598, 601-02 (S.D. Ala. 1990) (holding that Mills and McKoy could not be applied retroactively in collateral proceedings). Furthermore, the Court has reviewed the trial court's instructions regarding the jury's consideration of both mitigating

factors and aggravating circumstances, and the trial court never instructed or suggested to the jury that unanimity was required to find mitigating circumstances. While Petitioner may maintain that trial counsel erred in not requesting that the trial court expressly instruct the jury that unanimity was not required, Petitioner has cited no authority to support his contention that trial counsel were ineffective in this regard. Accordingly, the Court finds no attorney error.

Having fully considered the trial court's instructions on mitigation, as well as applicable law, the Court finds that trial court's instructions sufficiently guided the discretion of the jury and that Petitioner's trial counsel did not perform deficiently in not objecting to the charge as given and in not requesting that additional instructions be given or that written instructions on mitigation be given to the jury. Petitioner has not established that no competent lawyer would have performed as his trial counsel performed. Therefore, Petitioner's challenge under <u>Strickland</u> fails.

           i.     Failure to Object to Improper Evidence Admitted in Sentencing

Petitioner's next challenge is to trial counsel's failure to object to allegedly improper evidence of unadjudicated crimes admitted by the State during the sentencing phase and to the State's cross-examination of Petitioner with respect to these crimes. This challenge also fails because criminal conduct is relevant and is properly considered by the jury, even absent a conviction. <u>See</u> <u>Tucker v. Kemp</u>, 762 F.2d 1480, 1487 (11th Cir. 1985) (en banc) ("In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well. In general, the relevant inquiry for information at sentencing is whether it is reliable.") (citations omitted), <u>vacated</u>, 474 U.S. 1001, 106 S. Ct. 517, 88 L. Ed. 2d 452 (1985), <u>reinstated</u>, 802 F.2d 1293 (11th Cir. 1986) (en banc) (per curiam); <u>see also</u> <u>Devier v. Zant</u>, 3 F.3d 1445, 1464-65 (11th Cir. 1993); <u>Hammond v. State</u>, 260 Ga. 591, 597, 398 S.E.2d 168 (1990); <u>Isaacs v. State</u>, 259 Ga. 717, 728, 386 S.E.2d 316

(1989). As the Supreme Court of Georgia found during Petitioner's direct appeal, the State had four witnesses to provide testimony relating to the crimes. <u>Jefferson</u>, 256 Ga. at 825-27. This testimony strengthened the reliability of the evidence at issue, and trial counsel did not err in failing to object to the evidence of unadjudicated crimes or to the cross-examination of Petitioner concerning these crimes.

> j.  Failure to Object to Improper Prosecutorial Comment

Petitioner next claims that his trial counsel were ineffective when they failed to object to various arguments and comments made by the prosecutor during the trial proceedings. An improper closing argument by a state prosecutor in a capital sentencing hearing justifies federal habeas relief only if the argument rendered the hearing fundamentally unfair. <u>Nelson v. Nagle</u>, 995 F.2d 1549, 1555 (11th Cir. 1993) (stating that the relevant question is whether the prosecutor's closing argument rendered the sentencing phase of the trial so fundamentally unfair as to deny him due process). Petitioner must show that, absent the alleged improper argument, there is a reasonable probability that the sentencing outcome would have been different. <u>Presnell v. Zant</u>, 959 F.2d 1524, 1528 (11th Cir. 1992); <u>see also</u> <u>Johnson v. Wainwright</u>, 778 F.2d 623, 630-31 (11th Cir. 1985); <u>Tucker v. Kemp</u>, 762 F.2d 1496, 1503-09 (11th Cir. 1985) (en banc); <u>Drake v. Kemp</u>, 762 F.2d 1449, 1458-61 (11th Cir. 1985).

> 1.  <u>References to Other Victims</u>

Petitioner argues that his trial counsel rendered ineffective assistance when they failed to object to the prosecutor's comment to the jurors that he wanted the jurors "to think about Crosby Powell and Gail Hart and all of these other unknown victims and police officers and other persons who have met Lawrence before" before they decided whether to have mercy on Jefferson. (R. Ex. 25 at 1374-75.) Petitioner maintains that counsel's failure to object undermined the validity of the jury's sentencing verdict and rendered Petitioner's sentencing trial fundamentally unfair. The Court disagrees. The trial court charged the jury at the outset of the case that the

attorneys would be making arguments at various points during the trial. The trial court specifically instructed that the jurors were not bound by what the attorneys said but that they were to "take the facts from the witnesses and the other evidence presented in the case." (R. Ex. 20 at 167.) The trial court further explained to the jury that evidence consisted of testimony, exhibits admitted into evidence, and stipulations of fact. (Id. at 168.) Given these instructions, even if the prosecutor's comments were improper or inconsistent with the evidence, Petitioner's trial counsel were entitled to presume, as does the Court, that the jurors would follow the instructions of the trial court and not consider the arguments of the attorneys to constitute evidence. See Shriner v. Wainwright, 715 F.2d 1452, 1459 (11th Cir. 1983) ("with a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks"); Adams v. Wainwright, 709 F.2d 1443, 1447 (11th Cir. 1983) ("A jury is presumed to follow jury instructions."). As such, the Court finds no attorney error in trial counsel's failure to object, and any resulting prejudice was cured by the trial court's previous instructions to the jury.

### 2. Comment on Petitioner's Silence

Petitioner next argues that trial counsel were ineffective because they failed to object to improper prosecutorial comment on his silence at the time of his arrest and his decision not to testify during the guilt/innocence phase of the trial.

Petitioner first challenges the failure of his trial counsel to object to questioning and testimony regarding his refusal to sign a Miranda waiver form following his arrest and his statements to the police that he did not want to talk about the crime. Petitioner argues that his trial counsel should have objected because the questioning and testimony ran afoul of Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which held that a prosecutor may not use a defendant's post-arrest, post-Miranda silence to impeach a defendant's exculpatory statements or to create an inference of guilt. See also Sullivan v. Alabama, 666 F.2d 478, 484 (11th Cir. 1982).

Here, Detective Barry Banks testified in response to questions from the

prosecutor that Jefferson refused to sign the <u>Miranda</u> waiver form, that Jefferson never would explain or tell them what happened with respect to the murder of Taulbee, and that Jefferson had no comment about the ATM card or the tackle box that belonged to Taulbee.  (R. Ex. 22 at 676, 678-79.)  The prosecutor elicited similar testimony from Lieutenant Carlton Morris.  Lieutenant Morris testified before the jury that Jefferson refused to sign the <u>Miranda</u> waiver form, that Jefferson did not want to talk about the crime, that Jefferson wouldn't say that he did kill Taulbee, and that Jefferson would make no comment whatsoever about the ATM card.  (<u>Id.</u> at 696, 698-700.)

Having considered the questioning and testimony in context, it is clear to the Court that the State permissibly brought out evidence regarding Jefferson's refusal to sign the <u>Miranda</u> waiver form, as his refusal was not used by the State to create an inference of guilt.  In this regard, the record reflects that Jefferson made several statements to Detective Banks and Lieutenant Morris, <u>see</u> <u>supra</u> at 6, although there were certain matters about which he refused to speak, as mentioned above.  The defense had already indicated, albeit outside the presence of the jury, that it was going to make an issue of the voluntariness of the statements Jefferson gave to the police following his arrest.  (<u>See</u> R. Ex. 22 at 668-72.)  By preemptively disclosing and addressing the fact that Jefferson did not sign the waiver form, rather than waiting on the defense to bring that fact to the jury's attention, the State sought to bolster the credibility of its arguments and the strength of its evidence in anticipation of an attack by the defense.  Jefferson's refusal to sign the <u>Miranda</u> waiver form was not used by the State to create an inference of guilt but was a fact brought out by the State in the context of arguing that Jefferson nevertheless knowingly and voluntarily gave up his right not to speak with respect to the statements he did make to Detective Banks and Lieutenant Morris.  The comments on Jefferson's refusal to sign the <u>Miranda</u> waiver form therefore do not constitute a <u>Doyle</u> violation.

As to the remainder of the testimony elicited from Detective Banks and

Lieutenant Morris concerning Jefferson's refusal to talk about the crime or the ATM card and tackle box, the Court finds that this testimony impermissibly commented on Jefferson's silence to create an inference of guilt. Jefferson apparently chose to remain partially silent, and the questioning and testimony about his partial silence were not proper, particularly since Jefferson chose to remain silent about the most important issue in the case – the crime. See United States v. Toro-Pelaez, 107 F.3d 819, 826 (10th Cir. 1997) (comment on a defendant's partial silence for impeachment purposes or to suggest an inference of guilt violates the defendant's right against self-incrimination); United States v. Pennington, 20 F.3d 593, 599 (5th Cir. 1994) ("[T]he defendant's willingness to give some statements after arrest does not give the prosecutor the right to impeach him by commenting on what he did not say."); United States v. May, 52 F.3d 885, 890 (10th Cir. 1993) ("when a defendant is 'partially silent' by answering some questions and refusing to answer others, this partial silence does not preclude him from claiming a violation of his due process rights under Doyle"); United States v. Laury, 985 F.2d 1293, 1304 n. 10 (5th Cir. 1993) ("We do not believe ... that the Supreme Court in *Doyle* intended that a defendant remain *completely* silent following arrest in order to rely on the protection of the due process clause."). Petitioner's trial counsel did not object to this questioning or testimony, and their failure to object constituted deficient performance.

Petitioner still has not made out an ineffective assistance of counsel claim on this ground, however, because he has failed to demonstrate that had trial counsel objected to the questioning and testimony, there is a reasonable probability that the results of the proceeding would have been different. Strickland, 426 U.S. at 694. More specifically, the problematic testimony by Detective Banks and Lieutenant Morris was not the focus of the prosecutor's closing argument. That is, the prosecutor focused almost exclusively on the statements that Jefferson did make rather than on the subjects about which Jefferson refused to comment. See United States v. Cayasso, 130 Fed. Appx. 371, 375 (11th Cir. 2005). Further, even if the jury

had not heard the problematic questioning or testimony, there was still other compelling evidence of Jefferson's guilt. The evidence at trial revealed, <u>inter alia</u>, that Jefferson and Taulbee had gone in Taulbee's car to Lake Allatoona after work to fish and that Jefferson was the last person to be seen with Taulbee. Taulbee had loaned Jefferson money only a couple of weeks prior to the murder, and the money was due to be repaid to Taulbee on the day of the murder. Both Jefferson and Taulbee had gotten paid on that day, but only Taulbee had cashed his paycheck. Later that afternoon, after Jefferson had returned from fishing, Jefferson's next-door neighbor, Ronald Glade, went to visit Jefferson at his apartment and noticed that the door to the apartment was locked, which Mr. Glade testified was not usual. Mr. Glade also testified that Jefferson was acting strange and that he had a red mark on his chest, which he thought might have been blood. Mr. Glade noticed that Jefferson had clothes soaking in the bathtub. Mr. Glade testified that Jefferson told him that "his little fat buddy was dead." (R. Ex. 21 at 463-64.) That evening, Jefferson, Mr. Glade, and Dwayne Mitchell went to get liquor and marijuana, and Jefferson paid for both the liquor and the marijuana. When they returned to Jefferson's apartment, Jefferson complained that his wallet was missing and asked Mr. Mitchell if he would take him to a location to look for his wallet. Jefferson had Mr. Mitchell take him to Lake Allatoona, the same place where Taulbee's body was discovered the following day. Jefferson left Mr. Mitchell in the car and eventually came back with some fishing items. He gave Mr. Mitchell a tackle box and threw several other fishing items out into the woods. Thereafter, Jefferson had Mr. Mitchell take him to a bank, where Jefferson unsuccessfully tried to withdraw money using an ATM card. While Jefferson and Mr. Mitchell were away from the apartment, Ronald Glade found Jefferson's wallet in between the pillows of Jefferson's couch and testified that the wallet contained about $150.00 in cash. During a search of Jefferson's apartment the next day, to which Jefferson had consented, Jefferson briefly left his apartment and went to the apartment of the Glades and Dwayne Mitchell. Jefferson asked Rhonda

Glade to get rid of an ATM card, which police ultimately determined belonged to Taulbee. Ms. Glade placed the ATM card in an air conditioning unit. Days later, the police found Taulbee's car at a location close to Jefferson's apartment, and an ATM receipt was found in the car. Rhonda Glade also led police to the ATM card, which they recovered from the air conditioning unit. Police also located the tackle box that Jefferson had given to Dwayne Mitchell, and Mr. Mitchell also led police to the site where he had driven Jefferson on the night of the murder. The police found the fishing items that Mr. Mitchell said Jefferson had thrown into the woods. When arrested and questioned by police, Jefferson made the statements that he didn't need to be around other people and that he wanted to be executed and put to sleep. Having thoroughly reviewed the record of this case, the Court finds that, even in the absence of forensic evidence linking Jefferson to the crime and even though there were some inconsistencies in the testimony given by some of the witnesses, the aforementioned evidence was sufficient to establish Jefferson's guilt beyond a reasonable doubt. Thus, trial counsel's failure to object was not prejudicial, as there is not a reasonable probability that, but for counsel's failure to make a <u>Doyle</u> objection, the outcome of Petitioner's trial would have been different.

In addition to precluding comment on a defendant's post-arrest, post-<u>Miranda</u> silence, the law is also clear that it is not proper for a prosecutor to comment directly or indirectly on a defendant's decision to exercise his right not to testify. <u>Griffin v. California</u>, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). In determining whether a prosecutor has impermissibly commented on a defendant's failure to testify, the Court must ask "whether the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." <u>United States v. Watson</u>, 866 F.2d 381, 386 (11th Cir. 1989) (internal quotation marks and citations omitted); <u>see also</u> <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987); <u>United States v. Vera</u>, 701 F.2d 1349, 1362 (11th Cir. 1983). Importantly, to pose a constitutional violation,

the challenged comments must have been a reference to Jefferson's failure to testify, not merely a general statement about the failure of the defense to rebut the evidence presented by the State. "A comment on the failure of the defense, as opposed to the defendant, to counter or explain the testimony presented or evidence introduced does not violate the defendant's fifth amendment right not to testify." Watson, 866 F.2d at 386 (citing United States v. Dearden, 546 F.2d 622, 625 (5th Cir. 1977)).

Petitioner contends that his trial counsel should have objected to the following comments by the prosecutor:

> Now, I want to start off by saying that, first of all, the state's case that was presented through some 73 exhibits and 24 witnesses has been totally unrefuted. It's been totally unrefuted.
>
> This evidence has come to you from all of the witnesses has come from the state's witnesses. And that evidence, collectively and together, unrefuted as it is, charges and accuses and proves Lawrence Jefferson guilty of the murder and armed robbery of Ed Taulbee.

(R. Ex. 24 at 1002.) These comments clearly were directed at the defense's failure to present any evidence, not at Jefferson's decision not to testify during the guilt/innocence phase of the trial. See Duncan v. Stynchcombe, 704 F.2d 1213, 1215-16 (11th Cir. 1983) ("A comment on the failure of the *defense*, as opposed to that of the *defendant*, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege."). The jury would not have necessarily construed these comments to be comments on Jefferson's decision not to testify. Insofar as the prosecutor's comments were not improper, Petitioner cannot show attorney error or prejudice stemming from his counsel's failure to object to the comments.

Petitioner also contends that his trial counsel should have objected to the following comments made by the prosecutor during his closing argument during the guilt/innocence phase:

> "I ought to knock the 'ol boy in the head and take his money."
>
> Now I don't know how idle you take that. It may be idle. That's unrefuted testimony, and that has not changed from May 3 until the

> other day when the two witnesses testified. That hasn't changed. That's not an inconsistency in the evidence.

(R. Ex. 24 at 1022.)   Whether this argument by the prosecutor constitutes an impermissible comment on Petitioner's failure to testify presents a closer question because Petitioner was the only person who could have refuted the testimony of both Ronald Glade and Dwayne Mitchell in this regard.  See <u>Griffin</u>, 380 U.S. at 610-15 (comment on defendant's failure to provide evidence on matters that only he could have been expected to deny or explain violated Fifth Amendment).  Notwithstanding the prosecutor's use of the phrase "unrefuted testimony," however, the context of the prosecutor's argument in this case suggests that the prosecutor simply sought to draw the jury's attention to the fact that both Ronald Glade and Dwayne Mitchell testified consistently that Petitioner made a comment concerning knocking Taulbee in the head and taking his money.  The statements do not appear to have been made to urge the jurors to conclude that the testimony of the State's witnesses was believable because it had not been "contradicted" by Jefferson but to point out that the State's witnesses had not contradicted one another with respect to this particular piece of evidence.  Given that Petitioner's trial counsel focused heavily during his closing argument on the inconsistencies in the testimony provided by Rhonda Glade, Ronald Glade, and Dwayne Mitchell, the jury likely would have construed the prosecutor's comments as designed to highlight a piece of evidence about which two of the witnesses testified consistently and would not have naturally and necessarily taken the statements to be comments on Jefferson's decision not to testify.  In essence, the prosecutor's argument, considered in context, was a proper response to Petitioner's counsel's argument that none of the testimony of the Glades and Mitchell was credible because they testified inconsistently at trial and their trial testimony contradicted previous statements they had made to the police.  See <u>United States v. Griggs</u>, 735 F.2d 1318, 1322 (11th Cir. 1318) (holding that a prosecutor may make remarks to rebut argument by defense counsel that a state witness is a liar); <u>United</u>

States v. Dorr, 636 F.2d 117, 120 (5th Cir. 1981) (holding that a prosecutor "may even present what amounts to a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon him or his witnesses"). Thus, the prosecutor's statements, viewed in context of the overall proceedings, cannot reasonably be viewed as comments on Jefferson's decision not to testify. As such, Petitioner cannot show attorney error or prejudice based on his trial counsel's failure to object to the comments.

Petitioner next asserts that his trial counsel should have objected to the following comments by the prosecutor:

> He walks home, and he immediately tries to cover up and puts clothes and Clorox in a bathtub, which everybody thought was unusual. And I guess maybe he is a construction worker, but nobody has ever testified that they seen him do that.

(R. Ex. 24 at 1025.) This argument by the prosecutor is not improper because it does not directly or indirectly reference Petitioner's decision not to testify. Rather, it refers to the evidence presented at trial that the Glades and Mitchell regularly visited Jefferson's apartment, but none of them testified, whether on direct or cross-examination, that they had ever seen Jefferson put clothes and Clorox in his bathtub. The prosecutor's comments were not manifestly intended to comment on Petitioner's decision not to testify nor were the comments of such character that the jury would naturally and necessarily take them as such. Consequently, Petitioner has failed to show how trial counsel's failure to object to the prosecutor's comment fell below an objective standard of reasonableness and prejudiced his case.

Petitioner argues that his trial counsel rendered ineffective assistance when they failed to object after the prosecutor summarized the various arguments made by defense counsel and then stated, "But the evidence is unrefuted." (R. Ex. 24 at 1040.) Again, this comment by the prosecutor refers to the defense's failure to rebut the evidence, not Jefferson's decision not to testify. See Duncan, 704 F.2d at 1215-16. Insofar as the prosecutor's comment did not violate Petitioner's constitutional rights,

Petitioner cannot show that his trial counsel performed deficiently and likewise cannot establish prejudice.

With respect to Petitioner's argument that trial counsel should have objected to the prosecutor's statement during penalty-phase closing argument urging the jury to consider whether Petitioner displayed any remorse about the crimes for which he was convicted, the Court finds no attorney error. Notably, the prosecutor made this statement after Jefferson testified during the penalty phase of the trial. Petitioner argues that the statement "necessarily referred the jury back to the guilt/innocence trial and Petitioner's demeanor," (Petitioner's Br. at p. 127), but a review of the prosecutor's statement refutes this argument. The prosecutor specifically argued as follows:

> And I want you to think of the Lawrence Jefferson that sat up there. I want you to think, if you saw any remorse, any concern for what his actions were or what he did, whether he was contrite, or whether he was truthful with you about his involvements with the law in the past, or whether to him this is just a big game, and its [sic] just a case of being at the wrong place at the wrong time again.
>
> And when you think of his demeanor and you think about how he appeared on the stand and whether he was truthful to you, I want you to think about whether or not that's a person who deserves your mercy.

(R. Ex. 25 at 1376.) Clearly, the prosecutor was asking the jurors to think about whether Jefferson displayed remorse specifically while he was testifying during the penalty phase of the trial. Insofar as Jefferson did in fact testify during the penalty phase of the trial, the prosecutor's statements certainly were not a comment on Jefferson's failure to testify during the penalty phase. Moreover, even if the prosecutor's comments could somehow be construed to draw the jury's attention to Jefferson's demeanor earlier in the proceedings, such comments do not impermissibly violate a defendant's right to silence. See Hall v. Wainwright, 733 F.2d 766, 773 (11th Cir. 1984) (holding that a comment simply related to a defendant's demeanor during the trial would not naturally and necessarily be taken by the jury to be a comment on the defendant's failure to testify); accord Bates v. Lee, 308 F.3d

411, 421 (4th Cir. 2002) ("This court has found that prosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify."); <u>Cunningham v. Perini</u>, 655 F.2d 98, 100 (6th Cir. 1981) (holding that comments related to the defendant's demeanor in court did not run afoul of the Fifth Amendment). As such, Petitioner's trial attorneys did not err in not interposing an objection that would have been meritless, and Petitioner cannot show that their performance prejudiced him.

3.   <u>Misrepresentations</u>

Petitioner argues next that his trial counsel erroneously failed to object to a purported misrepresentation by the prosecutor that Petitioner, like Taulbee, had an ATM card and thus knew how to use it. However, as the state habeas corpus court concluded, this statement by the prosecutor was not a misrepresentation. The state habeas corpus court found that an ATM card was found in Petitioner's wallet and that Petitioner would have been given instructions on how to use it as well as a secret code. (R. Ex. 38 at 915.) These findings are presumed to be correct and are indeed supported by the record. (R. Ex. 22 at 722.) Inasmuch as the prosecutor's statement was not a misrepresentation, counsel had no basis upon which to object and consequently were not ineffective for not doing so.

k.   Failure to Conduct Reasonable Investigation

Next, Petitioner contends that his trial attorneys were ineffective during the penalty phase of trial due to their alleged failure to conduct a reasonable investigation of his life for mitigating evidence and due to their failure to present evidence of his organic brain damage. Petitioner specifically complains that his trial counsel prematurely abandoned their investigation of mitigating evidence, despite various indicators readily available to or observable by trial counsel that Petitioner might have suffered from brain damage. The Court agrees.

The United States Court of Appeals for the Eleventh Circuit has held that although no absolute duty exists to investigate particular facts or a certain defense,

"in preparing for a death penalty case, 'an attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'" Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994)). The Supreme Court has explained the requisite analysis of an attorney's performance in this regard as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-691. "[C]ounsel is not required to investigate and present all mitigating evidence in order to be reasonable." Grayson, 257 F.3d at 1225 (citing Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999)). What investigations are reasonable "may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691.

As found by the state habeas corpus court in this case, Petitioner's trial counsel had approximately ten months to prepare for trial. (R. Ex. 38 at 885.) On September 24, 1985, approximately four months into the case, Petitioner's attorneys filed a motion for the appointment of a psychiatrist, psychologist or other mental health specialists to determine Petitioner's competency and sanity. (R. Ex. 38 at 888; see also R. Ex. 1 at 137-140.) Said motion was granted on September 27, 1985. (R. Ex. 38 at 891; see also R. Ex. 1 at 165.) Counsel conferred with other attorneys with extensive experience in trial and habeas corpus death penalty litigation, such as George Kendall of the American Civil Liberties Union, the Southern Poverty Law Center in Alabama, Bruce Harvey, and Jimmy Berry. (R. Ex. 38 at 890.) Attorney Cella got the names of three suggested psychologists from the American Civil Liberties Union in

November of 1985, and Attorney Cella contacted Dr. Gary E. Dudley to conduct the examination of Petitioner. (R. Ex. 38 at 891-92; see also R. Ex. 39 at 66-68, 172-75.) Following the examination, Dr. Dudley related to Attorney Cella that Petitioner was in the midrange level of intelligence and that any mental deficiencies were "quite mild and in no way impaired his judgment or his decision-making capacity. (R. Ex. 38 at 892; see also R. Ex. 39 at 68.) Dr. Dudley also indicated to counsel that he found Petitioner both competent to stand trial and sane at the time of the offenses. (R. Ex. 38 at 892; R. Ex. 39 at 66-69, 73, 78-79, 172-77, 207-210.) Attorney Schuster then conferred with Dr. Dudley about his written report and, in particular, Dr. Dudley's suggestion that a neuropsychological evaluation be conducted "to rule out an organic etiology." (R. Ex. 38 at 892; see also R. Ex. 39 at 175-76.) In this subsequent conversation, Dr. Dudley led Mr. Schuster to believe that further investigation would simply be a waste of time because Petitioner was not psychotic, was intelligent and had a fairly high I.Q. (R. Ex. 38 at 892; see also R. Ex. 39 at 175-76.) Based upon Dr. Dudley's written report and the follow-up conversation, counsel saw no need to have further neuropsychological testing done, particularly given Petitioner's "adamant" assertion that he did not commit the crimes, not that Petitioner had committed the crimes but had been unable to control himself. (R. Ex. 38 at 892; see also R. Ex. 39 at 78-79, 176-77.) Counsel elected not to call Dr. Dudley as a defense witness because of "his conclusion that Lawrence's mental deficiencies did not prevent him from understanding what was right from wrong, did not impair his judgment or his decision-making capabilities, and that he was not psychotic." (R. Ex. 38 at 892-93; see also R. Ex. 39 at 78.) Counsel also considered but elected not to call Dr. Dudley as a mitigating witness because they determined Dr. Dudley had nothing helpful in mitigation. (R. Ex. 38 at 893; see also R. Ex. 39 at 73, 78, 174-77.) Based upon Dr. Dudley's experience as a psychologist in a Florida prison, Dr. Dudley had described Petitioner to Mr. Schuster as "just a criminal" and indicated he had no helpful testimony so that Mr. Schuster elected not to call Dr. Dudley in mitigation as counsel

saw no sense in presenting a witness who would not be helpful to Petitioner. (R. Ex. 38 at 893; <u>see also</u> R. Ex. 39 at 174.) Counsel knew that Petitioner claimed he had suffered a head injury in the past. (R. Ex. 38 at 893; <u>see also</u> R. Ex. 39 at 45-46.) However, as stated <u>supra</u>, based on the statements of Dr. Dudley, counsel were led to believe that further neuropsychological testing would be a waste of time. (R. Ex. 38 at 893; <u>see also</u> R. Ex. 39 at 175-76.) Counsel also believed that a defense regarding brain damage would have been inconsistent with Petitioner's version of events that he was innocent. (R. Ex. 38 at 893; <u>see also</u> R. Ex. 39 at 78-79.) Moreover, counsel never had any problems communicating with Petitioner or had any evidence to indicate potential brain damage. (R. Ex. 38 at 894; <u>see also</u> R. Ex. 39 at 79-80.)

In addition to investigating Petitioner's mental health, trial counsel contacted Petitioner's family in Louisville, Kentucky, and traveled to Kentucky to interview as many family members as possible prior to trial. (R. Ex. 38 at 895; <u>see also</u> R. Ex. 39 at 82-88, 105, 178-82, 198.) Counsel also conferred with Petitioner and specifically discussed with Petitioner his testifying during the sentencing phase. (R. Ex. 38 at 896; R. Ex. 39 at 184.)

Based on their pre-trial investigation, Petitioner's attorneys presented limited mitigating evidence at trial. The record reflects that the mitigation case included testimony from two employees of the Cobb County Sheriff's Department, Jefferson's mother, one of his sisters, the mother of Jefferson's children, and Jefferson himself. (R. Ex. 38 at 895-96.) The employees of the Cobb County Sheriff's Department generally testified that they had not had any problems with Jefferson since his incarceration. (R. Ex. 38 at 895; <u>see also</u> R. Ex. 25 at 1253-56, 1258-59.) Jefferson's mother, Vera Jefferson, testified about Jefferson's difficult childhood, including his having to grow up without a father in the house. She testified that Jefferson was responsible, generous, gentle, and kind. She stated that he loved people and was very playful as a child. She mentioned to the jury that Jefferson did suffer an injury to his head at the age of two when a car ran over the top of his head, but she was not

questioned and did not offer any testimony regarding the impact of that injury on Jefferson. Jefferson's mother otherwise plead to the jury to have mercy on her son. (R. Ex. 25 at 1261-66.) Jefferson's sister, Rita Jefferson, also testified about Jefferson's generosity and sense of responsibility. She explained to the jury that Jefferson would get her and her sisters ready for school, take them to school, bring them home from school, prepare them for bed, and take them to church. She also testified that he helped her with her sons. (Id. at 1268-72.) She testified about Jefferson being in the Navy and later attending vocational/technical school. (R. Ex. 38 at 896; see also R. Ex. 25 at 1267.) Linda Dale, the mother of Jefferson's two children, testified that Jefferson was a good father, who was responsible and liked to work. She testified that he was loved by his family. (R. Ex. 38 at 896; see also R. Ex. 25 at 1274-81.) Jefferson testified himself about his background, identified his handwritten autobiography that was admitted into evidence, and denied having made the statement that he had allegedly told police he wanted to be executed. (R. Ex. 38 at 896; see also R. Ex. 25 at 1289-1308.) Counsel prepared Petitioner for testifying, and in particular cross-examination, by having reviewed transcripts of and using questions from the prosecutor's cross-examination in other death penalty cases. (R. Ex. 38 at 896.)

### 1.     Ineffective Assistance

The record refutes Petitioner's contention that his trial counsel effectively presented the sentencing jury with no evidence in mitigation, but the record supports Petitioner's argument that his trial counsel performed ineffectively when they failed to conduct a reasonable investigation of mitigating evidence, including, in particular, mental health evidence. In examining this claim, the issue before the Court is not whether counsel should have presented additional mitigating evidence during the penalty phase. Rather, the question is whether the investigation supporting counsel's decision not to investigate further for mitigating evidence was reasonable. Wiggins, 539 U.S. at 522-23. Reasonableness in this context is assessed by looking to

"[p]revailing norms of practice as reflected in [the] American Bar Association standards." Strickland, 466 U.S. at 688.

When determining whether trial counsel conducted a reasonable investigation, the Court must undertake a three-part inquiry. First, "it must be determined whether a *reasonable investigation* should have uncovered the mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel." Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir. 1991) (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1998) (emphasis in original)). If the decision is tactical or strategic, that decision is afforded a "strong presumption of correctness." Blanco, 943 F.2d at 1500. Otherwise, the court must make a harmlessness review "to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Middleton, 849 F.2d at 493. The question of whether a decision was a strategic decision is a question of fact. Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991); see also 28 U.S.C. § 2254(d). However, whether the strategy was reasonable is a question of law subject to de novo review. Horton, 941 F.2d at 1462.

Here, had Petitioner's trial counsel not abandoned their investigation of Petitioner's mental health prematurely, they should have and likely would have become aware of Petitioner's brain damage. In regard to what counsel would have discovered with further reasonable investigation, including specifically a neuropsychological evaluation, Jefferson has presented affidavits from several mental health professionals providing relevant evidence. Dr. James R. Merikangas, who performed a comprehensive battery of neurological tests on Petitioner and reviewed Dr. Dudley's psychological report, Petitioner's life history, records from Petitioner's court proceedings in Cobb County, records from the Kentucky Department of Corrections, Petitioner's school records from Louisville, and Petitioner's medical records and various reports from the Georgia Department of Corrections, determined that Petitioner suffers from permanent brain damage of the

- 80 -

acquired, post-traumatic type, which is most pronounced in the right hemisphere of the brain, including the frontal lobe. (R. Ex. 40 at 236, 253-57, 319.) Dr. Merikangas further determined that his conclusions were consistent with those contained in Dr. Dudley's report. (Id. at 256.) More specifically, Dr. Merikangas reasoned that, in all probability, the attention deficit disorder and learning disability noted in Dr. Dudley's report are consequences of the severe trauma that Petitioner suffered to his head during childhood. (Id. at 256-57.) Another licensed clinical psychologist, Dr. Price, reached conclusions consistent with those of Dr. Merikangas. Dr. Price interviewed and examined Petitioner on March 22 and 26, 1991. Dr. Price determined that Petitioner has long suffered from frontal lobe syndrome or brain damage, which causes abnormal behavior in Petitioner over which he has no or substantially limited control. (R. Ex. 40 at 335.) Dr. Price opines that the significant difference between Petitioner's Verbal and Performance I.Q.s, which was noted by Dr. Dudley, indicated some differences in hemispheric integrity, which is characteristic of brain damage. (Id. at 340.) Dr. Price also referred to standard medical sources to support his findings and conclusions:

> As stated in DSM-III-R, describing the Frontal Lobe Syndrome as reviewed from the ICD-9-CM Classification: "Conscientiousness and powers of concentration are often diminished, but measurable deterioration of intellect or memory is not necessarily present. The overall picture is often one of emotional dullness, lack of drive and slowness; but particularly in persons previously with energetic, restless or aggressive characteristics, there may be a change toward impulsiveness, boastfulness, temper outbursts, silly fatuous humor, and the development of unrealistic ambitions." The tragedy of such brain damage is that the behavior that may result from it could, without the administration of proper testing, be mistaken for volitional.

(Id. at 343-44.) Dr. Dudley, having had an opportunity to review Dr. Price's findings, concurred with Dr. Merikangas and Dr. Price that Petitioner suffers from organic brain damage, presuming the test results of the tests performed by Dr. Price are correct. (R. Ex. 40 at 325.) Significantly, it is undisputed that the testing performed by Dr. Merikangas and Dr. Price could have easily been performed by available

mental-health professionals in the Atlanta area prior to Petitioner's sentencing.[16] (R. Ex. 40 at 259 ¶ 10, 322, 439 ¶¶ 3, 7.)

In addition to presenting affidavits from mental health professionals indicating that Petitioner suffers from organic brain damage as a result of the childhood injury to his head, counsel also has presented affidavits from several of his family members and friends. Counsel ultimately interviewed several of Petitioner's family members about a week before trial. However, had trial counsel paid attention to obvious information concerning Jefferson's childhood injury, developed questions concerning the injury as a part of their background investigation of Jefferson, and contacted the family members and friends of Jefferson earlier in the case, counsel likely would have learned critical information about the head injury and the medical problems that Jefferson had as a child. The May 8, 1985 "Health History" from the Cobb County jail, composed almost a year prior to the trial in this case, noted that Petitioner suffered a head injury years ago and that he had frequent headaches as a result of the head injury. (R. Ex. 40 at 369.) Trial counsel apparently failed to pay attention to the "Health History." (R. Ex. 39 at 37-38, 40-41, 205.) In addition, the written summary of Petitioner's statement to the police makes reference to the fact that Petitioner was hit by an automobile when he was a child. (R. Ex. 40 at 370.) Yet, counsel, who actually utilized the statement during a pre-trial hearing, failed to follow up on this critical information. Petitioner also had a visible scar on his forehead. This also was ignored. Had trial counsel taken care to notice and follow up on the information and

---

[16] Based upon certain comments made in Dr. Dudley's report of February 10, 1986, one of Petitioner's trial attorneys, Marc Cella, made mention during the hearing before the state habeas corpus court that he was doubtful about whether Petitioner would have cooperated with other mental health experts and permitted further mental health testing. (R. Ex. 39 at 79.) However, the record reflects that, as of February 14, 1986, trial counsel actually expected additional testing to be performed the week following February 14, 1986, notwithstanding Petitioner's prior lack of cooperation with Dr. Dudley. (R. Ex. 13 at 85-86.) There is no indication that the additional examination was performed, and the Court presumes this is the examination that counsel chose to forego.

scar, trial counsel would have learned from Petitioner's mother that Jefferson stayed in the hospital for a long time after he suffered the head injury and that he had heavy fevers the whole time.  (<u>Id.</u> at 355.)  Trial counsel also would have learned from her that Jefferson kept to himself as a child, that he was slower than others to pick up on things, and that he often had problems paying attention and concentrating on his work.  (<u>Id.</u> at 356.)  Vera Jefferson also indicates in her affidavit that Jefferson eventually started getting headaches regularly and that she worried about him driving because he got dizzy and his sight got blurry sometimes.  (<u>Id.</u>)  Petitioner's older brother, James Jefferson, whom trial counsel never contacted before trial, would have informed them that Petitioner used to sweat all the time, even during the winter.  (<u>Id.</u> at 349.)  Consistent with his mother, he also would have advised trial counsel that Petitioner kept to himself, had bad headaches as a child, and often experienced dizziness.  (<u>Id.</u> at 350.)  He further would have informed counsel that Jefferson occasionally would faint and that he had one time been hospitalized after fainting.  (<u>Id.</u>)  Significantly, counsel also would have learned that Jefferson had a history of mental illness in his family.  (<u>Id.</u> at 351.)  This information would have itself been additional mitigating evidence and likely would have prompted trial counsel to expand the scope of their mental health investigation, particularly if trial counsel had provided the information to Dr. Dudley prior to his mental evaluation of Petitioner.

In sum, a reasonable investigation in this case should have and likely would have uncovered evidence that Petitioner has long suffered from organic brain damage.  However, trial counsel did not notice or attribute much significance to the information about Jefferson's head injury, did not contact Jefferson's family members to perform a background investigation until after their mental health investigation was complete, and abandoned the mental health investigation without having any neuropsychological evaluation of Jefferson performed.

The trial court found as fact that counsel made a strategic decision not to

present any type of mental defense or pursue additional neuropsychological testing. (R. Ex. 38 at 894.) In doing so, the trial court specifically credited the testimony of Mr. Schuster and Mr. Cella regarding their efforts to investigate Petitioner's mental condition, both as to potential defenses to the crimes themselves as well as mitigating evidence, and their decision not to call Dr. Dudley as a witness in mitigation. (Id.)

This Court finds as a matter of law, however, that the strategic decision of Petitioner's trial counsel not to investigate Petitioner's mental health further and not to present mental health evidence during the sentencing phase of trial was unreasonable. First, the decision not to investigate further was erroneously based on oral statements made by Dr. Dudley that contradicted his written opinion without adequate explanation for the contradiction. Second, the decision not to investigate further was erroneously based on counsel's failure to inquire about and appreciate the potential value of evidence of brain damage as a mitigating circumstance. Third, the decision not to present mental health evidence can hardly be described as strategic, since trial counsel was not aware of the mental health evidence that might have been available.

With respect to Dr. Dudley's communications with Petitioner's trial counsel, Mr. Schuster was made aware that Dr. Dudley initially believed that further testing of Petitioner was advisable. Dr. Dudley, who had no background information on Petitioner furnished to him by trial counsel, submitted a written report on February 10, 1986, which stated the following: "One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology." (R. Ex. 40 at 279.) Based on their testimony before the state habeas corpus court, Attorneys Cella and Schuster did not follow up on this recommendation because they were ultimately led to believe by Dr. Dudley's subsequent oral statements that

further testing would be a waste of time.[17] (R. Ex. 39 at 174.)  Dr. Dudley apparently had stated to Mr. Schuster in a phone conversation that he believed Petitioner was "just a criminal" and that additional testing might be futile in light of the rest of the written report.  (Id. at 174-76.)  There is no indication, however, that Petitioner's trial counsel ever sought a clear-cut explanation from Dr. Dudley as to how or why he went from stating his opinion in a written report that it would be worthwhile to conduct a neuropsychological evaluation to stating orally that such an evaluation would likely be a waste of time and that Petitioner was "just a criminal."  Respondent states that "Dr. Dudley led Mr. Schuster to believe that further investigation would be a waste of time since Petitioner was not psychotic and he was intelligent and had a fairly high I.Q."  (Respondent's Br. at p. 124.)  However, all of this information was known to Dr. Dudley and trial counsel at the time that he initially submitted the written report.  The only new information offered by Dr. Dudley was that Petitioner was "just a criminal," but no competent lawyer would have abandoned an investigation into potential mitigating evidence based on the oral opinion of a mental health expert that the defendant was "just a criminal," particularly when that mental health expert previously had provided a written expert report explicitly stating that it would be worthwhile to conduct further testing to determine whether the defendant suffered from "organic etiology" or brain damage.  While "reasonably

---

[17]     During the evidentiary hearing before the state habeas corpus court, Petitioner offered the affidavit of Dr. Dudley in which Dr. Dudley claimed that he never, before or after his written report, suggested to Mr. Schuster or Mr. Cella that an evaluation for brain damage was not necessary or that it would not be worthwhile.  (R. Ex. 40 at 440.)  Dr. Dudley also averred that he never stated to Mr. Schuster that Petitioner was just a criminal and that, consequently, neuropsychological testing would not provide useful information.  (Id.)  However, the state habeas corpus court credited the testimony of trial counsel over the affidavit testimony of Dr. Dudley.  (R. Ex. 38 at 913.)  Notwithstanding the state habeas corpus court's failure to explain the basis for its credibility finding, particularly in the absence of live testimony from Dr. Dudley, the Court will not disturb the state habeas corpus court's credibility finding.  The Court therefore accepts as true that Dr. Dudley ultimately advised Petitioner's trial counsel that further testing was unnecessary.

diligent counsel may draw a line [in their investigation] when they have good reason to think further investigation would be a waste," <u>Rompilla v. Beard</u>, 545 U.S. 374, 383, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), trial counsel did not have a good reason here. Therefore, even if Petitioner's attorneys made a strategic choice not to spend additional time investigating Petitioner's mental health, the limit that counsel placed on the investigation was not supported by reasonable professional judgment. <u>See</u> <u>Wiggins</u>, 539 U.S. at 533.

Petitioner's trial counsel also failed to appreciate the purpose of neuropsychological testing and the value of brain damage evidence. As an initial matter, counsel unreasonably limited their mental-health inquiry to what they perceived as the three "standard" mental-health defenses (i.e., competency at the time of the crime, at the time of trial, or mental retardation). Trial counsel testified that one of the reasons they did not call Dr. Dudley as a witness for the defense was based on Dr. Dudley's conclusion that Petitioner's mental deficiencies did not prevent him from understanding right from wrong, did not impair his judgment or his decision-making capabilities, and that he was non-psychotic. (R. Ex. 39 at 78.) Dr. Dudley's conclusions in this regard, however, do not speak to the existence or non-existence of mitigating mental health evidence pertinent to the penalty phase of trial. Mr. Schuster also had fundamental misconceptions about neuropsychological testing and brain damage. In this respect, counsel was asked several times at the hearing before the state habeas corpus court why neuropsychological testing was not pursued. In response, Mr. Schuster stated that the testing was not pursued because Dr. Dudley had decided that exploration of explosive personality disorder was unnecessary. (R. Ex. 39 at 175-76.) Mr. Schuster also stated that in his and Mr. Cella's dealings with Petitioner, they had not become aware of any problems with explosive personality. (<u>Id.</u> at 177.) Mr. Schuster obviously erroneously equated explosive personality disorder with brain damage and testing for explosive personality disorder with neuropsychological testing. Simply put, trial counsel in this case had

no idea of, and did nothing to learn, the significance of developing mental-health testimony and evidence for the penalty phase of a capital trial, even if such testimony and evidence would not have assisted mental-health based claims at the guilt-innocence phase of the trial. <u>See, e.g.</u>, <u>Blanco</u>, 943 F.2d at 1503 ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have an opportunity to consider.").

Respondent argues that the record supports the conclusion that Petitioner's trial counsel reasonably made a strategic decision to abandon their investigation of Petitioner's mental health based on their belief that presenting evidence of organic brain damage during the penalty phase was inconsistent with the guilt phase strategy of innocence. However, strategic decisions must be based on full information, and trial counsel in this case did not have full information. <u>See</u> <u>Horton</u>, 941 F.2d at 1462 (rejecting "the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"). Here, trial counsel had the option of presenting powerful mitigating evidence regarding Petitioner's brain damage, albeit at the risk that such evidence would imply Petitioner's guilt and weigh against trial counsel's credibility, since trial counsel had advocated a theory of innocence during the liability phase of the trial. Alternatively, trial counsel had the option of arguing residual doubt and pleading for the jury's mercy. Trial counsel elected the latter option but without reasonably investigating the alternative.[18] Therefore, even if trial counsel's decision was "strategic," the decision was not an informed decision and therefore was unreasonable.

Even with Dr. Dudley's recantation of the suggestion that further testing be

---

[18]    Petitioner contends that trial counsel did not rely on a "residual doubt" sentencing phase strategy and only offered "good guy" evidence coupled with evidence that Petitioner would be a good prisoner if sentenced to life in prison. While trial counsel may not have focused on a "residual doubt" sentencing phase strategy, counsel's arguments did focus on residual doubt to some extent.

performed, no reasonable lawyer in counsel's position at the time would have decided not to have Petitioner tested for brain damage, particularly given the evidence readily available to counsel that Petitioner suffered a serious injury to his head as a child and also given the fact that Petitioner's life was at stake.  See Strickland, 466 U.S. at 668 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").  Trial counsel's strategic decision and investigation also were not reasonable in light of the guidelines set forth by the American Bar Association, which provide that the investigation into mitigating evidence in a capital case "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutors."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(c), p. 93 (1989); see also 1 ABA Standards for Criminal Justice 4-4.1, Commentary, p. 4-55 (2d ed. 1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing .... Investigation is essential to fulfillment of these functions").

In the many Eleventh Circuit cases where the sufficiency of counsel has been upheld where counsel presented evidence in mitigation but not all available evidence, the attorneys had conducted a reasonable investigation and were at least aware of the possible evidence that was available and simply decided not to present the evidence.  See, e.g., Jones v. Dugger, 928 F.2d 1020, 1028 (11th Cir. 1991); Clark v. Dugger, 834 F.2d 1561, 1567-78 (11th Cir. 1987); Funchess v. Wainwright, 772 F.2d 683, 690 (11th Cir. 1985).  Here, counsel abandoned "investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible."  Wiggins, 539 U.S. at 527-28.  Because Petitioner's counsel had no rational strategy or reason for failing to develop this mitigating evidence, their performance fell below an objective standard of reasonableness.

2.    Prejudice

Presented with the additional mitigating evidence regarding Jefferson's organic brain damage, there is a reasonable probability that the jury would not have sentenced him to death. <u>Strickland</u>'s prejudice prong is easily satisfied in this case, as the evidence that Petitioner's trial counsel could have presented would have: (1) explained how an otherwise largely inexplicable crime could have occurred because of circumstances beyond Petitioner's control; and (2) substantially impacted any "mercy-based" juror decision-making on sentencing, since it figures directly into the state of the murderer's mind.

The Eleventh Circuit has held in several cases that prejudice results from an attorney's failure to investigate and present or properly present mitigating mental health evidence. <u>See</u> <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1515 (11th Cir. 1995); <u>Cunningham v. Zant</u>, 928 F.2d 1006, 1019 (11th Cir. 1991); <u>Stephens v. Kemp</u>, 846 F.2d 642, 653 (11th Cir. 1988); <u>Blanco</u>, 943 F.2d at 1503; <u>Middleton</u>, 849 F.2d at 495; <u>Armstrong v. Dugger</u>, 833 F.2d 1430, 1432-34 (11th Cir. 1987). "The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing the particularized characteristics of the defendant." <u>Cunningham</u>, 928 F.2d at 1019. Although the evidence put on by trial counsel during the penalty phase focused on some particular characteristics of Petitioner, trial counsel ineffectively failed to present mental health evidence to the detriment of Petitioner. As the <u>Blanco</u> and <u>Armstrong</u> courts concluded, "'[t]he demonstrated availability of undiscovered mitigating evidence clearly me[ets] the prejudice requirement.'" <u>Blanco</u>, 943 F.2d at 1505 (quoting <u>Armstrong</u>, 833 F.2d at 1434).

Because of counsel's omissions in this case, the jury was deprived of the singularly most powerful explanation for the crime – Petitioner suffered from organic brain damage that impaired his judgment and his ability to control his behavior. Dr. Merikangas' testimony, in part, is and would have been the following:

The neurological damage has had a profound and lifelong impact on

Mr. Jefferson's behavior. The damage produces features including attention deficit disorder, learning disabilities, affective instability, markedly diminished impulse control, transient outbursts of rage which are totally inconsistent with his normal behavioral pattern, impaired social judgment, significant cognitive impairment, apathy, indifference, suspicion, and paranoid ideation. Mr. Jefferson's brain damage is clearly of the acquired, post-traumatic type. Persons with such severe cognitive disabilities have reduced moral culpability for acts generally, are more likely to fall victim to substance abuse, and, when intoxicated, are certain to be much more symptomatic.

(Id. at 257.) Dr. Price similarly attests:

[P]etitioner's brain damage has significant and far reaching implications for Mr. Jefferson because such damage compromises the patient's ability to act in a normal and acceptable manner, often without warning or explanation. Such damage to brain tissues would profoundly alter Mr. Jefferson's ability to plan and coordinate his actions, to be aware of the consequences of his behavior, and to engage in premeditated or intentional acts.

(R. Ex. 40 at 343.) All of this information could and should have been provided to the sentencing jury.

The Court is aware that Petitioner was still committed to his theory of innocence during the penalty phase of the trial, which might have diminished the impact of the mitigating mental health evidence, if Petitioner, aware of the evidence, had elected to remain committed to the theory of innocence. Still, however, the mental health evidence would have provided the jury an explanation for Petitioner's past behavior and his testimony regarding his past behavior. In this regard, Dr. Price noted the following:

Generally a person with this type of medical and physical condition is unable to learn from his or her mistakes, a condition starkly revealed but fundamentally mischaracterized during the sentencing trial in Mr. Jefferson's case. During Mr. Jefferson's testimony, the state reviewed a series of brushes with the law and/or authority figures that Mr. Jefferson had reportedly experienced. Following each of these experiences, Mr. Jefferson had reportedly been given a break, another chance, or an opportunity to learn from his mistakes without severe punishment. A person with Mr. Jefferson's disabling condition frequently cannot benefit from experience or "breaks" .... Repeated episodic spontaneous behavior which is organically caused, cannot be corrected through the withholding or granting of rewards. It is not learned behavior, and hence it cannot be unlearned.

(R. Ex. 40 at 345-46.) He further offered:

[T]he sentencers were informed that Petitioner had committed a series

of crimes, from petty offenses to robbery, before the offense in this case, and were led to believe that Mr. Jefferson somehow chose to lead a life of crime. Mr. Jefferson's testimony, offered to explain the earlier charges, ranged from his testimony that he was in the wrong place at the wrong time, to testimony that he did not participate in the crimes, to testimony that he had made a mistake, etc. All of this testimony is quite believable when one understands that Mr. Jefferson suffers from damage to his brain which causes spontaneous behavior with no or significantly reduced cognitive component, and that Mr. Jefferson's ability to learn from past mistakes is significantly compromised by his disability through no fault of Mr. Jefferson.

(Id.)

Petitioner has presented a compelling and unrebutted case that he suffers (and suffered) from organic brain damage, a dysfunction that affected his cognitive ability and his ability to conform his actions. This compelling evidence could and should have been presented to the sentencing jury. Had such evidence been presented, there is a reasonable probability that the jury would have returned a sentence of life in prison rather than a death sentence. Because trial counsel unreasonably failed to investigate and present this compelling mitigating evidence, this Court's confidence in the outcome actually reached at sentencing is significantly undermined. Petitioner has therefore established the prejudice resulting from trial counsel's ineffectiveness, and Petitioner is entitled to a new a sentencing hearing at which this mental health evidence can be presented.

l.      Failure to Present Expert Testimony in Support of the Motion to Suppress

Petitioner next claims that his trial counsel were ineffective because they failed to call expert witnesses or to adduce other supporting evidence to demonstrate to the trial judge during pretrial proceedings that Petitioner's post-arrest statements should have been suppressed. Specifically, Petitioner contends that his trial counsel should have presented evidence regarding the effect of smoking marijuana on an individual's ability to knowingly and voluntarily waive his Miranda rights. At the evidentiary hearing held before the state habeas corpus court, Marc Cella testified that he did consider seeking an expert to testify about the effects of marijuana. (R.

Ex. 39 at 98.) However, Mr. Cella also testified that when he discussed the marijuana issue with Petitioner, "Lawrence denied that he was smoking marijuana or that there was a lit marijuana cigarette at the time that he was taken into custody." (Id. at p. 99.) Given that Jefferson would not admit to the fact of smoking marijuana, counsel made a strategic decision not to pursue expert evidence as to the effect of smoking marijuana. As such, the Court concludes that counsel did not perform ineffectively in not presenting evidence regarding the effects of smoking marijuana.

m.     Cumulative Effect of Trial Counsel's Errors

Petitioner contends that the cumulative effect of trial counsel's errors entitles him to habeas relief. While consideration of cumulative effects may be appropriate when numerous individual instances of error and prejudice are present, the Court has only found one such significant error by trial counsel in this case. As such, the Court finds that Petitioner is not entitled to relief on the basis of this claim.

2.     *Claim II*

Petitioner next claims that his appellate counsel rendered ineffective assistance in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Essentially, Petitioner argues that appellate counsel was ineffective for failing to raise the same issues that he contends trial counsel should have raised and for failing to raise an ineffective assistance of trial counsel claim on direct appeal.

Ineffective assistance of appellate counsel claims are analyzed under the same Strickland test used for ineffective assistance of trial counsel claims. Peoples v. Bowen, 791 F.2d 861 (11th Cir.), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 597 (1986). The Supreme Court has held that a petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. Jones v. Barnes, 463 U.S. 745, 754, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); see also Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990) (holding that failure to raise non-meritorious issues is not considered ineffective assistance of counsel). As such, to be effective within the bounds of Strickland, "counsel need not pursue

constitutional claims which he reasonably believes to be of questionable merit."
Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995). To satisfy the prejudice prong of Strickland, a petitioner must establish that there was a reasonable probability that his claim would have been successful before the state's highest court but for the error of appellate counsel.

Here, the only ineffective assistance of appellate counsel claim that has any merit is a claim that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel rendered ineffective assistance when they failed to conduct a reasonable investigation. However, Petitioner did not cross-examine his appellate counsel, Ralph Kearns, at the evidentiary hearing before the state habeas corpus court and has offered no evidence to support his claim that Mr. Kearns was ineffective. Furthermore, Petitioner cannot satisfy the prejudice prong, as the Supreme Court of Georgia actually reviewed Petitioner's ineffective assistance of counsel claim following the decision by the state habeas corpus court and, contrary to this Court, agreed with the state habeas corpus court that the claim lacked merit. Jefferson, 263 Ga. at 318-20. As such, there is not a reasonable probability that the claim would have been successful before the Supreme Court of Georgia. Insofar as Petitioner has failed to explain how he might have otherwise suffered prejudice,[19] Petitioner's claim for ineffective assistance of appellate counsel is denied.

> 3. *Claim IV*

In Claim IV of the Corrected Amended Petition, Petitioner contends that an unconstitutional capital sentencing scheme violated his rights under the Eighth and Fourteenth Amendments. Petitioner specifically argues that Georgia's capital sentencing scheme fails to narrow the class of death-eligible defendants in instances

---

[19]     Petitioner might have suffered prejudice had the state habeas corpus court deemed the ineffective assistance of counsel claim procedurally defaulted. However, even though ineffective assistance of counsel was not raised on direct appeal, the state habeas corpus court reviewed the claim on the merits, thereby preserving the claim for review by this Court.

where the state relies on O.C.G.A. § 17-10-30(b)(2) to support a death sentence on a felony murder conviction. Petitioner raised this same argument on direct appeal before the Supreme Court of Georgia, and the Supreme Court of Georgia upheld Petitioner's sentence under this sentencing scheme, reasoning that the "evidence supporting the conviction supported the jury's (b)(2) finding." Jefferson, 256 Ga. at 828. Observing that the claim was decided adversely to Petitioner on direct appeal, the state habeas corpus court found that Petitioner was precluded from relitigating the claim in the state habeas proceeding. (R. Ex. 38 at 879.) The Supreme Court of Georgia affirmed this ruling.

The United State Supreme Court has rejected an identical challenge involving Louisiana's capital sentencing scheme. See Lowenfield v. Phelps, 484 U.S. 231, 241-246, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). In Lowenfield, a state prisoner argued that his death sentence was due to be vacated because "the sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime of which he was convicted." The Supreme Court rejected this argument and held that a sentence is not constitutionally infirm simply because an aggravating circumstance supporting a death sentence duplicates an element of the underlying crime for which a petitioner is convicted. 484 U.S. at 246. As long as the sentencing scheme narrows the class of death-eligible murderers and permits the jury to consider mitigating circumstances and to exercise their discretion, the requirements of the Constitution are met. Id. Georgia's sentencing scheme meets these requirements, and this claim therefore provides no basis for habeas relief.

> ### 4.    Claim XXII

Petitioner next argues that his death sentence was unconstitutionally imposed because there was insufficient evidence to establish that the murder of Taulbee occurred during the commission of an armed robbery. Petitioner did not raise this claim on direct appeal, but the Supreme Court of Georgia nevertheless made the finding that the evidence supported Petitioner's conviction and the jury's (b)(2)

finding. <u>Jefferson</u>, 256 Ga. at 822, 828.

In reviewing allegations of sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979) (emphasis in original). A federal habeas court does not make an independent determination regarding whether the evidence demonstrates guilt beyond a reasonable doubt. <u>Jackson</u>, 443 U.S. at 318-19. Where the record of historical facts supports conflicting inferences, the Court must presume that the jury resolved such conflicts in favor of the prosecution, and the Court defers to the jury's judgment as to the weight and credibility of the evidence. See <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1200 (11th Cir. 2004).

On direct appeal, the Supreme Court of Georgia found that the following facts supported Petitioner's conviction and the jury's (b)(2) finding:

> Soon after 4:00 p.m. on May 1, 1985, Jefferson and co-worker Ed Taulbee quit work for the day, and went to Lake Allatoona in Taulbee's car to do some fishing. Later that evening, Jefferson returned home, alone, in Taulbee's car.
>
> A neighbor dropped by and observed clothes soaking in Jefferson's bathtub and discovered that Jefferson's wallet contained some $100 in cash, although he had not yet cashed his paycheck. The neighbor testified that Jefferson told him "his little fat buddy was dead."
>
> Another neighbor testified that he took Jefferson to Lake Allatoona later that night, and that Jefferson disappeared into some woods and returned a few minutes later carrying a fishing pole and tackle box. Next, he took Jefferson to an automatic teller machine where Jefferson, asking whether it took "pictures," put on a straw hat and sunglasses and attempted to make a cash withdrawal.
>
> Jefferson subsequently gave Taulbee's bank card to a third neighbor and told her to get rid of it. It was recovered from the neighbor's window air-conditioning unit.
>
> One the morning of May 2, 1985, Taulbee's body was discovered lying face down in some woods near Lake Allatoona. A large log lay across

his head, and two large wooden sticks lay nearby, one of which was shattered and had hair and blood on it. The victim's pockets were empty except for his paycheck receipt.

Jefferson admitted to the police that he owed the victim some money, and, although he denied killing him, he stated that "[he] did not need to be around other people, that he wanted to be executed, and that he wanted to be put to sleep."

Jefferson, 256 Ga. at 821.

The facts, as stated by the Supreme Court of Georgia, are more than sufficient to support the conviction and sentence. Petitioner fails to articulate in his brief the precise basis for his insufficiency claim. However, Petitioner intimates in his statement of the case included in the Corrected Amended Petition that he takes issue with the fact that Taulbee's wallet was never recovered. (Corrected Am. Petition at 22-23.) Notwithstanding that the wallet was never recovered, there was ample evidence from which a reasonable jury could infer that Jefferson robbed Taulbee. Among other things, Taulbee's wallet was missing, Jefferson had not yet cashed his paycheck but nevertheless was in possession of a large sum of cash the night the murder occurred, Jefferson was in possession of an ATM card later determined to belong to Taulbee, and Jefferson attempted to use the ATM card to withdraw money while wearing a straw hat and sunglasses. The Court understands that most of this evidence is based on the testimony of the Glades and Mitchell and that Petitioner takes issue with the credibility of these witnesses. Again, however, this Court is required to defer to the jury's credibility determinations and weighing of the evidence. Jackson, 443 U.S. at 326; Wilcox, 813 F.2d at 1143.

Based on the standard articulated in Jackson, cited supra, the Court agrees that the evidence was sufficient for the jury to convict petitioner beyond a reasonable doubt and to find the existence of aggravating circumstances under § (b)(2). Petitioner's claim for relief based on insufficiency of the evidence is without merit. Therefore, this claim is denied.

C.    <u>Claims Found to be Procedurally Defaulted by State Habeas Corpus Court and the Supreme Court of Georgia</u>

Petitioner has raised many claims in this federal habeas corpus proceeding that he did not raise at trial and/or on direct appeal. Among these claims are the following:

1.    **Claim III** - Petitioner was denied a fair sentencing proceeding when the trial court allegedly gave inadequate instructions regarding mitigation;

2.    **Claim VI** - The death penalty constitutes cruel and unusual punishment in the State of Georgia in that it is applied in an arbitrary and capricious fashion;

3.    **Claim VII** - Petitioner was deprived of due process and a fair capital sentencing proceeding when the trial court allegedly submitted an erroneous (b)(7) instruction to the jury which expanded the proof of the statutory aggravating circumstance;

4.    **Claim VIII** - Petitioner's death sentence was unconstitutionally imposed because the definition of aggravated battery as it applied to the (b)(7) aggravating circumstance failed adequately to direct the jury's discretion and was void for vagueness;

5.    **Claim IX** - Petitioner's death sentence was unconstitutionally obtained when the trial court failed to instruct the jury on what constituted an armed robbery as it applied to the (b)(7) statutory aggravating circumstance;

6.    **Claim X** - Petitioner's death sentence was unconstitutionally obtained when the trial court instructed the jury that their verdict must be unanimous;

7.    **Claim XI** - Petitioner's death sentence was imposed unconstitutionally based on an impermissibly vague (b)(7) statutory aggravating circumstance;

8.    **Claim XII** - Petitioner was denied due process and a fundamentally fair capital trial and sentencing proceeding when the trial court failed to instruct the jury on the lesser included offense of voluntary manslaughter;

9.    **Claim XIII** - Petitioner was denied a fundamentally fair capital sentencing proceeding when the trial court failed to instruct the jury on residual doubt;

10.   **Claim XIV** - Petitioner's death sentence was unconstitutionally obtained based on an incomplete and factually inaccurate definition of aggravated battery as it applied to the (b)(7) statutory aggravating circumstance;

11.   **Claim XV** - Petitioner was denied due process and a fair capital trial by improper prosecutorial comments and admission of evidence which implicated Mr. Jefferson's right to silence;

12.   **Claim XVII** - Petitioner's death sentence was unconstitutionally imposed based on consideration of improper and inadmissible evidence at the sentencing phase of his capital trial;

13.   **Claim XVIII** - Petitioner's death sentence was unconstitutionally imposed based on improper prosecutorial argument at the sentencing phase of his capital trial;

14.   **Claim XX** - Petitioner was denied due process and a fair capital trial and sentencing proceeding by the admission of involuntary statements;

15.   **Claim XXI** - Petitioner was denied due process and a fair capital trial and sentencing proceeding when the trial court gave an erroneous and misleading instruction that directed the jury to disregard the exculpatory portions of Petitioner's custodial statements;

16.   **Claim XXIII** - Petitioner was denied a reliable sentencing proceeding when the trial court failed to instruct the jury on the sentence that was

to be imposed upon a verdict of life;

17. **Claim XXV** - Petitioner's death sentence was unconstitutionally imposed because the jury that sentenced him was under the misconception regarding parole;

18. **Claim XXVII** - Petitioner's death sentence was unconstitutionally obtained because he was sentenced by a death prone jury;

19. **Claim XXVIII** - Petitioner was denied due process and a fair and reliable capital sentencing proceeding when the court instructed the jury that it should not ask questions during their deliberations;

20. **Claim XXIX** - Petitioner was denied due process and a reliable capital proceeding by the introduction of prejudicially gruesome photographs;

21. **Claim XXXI** - The Unified Appeal Procedure ("UAP"), on its face and as applied in Petitioner's case, is unconstitutional;

22. **Claim XXXIII** - Petitioner's rights to due process and a fair trial were violated by the court's failure to provide adequate funds with which to obtain the assistance of competent mental health experts;

23. **Claim XXXV** - Petitioner was denied a reliable sentencing proceeding by the unconstitutional consideration of victim impact testimony during his trial;

24. **Claim XXXVI** - Petitioner was denied the right to confront the witnesses against him when the court allowed the State to introduce prior out-of-court statements of key state witnesses; and

25. **Claim XXXVII** - Petitioner was denied a fair trial and reliable sentencing proceeding by the court's improper instruction on reasonable doubt.

The state habeas corpus court found all of these claims to be procedurally defaulted under O.C.G.A. § 9-14-48(d). (R. Ex. 38 at 881-84.) On appeal, the Georgia Supreme Court found that the State had not waived any issues of procedural default, Jefferson, 263 Ga. at 317, and affirmed the dismissal of these claims for the reasons

articulated by the state habeas corpus court, id. at 320.

Pursuant to § 9-14-48(d), habeas relief will not be granted on claims that were not raised at trial and on direct appeal. See O.C.G.A. § 9-14-48(d); see also Black v. Hardin, 255 Ga. 239, 240, 336 S.E.2d 754 (1985) ("[A] failure to make timely objection to *any* alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus.") (emphasis in original). "A state court's determination that a claim is barred from review in state court because of the petitioner's failure to comply with state law procedures for presenting the claim precludes federal habeas review of that claim." Agan v. Vaughn, 119 F.3d 1538, 1548 (11th Cir. 1997). Therefore, absent the applicability of an exception to the procedural default rule, the above-mentioned claims are barred from this Court's review.

To overcome the procedural bar, a petitioner must show (1) cause for the default and actual prejudice growing out of the alleged violation of federal law, or (2) a resulting fundamental miscarriage of justice if the federal court does not consider the claims. Wainwright v. Sykes, 433 U.S. 72, 81-88, 97 S. Ct. 2497, 2503-2507, 53 L. Ed. 2d 594 (1977). To establish cause, the applicant must show that some objective factor external to the defense impeded his or counsel's efforts to comply with the State's procedural rule. Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2646, 91 L. Ed. 2d 397 (1986). A petitioner may also demonstrate cause by showing that he received constitutionally ineffective assistance of counsel. Id. at 488-89. Counsel's ineffectiveness, however, must relate to and be the cause of the procedural default. Id. at 488 (Attorney error that constitutes ineffective assistance of counsel is cause "if the procedural default is the result of ineffective assistance of counsel"). To show prejudice, the applicant must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir.), cert. denied, 504 U.S. 944, 112 S. Ct. 2283, 119 L. Ed. 2d 208 (1992).

Failure to demonstrate cause and prejudice is excused and the merits of a

procedurally defaulted claim considered only "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. Innocence is thus considered the "gateway" through which a petitioner must pass before a court may consider constitutional claims that are defaulted. Schlup v. Delo, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). Actual innocence means factual innocence, not mere legal insufficiency. Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). To show that this fundamental miscarriage of justice exception applies, the petitioner must show constitutional error coupled with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324.

In the instant case, the Court finds that Petitioner has not established cause and actual prejudice to excuse the procedural default of the claims referenced above. As an initial matter, Petitioner has not clearly alleged cause for the default of any of these claims. As for Claims III (inadequate instructions regarding mitigation), VIII (inadequate definition of aggravated battery), IX (failure to instruct jury on what constituted an armed robbery), X (unanimous jury verdict), XI (impermissibly vague (b)(7) statutory aggravating circumstance), XII (failure to instruct jury on voluntary manslaughter), XVIII (improper prosecutorial argument during sentencing), XXV (jury's misconception regarding parole), and XXVIII (instruction not to ask questions during deliberations), Petitioner presumably contends that ineffective assistance of counsel satisfies the cause requirement, since Petitioner raised these issues in the context of his ineffective assistance of counsel claims. However, as explained supra, Petitioner failed to demonstrate that either trial or appellate counsel rendered ineffective assistance with respect to these particular claims. Further, that counsel rendered ineffective assistance with respect to the investigation and presentation of mitigating mental health evidence for use during the penalty phase of Petitioner's

trial does not explain Petitioner's default of these unrelated claims.[20]  Accordingly, Petitioner has not established "cause" to excuse the procedural default of any of the above claims.

Additionally, the Court finds that Petitioner has failed to demonstrate that the miscarriage of justice exception applies.  In an effort to establish actual innocence in this federal habeas proceeding, Petitioner deposed Ronald Glade and Rhonda Glade and also had DNA testing performed on hairs that were retrieved from certain crime scene evidence.  Neither the deposition testimony of the Glades nor the DNA testing revealed any evidence that Petitioner is actually innocent of the crimes of which he was convicted.  Therefore, the miscarriage of justice exception does not apply.

   D.   Unexhausted Claims Deemed Procedurally Defaulted

Before bringing a federal habeas petition, a state prisoner usually must exhaust all available remedies in state courts.  Granberry v. Greer, 481 U.S. 129, 131, 107 S. Ct. 1671, 95 L. Ed. 2d 119 (1987).  State courts must be given an opportunity to consider a petitioner's legal theory of any federal constitutional deficiency and the factual basis for that theory.  Picard v. Connor, 404 U.S. 270, 277, 92 S. Ct. 509, 30 L. Ed. 2d

---

[20]   Petitioner might argue that counsel's ineffectiveness in not developing mitigating mental health evidence is closely tied to his claim that his rights to due process and a fair trial were violated by the court's failure to provide adequate funds with which to obtain the assistance of competent mental health experts.  However, even if Petitioner could somehow establish cause for the default of this claim on the basis of counsel's ineffectiveness, the underlying claim is itself without merit.  In this respect, Petitioner points to nothing in the record indicating that the trial court failed to provide adequate funds for the retention of mental health experts.  The one motion filed by Petitioner's trial counsel requesting the appointment of a mental health expert was granted by the trial court, and no other motions followed.  Petitioner's own brief states that "the Due Process Clause of the Fourteenth Amendment requires that the State, *upon request*, provide indigent defendants with the 'basic tools of an adequate defense ... when those tools are available for a price to other prisoners.'" (Petitioner's Br. at 165-66) (quoting Britt v. North Carolina, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971)).  Here, the trial court granted all funds requested for the retention of competent mental health experts.  Thus, to the extent that an adequate defense of Petitioner required the retention of mental health experts other than Dr. Dudley, Petitioner's trial counsel, not the trial court, are at fault for not retaining such experts.

438 (1971). While dismissal of a petition with unexhausted claims is generally required, a federal court need not dismiss a petition to allow for exhaustion of state remedies if such a dismissal would be futile based on applicable state law. <u>Kelley v. Secretary for Dep't of Corrections</u>, 377 F.3d 1317, 1351 (11th Cir. 2004) (discussing the futility exception to the exhaustion requirement); <u>Allen v. State of Alabama</u>, 728 F.2d 1384, 1387 (11th Cir. 1984) (same).

Under O.C.G.A. § 9-14-51, a second or successive Georgia state habeas petition is procedurally barred unless a state habeas judge concludes that the grounds cited in the petition could not have been raised in the original petition. <u>See</u> <u>id.</u> The Eleventh Circuit has held that federal courts should enforce Section 9-14-51 "unless there is some indication that a state court judge would find the claims in question 'could not reasonably have been raised in the original or amended state habeas petition.'" <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1327 (11th Cir. 1998) (quoting O.C.G.A. § 9-14-51).

In the instant case, Petitioner raises three claims that are barred from this Court's review pursuant to O.C.G.A. § 9-14-51. First, Petitioner argues in Claim XVI of the Corrected Amended Petition that he was deprived of a fundamentally fair capital trial and sentencing by improper prosecutorial argument that shifted the burden of proof to the defendant in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Second, Petitioner contends in Claim XXXVIII, erroneously referred to in the Corrected Amended Petition as a second Claim XXXIV, that he was denied a fundamentally fair trial and reliable capital sentencing proceeding when there was improper contact between jurors and the bailiffs in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Third, Petitioner argues in Claim XL, erroneously referred to in the Corrected Amended Petition as Claim XXXXI, that he was denied a fundamentally fair trial and reliable sentencing proceeding by the prosecutors' systematic exclusion of African-Americans from jury service in Cobb County in violation of the Fifth, Sixth, Eighth, and Fourteenth

Amendments.

Petitioner did not raise any of the above-referenced claims in his state habeas corpus petition or in the amendments thereto, notwithstanding Georgia's requirement that state habeas petitioners raise all available grounds for relief in a first or amended habeas petition. See O.C.G.A. § 9-14-51. Petitioner has not presented and the Court is not aware of any reason why Petitioner could not have previously presented these claims to the state habeas corpus court. Accordingly, because the claims are unexhausted and it is clear that these claims would be procedurally barred in Georgia state court, the Court finds that O.C.G.A. § 9-14-51 bars consideration of these claims.

      E.    Claims for Which This Court Allowed Evidentiary Development

This Court's Order of August 31, 1999, ordered that Petitioner could develop the following claims at an evidentiary hearing: (1) Petitioner's McCleskey claim, asserted as a part of Claim V of the Corrected Amended Petition, that his death sentence was part of a pattern and practice of discrimination on the basis of race by the district attorney who made the decision to seek the death penalty in Petitioner's case; (2) Petitioner's Brady claim, asserted as Claim XIX of the Corrected Amended Petition, that the Cobb County District Attorney's Office did not disclose the entire file on the Petitioner's case as it related to Petitioner's prior arrest and conviction record in Kentucky; (3) Petitioner's Herrera claim, asserted as Claim XXVI of the Corrected Amended Petition that he is actually innocent of the crimes for which he was convicted; and (4) Petitioner's juror misconduct claim, asserted as Claim XXXIX of the Corrected Amended Petition, which alleges that a juror read from a Bible out loud during sentencing deliberations. The Court considers each of these claims in turn below but finds each of the claims to be without merit.

      1.    Claim V

In Claim V of the Corrected Amended Petition, Petitioner alleges that the death sentence is being exacted pursuant to a pattern and practice of discrimination

by Georgia prosecuting authorities in that the death penalty is being discriminately imposed particularly against poor, black males accused of crimes committed against Caucasians. Petitioner also contends in this claim that the prosecutor, trial judge, and jury in his case specifically acted with racial animus. Respondent has argued throughout this habeas proceeding and continues to argue that this entire claim is procedurally defaulted. Notwithstanding this Court's prior decision to allow Petitioner to develop an evidentiary basis for his claim regarding the prosecutor's alleged racial bias, having closely reviewed the complex record of this case, the Court agrees with Respondent that the entire claim is procedurally defaulted.

The portion of Petitioner's claim generally challenging Georgia's sentencing scheme as being discriminatory against poor blacks was found to be procedurally defaulted by the state habeas corpus court pursuant to O.C.G.A. § 9-14-48(d). (See R. Ex. 38 at 883.) Petitioner has shown no cause or prejudice for his procedural default of this portion of the claim, nor has he demonstrated that a fundamental miscarriage of justice will occur if the claim is not addressed on the merits. As Petitioner has presented no basis for excusing his procedural default, this portion of the claim is due to be dismissed. See Sims v. Singletary, 155 F.3d 1297, 1311 (11th Cir. 1998).

The remainder of Petitioner's claim was not fairly presented to the state courts, is unexhausted, and would be procedurally barred in Georgia state courts pursuant to O.C.G.A. § 9-14-51. More specifically, Petitioner makes factual allegations in this Court that he never made in state court. In the state habeas corpus proceedings, Petitioner mentioned that he was convicted by an all-white jury in a virtually all-white county, and he made general allegations that the death penalty in Georgia was most frequently imposed on impoverished blacks. However, Petitioner made no allegation that the prosecutor, trial judge, and jury in his case acted with racial animus with respect to the imposition of the death penalty against him. In Claim V of the habeas petition pending before this Court, Petitioner expands his allegations

to state that the death penalty is discriminately imposed against poor, black males accused of killing Caucasians. Petitioner also alleges for the first time "that virtually everyone involved in this case, including the trial judge, the prosecuting attorneys, and members of the jury, held racist views that impermissibly played a role in the consideration of the sentence imposed upon [him]." (Corrected Am. Petition at 62.)

In McNair v. Campell, 416 F.3d 1291, 1302 (11th Cir. 2005), the Eleventh Circuit held the following:

> In order to be exhausted, a federal claim must be fairly presented to the state courts. It is not sufficient merely that the federal habeas petitioner has been through the state courts ... nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made. Rather, in order to ensure that state courts have the first opportunity to hear all claims, federal courts have required a state prisoner to present the state courts with the same claim he urges upon the federal courts. While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.

Id. at 1302. The claim that Petitioner seeks to place before the Court here is obviously not the same claim that was presented to the state habeas corpus court, as the factual foundation for the claim is not the same. Therefore, unless an exception to the procedural default rule applies, the claim cannot provide a basis for federal habeas relief.

Petitioner has not shown cause to excuse the procedural default. Petitioner aptly argues that McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) had not been decided at the time of his trial or his direct appeal, but there is no dispute that McCleskey had been decided at the time of the state habeas proceedings. As Petitioner has pointed out himself during the instant proceedings, he specifically referenced McCleskey in his briefing before the state habeas corpus court, but Petitioner never alleged or argued that the prosecutor's decision to seek the death penalty in his case was driven by racial bias or that the trial judge and jury in his case acted with racial animus in imposing the death penalty against him.

Petitioner has not convincingly explained why he failed to present these specific factual allegations to the state habeas corpus court,[21] and his failure to do so is fatal to his claim.

Even if Petitioner could establish cause for his failure to raise the <u>McCleskey</u> claim before the state habeas corpus court, Petitioner cannot establish actual prejudice to the outcome because the claim lacks merit. That is, there is absolutely no evidence that the trial judge or jury were biased against Petitioner because of his race,[22] and Petitioner cannot show that Mr. Charron sought the death penalty in his case as a result of purposeful discrimination. For these same reasons, even the fundamental miscarriage of justice exception to the procedural default rule, assuming it applies, cannot save Petitioner's claim.

The seminal case addressing racial bias in the administration of the death

---

[21] In Petitioner's Reply to Respondent's Response in Opposition to Petitioner's Motion for Evidentiary Hearing (Doc. No. 50), Petitioner argued that he sought to present evidence in support of his <u>McCleskey</u>-type claim during his state habeas corpus proceedings, but the state habeas corpus court refused to allow the presentation of any evidence on this issue. Petitioner, however, has provided no citation to the record to support that contention, and the Court has found no support for that contention. The Court is aware that Petitioner requested a continuance of the evidentiary hearing to permit him to subpoena former District Attorney Charron in connection with his <u>Brady</u> claim, as he believed he needed to do to satisfy his obligations under <u>McCleskey v. Zant</u>, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991). (<u>See</u> R. Ex. 39 at 12-18.) However, there is no indication in the record that Petitioner ever sought to provide evidence that then District Attorney Charron acted with racial bias in pursuing the death penalty in his case. That issue simply was not before the state habeas corpus court. Notably, while Petitioner contends in this proceeding that the state habeas corpus court did not afford him a full and fair hearing on this issue, he made no such argument before the state habeas corpus court, although he did argue in his post-hearing brief before the state habeas corpus court that he had not been afforded a full and fair hearing with respect to numerous other issues. (<u>See</u> R. Ex. 38 at 19-30.)

[22] In fact, as Petitioner's final evidentiary brief focuses only upon the alleged racial bias of the prosecutor, it appears that Petitioner has abandoned his allegations that the trial judge and jury acted with racial animus. (Final Evidentiary Brief at 109-111.) The Court therefore will not discuss the latter allegations any further.

penalty is <u>McCleskey v. Kemp</u>, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).[23]
<u>McCleskey</u> involved a habeas petitioner who sought to challenge the imposition of the death penalty using statistical evidence to show that the death penalty was being administered in a racially discriminatory manner in violation of the Equal Protection Clause and the Eighth Amendment. The Supreme Court ruled that the statistical evidence presented was insufficient to establish a violation of the Equal Protection Clause or the Eighth Amendment because the petitioner had not proven that the decision makers in his case acted with discriminatory purpose and the petitioner had presented no evidence specific to his case. Accordingly, to prevail on what is now commonly referred to as a <u>McCleskey</u> claim, a habeas petitioner must show "purposeful discrimination" that had a discriminatory effect on the petitioner in his particular case. <u>Id.</u> at 292. Further, because discretion is essential to the optimal functioning of the criminal justice system, <u>McCleskey</u> mandates that a petitioner present "exceptionally clear proof" that the decision maker acted with discriminatory purpose. <u>Id.</u> at 292-97. Any legitimate explanation for a state's decision to seek the death penalty precludes a finding of a Fourteenth Amendment violation. <u>Id.</u> at 297.

A prosecutor's discretion to seek the death penalty is not unbridled. Indeed, the law places limits on a prosecutor's discretion, and there are specific statutory aggravating circumstances that must be present before a prosecutor in Georgia can even seek to have the death penalty imposed in a homicide case. <u>See</u> O.C.G.A. § 17-10-30. The issue presented by Petitioner here is whether Mr. Charron, in deciding whether to seek or not to seek the death penalty, impermissibly considered race as a factor in cases, including his case, that otherwise met the statutory requirements for the imposition of the death penalty.

---

[23]      Petitioner asserts in a footnote of his Final Evidentiary Brief that he is not relying on <u>McCleskey</u> alone in pursuing this claim. While this may be so, <u>McCleskey</u> sets the standard that Petitioner must meet to succeed on the claim, and Petitioner has cited no case holding to the contrary. Accordingly, this Court's focus is on whether Petitioner can satisfy the standard set forth in <u>McCleskey</u>.

In the instant case, unlike in <u>McCleskey</u>, Petitioner presents evidence pertaining to the specific decision maker in his case, former District Attorney Charron. Still, the evidence presented is insufficient to show exceptionally clear proof of purposeful discrimination. In his deposition, Mr. Charron testified that from January 1, 1977, through January of 1998, he personally made the decision whether to seek the death penalty in any homicide case prosecuted in Cobb County that was eligible for death penalty prosecution under O.C.G.A. § 17-10-130. (Deposition of Thomas Charron "Charron Dep." at 23-24, 141, 155.) Mr. Charron explained that he did not seek the death penalty in all homicide cases that were eligible for the death penalty. (<u>Id.</u> at 22-23.) Rather, he testified that he assessed each case and determined, based upon the circumstances he believed relevant and controlling, whether the case merited death penalty prosecution. (<u>Id.</u> at 21-23.) Mr. Charron testified that he could say "unequivocally" that the race of the defendant and victim did not play any part in his decision making. (<u>Id.</u> at 31, 33, 49.) Mr. Charron acknowledged that there is a remote possibility that racial prejudice or stereotypes can subconsciously impact decisions, but he testified that "the likelihood [he] would allow something like that to enter into a decision is certainly very remote." (<u>Id.</u> at 92-93.) Petitioner emphasizes, however, that Mr. Charron had not examined the pattern of his decisions in death penalty cases to seek to determine whether any unconscious racism had affected those decisions. (<u>Id.</u> at 91-92.)

In an effort to show that racism did impact Mr. Charron's decisions, Petitioner presents a statistical analysis of the decisions made by Mr. Charron to institute death penalty prosecutions in Cobb County during his tenure in office up to and including the trial of Petitioner. (<u>See</u> Affidavit of Jeffrey O'Neal Martin, Doc. No. 96.) This statistical analysis reflects that there were 32 cases determined to be eligible for the death penalty during the applicable time period and for which the race of the defendant and the victim were known. The death penalty was sought in 15 of the 32 cases or 47% of the time. Seven of the 32 cases involved a black defendant and a

black victim, and the death penalty was sought in only 2 of these 7 cases or 29% of the time. Five of the 32 cases involved a black defendant and a white victim, and the death penalty was sought in 5 of these 5 cases or 100% of the time. Only 1 of the 32 cases involved a white defendant and a black victim, and the death penalty was not sought in this 1 case. Nineteen of the 32 cases involved a white defendant and a white victim, and the death penalty was sought in 8 of these 19 cases or 42% of the time. The death penalty was sought in 58% of the cases where the defendant was black but in only 40% of the cases where the defendant was white. The death penalty was sought in only 25% of the cases where the victim was black and 54% of the cases where the victim was white.

Petitioner urges that these disparities raise a presumption that race played a role in Mr. Charron's decision to seek the death penalty in his case, and Petitioner further urges that Respondent should be required to rebut this presumption to defeat the <u>McCleskey</u> claim, as is required with challenges brought pursuant to <u>Swain v. Alabama</u>, 380 U.S. 202, 223, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965) and <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). However, assuming such a burden-shifting paradigm were even appropriate to employ in this case, Petitioner has not presented "a <u>prima</u> <u>facie</u> case of unconstitutional conduct with respect to his case." <u>McCleskey</u>, 481 U.S. at 297 n. 18. In this regard, <u>McCleskey</u> is clear that "exceptionally clear proof" of purposeful discrimination is required before the Court even draws an inference that a prosecutor has abused his discretion in seeking the death penalty in a particular case. <u>McCleskey</u>, 481 U.S. at 297.

While Petitioner's expert, Jeffrey O'Neal Martin, avers that the disparity in decision making based upon the race of the defendant and the victim is statistically significant, Mr. Martin does not explain, mathematically or otherwise, how he arrived at that conclusion. Given the small sample size of only 32 cases, the Court finds it unlikely that any statistically meaningful findings could be made and cannot attribute great weight to Mr. Martin's finding of statistical significance.

In addition, Petitioner has failed to show "purposeful" discrimination. Throughout his briefs, Petitioner concedes that the evidence presented may only establish subconscious racial bias. However, <u>McCleskey</u> unambiguously requires that the decision maker have acted with discriminatory purpose, <u>id.</u> at 292, and subconscious discrimination is the antithesis of intentional or purposeful discrimination. Statistics simply do not go far in showing discriminatory intent, and the statistical evidence in this case is not "so strong as to permit no inference other than that the results are the product of a racially discriminatory intent or purpose." <u>McCleskey v. Kemp</u>, 753 F.2d 877, 888 (11th Cir. 1985) (citations omitted). The evidence here simply does not constitute "exceptionally clear proof" of purposeful discrimination, and "far stronger proof" is required before a rebuttal from the prosecutor is necessary. <u>Id.</u> at 296-97.

In any event, as in <u>McCleskey</u>, there was a legitimate, race-neutral reason for Mr. Charron to seek a death sentence in this particular case. Here, Mr. Charron found the existence of two statutory aggravating circumstances. First, the murder was committed while Petitioner was engaged in the commission of another capital felony, armed robbery. <u>See</u> O.C.G.A. § 17-10-30(b)(2). Second, the nature and brutality of the murder made another statutory aggravating circumstance applicable. <u>See</u> O.C.G.A. § 17-10-30(b)(7). Mr. Charron also testified that he considered Petitioner's propensity toward criminal behavior and the underlying facts and circumstances of the case in deciding to seek the death penalty against Petitioner. (Charron Dep. at 46-48.) There is absolutely nothing in the record that indicates Mr. Charron impermissibly considered race in making the decision to seek the death penalty in Petitioner's case. No further explanation from Mr. Charron is required.

Since Petitioner has failed to demonstrate that former District Attorney Charron acted with any discriminatory intent in seeking that the death penalty be imposed against him, and since the evidence discovered shows that non-race based criteria guided Mr. Charron's decision to seek the death penalty, including

specifically the presence of two aggravating circumstances, the Court finds that Petitioner's <u>McCleskey</u> claim is procedurally defaulted, because Petitioner cannot establish actual prejudice. Further, even if the claim were considered under the miscarriage of justice exception to the procedural default rule, the claim would fail on the merits for the same reasons.

   2.   *Claim XIX*

   Claim XIX of the Corrected Amended Petition alleges that a new sentencing should be ordered due to the State's failure to disclose favorable evidence known to it relevant to sentencing and the State's knowing presentation at sentencing of false or substantially misleading evidence. Here, Petitioner specifically challenges the failure of the prosecutor to disclose to defense counsel (1) an interview with Bernie Tabler, an alleged victim of a previous robbery that Petitioner had been charged with committing; (2) the police report from the time of Petitioner's arrest in connection with the robbery of Mr. Tabler; and (3) documents relating to a gun which was allegedly used by Petitioner in connection with a series of robberies. Because Petitioner also contended and produced an affidavit indicating that two boxes of documents previously in the possession of the Cobb County District Attorney's Office had never been produced to Petitioner, despite his best efforts under the Open Records Act, the Court allowed Petitioner the opportunity to make the documents a part of the record, if the documents could be found.

   In <u>Brady v. United States</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. To establish a <u>Brady</u> violation, a defendant must prove that (1) the government suppressed evidence favorable to the defense; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; and (3) disclosure would likely have affected the outcome of the

proceeding. United States v. Meros, 866 F.2d 1304, 1308 (11th Cir. 1989). Evidence is "material" when its suppression creates a reasonable probability of a different result. Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

Petitioner's challenge to the failure of the prosecutor to disclose the Bernie Tabler interview, the police report, and the documents regarding the stolen gun was deemed procedurally defaulted by the state habeas corpus court. (R. Ex. 38 at 881-82.) As the Court has stated previously, a federal court undertaking habeas review will not review a claim that has been defaulted in state court on an independent and adequate state procedural ground unless the petitioner demonstrates cause for default and actual prejudice, or, alternatively, demonstrates a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

Assuming arguendo that there is cause to excuse the procedural default of these Brady challenges, Petitioner cannot establish actual prejudice. The analysis of prejudice for the procedural default of a Brady claim is identical to the analysis of materiality. The failure to disclose evidence is prejudicial only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280, 282, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). The evidence at issue here is relevant only to the penalty phase of Petitioner's trial. Therefore, to demonstrate actual prejudice, Petitioner would have to show that there is a reasonable probability that the outcome of the penalty phase of the trial would have been different had the exculpatory evidence been disclosed.

During the penalty phase of Petitioner's trial, the State introduced evidence of Petitioner's prior arrest in connection with two robberies and an attempted robbery that all occurred on November 9, 1979, his indictment in connection with those incidents, and his dismissal record in Kentucky. Petitioner states that District Attorney Charron cross-examined Petitioner about participating in the robbery of an

individual by the name of Charles Bernie Tabler, but Petitioner contends that the prosecutor knew that Mr. Tabler never identified Petitioner in connection with the offense. Petitioner points out that District Attorney Charron had both a recorded interview and a police report in his possession, which were not provided to the defense, that proved that Mr. Tabler never identified Petitioner as a participant in the robbery. A review of the trial transcript indicates that, on cross-examination, District Attorney Charron asked Petitioner whether he knew anything about the robbery of Mr. Tabler and whether he was with the two individuals who robbed Mr. Tabler at the time of the robbery. (R. Ex. 25 at 1328.) Although it is true that Mr. Tabler never identified Petitioner as a participant in the robbery, it is undisputed that, shortly after the robbery of Mr. Tabler, Petitioner was a passenger in the vehicle that fit the same description as the one that left the scene of the robbery where Mr. Tabler was robbed and that two other individuals in the vehicle were later identified by Mr. Tabler as the individuals who robbed him. (Id. at 1223-25, 1323.) The information in the documents that Petitioner contends the State failed to disclose is consistent with this evidence. (R. Ex. 40 at 392, 398-400.) It is also undisputed that Petitioner was in this same car during the robbery of Cosby Powell, which occurred earlier in the afternoon on the same day as the robbery of Mr. Tabler. (Id. at 1325.) Mr. Powell positively identified Petitioner as the person who robbed him. (Id. at 1198-1200). Even if some of the information in the Tabler interview and the police report could fairly be described as exculpatory, Petitioner's connections to the participants in the Tabler robbery and to the getaway vehicle remain. Given all of the evidence presented, including that Petitioner pled guilty only to the armed robbery of Cosby Powell and that the other armed robbery and attempted armed robbery charges were dismissed, there is not a reasonable probability that the outcome of the penalty phase proceeding would have been different, had the Tabler interview and related police report been disclosed to the defense.

The District Attorney also questioned Petitioner about a gun that was believed

to have been stolen from the home of Officer William Hubble and to have been used during all three robberies. Petitioner contends, however, that the prosecutor had materials in his file that indicated that the serial number of the gun seized following the arrest was not the same as the serial number on the gun that Officer William Hubble testified had been stolen from him. This conflicting information regarding the serial numbers was available to both the defense and the jury at the time of trial. Despite the fact that several of the State's witnesses identified the gun used in the robberies as being the same gun that Officer William Hubble testified was stolen from him, the jurors had evidence available to them indicating that there was a conflict with respect to the serial numbers. In this regard, Officer Hubble identified State's Exhibit No. 82 as the pistol stolen from his residence and read the serial number as 70DB76865. (R. Ex. 25 at 1187-88.) Service station manager Cosby Powell identified State's Exhibit No. 82 as looking like the gun used in the armed robbery of him. (Id. at 1197.) Roslynn Gail Hart also identified State's Exhibit No. 82 as the one she saw in the attempted robbery. (Id. at 1214). Notwithstanding the foregoing, introduced into evidence was State's Exhibit No. 75, which was a six-count true bill of the grand jury of the Jefferson Circuit Court, Commonwealth of Kentucky, November term, 1979. This exhibit showed that the gun recovered in connection with the robberies had the serial number 70G76865. Therefore, insofar as the jury had evidence before them demonstrating the conflict with the serial numbers and still recommended a sentence of death for Petitioner, the Court cannot say that the outcome of the penalty phase would have differed if the defense had been provided with the documents relating to the allegedly stolen gun.

Petitioner additionally alleges in connection with this claim that the prosecutor conveyed false and misleading information to the jury. Petitioner first argues that the District Attorney cross-examined Petitioner about being at the service station during the attempted robbery of Roslynn Gail Hart despite the fact that he knew that Ms. Hart never placed Petitioner at the scene during the robbery but only said she

thought she had seen him at the station hours earlier when she reported for work. Second, Petitioner argues that the District Attorney questioned Petitioner about drugs that the prosecutor contended were in the car in which Petitioner was arrested when he knew that the substances seized contained no controlled substances.

While the District Attorney questioned Petitioner about whether he was at the service station during the attempted robbery of Ms. Hart, the jury heard Ms. Hart's testimony that she saw Petitioner when she was coming into work, that Petitioner was not the individual who attempted to rob her, and that she did not see Petitioner with the man who attempted to rob her until later in the afternoon when both Petitioner and the individual who attempted to rob her were in a lineup. (R. Ex. 25 at 1212-13, 1215-1218.) There was also undisputed evidence introduced during the penalty phase of trial, however, that Petitioner and the individual who attempted to rob Ms. Hart were both passengers in the vehicle that was stopped by the police later in the day following the robbery of Mr. Tabler. Given the undisputed evidence that Petitioner was in the car with the individual who attempted to rob Ms. Hart on the same day in question, it was not misleading for the District Attorney to ask Petitioner whether he was at the service station during the attempted robbery of Ms. Hart, although Ms. Hart did not see Petitioner herself.

With respect to the prosecutor's questioning and arguments regarding the seizure of controlled substances from the car, Detective Leonard L. Hurst, who investigated the series of robberies that occurred on November 7, 1979, testified that he believed narcotics were found in the rear seat. (R. Ex. 25 at 1226.) Detective Hurst also testified he caused an arrest to be made of Mr. Jefferson in connection with the armed robberies as well as for a narcotics charge. (Id. at 1228.) The prosecutor's questioning was consistent with the testimony of Detective Hurst that narcotics were found in the getaway vehicle and therefore was not misleading.

Finally, with respect to the two boxes of documents possessed by the Cobb County District Attorney's office pertaining to Petitioner's criminal record in

Kentucky that allegedly were never produced to Petitioner, these two boxes still have not been found. Accordingly, as the exact contents of those two boxes is unknown, Petitioner cannot prove that the evidence contained therein would likely have affected the outcome of the proceeding.

Petitioner's <u>Brady</u> claim is denied in its entirety. Considered separately and collectively, the known withheld evidence was not material, as there is not a reasonable probability that the result of the sentencing proceeding would have been different had the evidence been disclosed to the defense.

### 3. Claim XXVI

Petitioner contends in Claim XXVI of the Corrected Amended Petition that he is actually innocent and that his execution therefore would violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. In raising this argument as a separate claim for habeas relief, Petitioner misconstrues the law regarding "actual innocence." Actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Herrera v. Collins</u>, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). The Court is aware that the <u>Herrera</u> Court stated, in the alternative, that even if substantive actual innocence claims by themselves were legally cognizable, they would require an "extraordinarily high" showing of evidence to justify relief. <u>Id.</u> at 869. However, this statement and the analysis that followed constituted nothing more than <u>dicta</u>. <u>See</u> <u>Lucas v. Johnson</u>, 132 F.3d 1069, 1074-75 (5th Cir. 1998). Assuming, <u>arguendo</u>, that actual innocence could provide an independent basis for federal habeas relief, Petitioner has fallen far short of making the "extraordinarily high" showing of entitlement to relief.[24] Petitioner's DNA

---

[24] The Court additionally notes that the claim is not properly before this Court, as Petitioner can pursue a claim of actual innocence in state court by filing an extraordinary motion for new trial. <u>See</u> O.C.G.A. §§ 5-5-23, 5-5-40, 5-5-41; <u>Timberlake v. State</u>, 246 Ga. 488, 271 S.E.2d 792 (1980).

evidence failed to shed any light on Petitioner's alleged innocence, and the deposition testimony of Ronald Glade and Rhonda Glade did not differ materially from the testimony that they gave at trial. In sum, Petitioner's actual innocence claim is grossly deficient and, as such, is due to be denied.

### 4. Claim XXXIX

Petitioner next claims that he was denied a fundamentally fair trial and reliable sentencing proceeding when jurors impermissibly considered extra-judicial evidence during their deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. More specifically, Petitioner contends that he was denied a fair trial and reliable sentencing proceeding when one of the jurors, identified by Petitioner as Marjorie West, read from a Bible in the jury room during deliberations. Respondent contends that this claim is barred pursuant to O.C.G.A. § 9-14-51 due to Petitioner's failure to raise this claim in the state habeas corpus proceeding.

The Court first finds that the instant claim is not procedurally barred as successive because Georgia law indicates that a state court judge would find that the claim could not reasonably have been raised in the state habeas petition or the amendments thereof. Specifically, in Turpin v. Todd, 268 Ga. 820, 493 S.E.2d 900 (1997), the Court held that where there was no evidence that would have caused trial or appellate counsel to suspect misconduct by the jury and such evidence becomes available after a state habeas proceeding, there is cause, which when combined with the required prejudice, is sufficient to excuse any bar to presenting claims based upon the newly discovery evidence in a successive habeas corpus petition under O.C.G.A. § 9-14-51. 268 Ga. at 827. Such is the case here.

Respondent argues that Petitioner could have investigated and presented evidence of juror misconduct in the state habeas proceeding, but the undisputed evidence of record discloses that this evidence was not discovered until after the filing of Petitioner's federal habeas petition, despite diligent efforts made by Petitioner's former attorneys to discover evidence from jurors who were willing to

be interviewed that would form the basis for constitutional claims during the state habeas proceedings. Notably, although Richard Berry was interviewed by Petitioner's state habeas counsel in 1991, Richard Berry testified during his deposition in this habeas proceeding that he did not recall mentioning a juror reading from a Bible to Petitioner's state habeas counsel. (Deposition of Richard Berry "Berry Dep." at 14.) Further, the interview notes signed by Mr. Berry following those interviews, which summarize the substance of what he discussed, make no mention of a juror reading from a Bible. (Berry Dep., Exs. 1 and 2.) Respondent presumes that Petitioner's counsel did not ask the "right questions" to uncover the alleged juror misconduct. However, there is no evidence indicating that there was a reason to suspect juror misconduct and, absent such evidence, additional questions of the jurors by Petitioner's counsel might have bordered on harassment, which the Georgia Supreme Court has indicated is frowned upon in the ABA Standards for Criminal Justice. See Turpin, 268 Ga. at 827. As Petitioner argues, the trial court instructed the jurors to decide the case based solely upon the law and the evidence, (e.g., Tr. at 167, 1405), and "[t]he law presumes that the jury will follow the court's instructions," United States v. Phelps, 733 F.2d 1464, 1473 (11th Cir. 1984). Thus, counsel reasonably believed that the jury considered only the law and the evidence in reaching a sentencing decision. Based on Turpin, the Court finds that a Georgia state court judge likely would conclude that Petitioner's claim of juror misconduct could not have been reasonably raised in the state habeas petition or the amendments thereof.

Respondent next argues that the Court should not have permitted evidentiary development of this claim due to the rule prohibiting the impeachment of jury's verdicts, but this argument is likewise unpersuasive. Jury deliberations are generally protected from intrusive inquiry by courts. Tanner v. United States, 483 U.S. 107, 127, 107 S. Ct. 2739, 97 L. Ed .2d 90 (1987). The general rule is that juror testimony may not be used to impeach a jury verdict. Id. at 117. The Supreme Court has carved out

a limited exception to this rule, however, when it is alleged that an external influence affected jury deliberations. <u>Parker v. Gladden</u>, 385 U.S. 363, 364-66, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966).

The United States Court of Appeals for the Eleventh Circuit has stated the following regarding the consideration of extra-judicial evidence by a jury:

> Under federal law, any evidence that does not come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, or cross-examination, and of counsel is presumptively prejudicial. In order to give rise to this presumption, a defendant need only demonstrate that jurors had contact with extrinsic evidence. Once the defendant makes this showing, the State bears the burden of rebutting the presumption by showing that the jurors' consideration of the extrinsic evidence was harmless to the defendant. When evaluating whether the State has met its burden, courts are to consider the totality of the circumstances surrounding the introduction of the extraneous evidence to the jury. Our case law indicates that the factors to be considered include the heavy burden on the State, the nature of the extrinsic evidence, how the evidence reached the jury, and the strength of the State's case.

<u>McNair v. Campbell</u>, 416 F.3d 1291, 1307 (11th Cir. 2005) (internal citations and punctuation omitted).

The evidence developed in this case indicates that an older woman, who fits the description of a juror by the name of Marjorie West, read from a Bible during the penalty phase of Petitioner's trial. According to Mr. Berry's deposition testimony, while the jurors were going around each giving their opinion on the appropriate sentence for Petitioner, an older, female juror selected and read a random passage after flipping open her Bible. (Berry Dep. at 7-9.) Mr. Berry was not familiar with the passage, which he testified was short in length and approximately a paragraph. (<u>Id.</u> at 9-10, 13, 18-19.) He could not recall whether the passage was from the Old Testament or the New Testament. (<u>Id.</u> at 10.) Although the juror read the passage out loud, the jurors did not discuss the passage. (<u>Id.</u> at 20.) Petitioner contends that Juror West relied on the Bible passage inasmuch as it appeared to Mr. Berry that she was looking for divine guidance and justification for her position on Petitioner's sentence, (Berry Dep. at 10, 19), but the evidence before the Court consists only of Mr.

Berry's speculative perceptions.

Having considered the evidence of record, the Court finds that the evidence is too weak to demonstrate that juror misconduct actually occurred, or assuming that such misconduct did occur, that the misconduct prejudicially influenced the jury's sentencing deliberations. As an initial matter, only Mr. Berry recalled a juror reading from a Bible during the sentencing deliberations. At the evidentiary hearing held by this Court, Petitioner's counsel stated that of the other surviving jurors interviewed, none remembered a juror reading from a Bible. (Transcript of April 29, 2002, at p. 24-25.) Mr. Berry's deposition testimony reflected that he was fairly certain that a juror had read from the Bible during the sentencing phase, but he could not recall the identity of the juror or the passage read aloud. Mr. Berry had the impression that the juror believed the passage justified her decision, but Mr. Berry's testimony in this regard delves into the juror's mental processes and deliberative considerations, which are inadmissible under Federal Rule of Evidence 606(b).[25] Significantly, given the absence of evidence regarding the specific passage read, Petitioner cannot show that the passage was even relevant to the sentencing issues that were before the jury. See Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (stating

---

[25]    Rule 606(b) of the Federal Rules of Evidence provides in pertinent part:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

that presumption of prejudice arises only when extraneous contact concerns the matter pending before the jury); <u>see also</u> <u>Lenz v. Washington</u>, 444 F.3d 295 (4th Cir. 2006) (upholding denial of habeas corpus relief in part because of absence of evidence that Biblical passages read by juror members related to sentencing decision). What is clear from Mr. Berry's deposition testimony is that any such passage read was far from being the focus of the jury's sentencing deliberations, as the passage was not even discussed among the jurors. In sum, the evidence presented in the case at bar is too weak and speculative to demonstrate that juror misconduct actually occurred or, assuming that such misconduct did occur, that one juror's alleged reading of an unidentified, random passage from the Bible improperly influenced the jury's sentencing deliberations.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Petitioner's Corrected Amended Petition for Writ of Habeas Corpus by a Person in State Custody. The Court **GRANTS** Petitioner's claim that trial counsel was ineffective during the penalty phase of trial and **DENIES** all other claims in the Petition. Petitioner's sentence is **VACATED**. The Court **ORDERS** Respondent Terry to conduct a new sentencing hearing for Petitioner to commence within six months from the date of this Order, or if an appeal is taken from this Order, within six months of the date this Order becomes final.

SO ORDERED this <u>10th</u> day of <u>May</u>, 2007.

<u>s/  CLARENCE COOPER</u>

CLARENCE COOPER
UNITED STATES DISTRICT JUDGE