# United States Court of Appeals

## For the Eleventh Circuit

No. 07-12502

District Court Docket No.
96-00989-CV-CC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 12, 2009

THOMAS K. KAHN
CLERK

LAWRENCE JOSEPH JEFFERSON,

Petitioner-Appellee,
Cross-Appellant,

versus

WARDEN HILTON HALL,

Respondent-Appellant.
Cross-Appellee.

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 1 4 2009

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

---

Appeal from the United States District Court
for the Northern District of Georgia

---

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:     June 12, 2009
For the Court:  Thomas K. Kahn, Clerk
By:       Patch, Jeffrey

ISSUED AS MANDATE
SEP 1 0 2009
U.S. COURT OF APPEALS
ATLANTA, GA.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By_____
Deputy Clerk
Atlanta, Georgia

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 12, 2009
THOMAS K. KAHN
CLERK

No. 07-12502

D. C. Docket No. 96-00989-CV-CC

LAWRENCE JOSEPH JEFFERSON,

Petitioner-Appellee,
Cross-Appellant,

versus

WARDEN HILTON HALL,

Respondent-Appellant.
Cross-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

(June 12, 2009)

Before TJOFLAT, CARNES and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, the Warden of the Georgia Diagnostic and Classification Prison, Hilton Hall ("Hall"), appeals from the district court's order granting in part Lawrence Joseph Jefferson's ("Jefferson") petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. The district court granted relief on Jefferson's claim that his trial counsel were constitutionally ineffective during the penalty phase of the trial, holding that the Petitioner's trial counsel performed deficiently when they failed to conduct a reasonable investigation of mitigating evidence and failed to present in particular certain mental health evidence. Petitioner Jefferson, in turn, has cross-appealed from the district court's denial of Jefferson's claim that he was denied a fundamentally fair trial and reliable sentencing proceeding because jurors impermissibly considered extra-judicial evidence -- the Bible -- during their deliberations, in violation of the Constitution.

After thorough review we affirm in part and reverse in part. Applying the law to the record before us, we hold that Jefferson's counsel were not constitutionally ineffective in preparing for the penalty phase of his trial. In addition, we can discern no merit in Jefferson's claim on cross-appeal, and agree with the district court that Jefferson was not denied a fundamentally fair trial when one juror allegedly read from a Bible in the jury room during deliberations.

Accordingly, we reverse the district court's order granting relief, and remand with instructions to reinstate Jefferson's original sentence.

## I. Facts and Procedural History

### A. The Guilt Phase of Jefferson's Trial

The facts of the murder, as elicited from the trial testimony and not disputed here, are these. On May 2, 1985, the body of the victim, Edward Taulbee, was spotted lying in the woods near Lake Allatoona by two men driving along the highway. Ex. 20 at 217-18, 227-28. Responding to the report, the Cobb County Police found Taulbee's body face down in the underbrush. Ex. 20 at 235-36. Taulbee was dressed in a yellow shirt, overalls, and boots. Ex. 20 at 219, 229, 235. A large log with blood on it was lying across Taulbee's head. Ex. 20 at 220, 229, 236. Near the body, the police found two sticks or clubs, and one of the sticks, which later was determined to have some of Taulbee's blood and hair on it, appeared to have been shattered in several places. Ex. 21 at 270-71; Ex. 23 at 802. The police observed that Taulbee's head had been driven into the ground, apparently by the force of the log. Ex. 21 at 274-75.

An autopsy revealed that Taulbee suffered approximately two lacerations above his left eyebrow, one laceration above his forehead, one laceration above his right ear, and five lacerations on the back of his scalp. Ex. 23 at 822. Taulbee also

had several fractured teeth, an abrasion across his face, an abrasion across his back, skull fractures, brain bruises, and brain hemorrhaging. Ex. 23 at 822-24. The medical examiner opined that Taulbee's injuries were consistent with those caused by being struck with the wooden sticks or clubs found near his body, that Taulbee was probably knocked to the ground by the blows to his head, and that the log was then dropped on Taulbee's head, driving his face into the ground. Ex. 23 at 822, 828-29, 831-32. The medical examiner further opined that these head and brain injuries caused Taulbee's death, which occurred some time on May 1, 1985, between 5:00 p.m. and 11:00 p.m. Ex. 23 at 833-35. On cross-examination, the medical examiner said that Taulbee probably did not struggle significantly, and that death "most probably" was instantaneous. Ex. 23 at 837-39.

The medical examiner did not find a wallet on Taulbee's body, but the victim did have a still-ticking Timex watch, a pocket knife, and a small amount of cash on him. Ex. 21 at 277; Ex. 23 at 820-21, 840. Also found in Taulbee's belongings was a pay stub from Zenith Construction Company ("Zenith"). Ex. 21 at 357-58. Upon finding the pay stub, Cobb County Police Lt. Carlton Morris telephoned the company and ascertained that the pay stub number corresponded to Taulbee. Ex. 21 at 358. Brad Stewart, Zenith's construction superintendent, informed Lt. Morris that the Petitioner, Jefferson, worked with Taulbee, and upon

4

Lt. Morris's request, Stewart and Jefferson came to the station and identified Taulbee from pictures of the body. Ex. 21 at 329, 358, 374-75.

During Lt. Morris's interview with Jefferson, Jefferson said that he had seen Taulbee leave the Zenith site alone around 5:30 p.m. on the day of the murder and head north in his automobile to go fishing. Ex. 21 at 376-78. Jefferson explained that he knew Taulbee was going fishing because earlier that day, Taulbee had dug up some worms to use as bait. Ex. 21 at 376. Jefferson also offered that he did not join Taulbee that afternoon because "he didn't have the patience to fish." Ex. 21 at 377-78. Jefferson said that after Taulbee left work, Jefferson rode his bicycle home, where he lived alone, watched television, drank beer, and stayed in that evening. Ex. 21 at 378-79.

Jefferson also told the police that Taulbee had loaned him $120 that was due on May 2, 1985, the day after the murder. Ex. 21 at 380. Jefferson said that he had not yet paid Taulbee because he did not receive his paycheck on May 1 from Stewart, as he had expected. Ex. 21 at 380. Stewart independently informed Lt. Morris that he had given both Taulbee and Jefferson their paychecks on the day of the murder. Stewart also said that Taulbee and Jefferson had never had any money problems, and got along well with each other. Ex. 21 at 322, 325-26, 383.

As Jefferson's interview progressed, Jefferson became more nervous. Ex.

21 at 381. Nevertheless, Jefferson consented to a search of his apartment. Ex. 21

at 381. Jefferson cooperated with the police, opening drawers and closet doors

while the police searched the apartment. Ex. 21 at 388. Lt. Morris did not find

anything connecting Jefferson to the murder of Taulbee. Ex. 21 at 312, 388-90.

The police did find, however, a straw hat and sunglasses in Jefferson's closet. Ex.

22 at 654.

During the investigation, the police learned that Taulbee kept money with

him so that he could lend it to co-workers and others, and charge interest. Ex. 21 at

383. Stewart also informed the police that Taulbee carried large sums of money on

his person, and that Stewart had told him to keep it in a more secure location. Ex.

21 at 323.

On May 7, 1985, while the investigation was still underway, the police

spoke with Jefferson's neighbors, Rhonda Glade, her brother Ronald Glade, and

Dwayne Mitchell. Ex. 21 at 390. At trial, Ms. Glade testified that she saw

Jefferson, Taulbee, and Mitchell talking outside of Jefferson's apartment at

approximately 4:15 p.m. on the day of Taulbee's murder. Ex. 21 at 400. She

testified that she had seen Jefferson and Taulbee leave from Jefferson's apartment

to go fishing, and later on the night of the killing, she saw Jefferson return to his

6

apartment on foot and heard no car arrive. Ex. 21 at 399-400, 408. Ms. Glade further testified that Jefferson came to her apartment on May 2, 1985, gave her an automated teller bank card (an "ATM card") and asked her to get rid of it. Ex. 21 at 412, 414-15. She said that she then hid it in an air conditioning vent. Ex. 21 at 417. Jefferson also gave her a fishing tackle box, which she put under her brother's bed. Ex. 21 at 412.

On cross-examination, Ms. Glade admitted she had originally told the police she heard a car arrive and two doors slam when Jefferson returned home on May 1. Ex. 21 at 427. She also admitted that she had told the police that she was "sure" her brother and Mitchell had not gone to the lake that night because they spent the evening of May 1, 1985 with her, even though at trial, she testified that both her brother and Mitchell had left the apartment during the course of the evening. Ex. 21 at 434-36.

Ronald Glade testified that on May 1, 1985, he had gone to Jefferson's apartment at around 6:00 p.m. Ex. 21 at 453. He said that Jefferson had locked the door to his apartment, although Jefferson was inside, which Glade thought was unusual. Ex. 21 at 453-54. Glade further testified that Jefferson was acting funny and that his chest looked red. Ex. 21 at 456-59. He testified that Jefferson had, prior to Taulbee's murder, made a statement about the money Taulbee had and

7

how Jefferson "ought to knock him on the head," and that, after the murder, Jefferson had said that his "little fat buddy was dead." Ex. 21 at 463.[1] Glade further testified that on the evening of May 1, 1985, Jefferson said he had lost his wallet and went out with Dwayne Mitchell to look for it, although Glade later found the wallet in Jefferson's apartment with approximately $100 in it. Ex. 21 at 465, 467.

Dwayne Mitchell testified that he took Jefferson to buy marijuana and liquor on the night of May 1, 1985. Ex. 21 at 499-500. He further testified that Jefferson asked him to drive Jefferson to Lake Allatoona that night, purportedly to find his wallet, which Jefferson claimed was missing. Ex. 21 at 501. Mitchell said that when they arrived at Lake Allatoona, Jefferson left the car for five to ten minutes and returned with a fishing pole and a tackle box. Ex. 21 at 502, 505. According to Mitchell, Jefferson discarded the fishing pole and gave the tackle box to him. Ex. 21 at 505-06. Mitchell further testified that, on the way back from the lake, Jefferson asked Mitchell to take him to a bank with an ATM, where Jefferson disguised himself with a straw hat and sunglasses and attempted unsuccessfully to

---

[1] On cross-examination, Glade admitted he had originally told the police that Jefferson informed him that Taulbee was dead on May 2, not May 1. Ex. 21 at 473-74, 479. Glade explained that he changed his mind about the date when he discussed it with his sister and Mitchell "as a group." Ex. 21 at 480. Glade also admitted that he had told the police he wanted to "get" the money in Jefferson's wallet, because Glade was broke. Ex. 21 at 482.

make a cash withdrawal. Ex. 21 at 506-07. Prior to going to the ATM, Jefferson

asked Mitchell if the machine took pictures of those people who used it. Ex. 21 at

507.[2]

Following the initial conversations with Jefferson's neighbors, the police

located Taulbee's car in the parking lot of a food store about eight-tenths of a mile

from Jefferson's residence. Ex. 22 at 586, 589. Inside the car, the authorities

found the keys to the car, and in the glove compartment, they found an ATM

receipt, dated May 2, 1985, at approximately 1:07 a.m. Ex. 22 at 591, 634. Back

at Jefferson's apartment complex, the police recovered the victim Taulbee's ATM

card that Rhonda Glade had stashed in the air conditioning unit outside her

apartment. Ex. 22 at 594, 598-99. The police also recovered some of Taulbee's

other fishing gear that Jefferson had attempted to discard. Ex. 22 at 656, 663.

Specifically, Mitchell directed the police to Taulbee's fishing tackle box, which

Jefferson had given him, and Glade and Mitchell went with the police to Lake

Allatoona so that they could point out where Jefferson had thrown some of the

fishing gear into the woods and along the side of the road. Ex. 22 at 656, 663.

---

[2] On cross-examination, Mitchell testified that Ms. Glade was mistaken when she said that Mitchell had been talking with Jefferson and Taulbee on the afternoon of May 1. Ex. 22 at 529-30. Mitchell also admitted that Jefferson had denied killing Taulbee to him. Ex. 22 at 535.

9

The authorities analyzed the evidence, but did not find any latent prints, other than Taulbee's, either on the car, the receipt, the ATM card or the fishing gear. Ex. 22 at 644, 646; Ex. 23 at 796, 789-95. Nor did they find any of Jefferson's hair on any of the evidence. Ex. 23 at 805.

Jefferson was arrested on the evening of May 7, 1985. Ex. 22 at 665. A smoking marijuana cigarette was found on the coffee table in Jefferson's living room at the time of his arrest. Ex. 22 at 665. After administering multiple Miranda warnings, the police asked Jefferson why he had killed Taulbee. Ex. 22 at 667-78. According to the testimony of Detective B.J. Banks, Jefferson said that "he didn't need to be around other people, that he wanted to be executed, and that he wanted to be put to sleep." Ex. 22 at 678. Lt. Morris likewise testified that Jefferson said:

> I don't need to be around people . . . . I talk to myself. I ain't crazy. I don't know nothing. I got hit by an auto when I was a kid. I had another dream and saw the man in my dream. I call myself Tony. I don't think I am two people. How quick can I be put to sleep? I don't feel anything about this. Do you believe in heaven and hell? . . . I want to be put to sleep . . . . I want to be executed.

Ex. 22 at 699-700. During the penalty phase of the trial, Jefferson testified that he was threatened with the death penalty during the interrogation. Ex. 25 at 1306. Jefferson said that he had replied: "Well, yeah, man, do what up [sic] want to do, if

10

you want to execute me. Let me go over to the jail and go to sleep." Ex. 25 at 1307.

The authorities later determined that Taulbee had cashed his paycheck on May 1, and had received $223.15. Ex. 22 at 717-18. Jefferson, who received his paycheck on May 1, did not cash it until May 3, and received approximately $136.21. Ex. 22 at 686. The police also learned that in the early morning hours of May 2, 1985, someone attempted to use Taulbee's ATM card to make a withdrawal. Ex. 22 at 728-34.

On August 8, 1985, Jefferson was indicted in the Superior Court of Cobb County, Georgia. Jefferson was tried before a jury on February 24 through March 9, 1986. Following deliberations, he was found guilty of felony murder in the commission of an armed robbery, in violation of Ga. Code Ann. § 16-5-1, and of armed robbery, in violation of Ga. Code Ann. § 16-8-41. Ex. 2 at 327.

### B. The Penalty Phase of Jefferson's Trial

The penalty phase of Jefferson's trial began with the State's introduction of Jefferson's past offenses. Specifically, the State offered Jefferson's guilty plea from Kentucky to one count of robbery, resulting from Jefferson's armed robbery of a Louisville, Kentucky gas station in 1979, when he had threatened a gas station attendant with a gun. Ex. 25 at 1231. The State also presented the testimony of

11

two Kentucky police officers and two victims from Kentucky, which indicated that Jefferson had been one of four men who had participated in three other armed robberies of gas stations on that same day in 1979, although Jefferson was not prosecuted for these other armed robberies. Ex. 25 at 1185-1231.

In mitigation, Jefferson presented the testimony of two Cobb County deputies, his mother, one of his sisters, the mother of his two children, and his own testimony. Ex. 25 at 1253, 1258, 1262, 1267, 1273, 1289. The employees of the Cobb County Sheriff's Department generally testified that Jefferson had caused no problems since his incarceration. Ex. 25 at 1253-60.

Jefferson's mother, Vera Jefferson, testified about his difficult childhood, which included growing up without a father and taking care of his siblings. Ex. 25 at 1263-65. She testified that Jefferson was responsible, generous, gentle, and kind, loved people and was very playful as a child. Ex. 25 at 1263-66. She mentioned to the jury that Jefferson was injured at the age of two when a car ran over the top of his head, but she was not questioned and did not offer any testimony regarding the impact, if any, that the accident had on him. Ex. 25 at 1264. Jefferson's mother asked the jury to have mercy on her son. Ex. 25 at 1266-67.

Jefferson's sister, Rita Jefferson, also testified about Jefferson's generosity and sense of responsibility. Ex. 25 at 1269-70. She explained to the jury that Jefferson would get her and her sisters ready for school, take them to school, bring them home from school, prepare them for bed, and take them to church. Ex. 25 at 1270-71. She added that he helped her with her sons. Ex. 25 at 1269. She testified about Jefferson being in the Navy and later attending vocational/technical school. Ex. 25 at 1269-70. Linda Dale, the mother of Jefferson's two children, testified that Jefferson was a good father, who was responsible and liked to work. Ex. 25 at 1275, 1278-79. She also said that he continued to have a relationship with his children, even though he was in jail, and that she loved him. Ex. 25 at 1281.

Jefferson then testified. He discussed his difficult upbringing without a father, how he helped his mother raise his siblings, and his decision to leave high school to help make money for his family. Ex. 25 at 1290-92. He testified that he loved his children and never abandoned them, and contrary to the State's insinuations, he explained that he paid child support directly to his children's mother, though not to the court. Ex. 25 at 1294-95, 1320-22, 1333. He also explained that he had moved to Georgia to find work, and would send money to his family. Ex. 25 at 1296-97.

Jefferson then responded to the list of past crimes the State had introduced against him -- including his armed robbery conviction, as well as his arrests for disorderly conduct, marijuana possession, attempted burglary of a house, theft by taking, harassment, and burglary of a service station -- attempting to explain them away. Ex. 25 at 1297-1300, 1305, 1312-20, 1322-33. As for the armed robbery conviction, he said that he had been joyriding with his friends, and had not participated in any of the four robberies that supposedly happened that day, and had gotten in the car with them just before the police pulled it over. Ex. 25 at 1297-98, 1322-33. He explained that he had nonetheless pled guilty to the one armed robbery count because he was concerned that he would be charged for the other robberies and could not afford an attorney to fight the charge. Ex. 25 at 1299. As for the other arrests, Jefferson generally claimed that he had not committed most of the crimes, but he had been in the wrong place at the wrong time. Ex. 25 at 1312-19.

Jefferson also detailed his schooling and job experiences, saying that he had received his GED while in prison, and had gone on to become certified in masonry, welding, and auto body work. Ex. 25 at 1300-01. He admitted that he had been expelled from junior high school for hiding in the gym while the girls were in there and other "goofy stuff." Ex. 25 at 1312. He further explained that he was

14

dishonorably discharged from the Navy after three and a half years because he returned late from leave when his mother was sick. Ex. 25 at 1301-03, 1307-10. Finally, Jefferson denied telling the police that he wanted to be executed. Ex. 25 at 1306-07.

Following this testimony and deliberations, the jury returned a verdict finding the existence of two aggravating circumstances -- (1) the offense of murder was committed while the defendant was engaged in another capital felony (i.e., armed robbery); and (2) the offense of murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim"[3] -- and recommended that he be sentenced to die. Ex. 26 at 1435; Ex. 2 at 328. On March 9, 1986, Jefferson was sentenced to death by the state trial court. Ex. 26 at 1447-48; Ex. 2 at 332-34.

## C. The Conduct of Jefferson's Trial Counsel

Because the performance of Jefferson's counsel during the penalty phase of his trial is the primary focus of this appeal, we turn to the facts presented at the state collateral hearing concerning Jefferson's representation by his attorneys Stephen Schuster and Mark Cella. Schuster began his career as an assistant solicitor in Cobb County, and after two years, became an assistant district attorney

---

[3] These aggravating circumstances are found at Ga. Code Ann. § 17-10-30(b)(2) and § 17-10-30(b)(7), respectively.

in Cobb County, prosecuting all varieties of felony cases including burglaries, rapes, sex crimes and seven murder cases, and assisting in some death penalty cases. Ex. 39 at 158-60. Two years later, in 1980, Schuster entered into private practice, continuing to practice criminal law, working on about ten or eleven active felony cases a year, including murder cases, trying five or six a year, and assisting his partner in one death penalty case. Ex. 39 at 159-61. Petitioner's case was Schuster's first death penalty case as lead counsel. Ex. 39 at 161. Cella likewise started as an assistant solicitor in Cobb County, participating in approximately fifty jury trials, which included driving under the influence, misdemeanor shoplifting, child abandonment and simple battery cases. Ex. 39 at 35-36. After about three years there, in 1984, Cella entered private practice as a criminal defense attorney. Ex. 39 at 35, 60.

Schuster was appointed as lead counsel to represent Jefferson in May 1985, and Cella was appointed to assist him in July 1985. Trial Record at 8-10. Schuster and Cella "made a decision early on to do as much investigation as [they] could [them]selves." Ex. 39 at 166. In the process, they met with Jefferson "fairly frequently," independently of each other. Ex. 39 at 162. Jefferson maintained to both Cella and Schuster that he and Taulbee had a long relationship and were friends, they fished together, the victim loaned him money, and he had gone

fishing with Taulbee at Lake Allatoona on the day of the murder but that he was innocent, although his story changed a bit. Ex. 39 at 164. Jefferson first told Cella that he had seen two white people attack Taulbee, then he said he had seen two black people attack him. Ex. 39 at 72. He first told Schuster that he had hidden while Taulbee was attacked and came back later; then he said that he had assisted Taulbee while he was down, but later went back home. Ex. 39 at 164. According to Schuster, "[t]here were some changes in it but that was the basic theme of what happened, that two people had approached Ed and attacked him." Ex. 39 at 164. Regardless of the version of the story Jefferson told, he "adamantly" and consistently maintained to his counsel that he did not kill Taulbee. Ex. 39 at 72, 162-63.

Jefferson's counsel conducted an extensive investigation into his claims of innocence. Ex. 39 at 162-63. They visited the crime lab, the medical examiner's office, and Jefferson's apartment complex, and interviewed the detectives on the case, Stewart, the Glades, and the employer for Glade and Mitchell. Ex. 39 at 62-64, 166-70. They sought information from the trust company regarding Taulbee's bank account and how the ATM worked. Ex. 39 at 169. They went to the campground to find witnesses, and spoke to the beat officer on duty the night of the crime and to the people who ran the campground. Ex. 39 at 177-78. Although

17

they failed to uncover any helpful information at the crime scene, they recognized that the area was highly transient. Ex. 39 at 177-78. Ultimately, they learned that there was no physical or scientific evidence against Jefferson. Ex. 39 at 64.

Based on their investigation and Jefferson's adamant assertion that "he did not do it," Jefferson's counsel decided to argue at trial that the State could not prove beyond a reasonable doubt that he had murdered Taulbee. Ex. 39 at 62-63, 81, 171, 182. Schuster believed that "we had a good shot at winning [since] . . . there were a number of ambiguities . . . ." Ex. 39 at 171. Schuster further thought they could show that Taulbee was "worth more to Lawrence [Jefferson] alive than dead," since Taulbee lent Jefferson money, drove him around, and helped him on the job. Ex. 39 at 171. According to Schuster, "Lawrence [Jefferson] did not do it and that was the strategy all the way through. It wasn't one he wavered from." Ex. 39 at 182.

While investigating Jefferson's claim of innocence, his counsel also sought information about his life history. They asked him to write down a biography, in which he listed his family members and discussed his upbringing, discharge from the Navy, schooling, and jobs. Ex. 26 at Def.'s Ex. 16; Ex. 39 at 207. Jefferson did not mention a head injury in the biography. Ex. 26 at Def.'s Ex. 16. At some

point during their investigation, however, Jefferson's counsel learned that he had suffered a head injury at the age of two. Ex. 39 at 43-44.

To flesh out his life history, Jefferson's counsel obtained court funds to travel to his hometown of Louisville, Kentucky. Ex. 39 at 82-83, 169, 178; Ex. 40 at 457. They asked Jefferson for possible witnesses who could provide mitigating evidence, and then met with Jefferson's mother and the family members she had gathered, securing a history from each of them. Ex. 39 at 83-85, 178-79, 181. They were able to meet with most of the people Jefferson recommended. Ex. 39 at 84-85, 201-02. While in Kentucky, Jefferson's counsel also visited the gas station where he allegedly had committed a prior robbery, the courthouse for his prior records, and his probation officer. Ex. 39 at 178, 181, 199-200.

Jefferson's counsel additionally moved for the appointment of a mental health specialist to evaluate Jefferson. Ex. 39 at 66, 173.[4] Schuster explained that

---

[4] In all, Jefferson's counsel filed about 30 motions with the state court before and during his trial. These included: demands for a jury trial, witness list, copy of indictment and warrants; a demand for copies of Petitioner's statements; a discovery motion; a motion for copies of scientific reports and for preservation of and inspection of documents; a motion to examine the physical evidence; a motion requiring state agents and attorneys to keep written notes; a motion for a pretrial conference on the motion for funds; a motion for complete recordation; a challenge to the composition of the grand jury; a motion to prevent questioning of prospective jurors regarding their views on the death penalty; a motion for individual, sequestered voir dire; a motion to bar the prosecutor from using his strikes in a racially discriminatory manner; a motion for sequestration of the jury during trial; a motion reserving the right to file additional motions; a motion for the appointment of a psychiatrist or psychologist or a mental health specialist to determine Petitioner's competency and sanity; a motion for access to Lexis; a motion to provide Petitioner suitable clothing at trial; a motion for disclosure of impeaching information and any deals; a challenge to the traverse jury composition; a motion for funds for defense experts to

"[w]e didn't want to use the State Psychologist, Georgia Forensic Psychologist,

and we needed somebody who could testify for us at the sentencing phase if need

be." Ex. 39 at 172. After winning this motion, Schuster and Cella conferred with

other attorneys who had extensive experience with death penalty litigation,

including George Kendall of the American Civil Liberties Union ("ACLU"), the

Southern Poverty Law Center in Alabama, Bruce Harvey, and Jimmy Berry. Ex.

39 at 165-66. In November 1985, Cella received three names from the ACLU of

suggested psychologists, one of whom was Dr. Gary E. Dudley. Ex. 39 at 67, 173.

Dr. Dudley had received his Ph.D. in Clinical Psychology from the University of

Miami in 1975, and, among other things, had been the Chief Clinical Psychologist

in the Dade County Corrections and Rehabilitation Department, a

consultant/instructor in Criminal Justice at Nova University, and a member of the

American Association of Correctional Psychologists. Ex. 37 at 268-69.

Cella selected and contacted Dr. Dudley to conduct a mental examination of

Jefferson. Ex. 39 at 66. Dr. Dudley met with Jefferson four times during

December 1985. Ex. 37 at 224. Following his examinations, Dr. Dudley

---

assist in the jury composition challenge; a motion to suppress Petitioner's statements; a motion to suppress evidence seized during a search of Petitioner's apartment; a motion to transfer jurisdiction of the case to federal district court; a motion for funds for defense witnesses from out of state; seventeen requests to charge; a motion to determine if the rule of sequestration had been violated; eighteen additional requests to charge; a motion to submit a particular verdict form for sentencing purposes; and three additional requests to charge for the sentencing phase. Ex. 1 at 48-134, 137-64, 169-73, 190-98; Ex. 2 at 240-50, 274-93, 309, 314-26.

submitted a written report to Jefferson's counsel stating that Jefferson's test results were consistent with attention-deficit disorder, and that the "magnitude of his deficiencies is quite mild, and in no way impair[s] his judgment or decision-making capacity." Ex. 37 at 225. Dr. Dudley further opined:

> [T]his is an individual of average intelligence, apparently from a family environment that was involved in some violence (father reportedly killed in an argument) and whose adulthood has included participation in a robbery at gunpoint. His psychologic status at the time of my evaluation is non-psychotic, but he does present with very immature ego functions and tenuous ego integration. His major personality deficits seem centered around identity issues and the failure to achieve a coherent sense of self. This, in conjunction with great immaturity of ego functions generally, renders him prone to various forms of acting out, with very little mitigating personality structures and dynamics. There is no evidence in the test record to suggest that he has experienced a previous level of psychotic impairment. One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology. Because he denies the alleged crime, exploration of explosive personality disorder is not pursued. However, he denies a history involving significant amounts of violence.

Ex. 37 at 225-26.

Cella and Schuster spoke with Dr. Dudley about his findings, and "whether he would help or hurt us on the stand and whether we should call him to help our case." Ex. 39 at 77, 173-74. Cella determined that "Dr. Dudley's report conclude[d] and he suggested that he would hurt us more than help us if we did call

21

him," and additionally, that Dr. Dudley did not have "anything to say that would help our defense . . . [b]ecause of his conclusion that Lawrence's mental deficiencies did not prevent him from understanding right from wrong, did not impair his judgment or his decision-making capabilities, and that he was non psychotic." Ex. 39 at 73, 78. Cella further believed that a neuropsychological evaluation was unnecessary because they were "proceeding on the defense that Lawrence gave us, which was that he was an eyewitness to this incident." Ex. 39 at 78-79.

Counsel Schuster reached essentially the same conclusions about Dr. Dudley's assistance. Dr. Dudley "basically" told him that "[t]here is nothing I could testify to that would help you, if you get to the sentencing phase in Lawrence's case." Ex. 39 at 174. Dr. Dudley said that he had worked in prison psychology in Florida and that "Lawrence was just a criminal." Ex. 39 at 174-75. Schuster specifically asked Dr. Dudley about his recommendation for neuropsychological testing, and Dr. Dudley "basically said it may be a waste of time because the rest of the report . . . said that he was non psychotic, that he was intelligent, he had a fairly high I.Q., and . . . '[b]ecause he denies the alleged crime.'" Ex. 39 at 175-76. According to Schuster, "Dr. Dudley didn't pursue it and we saw no reason to further pursue it." Ex. 39 at 176.

In the course of the state court habeas proceedings, Dr. Dudley submitted affidavits that contradicted Schuster's and Cella's recollections of their interactions with him. Specifically, Dr. Dudley denied suggesting to Jefferson's counsel that a neuropsychological evaluation would not be necessary or that it would not be worthwhile. Ex. 40 at 440. Dr. Dudley claimed that he understood that the testing was not requested because funds were not available for it. Ex. 40 at 441. Dr. Dudley also denied telling Schuster that Jefferson was "just a criminal," and that he could not help them at trial. Ex. 40 at 440.

In any event, both Schuster and Cella testified at the state habeas hearing that they did not pursue further testing based on Dr. Dudley's report and their conversations with him, Ex. 39 at 78-79, 174-76, as well as on their interactions with Jefferson. Cella noted that he never had any problems communicating with Jefferson, Jefferson had a good vocabulary, understood his questions, and even paid child support. Ex. 39 at 79-80. Indeed, Cella said that he "never saw any evidence that Lawrence was brain damaged" and saw no reason to pursue a mental health defense further. Ex. 39 at 80. Cella said that he "didn't think [Dr. Dudley] had anything to say that would help our defense." Ex. 39 at 78. Cella also believed that, even assuming a brain damage defense existed, it would have been inconsistent with Jefferson's claim that he did not commit the crime. Ex. 39 at 79.

23

Schuster likewise testified that Jefferson never showed any evidence of brain injury: he had a good record in the Navy during his three and a half years of service; had a "pretty good work history that we used," which included Jefferson's job at a scale company where he was certified in making sure the scales were fixed and weighed properly; was "always very calm and always extremely helpful"; put together a biography for them that "pretty much listed everything"; kept good notes; helped coordinate interviews with his family and co-workers; gave them information about Mitchell and the Glades; and "was very workable within the sense that he helped us in any way he could to prepare the defense." Ex. 39 at 176-77, 179-80. Schuster continued:

> We had no indication, through our dealings with him, that there were any problems with explosive personality or anything like that . . . . I mean, there was nothing in our day-to-day relationship with Lawrence that would lead us to go further with [the mental health investigation]. We didn't have any problem. He kept good notes and helped us out. If there was something, I must have missed it.

Ex. 39 at 177.

In light of their investigation into the murder and Jefferson's life history, Jefferson's counsel decided to approach the penalty phase of the trial by minimizing Jefferson's past offenses and emphasizing his good qualities, including the relationships he had with his family. Ex. 39 at 96-97. And in addition to offering Jefferson's character as a mitigating factor at the penalty phase, they also

24

presented a residual doubt defense. As Cella described it, Jefferson's counsel sought, "in an indirect way, to point out to the jury that they were taking the word of three fairly unreliable witnesses and coming to the conclusion that he was guilty in the first place." Ex. 39 at 97. In doing so, Jefferson's counsel emphasized during the closing argument of the penalty phase that there were no eye witnesses to the crime, no guilty plea, and "no evidence of any consciousness of guilt." Ex. 25 at 1380.

### D. Jury Deliberations During the Penalty Phase of Jefferson's Trial

We pause briefly to describe an incident that allegedly occurred during the jury's deliberations over Jefferson's sentence, because it is relevant to Jefferson's cross-appeal. Relying on deposition testimony taken from a juror fifteen years after the trial, Jefferson claims that during the deliberations, when the jurors were each offering their opinions on an appropriate sentence for Jefferson, an older, female juror selected and read a passage from the Bible. Berry Dep. at 7-9. The juror who testified to this incident, Richard Berry, could not recall the name of the female juror in question and was not familiar with the passage she read, but believed that it was approximately a paragraph in length. Berry Dep. at 9-10, 11, 13, 18-19, 21. Although the juror read the passage out loud, the jurors did not discuss the passage, and it had no impact on Berry's sentencing decision. Berry

25

Dep. at 20-21. Berry was unclear whether the juror made any comments about the passage when she read it, but it appeared to Berry that she was looking for divine guidance and justification for her position on Jefferson's sentence. Berry Dep. at 10, 19-20.

One of Jefferson's habeas attorneys testified that he and another attorney interviewed at least five of the jurors from Jefferson's trial. Ertel Dep. at 24. None of the jurors besides Berry recalled the incident concerning the Bible. Ertel Dep. at 24-25. Jefferson's counsel were unable to locate the juror who, Berry said, had read from the Bible. Ertel Dep. at 24.

### E. Post-Trial Procedural History

Following his trial, Jefferson filed a motion for a new trial, which was denied on June 20, 1986. Ex. 2 at 351, 357-62. The Supreme Court of Georgia then affirmed his conviction and sentence of death and denied rehearing. Jefferson v. State, 256 Ga. 821, 828 (1987). The United States Supreme Court denied certiorari review on October 5, 1987, Jefferson v. Georgia, 484 U.S. 872 (1987), and denied a petition for rehearing on November 30, 1987, Jefferson v. Georgia, 484 U.S. 971 (1987).

On December 23, 1987, Jefferson sought state post-conviction relief in the Superior Court of Butts County, Georgia challenging his convictions and sentence.

Jefferson alleged, among other things, that his counsel were ineffective because they had failed to conduct an adequate pretrial investigation into the Petitioner's life and mental health to present to the jury evidence in mitigation at sentencing. Ex. 38 at 450. After a two-day evidentiary hearing, the state court rejected Jefferson's claim of ineffectiveness of counsel, making numerous factual findings regarding the investigation conducted by Jefferson's counsel into his mental health. First, the state court found that Jefferson's counsel conferred with Dr. Dudley about his report and "specifically discussed with Dr. Dudley" the suggestion in the report that a neuropsychological evaluation be conducted "to rule out an organic etiology," and that during this conversation, "Dr. Dudley led Mr. Schuster to believe that further investigation would simply be a waste of time because Petitioner was not psychotic, was intelligent and had a fairly high I.Q." State Habeas Corpus Order of October 7, 1992 ("State Habeas Order") at 16-17. "Based upon this report and the follow-up conversation, counsel saw no need to have further neuropsychological testing done, particularly given Petitioner's 'adamant' assertion that he did not commit the crimes, not that Petitioner had committed the crimes but had been unable to control himself." State Habeas Order at 16.

The state court further found that Jefferson's counsel saw no other basis for pursuing a mental health defense. Cella knew that Jefferson claimed he had

suffered a head injury in the past, but had no communication problems with Jefferson and saw no evidence to indicate any potential brain damage. State Habeas Order at 17-18. Schuster also saw no evidence from his conferences with his client that would have warranted further exploration of potential mental defenses. State Habeas Order at 18.

Second, the state court found that Jefferson's counsel did not call Dr. Dudley as a defense witness because "they determined Dr. Dudley had nothing helpful in mitigation." State Habeas Order at 16-17. Indeed, Dr. Dudley concluded that Jefferson's mental deficiencies did not prevent him from understanding what was right from wrong nor impair his judgment or his decision-making capabilities, and that Jefferson was not psychotic. State Habeas Order at 17. According to the state trial judge, Dr. Dudley further indicated that he had "experience as a psychologist in a Florida prison," and had described Jefferson to Schuster as "'just a criminal' and indicated that he had no helpful testimony." State Habeas Order at 17. For these reasons, Schuster "elected not to call Dr. Dudley in mitigation as counsel saw no sense in presenting a witness who would not be helpful to Petitioner." State Habeas Order at 17. Moreover, "[p]articularly since counsel were relying upon Petitioner's version of events that he did not commit the crimes but was an eyewitness to the incident, a defense regarding brain damage would have been

28

inconsistent with Petitioner's version of events that he was innocent." State Habeas Order at 17.

The state habeas court thus concluded that Jefferson's counsel "made a strategic decision, based upon their investigation, not to present any type of mental defense or pursue additional neuropsychological testing as counsel had investigated this line of inquiry but found nothing helpful to the defense, either as to the crimes themselves or for mitigation." State Habeas Order at 18, 36. In making these findings of fact, the state court "specifically credit[ed] the testimony of Mr. Schuster and Mr. Cella with regard to their efforts to investigate Petitioner's mental condition, both as to potential defenses to the crimes themselves as well as mitigating evidence, and their decision not to call Dr. Dudley as a witness in mitigation." State Habeas Order at 18, 36.

Applying Strickland v. Washington, 466 U.S. 668 (1984), the state habeas corpus court then held:

> This Court has found counsel made a reasonable investigation into the mental health area, obtained an independent report which was not favorable to the defense, followed up on the suggestion of further neurological testing but then were led to believe it would not be worthwhile, had no other evidence indicating further examination was warranted and simply concluded that this line of investigation was no longer plausible. Petitioner has shown no attorney error in this regard. See Francis v. Dugger, 908 F.2d 696 (11th Cir. 1990). As Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114 (1987), makes clear, an attorney only has a constitutional duty to conduct a reasonable investigation for

29

mitigating evidence. Here, counsel did that and made a reasonable decision not to investigate further. That Petitioner now offers affidavits of experts, after the fact, giving favorable testimony on this issue does not mean that Mr. Schuster and Mr. Cella could have found such testimony at the time of trial or show they were ineffective. Daugherty v. Dugger, 839 F.2d [1426], 1432 (11th Cir. 1988).

. . . .

In conclusion, the record shows that trial counsel more than vigorously represented their client at trial after thoroughly investigating the case and presenting the only viable defenses they determined were available. Petitioner has failed to establish attorney error and prejudice under the standard of Strickland v. Washington.

State Habeas Order at 37, 44.

The Georgia Supreme Court also rejected Jefferson's Strickland claim,

finding that trial counsel "prepared extensively for a possible sentencing phase,

including travelling to Jefferson's home in Kentucky to interview family members

and obtaining a psychological evaluation by a psychologist recommended to them

by the American Civil Liberties Union." Jefferson v. Zant, 263 Ga. 316, 319

(1993). The Georgia Supreme Court further found that:

> The report did suggest that a neuropsychological evaluation might be "worthwhile . . . to rule out an organic etiology." However, in subsequent telephone conversations with Jefferson's attorneys, the psychologist indicated that further examination would not likely be beneficial because Jefferson did not have serious mental problems and was of normal intelligence. Counsel explained that in light of this advice, as well as their own observations of Jefferson and Jefferson's adamant assertion that he had not committed the crime, they

30

concluded that there was no reason to explore further any mental issue, or to call the psychologist to testify in mitigation.

. . . .

Jefferson's counsel investigated the possibility of mental mitigation and concluded that there was nothing substantive to develop. The record supports the finding that Jefferson's counsel did not believe, and had no reason to believe, that Jefferson suffered mental deficiencies that could have been exploited in mitigation.

. . . .

Although other attorneys might have explored the mental issue further, we cannot conclude that the investigation by and tactical judgment of Jefferson's attorneys was outside the wide range of reasonably effective assistance. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Since we agree with the habeas court that there was no deficient attorney performance, we need not address the issue of prejudice.

Id. (citation omitted). Jefferson's motion for reconsideration was denied by the

Georgia Supreme Court on July 27, 1993, and then the United States Supreme

Court denied Jefferson's petition for a writ of certiorari. Jefferson v. Zant, 511

U.S. 1046 (1994).

Thereafter, Jefferson filed this Petition for Writ of Habeas Corpus in the

United States District Court for the Northern District of Georgia. In addition to

allowing discovery on Jefferson's claims of racial bias, juror misconduct, Brady

violations and "actual innocence," the district court held evidentiary hearings on

February 21, 2001 and February 22, 2005.

On May 10, 2007, the federal habeas corpus court granted in part and denied in part Jefferson's petition. The district court granted relief concerning "Petitioner's claim that trial counsel was ineffective during the penalty phase of trial," concluding that Jefferson's trial counsel performed ineffectively when they failed to conduct a reasonable investigation of mitigating evidence, including, in particular, mental health evidence. Jefferson v. Terry, 490 F. Supp. 2d 1261, 1348 (N.D. Ga. 2007). Specifically, the district court concluded "as a matter of law" that counsel's strategic decision not to investigate and present this evidence was unreasonable for three reasons: (1) the lawyers erroneously relied on "oral statements made by Dr. Dudley that contradicted his written opinion without adequate explanation for the contradiction"; (2) they erroneously failed to "inquire about and appreciate the potential value of evidence of brain damage as a mitigating circumstance"; and (3) they were unaware of the mental health evidence "that might have been available." Id. at 1324. The district court further determined that Jefferson was prejudiced by his counsel's ineffective assistance, because the lawyers' omissions deprived the jury of the "most powerful explanation for the crime" -- that Jefferson suffered from organic brain damage that impaired his judgment and his ability to control his behavior. Id. at 1327.

The district court denied all of the other claims raised in the petition, including Jefferson's claim that he was denied a fundamentally fair trial and reliable sentencing proceeding because jurors impermissibly considered extra-judicial evidence -- the Bible -- during their deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. In denying relief on this ground, the district court found:

> [Juror] Berry's deposition testimony reflected that he was fairly certain that a juror had read from the Bible during the sentencing phase, but he could not recall the identity of the juror or the passage read aloud . . . . [G]iven the absence of evidence regarding the specific passage read, [Jefferson] cannot show that the passage was even relevant to the sentencing issues that were before the jury. What is clear from Mr. Berry's deposition testimony is that any such passage read was far from being the focus of the jury's sentencing deliberations, as the passage was not even discussed among the jurors. In sum, the evidence presented in the case at bar is too weak and speculative to demonstrate that juror misconduct actually occurred or, assuming that such misconduct did occur, that one juror's alleged reading of an unidentified, random passage from the Bible improperly influenced the jury's sentencing deliberations.

Id. at 1347-48 (citations omitted).

The State's appeal, and Jefferson's cross-appeal, now follow.

## II. Standards of Review

Because Jefferson filed his federal habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), this Court must review his claims under the

pre-AEDPA statute. Bradshaw v. Stumpf, 545 U.S. 175, 182 (2005); Lindh v. Murphy, 521 U.S. 320, 327 (1997).

Pre-AEDPA, questions of law and mixed questions of law and fact resolved by state habeas courts are reviewed de novo, while the state courts' factual findings are "subject to the presumption of correctness." Freund v. Butterworth, 165 F.3d 839, 861 (11th Cir. 1999).[5] Although these findings may be disregarded if, for example, they are "not fairly supported by the record," Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir. 1995) (quoting 28 U.S.C. § 2254(d)(8)), this Court has construed the "presumption of correctness" standard to be the same as the "clear error" standard of review. Conklin v. Schofield, 366 F.3d 1191, 1199-1200 (11th Cir. 2004) ("When the state habeas court has held an evidentiary hearing, . . . the findings of fact by the state court are generally presumed to be correct unless clearly erroneous."); Panzavecchia v. Wainwright, 658 F.2d 337, 339 (5th Cir. Unit B 1981) (under § 2254(d), "factual issues resolved by state courts are presumed correct and may not be set aside unless clearly erroneous").[6]

---

[5] We note that deference is owed not only to the state trial court's findings of fact, but to the Georgia Supreme Court's findings as well. See Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998) ("deference is owed to state appellate court findings based upon statements in the trial record even when those statements were not made under oath").

[6] See Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982) (adopting all post-September 30, 1981 decisions of Unit B of the former Fifth Circuit as binding precedent in the Eleventh Circuit).

We also review for clear error the district court's findings of historical facts underlying a habeas claim, while conclusions of law are reviewed de novo. See Mincey v. Head, 206 F.3d 1106, 1142 (11th Cir. 2000); Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir. 1993) ("The district court held an evidentiary hearing on this issue; therefore, this court will accept the district court's findings of fact as correct unless they are shown to be clearly erroneous.") (citing Fed. R. Civ. P. 52(a)); Strickland, 466 U.S. at 698 ("state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and . . . district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a)").

### III. Jefferson's Ineffective Assistance of Counsel Claim

Jefferson's central claim is that his trial attorneys were ineffective during the penalty phase of his trial because they failed to conduct a reasonable investigation of mitigating evidence and because they failed to present evidence of his claimed organic brain damage. We are not persuaded.

### A.

To succeed on an ineffective-assistance-of-counsel claim, Jefferson must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 688, 694; accord Knowles v. Mirzayance, 129 S. Ct. 1411,

1420, 1422 (2009); Wiggins v. Smith, 539 U.S. 510, 521-22 (2003); Williams v.

Taylor, 529 U.S. 362, 390 (2000); Darden v. Wainwright, 477 U.S. 168, 184

(1986).

Since Jefferson's claim stems from his lawyers' decision to limit the scope

of their investigation into potentially mitigating mental health evidence, we view

the deference owed these strategic judgments through this prism:

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91; accord Knowles, 129 S. Ct. at 1420. Thus, "even

when trial counsel's investigation and presentation is less complete than collateral

counsel's, trial counsel has not performed deficiently when a reasonable lawyer

could have decided, under the circumstances, not to investigate or present

particular evidence." Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir.

2001); see also Wiggins, 539 U.S. at 523 ("[O]ur principal concern . . . is not

whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable.") (emphasis omitted). If "we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994).

In reviewing a lawyer's professional judgments, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness.'" Mills v. Singletary, 63 F.3d 999, 1021 (11th Cir. 1995) (quoting Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987)); see also Strickland, 466 U.S. at 690 ("counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). Indeed, our standard is a high one -- "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers, 13 F.3d at 386 (emphases added); Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) ("And because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action

that his counsel did take."). The standard is even higher where experienced

counsel is involved. See Chandler, 218 F.3d at 1316 ("When courts are examining

the performance of an experienced trial counsel, the presumption that his conduct

was reasonable is even stronger.").

Moreover, the Supreme Court has emphasized that "[t]he reasonableness of

counsel's actions may be determined or substantially influenced by the defendant's

own statements or actions . . . [and] what investigation decisions are reasonable

depends critically on such information." Strickland, 466 U.S. at 691. As a result,

"when a defendant has given counsel reason to believe that pursuing certain

investigations would be fruitless or even harmful, counsel's failure to pursue those

investigations may not later be challenged as unreasonable." Id.

Reasonableness is assessed objectively, measured "under prevailing

professional norms," id. at 688, and includes a context-dependent consideration of

the challenged conduct as seen "from counsel's perspective at the time," id. at 689,

104 S.Ct. 2052. See also Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1151

(11th Cir. 2009) ("The standard we apply in assessing the first prong is that of a

reasonable attorney, not a paragon of the bar.") (quotations omitted); Williams v.

Head, 185 F.3d 1223, 1236 (11th Cir. 1999) ("'[I]n retrospect, one may always

identify shortcomings,' but perfection is not the standard of effective assistance.")

(quoting Cape v. Francis, 741 F.2d 1287, 1302 (11th Cir. 1984)); Atkins v.

Singletary, 965 F.2d 952, 958, 960 (11th Cir. 1992) ("Most important, we must

avoid second-guessing counsel's performance . . . . Nothing is so easy as to be wise

after the event . . . . A lawyer can almost always do something more in every case.

But the Constitution requires a good deal less than maximum performance.")

(quotations omitted). As we have said:

> In reviewing counsel's performance, a court must avoid using the
> distorting effects of hindsight and must evaluate the reasonableness of
> counsel's performance from counsel's perspective at the time . . . .
> The widespread use of the tactic of attacking trial counsel by showing
> what 'might have been' proves that nothing is clearer than hindsight --
> except perhaps the rule that we will not judge trial counsel's
> performance through hindsight.

Chandler, 218 F.3d at 1316-17 (quotations and citation omitted). In other words,

we recognize that "the trial lawyers, in every case, could have done something

more or something different. So, omissions are inevitable. But, the issue is not

what is possible or what is prudent or appropriate, but only what is constitutionally

compelled." Id. at 1313 (quotations omitted).

**B.**

When measured against these standards, we conclude that the decision of

Jefferson's trial counsel not to conduct neuropsychological testing or to present a

mental health defense at the penalty phase of trial was not constitutionally

ineffective. As the record establishes, both of Jefferson's attorneys were seasoned criminal defense lawyers, and during the ten months they had to prepare their defense, they conducted an extensive investigation into both the details of the crime and Jefferson's life history. They visited the crime scene, as well as Jefferson's apartment complex, and his place of employment. They interviewed the State's witnesses and identified important weaknesses in the prosecutor's case. And they traveled to Jefferson's hometown in Kentucky to meet with his family members. Throughout this period, counsel also interacted frequently with Jefferson himself. During these meetings, Jefferson's demeanor was invariably calm; he was articulate and appeared intelligent; and he was always helpful to counsel, for example, providing them with the details of his employment history and military service.

Notably, however, counsel's investigation did not end there. They consulted with at least four other attorneys with extensive death penalty experience at the trial and appellate levels, including specialists at the Southern Poverty Law Center and the ACLU. And despite the fact that Jefferson had adamantly proclaimed his innocence all along, and despite the fact that counsel saw no evidence of any mental health problems in their many interactions with Jefferson, counsel took the additional precaution of requesting a psychological evaluation of Jefferson.

Indeed, this motion was one of some thirty motions they filed with the trial court.[7] After prevailing on their motion for psychological testing, counsel sought out recommendations from the ACLU for psychologists, and selected Dr. Dudley, one of the three experts recommended to them.

After meeting with Jefferson on four occasions, Dr. Dudley drafted an expert report. However, the report, and their conversations with Dr. Dudley, gave Jefferson's counsel precious little to work with. The report concluded that Jefferson was in the middle range of intelligence, that the magnitude of his deficiencies was quite mild, and in no way impaired his judgment or decision-making capacity, and that he was not psychotic. The report also mentioned "sequelae to head injury experienced during childhood" as a "possibility" that Dr. Dudley was unable to explore, and said that "it would be worthwhile to conduct neuropsychological evaluation of [Jefferson] to rule out an organic etiology." But as the state court found, when counsel spoke directly with Dr. Dudley specifically about whether to explore that "possibility," he "led Mr. Schuster to believe that

_____

[7] As the state habeas court details, Jefferson's counsel -- in addition to filing these dozens of motions -- aggressively represented him. State Habeas Order at 12-22. For example, they participated in at least ten pretrial motion hearings, including one in which they presented two jury composition experts as well as the testimony of former and current jury commissioners regarding jury selection practices. The voir dire process alone resulted in five separate volumes of transcripts. And during the course of the trial, Jefferson's counsel cross-examined virtually every State's witness, and voiced numerous objections, including objections to the jury, the trial court's and the prosecutor's remarks, the State's evidence, and the jury instructions.

further investigation would simply be a waste of time." State Habeas Order at 16-17.[8] In conversation, Dr. Dudley also remarked upon his experience as a psychologist in a Florida prison and stated that, in his opinion, Jefferson was "just a criminal." Ex. 39 at 174-75. In light of their conversations with Dr. Dudley, Jefferson's counsel elected not to conduct further testing, and instead presented an innocence defense at trial. Based on these factual findings of the state habeas courts -- all of which are fairly supported by the record -- we believe that

---

[8] We specifically note that neither Jefferson nor the district court questioned the state court's factual finding that "Dr. Dudley led Mr. Schuster to believe that further investigation would simply be a waste of time," (emphasis added), despite Schuster's testimony that Dr. Dudley told him it "may" be a waste of time. Nevertheless, the state court's use of the word "would" is "fairly supported" by all of the written and oral advice Dr. Dudley gave to Jefferson's counsel -- including the statements in the written report that Jefferson was in the middle range of intelligence, that the magnitude of his deficiencies was quite mild, and in no way impaired his judgment or decision-making capacity, and that he was not psychotic, as well as Dr. Dudley's oral statements that based upon his experience as a psychologist in a Florida prison, Jefferson was "just a criminal." The dissenting opinion appears reluctant to accept the findings of the state habeas court or the Georgia Supreme Court. But it is irrelevant whether or not the oral statements upon which the state courts relied in making their findings are characterized as "informal"; indeed, the state courts' findings are clear, unambiguous, and fairly supported by the record, and we are therefore duty-bound to accept them. Jackson, 42 F.3d at 1366.

It is also worth noting that Jefferson has not argued that any of the state courts' factual findings were "not fairly supported by the record," and thus, they are likewise "entitled to a presumption of correctness." Id. We recognize that Jefferson notes that "[t]he state habeas court's 'fact-finding' is dubious at best," Red Brief at 31 n.10, describing how the state court's order mentions a witness as not credible, even though that witness did not actually testify, and asks this Court to "harbor serious doubts about the findings of fact and credibility determinations in the state court record." However, Jefferson does not point to any particular factual finding that was clearly erroneous, and Jefferson even says in the argument section of his brief that "[t]he relevant facts are not in dispute." Red Brief at 24.

Jefferson's counsel were reasonable in deciding not to pursue neuropsychological testing.

The most that can be said in support of Jefferson's position is that counsel were presented with two contradictory statements from Dr. Dudley -- a statement in his written report and his oral statements in response to specific questions by counsel. Jefferson effectively asks us to discard the state habeas court's finding of fact that defense counsel were led by Dr. Dudley's oral statements to believe that further inquiry into neuropsychological testing would be a waste of time. This we are not prepared to do, especially where our inquiry focuses on whether it was reasonable under the circumstances not to inquire further.

Jefferson suggests, nevertheless, that when confronted with this contradiction, his attorneys had a duty to explore the issue further in order to definitively determine whether or not neuropsychological testing would be helpful to his case. We cannot agree. Counsel's decision not to explore the matter further was based on several sound reasons rooted in the facts and circumstances of this case. First, Dr. Dudley's suggestion that neuropsychological testing be conducted in order to explore the "possibility" of "sequelae to head injury" is mentioned only briefly and at the very end of his report. All of the report's other conclusions and observations -- e.g., that Jefferson was in the middle range of intelligence, that he

was not psychotic, and that he had mild deficiencies that did not affect his judgment or decision-making -- indicated that Jefferson did not suffer from any significant psychological impairment. When taken together with Dr. Dudley's statements to them in discussions designed to address this very issue, it was reasonable for Jefferson's counsel to accord little weight to the statement in the written report regarding neuropsychological testing.

In addition to Dr. Dudley's report and his oral statements, Jefferson's counsel had other substantial reasons for deciding not to pursue neuropsychological testing or to present a mental illness defense. As we have noted, for example, neither Schuster nor Cella witnessed anything in their frequent and extensive dealings with Jefferson to indicate that he was afflicted with any mental disorder that might have been relevant to the murder. Cf. Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) (counsel not ineffective for failing to pursue mental health investigation where counsel knew the defendant had suffered a head injury in an automobile accident, but observed nothing unusual about the defendant's behavior, testifying that he was one of counsel's "most intelligent" clients); Holladay v. Haley, 209 F.3d 1243, 1252 (11th Cir. 2000) (counsel not ineffective for failing to pursue mental health investigation where the petitioner did not tell counsel of his stay at a mental hospital and counsel found the petitioner to

be cooperative, articulate, and affable); Williams, 185 F.3d at 1239 (counsel not ineffective for failing to pursue mental health investigation where counsel had no problems communicating with the petitioner, found the petitioner to be intelligent, attentive, cooperative, polite, and interested in what was happening, to ask intelligent questions and to respond intelligently to counsel's questions).

Two other important elements in the calculus were that Jefferson had unwaveringly proclaimed his innocence, and that the State's case against him suffered from many weaknesses: there was no physical evidence of Jefferson's guilt; there were no eyewitnesses to the crime; Jefferson was a "friend" of the victim and stood to benefit from a continued relationship with him; and the testimony from Jefferson's neighbors, on which the State relied, was patchy, volatile, and self-serving. Jefferson's insistence on his innocence, together with the vulnerabilities in the State's case, made it reasonable for Jefferson's counsel to focus their energies on presenting a defense of innocence.

Moreover, presenting an innocence defense would not have meshed easily with the presentation of a mental illness defense at the penalty phase. We have repeatedly recognized the difficulty that defense counsel face in arguing to the jury at the guilt phase that their client is undeniably innocent, only to switch gears at the penalty phase, admit that the defendant committed the crime, and argue that the

defendant's mental impairment caused him to have done so. See Collins v. Francis, 728 F.2d 1322, 1349 (11th Cir. 1984) ("Counsel, having chosen a reasonable strategy to portray [another person] as the villain, should not be found ineffective because he did not push a line of defense that his client actually contributed to the victim's death but did so only because he was under psychological duress. Counsel's strategic choice as to the defense in this case was reasonable."); see also Jones v. Dugger, 928 F.2d at 1020, 1028 (11th Cir. 1991); Chandler, 218 F.3d at 1319 ("Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."). Presenting a mental illness defense during the penalty phase of the trial would have placed Jefferson's counsel in just such a precarious position, maintaining that Jefferson had not committed the crime, and then presenting testimony that if indeed Jefferson had committed a particularly violent murder, it would have been due to an organic brain injury.

We have also previously observed "that residual doubt is perhaps the most effective strategy to employ at sentencing." Chandler, 218 F.3d at 1320 n.28 (citing Tarver, 169 F.3d at 715-16). This is especially true where, as here, "[t]he reasonableness of counsel's actions may be determined or substantially influenced

46

by the defendant's own statements or actions . . . [and] what investigation decisions are reasonable depends critically on such information." Strickland, 466 U.S. at 691. Viewed in this light, we think that counsel's decision to present an innocence defense at the guilt phase of the trial, and to reference it, among other things, in the penalty phase -- for example, by emphasizing during closing argument that there were no eye witnesses to the crime, no guilty plea, and "no evidence of any consciousness of guilt," Ex. 25 at 1380, 1401 -- was reasonable. While it may have been possible to argue the case in the alternative during distinctive phases of a death case, we cannot say that counsel were constitutionally ineffective for opting not to present a mental illness defense during the penalty phase.

Nor are we persuaded by the suggestion that it was unreasonable for Jefferson's counsel to decide against neuropsychological testing because they had nothing to lose by doing so. The mere fact that there was "nothing to lose" by pursuing a defense does not, by itself, mean that counsel's performance was deficient. As the Supreme Court has recently observed, it has never found counsel to be deficient simply because he "abandon[ed] [a defense] [when] there was nothing to lose by pursuing it." Knowles, 129 S. Ct. at 1419 & n.3.

Moreover, we cannot accept the underlying premise that nothing was in fact to be lost by pursuing the neuropsychological evidence. On the contrary, pursuing

such a strategy would have come with several costs. First, as the record shows, Jefferson's counsel spent a significant amount of time traveling and interviewing witnesses in building their strategy of innocence. Because it is undeniable that attorneys in these cases have finite resources to expend, seeking funds for and gathering additional mental health evidence may have hampered the ability of Jefferson's counsel to work on establishing his innocence. Housel, 238 F.3d at 1296.

Beyond concerns over resource allocation, however, counsel also had significant strategic concerns about presenting multiple defense theories. For example, as we have explained above, there was a distinct possibility that presenting a mental illness defense during the penalty phase could have backfired. Moreover, adopting another strategy might have affected Jefferson's ability to testify, which also could have harmed his case. Not only did Jefferson testify at the penalty phase in order to explain his past crimes and deny the statement that he wanted to be executed, but he was able to explore his positive characteristics, including his employment history and relationship with his family. In addition, his mother, sister, and girlfriend testified about his contributions to his family and how much they loved each other, and his mother asked for mercy. See Callahan v.

<u>Campbell</u>, 427 F.3d 897, 935 (11th Cir. 2005) (recognizing mercy as a reasonable defense in the penalty phase).

In sum, since the state habeas courts' findings of fact are fairly supported by the record, and according them, as we must, a strong presumption of correctness, and evaluating the reasonableness of counsel's performance from counsel's perspective at the time, <u>Strickland</u>, 466 U.S. at 690; <u>Chandler</u>, 218 F.3d at 1316-17, we conclude that the performance of Jefferson's counsel at the penalty phase of his trial was reasonable. Counsel's decision not to pursue neuropsychological testing was, as the state courts unambiguously found, a considered judgment, made only after substantial inquiry, not an oversight or the result of an arbitrary whim. Jefferson's counsel carefully weighed various options, and, based on their substantial experience as criminal law practitioners, exercised their professional judgment about the most promising route to pursue. This mode of calculation and deliberation embodies the essence of "reasonableness." In the words of the Supreme Court, Jefferson's counsel made "strategic choices . . . after less than complete investigation" that were supported by "reasonable professional judgments," and were "determined or substantially influenced by the defendant's own statements" that he was innocent. <u>Strickland</u>, 466 U.S. at 690-91. Even if another lawyer might have taken a different tack, we cannot say that <u>no</u> reasonable

lawyer would have made the decisions Schuster and Cella made. Rogers, 13 F.3d at 386. We, therefore, conclude that the state habeas courts were correct in holding that Jefferson's counsel were not constitutionally ineffective.[9]

## C.

Accordingly, we cannot accept the federal district court's conclusion that Jefferson's counsel performed unreasonably, nor with several underpinnings of that decision. First, contrary to the district court's suggestion that trial counsel

---

[9] We do not -- as the dissenting opinion suggests -- rest our decision solely, or even mainly, on counsel's decision to pursue a residual doubt defense at sentencing, but rather, on the many reasons enumerated in this opinion, including: (1) counsel's own experience as criminal attorneys and their request for advice from seasoned capital attorneys; (2) counsel's thorough investigation into the crime and Jefferson's life history, which revealed many weaknesses in the State's circumstantial case, Jefferson's record in the Navy, a "pretty good work history," and, notably, no record of any explosive behavior; (3) Dr. Dudley's written report and oral comments to counsel, which, as the state courts found, led counsel to believe that further investigation "would be a waste of time"; (4) counsel's interactions with Jefferson himself, who was "always very calm and always extremely helpful," helped coordinate interviews with his family and co-workers, gave counsel information about the State's witnesses, had a good vocabulary, understood counsel's questions, and "was very workable within the sense that he helped us in any way he could to prepare the defense"; (5) Jefferson's "adamant" insistence that he was innocent of the crime; and (6) the costs of switching defenses at sentencing, which may have lost credibility with the jury and affected Jefferson's decision to testify. In this respect, it was reasonable for counsel to believe that evoking sympathy or asking the jury for mercy did not involve an explicit admission of guilt; and surely, not to the same degree as a neurological defense would have. It is one thing to plead for mercy and quite another to say, "I committed a particularly brutal murder, but did so only because of organic brain injury."

As we see it, this case is very different from the two cited by the dissenting opinion -- Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991), and Wiggins, 539 U.S. 510 -- that did not involve situations where: (1) counsel spoke with numerous family members prior to trial; (2) a psychologist led counsel to believe, unlike in Wiggins, that "further investigation would have been fruitless," 539 U.S. at 525; and (3) there were no prior diagnoses of mental illness or other readily available materials that counsel missed.

must always have "full information," 490 F. Supp. 2d at 1326, our en banc

decision in Chandler makes clear, as Strickland recognized from the outset, that the

law does not require counsel always to investigate extensively every conceivable

defense:

> [C]ounsel need not always investigate before pursuing or not pursuing
> a line of defense. Investigation (even a nonexhaustive, preliminary
> investigation) is not required for counsel reasonably to decline to
> investigate a line of defense thoroughly.FN22 For example, counsel's
> reliance on particular lines of defense to the exclusion of others --
> whether or not he investigated those other defenses -- is a matter of
> strategy and is not ineffective unless the petitioner can prove the
> chosen course, in itself, was unreasonable.
>
>> FN22. As we have recognized, Strickland's approach toward
>> investigation "reflects the reality that lawyers do not enjoy the
>> benefit of endless time, energy or financial resources." Rogers,
>> 13 F.3d at 387. How a lawyer spends his inherently limited time
>> and resources is also entitled to great deference by the court.
>> See White, 972 F.2d at 1224 ("[G]iven the finite resources of
>> time and money that face a defense attorney, it simply is not
>> realistic to expect counsel to investigate substantially all
>> plausible lines of defense. A reasonably competent attorney
>> often must rely on his own experience and judgment, without
>> the benefit of a substantial investigation, when deciding
>> whether or not to forego a particular line of defense . . . .").

Chandler, 218 F.3d at 1318 & n.22 (citations omitted); Foster v. Dugger, 823 F.2d

402, 405 (11th Cir. 1987). Rather, Jefferson's counsel were required only to make

"a reasonable decision" that further investigation into Jefferson's mental health

was "unnecessary," Strickland, 466 U.S. at 690-91, and Jefferson's counsel did just that.

Nor do we think this case is at all like Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir. 1991), or Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988). In Blanco and Middleton, counsel performed no investigation into mitigating evidence, or no investigation at all into certain mitigating factors, and provided no explanation for their failure. See Blanco, 943 F.2d at 1500-03 (counsel informed the court that he was not prepared for the penalty phase and needed a continuance to locate witnesses, and after the continuance, counsel nonetheless failed to put on any mitigation evidence, "primarily a result of counsels' eagerness to latch onto Blanco's statements that he did not want any witnesses called"); Middleton, 849 F.2d at 493-94 ("Middleton's trial counsel conducted almost no background investigation, despite discussions with Middleton concerning the existence of such mitigating evidence," and counsel testified that they had no tactical reasoning behind their failure to perform a background investigation for possible mitigating evidence).

Here, in sharp contrast, counsel performed an investigation into Jefferson's background and mental health, and obtained an expert on this issue before intentionally abandoning the defense in favor of others that seemed more

52

promising. In fact, this case more closely resembles the facts in <u>Rogers</u>. There, Rogers's counsel conducted an investigation and presented evidence about mitigating circumstances, but after failing to investigate the effects of PCP on users, presented no evidence or argument about Rogers's PCP use. Rather than focusing on what counsel could have learned through further investigation, the Court held:

> Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced. Nor do we need to decide whether the information that would have resulted from further investigation would have necessarily been used at trial by every reasonable lawyer who was armed with such information. <u>If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question about the reasonableness of having failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to investigate no further.</u> Cf. <u>Middleton v. Dugger</u>, 849 F.2d 491, 493 (11th Cir.1988) (where lack of investigation is inadequately explained, court looks at information that more investigation would have produced and determines whether a reasonable trial counsel might not have used it).

<u>Rogers</u>, 13 F.3d at 388 (emphasis added); <u>see also Chandler</u>, 218 F.3d at 1317 n.20 ("basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight"). Here, notwithstanding the district court's suggestion to the contrary, it cannot fairly be said that Jefferson's counsel had no reasonable basis for not investigating further, nor was the rationale

53

"inadequately explained," nor finally did counsel fail to appreciate the possible value of further investigation. Quite simply, counsel engaged an expert psychologist to evaluate Jefferson, and the psychologist expressly discouraged them from pursuing the matter further.

For all of these reasons, we hold that Jefferson has not established that counsel's performance at the penalty phase was unreasonable under Strickland. Since Jefferson has failed to meet the first prong of Strickland, we need not address the second prong of the analysis -- whether his defense was prejudiced. Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1100 (11th Cir. 2007) ("Because Dingle has failed to establish the deficient performance prong of his Strickland claim, we need not address the prejudice prong."); see also Strickland, 466 U.S. at 697. The state habeas courts properly denied relief on the Petitioner's ineffective-assistance-of-counsel claim.

## IV. Jefferson's Juror Misconduct Claim

Jefferson cross-appeals claiming that he was denied a fundamentally fair trial and reliable sentencing proceeding because jurors allegedly considered an unknown biblical passage during their deliberations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. As an initial matter, Jefferson did not raise this claim in the state courts, and, we, therefore, must address whether Jefferson

has excused his procedural default with a showing of cause <u>and</u> actual prejudice.

<u>Francis v. Henderson</u>, 425 U.S. 536, 542 (1976); <u>Mincey v. Head</u>, 206 F.3d 1106,

1135 (11th Cir. 2000) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991);

<u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992)); <u>see also</u> <u>Turpin v.</u>

<u>Todd</u>, 268 Ga. 820, 828 (Ga. 1997) ("to overcome the procedural bar, Todd must

not only demonstrate cause for failing to raise the claim on direct appeal, but also

actual prejudice").

Under the "actual prejudice" test, a defendant must show "not merely that

the errors at his trial created a <u>possibility</u> of prejudice, but that they worked to his

<u>actual</u> and substantial disadvantage, infecting his entire trial with error of

constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982);

<u>Hollis v. Davis</u>, 941 F.2d 1471, 1480 (11th Cir. 1991); <u>Turpin</u>, 268 Ga. at 828

(citing <u>Reece v. United States</u>, 119 F.3d 1462, 1467-68 (11th Cir. 1997)). <u>See also</u>

<u>Booker v. Wainwright</u>, 764 F.2d 1371, 1380 (11th Cir. 1985) (finding no showing of

actual prejudice where there was overwhelming evidence of guilt and the petitioner

admitted on the stand that death was the only appropriate penalty, as "Booker faced

a difficult task in arguing that the prosecutor's description of the victim as 'white'

destroyed a substantial likelihood that he would receive mercy"). Notably, even if

the law presumes prejudice for certain errors when they are timely raised, a

convicted defendant who is seeking to overcome a procedural bar does not have the benefit of that presumption of prejudice, and must instead meet the actual prejudice test set forth in Frady. See Francis, 425 U.S. at 542 n.6 ("The presumption of prejudice which supports the existence of the [constitutional] right is not inconsistent with a holding that actual prejudice must be shown in order to obtain relief from a statutorily provided waiver for failure to assert it in a timely manner."); Hollis, 941 F.2d at 1479-80; Turpin, 268 Ga. at 828.

Regardless of whether Jefferson has established "cause" for his failure to present the juror misconduct issue to the state courts, he has not come close to making a showing of "actual prejudice." All that Jefferson has suggested, at the highest order of abstraction, is that he somehow suffered prejudice "when the sentencing decision of at least one of the jurors necessary to the death sentence verdict in this case was arbitrarily based upon extrajudicial material." (Gray Br. at 13.) This claim -- which does nothing more than "presume prejudice" based on jury exposure -- does not establish "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170. On this basis alone, his claim is due to be denied.

But even if we were to reach the merits of Jefferson's procedurally defaulted claim, we would reject it. To establish jury misconduct, "[t]he defendant has the

burden to show that the jury has been exposed to extrinsic evidence or extrinsic contacts. Once the defendant establishes that such exposure in fact occurred, prejudice is presumed and the burden shifts to the government to rebut the presumption." United States v. Ronda, 455 F.3d 1273, 1299 (11th Cir. 2006); McNair v. Campbell, 416 F.3d 1291, 1307 (11th Cir. 2005). The "presumption of prejudice" arises upon a showing of two elements: that an extraneous contact with or by a member of the jury took place and that such contact was "about the matter pending before the jury." Remmer v. United States, 347 U.S. 227, 229 (1954).[10]

Here, after holding an evidentiary hearing, the district court rejected Jefferson's suggestion that a juror consulted a Bible verse in reaching her sentencing verdict. Specifically, the district court found as a fact that "the evidence is too weak to demonstrate that juror misconduct actually occurred, or assuming that such misconduct did occur, that the misconduct prejudicially influenced the jury's sentencing deliberations." 490 F. Supp. 2d at 1347-48. These findings are not clearly erroneous. As for whether the incident occurred, the record plainly shows that only one juror, Richard Berry, recalled a female juror

[10] "Although prior precedent recognized the presumption of prejudice from Remmer, this Court, on at least two later occasions, has stated that prejudice is not presumed even when jurors considered extrinsic evidence." Ronda, 455 F.3d at 1299 n.36 (citing United States v. Rowe, 906 F.2d 654, 656-57 (11th Cir. 1990); United States v. De La Vega, 913 F.2d 861, 870 (11th Cir. 1990)). Ronda did not ultimately resolve the issue because "we conclude[d] that the government ha[d] sufficiently rebutted that presumption." Id. Likewise, we need not resolve the issue today.

57

with a Bible, despite the fact that at least four other jurors were interviewed about the alleged incident. Furthermore, while Berry testified that he was fairly certain that a juror had read from the Bible during the sentencing phase, he could not recall the name of the juror or which passage was read. The district court did not clearly err in finding the evidence "too weak" to establish that a juror read a Bible passage out loud during Jefferson's sentencing deliberations.

Moreover, even if we were to assume that a female juror did read from the Bible -- and that an individual juror's private consultation with the Bible constitutes extrinsic evidence[11] -- the evidence concerning which passage was read from the Bible, and in what manner, is too innocuous and nebulous to establish that the Bible passage reading was "about the matter pending before the jury." Remmer, 347 U.S. at 229. On the record before us, we do not know who had the Bible, what was read, or whether the reading was considered, let alone drove her

---

[11] Jefferson has cited no federal, or even Georgia cases in which an individual juror's private consultation with the Bible constituted extrinsic evidence. Instead, many of the cases he has drawn our attention to involve instances in which the prosecutor or the trial judge introduced religion to the jury, or where the jury considered the Bible as a group. See McNair, 416 F.3d at 1307; United States v. Bakker, 925 F.2d 728, 740-41 (4th Cir. 1999); Jones v. Kemp, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989); Carruthers v. State, 272 Ga. 306, 308-11 (2000), overruled on other grounds by Vergara v. State, 283 Ga. 175 (Ga. 2008); Ice v. Commonwealth, 667 S.W.2d 671, 676 (Ky. 1984); Commonwealth v. Chambers, 599 A.2d 630, 644 (Pa. 1991); see also Jones v. Francis, 252 Ga. 60, 61 (Ga. 1984) (finding harmless error where the trial judge permitted a Bible to go out with the jury during its deliberations in the sentencing phase of the trial, and defense counsel's closing argument traced the history of the Bible from a milieu in which the death penalty was imposed for such things as witchcraft and false prophesy, to a new milieu of forgiveness and mercy).

decision. Without more, Jefferson has not met his initial burden of showing that "the jury has [in fact] been exposed to extrinsic evidence or extrinsic contacts." Ronda, 455 F.3d at 1299. The district court properly denied relief on this ground.

## V.

Because we have concluded that Jefferson is not entitled to habeas relief on either ground raised on appeal, Jefferson's Petition for Writ of Habeas Corpus must be and is denied. We AFFIRM the district court's denial of Jefferson's juror misconduct claim, REVERSE the ruling of the district court granting Jefferson's petition as to his sentence of death, and REMAND with instructions that the district court reinstate Jefferson's original sentence.

**AFFIRMED in part, REVERSED in part, and REMANDED with instructions.**

CARNES, Circuit Judge, dissenting:

The twelve men and women who decided whether Lawrence Jefferson should live or die heard only a brief reference to the fact that when he was two years old a car ran over the top of his head, he was taken to the hospital, and "he just barely made it." The jury heard nothing else about the extent of his injuries and nothing about the devastating effect those injuries had on his life. The jury was not told that he was hospitalized for weeks. That the trauma he suffered permanently misshaped his head, leaving him with a cranial indentation and an abnormally enlarged skull caused by the pressure of cerebrospinal fluid. That it resulted in frontal lobe and neurological damage, which had a profound and lifelong impact on his behavior. That it caused learning disabilities, emotional instability, diminished impulse control, and intermittent outbursts of rage. That it led to impaired judgment and paranoia. That the neurological damage resulting from the head injury deprived him of a normal ability to premeditate, deliberate, distinguish right from wrong, and act rationally. That he had substantially limited or no control over the abnormal behavior caused by the brain damage he suffered.

The jury was told nothing about the impact of Jefferson's childhood injury on his life and his behavior. As far as the jury knew, Jefferson did not suffer from brain damage or neurological impairment; he had no organic disorders or

60

pathologies; his emotional stability, impulse control, and judgment were perfectly normal; he could premeditate, deliberate, distinguish right from wrong, and act rationally as easily as the next person. The jury had that misleading picture of Jefferson's moral culpability because the most important mitigating circumstances were withheld from it.

The reason the jury did not know the critical facts about Jefferson's organic brain damage and its devastating effects on him is that his trial counsel failed to request a neuropsychological examination. They failed to request one even though they knew from what Jefferson told them, from the statements he made to the detectives, and from what his mother said that Jefferson had suffered a serious head injury as a child when he was run over by a car. They failed to request an examination even though they were advised to do so by Dr. Gary Dudley, the psychologist who had seen Jefferson. His report to them stated:

> One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology.

Neuropsychological examinations were "available and routine at the time of Mr. Jefferson's trial," and "it is undisputed that the testing . . . could have easily been performed by available mental-health professionals in the Atlanta area prior to

61

[Jefferson's] sentencing," Dist. Ct. Habeas Corpus Order, R. 146 at 81–82

(hereinafter "Dist. Ct. Order"). The State does not contend that a motion

requesting the examination would have been denied. All the attorneys had to do

was ask for one.

The attorneys' main excuse for not asking is that when Stephen Schuster,

lead counsel for Jefferson, called Dr. Dudley about his report he discouraged

Schuster from seeking a neuropsychological examination. Schuster testified: "He

basically said it may be a waste of time because the rest of the report . . . said that

[Jefferson] was non psychotic, that he was intelligent, he had a fairly high IQ. . . ."[1]

According to Schuster, Dr. Dudley told him Jefferson was "just a criminal."

Dr. Dudley submitted an affidavit adamantly denying that he had ever said

anything of the sort to Schuster or to anyone else. Dr. Dudley insisted that it had

always been his expert opinion "that neuropsychological testing was necessary"

and that he "meant it." He swore: "I never, before or after that report, suggested to

[Jefferson's attorneys] that such an evaluation was not necessary or that it would

not be worthwhile." The state collateral court credited the testimony of Jefferson's

---

[1] Schuster's testimony that Dr. Dudley told him that the report described Jefferson as being intelligent with "a fairly high IQ" is inconsistent with the report itself. The report states that Jefferson's IQ is 100, which it correctly describes as only "the middle of the average range." As for Jefferson not being psychotic, the absence of psychosis in no way rules out organic brain damage. [Respondent's Ex. 40: 258].

attorney over that of Dr. Dudley, and we are obliged to accept that credibility determination, see Hance v. Zant, 981 F.2d 1180, 1183 n.3 (11th Cir. 1993), although there are reasons to doubt it.

Taking everything that Schuster says as true, his representation still falls outside of the wide range of reasonably effective assistance. Schuster knew that Jefferson had suffered a serious head injury when he was a child, that his head had actually been run over by a car. He had a transcript of an interview in which Jefferson referred to the injury, he had been told about the injury by Jefferson's mother, and he had Dr. Dudley's report referring to the injury. Schuster also knew that in his written report Dr. Dudley had recommended a neuropsychological examination to check for organic brain damage resulting from the head injury. Yet Schuster did not bother to file a motion requesting the examination because of some informal remarks Dr. Dudley made over the telephone.

Schuster has never explained why he thought Dr. Dudley, after issuing a formal report recommending an important examination to check for organic brain injury, would pivot 180 degrees and take back that recommendation when he spoke informally with Schuster over the phone. The facts Dr. Dudley allegedly mentioned to Schuster during their telephone conversation are all facts he knew at the time he submitted his written report recommending the examination. Indeed,

63

they are all set out in the same report that contains the recommendation. Yet, from all that appears in the record, Schuster never even asked Dr. Dudley why he would write one thing in the report and say exactly the opposite thing over the telephone. See Dist. Ct. Order at 85 ("There is no indication, however, that [Jefferson's] trial counsel ever sought a clear-cut explanation from Dr. Dudley as to how or why he went from stating his opinion in a written report that it would be worthwhile to conduct a neuropsychological evaluation to stating orally that such an evaluation would likely be a waste of time and that [Jefferson] was 'just a criminal.'").

Knowing that his client had suffered a serious head injury as a child and that a psychologist had issued a formal report recommending further testing to determine if the injury had caused organic brain damage, no reasonable attorney would have let the matter drop because of informal remarks made to him during a telephone conversation. Not without a convincing explanation for the change of mind, and there was none. Absent any explanation for the about-face, any reasonable attorney would have filed a motion for a neuropsychological examination, citing the head injury and the recommendation in the report. Schuster's failure to do so was deficient performance. See Dist. Ct. Order at 85 ("[N]o competent lawyer would have abandoned an investigation into potential mitigating evidence based on the oral opinion of a mental health expert that the

defendant was 'just a criminal,' particularly when that mental health expert previously had provided a written expert report explicitly stating that it would be worthwhile to conduct further testing to determine whether the defendant suffered from 'organic etiology' or brain damage.").

This case is similar to Cunningham v. Zant where we found trial counsel had rendered ineffective assistance at the sentencing stage for several reasons, one of which was their failure to adequately develop and present the facts concerning the petitioner's head injury. 928 F.2d 1006, 1016–19 (11th Cir. 1991). Cunningham had been injured in a car accident six years before the crime and as a result of the accident had a steel plate in his head. Id. at 1017–18. He and his mother testified at the sentence stage about that accident, telling the jury about his being hospitalized for three months, having a steel plate put into his head, and suffering from severe headaches. Id. at 1018–19 & nn.17 & 18. We found counsel ineffective in Cunningham partly because of their failure "to substantiate the existence of this injury or its effects on Cunningham by introducing Cunningham's medical records or [his boss'] testimony witnessing the headaches." Id. at 1018. Our conclusion that they were ineffective was also based on their failure to mention the head injury in their closing argument, "thereby failing to place this evidence squarely in front of the jury." Id.

Those same failures happened here, but to an even greater extent.

Jefferson's head injury was mentioned briefly during his mother's testimony, but when Jefferson himself testified he was not asked anything about it. No medical records were introduced to substantiate the injury. The effects it had on Jefferson were not mentioned by any witness. And defense counsel did not even allude to the subject in their closing arguments. Jefferson, like Cunningham, received ineffective assistance of counsel.

In concluding that Jefferson's trial counsel were not ineffective, the majority opinion lists "about 30 motions" that they filed before and during the trial. Majority Op. at 19 n.4. Virtually all of those motions relate solely to the guilt stage, and all of them are beside the present point. Adequate, or even stellar, performance in regard to one aspect of the trial does not bar a conclusion that counsel performed ineffectively in another regard. The cases are legion in which an attorney's performance has been found to be effective at the guilt stage and ineffective at the sentence stage. E.g., Williams v. Taylor, 529 U.S. 362, 395, 120 S. Ct. 1495, 1514 (2000); Brownlee v. Haley, 306 F.3d 1043, 1067 (11th Cir. 2002); Collier v. Turpin, 177 F.3d 1184, 1196 n.17 (11th Cir. 1999) ("Our finding that Collier has not demonstrated that his counsel were ineffective in the guilt phase does not affect our examination of their performance in the sentencing

phase."); Baxter v. Thomas, 45 F.3d 1501, 1511 n.25, 1512 (11th Cir. 1995); Cave v. Singletary, 971 F.2d 1513, 1519–20 (11th Cir. 1992); Blanco v. Singletary, 943 F.2d 1477, 1498 (11th Cir. 1991); Stephens v. Kemp, 846 F.2d 642, 652 (11th Cir. 1988). And relief is due if an attorney has rendered ineffective assistance in one aspect of the sentence stage even if his performance in other aspects of it was adequate. See Rompilla v. Beard, 545 U.S. 374, 388, 125 S. Ct. 2456, 2467 (2005) (rejecting an argument that defense counsel's efforts to find mitigating evidence by other means, including the assistance of three mental health experts, excused them from looking at a file relating to a prior conviction they knew would be introduced as an aggravating circumstance). The focus of ineffective assistance of counsel claims is specific not general. See Horton v. Zant, 941 F.2d 1449, 1461 (11th Cir. 1991) (We "evaluate[] an attorney's performance during discreet portions of a trial without regard to the attorney's performance at other points during the trial.").

The majority takes the position that defense counsel's failure to ask for a neuropsychological examination was based on a reasonable decision to follow a residual doubt strategy instead. That position cannot withstand scrutiny for several reasons. First, while "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," those made after "less than complete investigation" are reasonable only to the extent that

reasonable professional judgment supports the limitations on investigation. Strickland v. Washington, 466 U.S. 668, 690–91, 104 S. Ct. 2052, 2066 (1984); accord Wiggins v. Smith, 539 U.S. 510, 527–28, 123 S. Ct. 2527, 2538–39 (2003) (finding ineffective assistance because "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); Ford v. Hall, 546 F.3d 1326, 1333–34 (11th Cir. 2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (internal citations and quotation marks omitted); Williams v. Allen, 542 F.3d 1326, 1337 (11th Cir. 2008) (holding that "the decision to limit an investigation must flow from an informed judgment") (internal citations and quotation marks omitted).

Here, defense counsel's investigation into the effects of the serious head injury Jefferson suffered as a child was not just "less than complete," it was virtually non-existent. Reasonable professional judgment did not support their failure to file a motion requesting a neuropsychological examination. The decision that followed from that failure was not based on strategy but on ignorance, not only about whether Jefferson was brain-damaged but also about how it might affect his

behavior.[2] See Dist. Ct. Order at 84 ("[T]he decision not to present mental health evidence can hardly be described as strategic, since trial counsel was not aware of the mental health evidence that might have been available."). Making decisions based on ignorance is not professionally reasonable. See Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (citing a long line of decisions showing that "our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options") (internal citations and quotation marks omitted).[3]

---

[2] Both attorneys testified in the state collateral hearing that they did not know how this type of brain damage affects a person. Schuster's four-word answer to the relevant question speaks volumes:

Q. So from your experience, you couldn't tell me how it affects a person . . . ?

A. I'm not a psychologist.

[Respondent's Ex. 39: 211]

[3] The majority opinion, without much enthusiasm, suggests that filing the motion "would have come with several costs" and "may have hampered the ability of Jefferson's counsel to work on establishing his innocence." Majority Op. at 47–48. Hardly. All that it would have taken is a simple, short motion informing the court of Jefferson's serious childhood head injury and attaching a copy of Dr. Dudley's report. Given the fact that counsel filed "about 30 motions" in the case, id. at 19 n.4, one more could scarcely have derailed preparation for the guilt stage. Attorneys who took the time to file, as these did, a "motion to transfer jurisdiction of the case to federal district court," id. at 20 n.4, surely had time to file a motion to determine the effects that a serious head injury had on their client and his conduct.

Besides, we have never excused subpar preparation for the sentence stage on the ground that counsel was busy getting ready for the guilt stage. See Cave, 971 F.2d at 1519 (finding ineffective assistance at the sentence stage where counsel had spent all of her time and effort preparing for the guilt stage); Blake v. Kemp, 758 F.2d 523, 533 (11th Cir. 1985).

There is a second reason that following a residual doubt strategy at the sentence stage does not make defense counsel's failure to request a neuropsychological examination in search of mitigating circumstances reasonable. The attorneys did not choose to rely on residual doubt instead of presenting mitigating circumstances. At the sentence stage they put on six witnesses, including Jefferson himself, to testify about his life history, his service in the Navy, and his work history—testimony emphasizing his hard life, some of his good qualities, and his family relationships. Through the testimony of Jefferson's mother they also brought out—although almost in passing—the fact that he had been injured when he was two years old by a car that ran over his head.[4] If the existence of that kind of head injury is not inconsistent with a residual doubt strategy, the fact that it had resulted in permanent and profound organic brain damage is not either.

---

[4] Q: Now, when Lawrence was young, was he involved in any sort of accident?

A: Well, he had a car accident when he was two years old. A car ran over his head, the top of his head

Q. What happened because of that? Did he have to go to the hospital?

A: Yes, he did, was in the hospital, and he said, they said he just barely made it.

[Respondent's Ex. 25: 1264]

This case is like Wiggins. In that case defense counsel testified that they had made a reasonable strategic decision to focus the jury's attention on the defendant's role in the crime instead of presenting the defendant's difficult life and history as mitigating circumstances. 539 U.S. at 517, 123 S. Ct. 2533. The Supreme Court rejected that justification for counsel's failure to perform a more thorough investigation. It did so because "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct" by showing that the failure to investigate was not the result of reasoned strategic judgment. Id. at 526, 123 S. Ct. at 2537. What the record showed in Wiggins was that "[f]ar from focusing exclusively on petitioner's direct responsibility, then, counsel put on a halfhearted mitigation case." Id., 123 S. Ct. at 2538. Likewise, the record in this case shows that far from focusing exclusively on a residual doubt strategy, counsel put on a halfhearted mitigation case. Here, as in Wiggins, the decision not to investigate further into the mitigating circumstances stemming from the childhood head injury was not reasonable. It was unreasonable.

There is a third reason that pursuit of a residual doubt strategy does not excuse trial counsel's failure to investigate Jefferson's brain damage and its effect on his life and behavior. Trial counsel did not actually pursue a residual doubt strategy, at least not one worthy of the name. The state collateral court never

found that a residual doubt strategy was actually used. The majority says one was, but the record tells another story.

As I have already pointed out, trial counsel called Jefferson and five other witnesses to testify at the sentence stage. None of them gave any testimony relevant to residual doubt. The jury heard Jefferson testify about his life and heard him deny that he was guilty of some of the prior crimes on his record. But they did not hear him deny that he had robbed and murdered the victim in this case, Ed Taulbee. Conspicuously, Jefferson said nothing at all about that. Trial counsel never asked the most important question to a residual doubt defense: Did you do it? Their failure to ask that question is inconsistent with the majority's theory that a residual doubt strategy trumped the need to investigate mitigating circumstances based on the serious head injury that Jefferson had suffered. A residual doubt strategy in which the defendant takes the stand at sentencing but does not deny committing the crime is a strategy not pursued.

Jefferson's two attorneys divided the closing argument at the sentence stage. Marc Cella argued first. The majority opinion states that he "emphasized during the closing argument of the penalty phase that there were no eye witnesses to the crime, no guilty plea, and 'no evidence of any consciousness of guilt.'" Maj. Op. at 25. The record shows, however, that Cella did not emphasize any of that. He

merely mentioned it. He talked about the evidence of guilt in only four sentences, with a lead in of three more, in his twenty-one pages of closing argument. Any weaknesses in the case against Jefferson were not emphasized. What was emphasized was the need for mercy despite guilt.

The bulk of Cella's closing argument was about mitigating circumstances that the jury should find despite Jefferson's guilt. Cella talked about how Jefferson grew up in unfortunate circumstances "in the ghetto" and mostly without a father. Cella asked the jury to "[r]ealize that you are looking at someone who grew up in an entirely different environment than most of you have experienced" and to "realize that you are looking into a different culture." He urged the jury to consider that the people with whom Jefferson associated had been a bad influence on him. Cella also pointed out Jefferson's positive qualities, such as his "good work record" and his desire to provide for his family.

Cella attempted to explain Jefferson's history of getting into trouble this way:

> It's rough growing up in a house without that fatherly influence, even putting aside the problems with worrying about your income, worrying about your landlord evicting you, worrying about your mentally retarded brother and your sisters, taking care of them while your mom is in high school.

> He had problems to deal with. And he did the best he could.

73

You know, it's very difficult for us to sit in judgment on someone whose burdens we haven't had to bear. Each one of us has been put on this life, and we are destined from the day we are put here to travel our own paths, take our own way through life's travels and tribulations.

Lawrence has had a rougher path than any of us.

[Respondent's Ex. 25: 1395] Cella asked the jury "not to make Lawrence Jefferson's mama and his children victims, too." He urged the members of the jury to "look in [their] hearts, find some understanding, some love, some compassion for Lawrence." He invoked religious references and asked the jury to have "compassion and mercy." None of those arguments had anything to do with residual doubt. All of them would have been entirely consistent with evidence of conduct-altering brain damage caused by a serious head injury.

Cella's mercy-despite-guilt strategy is illustrated by his use of popular culture analogies. He told the jury about what he termed "the Star Wars philosophy," which uses Princess Leia and Darth Vader as symbols of pure good and pure evil. The world, Cella argued, is not that simple and "nobody is Dar[th] Vad[e]r in the real world." He argued instead that we all have the "capacity for both good and evil," concluding: "In short, we human beings are all products of the combined forces of our heredity and our environment. And we don't have very much control over either one of them."

74

Cella's remarks moved from Star Wars to How the Grinch Stole Christmas. He argued that the Grinch story illustrated that "[w]hen you change for the better, when we take mercy on someone, we gain strength." Cella also talked about the children's toy "Fearless Fotog," a superhero who has the power to drain the evil out of creatures by taking pictures of them and transferring the evil onto his film. He noted that the superhero was created by a twelve-year-old boy who believed that "there is good in all of us." He asked the jury to separate the good from the bad in Jefferson and have mercy on him.

The reason Cella talked at length about Star Wars, How the Grinch Stole Christmas, and "Fearless Fotog" is not that they supported a residual doubt strategy; they had nothing to do with residual doubt. Instead, they all supported Cella's mercy-despite-guilt strategy. The abundant mitigating circumstances that Cella and his co-counsel could have offered if only they had asked for a neuropsychological examination would have been entirely consistent with that strategy.

Not only did Cella's remarks fail to carry along a residual doubt argument, he actually threw the possibility of residual doubt under the mercy bus. The only fleeting references to the evidence against Jefferson came early on in Cella's

remarks, but after talking at length about why the jury should show him mercy, Cella told the jury this near the conclusion of his argument:

> You know, Lawrence's background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity, and ya'll found that.
>
> But aren't we as a society better than that? Don't we expect more of ourselves? You folks are better people than Lawrence is right now. We trust you to be more just than he was.

[Id. at 1396] Those remarks concede that Jefferson killed the victim. They are inconsistent with a residual doubt strategy, which may explain why the state collateral court never found that counsel had such a strategy.

Schuster also made a closing argument to the jury, although it was only about one-fourth the length of Cella's. Schuster, like Cella, made a passing reference to the possibility of doubt: "Death is final. There is no margin of error. You find a man guilty beyond a reasonable doubt, but that's not all doubt." [Id. at 1401] But Schuster, like Cella, essentially threw away any residual doubt argument by telling the jury:

> Now, as [the prosecutor] said in his argument, you are not here to determine guilt or innocence. You have determined that. It is behind you. You have made your determination.
>
> As an officer of the court I have to abide by it and I have to live by it. And as Mar[c] [Cella] said, though, the issue you have now is which of two very, very severe sentences you give.

76

[Id.] And Schuster, like Cella, spent almost all of his time arguing for mercy despite guilt.

Schuster told the jury that the death penalty is reserved for the "most heinous situations" and stressed that under Georgia law the jury was free to return a life sentence for any reason or for no reason at all. He emphasized the hardships of Jefferson's upbringing as the basis for mercy. The following is a fair sample of his remarks:

> I am not going to come before you and say because he grew up among roaches and rodents he is not responsible for his acts. Lawrence Jefferson is responsible for his acts.

> But Lawrence Jefferson is not responsible for that person as much as that person who grew up in East Cobb or Dunwoody or West Cobb.

> We, or you, because you are a final arbiter of this case, have to decide whether or not to show mercy. You have to show it, decide whether or not to show mercy. You have to show it, decide sitting there, knowing that when this is all over you are going back to your nice home and your families, whether to show mercy.

> People do break out of their barrell [sic] of poverty. People do break out of that cycle of poverty. They are the exception rather than the rule. They do go to college and they have careers. They are the exception.

> Lawrence Jefferson's predecessors grew up in poverty, and Lawrence Jefferson's children will grow up in poverty, and their children's children will grow up in poverty.

Maybe we as a society have failed them. I don't know. Lawrence Jefferson failed himself.

But we should show him mercy. You should show him mercy. And I beseech you to show him that mercy and to sentence him to life imprisonment.

[Id. at 1403–04] So, after telling the jury that the question of guilt or innocence "is behind you," Schuster, like Cella, argued for mercy despite guilt.

The point is that in a combined twenty-seven transcribed pages of argument Jefferson's attorneys made only two passing references to possible weaknesses in the state's case. One counsel acknowledged that the issue of guilt was closed while the other conceded that Jefferson had committed the murder, stating that his "background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity." [Id. at 1396] A residual doubt strategy that concedes the defendant murdered the defenseless victim is not a strategy at all. In the proper circumstances residual doubt can be a strong argument for a life sentence. But these are not those circumstances and the argument, if made at all, was not effectively made.

Given that Jefferson's head was run over by a car when he was a child, it was unreasonable to abandon an investigation into organic brain damage as a source of mitigating circumstances in favor of a throw-away residual doubt argument—especially one that actually was thrown away in closing argument.

Showing that Jefferson suffered from organic brain damage which had a profound and lifelong impact on his behavior, causing him all kinds of emotional and behavioral problems and leaving him with impaired judgment and diminished impulse control, would have fit perfectly into counsel's mercy-despite-guilt arguments. The best evidence to support a mercy argument is that, through no fault of his own, Jefferson had a damaged brain that deprived him of a normal ability to premeditate, deliberate, and distinguish right from wrong and that caused him to behave abnormally. But trial counsel's unreasonable failure to file a motion requesting a neuropsychological examination deprived Jefferson of all that mitigating evidence.[5]

---

[5] In footnote 9 the majority opinion itemizes six grounds for its decision that the failure to request a neuropsychological examination was good strategy. Using the same numbers, this is my response: (1) Counsel's own experience and advice from seasoned capital defense attorneys played no role in their failure to request an examination. Neither counsel ever suggested that he had any experience with such examinations or with brain-damaged clients in the past, and no seasoned capital defense attorney would have advised them not to look for organic brain damage when their client had suffered a serious head injury as a child. (2) Any weaknesses in the case against Jefferson were irrelevant in view of the fact that counsel did not actually pursue a residual doubt strategy at the sentence stage. (3) Dr. Dudley's written report could not have led counsel to believe that a neuropsychological examination would be a waste of time because it explicitly recommended one. (4) That Jefferson was helpful and always cooperated in building a defense is not inconsistent with brain damage. The statement that Jefferson "was 'always very calm and always extremely helpful'" overlooks the part of Dr. Dudley's report about what happened when he went to the jail to continue with testing that he had begun the day before: "Mr. Jefferson became agitated and disorganized in his behavior, berating me for not having made an appointment with him, and insisting that I come back another day. I discussed with him the possibility that his failure to cooperate would not be in his best interests, but he was adamant in refusing to work with me at that time." Jefferson later explained to Dr. Dudley, "I get that way sometimes, man." [Respondent's Ex. 40: 372] (5) Adamant insistence on innocence is not at all inconsistent with brain damage. That insistence does, however, make even more inexplicable counsel's decision to have Jefferson testify at sentencing without asking him if he

79

The majority opinion does not reach whether the failure of counsel to request a neurological examination was prejudicial to Jefferson. I will. Georgia law mandates a life sentence unless the jury unanimously agrees on death. Hill v. State, 301 S.E.2d 269, 270 (Ga. 1983); Miller v. State, 229 S.E.2d 376, 377 (Ga. 1976). Because of that, the measure of prejudice is whether "there is a reasonable probability that at least one juror would have struck a different balance" of aggravating circumstances and mitigating circumstances. Wiggins, 539 U.S. at 537, 123 S. Ct. at 2543. Here there is that reasonable probability and more. The results the examination would have produced are summarized in the opening paragraph of this opinion, and so far as the record shows they are not disputed. See Dist. Ct. Order at 91 (noting that Jefferson "has presented a compelling and unrebutted case that he suffers (and suffered) from organic brain damage, a dysfunction that affected his cognitive ability and his ability to conform his actions"); id. at 87 (referring to the "powerful mitigating evidence regarding

---

was innocent. (6) Presenting evidence of brain injury at sentencing would not have amounted to "switching defenses" any more than their presenting all of the life history, hardship, and character evidence did. And presenting evidence that Jefferson suffered from serious organic brain damage would not have implicitly admitted guilt to any greater extent than the evidence that was submitted about his poverty and hard life. Not only that, but in making their mercy argument counsel explicitly admitted guilt. Cella argued that "Lawrence's background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity," and he used that as a reason the jury should show Jefferson more mercy than he had shown Taulbee. Exactly the same reasoning could have been used to argue serious brain damage as a powerful mitigating circumstance.

[Jefferson's] brain damage"). On this record depriving the jury of all that strong mitigating circumstance evidence does not just undermine confidence in the death sentence but substantially undermines it.

As the district court explained, "[b]ecause of counsel's omissions in this case, the jury was deprived of the singularly most powerful explanation for the crime—[Jefferson] suffered from organic brain damage that impaired his judgment and his ability to control his behavior." Id. at 89. "The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant," and by failing to provide the jury with evidence about the effects of Jefferson's head injury, trial counsel "prejudiced [the petitioner's] ability to receive an individualized sentence." Cunningham, 928 F.2d at 1019. The prejudice question is not even close to being close.

I have laid out the reasons for concluding that counsel rendered ineffective assistance as though it were an issue for us to decide anew. And it is. This is one of the few remaining cases in this circuit that were filed before the effective date of the AEDPA. For that reason, the AEDPA provisions do not apply to it. Woodford v. Garceau, 538 U.S. 202, 207, 123 S. Ct. 1398, 1401–02 (2003). We do not owe the state court decision on the ineffective assistance of counsel issue substantial

deference, or any deference at all. We have a duty to decide the issue de novo. Huynh v. King, 95 F.3d 1052, 1056 (11th Cir. 1996).

The question is not whether, applying Supreme Court precedent, one reasonably could conclude that counsel performed effectively in investigating mitigating circumstances even though they failed to request a neuropsychological examination of Jefferson. The question is simply whether on independent, de novo review, we should conclude that the failure to request an examination amounted to ineffective assistance of counsel. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("AEDPA, however, changed the standards for granting federal habeas relief. . . . The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." (footnote omitted)); see also Huynh, 95 F.3d at 1056 (ineffective assistance is a mixed question of fact and law subject to de novo review); Waldrop v. Jones, 77 F.3d 1308, 1312 (11th Cir. 1996) (same); Oliver v. Wainwright, 782 F.2d 1521, 1524 (11th Cir. 1986) (same). The correct answer to that question is the one the district court gave when it conditionally granted habeas relief as to the sentence.

Because Jefferson beat a man to death with a tree limb in the course of robbing him, the law demands that he suffer one of two severe punishments: life

82

imprisonment or death. But the law also demands that he have a fair chance to persuade a jury that the less severe punishment is enough, and that requires effective assistance of counsel. Because Jefferson did not have effective assistance of counsel at sentencing, he has not yet had his fair chance. I would affirm the grant of relief.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia