# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LAWRENCE JOSEPH JEFFERSON,   &#42;   CIVIL ACTION NO.
  &#42;   1:96-CV-989-CC

    Petitioner,   &#42;

  &#42;

v.   &#42;   HABEAS CORPUS

  &#42;

STEVE UPTON, Warden   &#42;
Georgia Diagnostic and   &#42;
Classification Center,   &#42;

  &#42;

    Respondent.   &#42;


## RESPONDENT'S BRIEF IN OPPOSITION TO PETITIONER'S POST-HEARING BRIEF


SAMUEL S. OLENS
Attorney General

BETH A. BURTON
Deputy Attorney General

SABRINA D. GRAHAM
Senior Assistant Attorney General

Please serve:
Sabrina Graham
40 Capitol Square
Atlanta, Georgia  30334-1300
(404) 656-7659
Facsimile (404) 651-6459
sgraham@law.ga.gov

# TABLE OF CONTENTS

I.    STATEMENT OF THE CASE ..........................................................................1

II.   STATEMENT OF THE FACTS........................................................................5

III.  STANDARD OF REVIEW ............................................................................10

IV.   ARGUMENT AND CITATION TO AUTHORITY ........................................13

    A.   Trial Counsel's Investigation Was Reasonable.......................................16

        1.   Trial Counsel's Background Investigation .......................................17

        2.   Trial Counsel's Decision to Forgo Further Mental Health
            Evaluations Was Reasonable ..........................................................22

        3.   When Viewed As A Whole Trial Counsel's Investigation Was
            Reasonable .......................................................................................48

    B.   Petitioner's Evidence Of Alleged Severe Brain Damage Would
        Not Have Created A Reasonable Probability Of A Different
        Outcome ...................................................................................................51

        1.   Petitioner's Mental Health Experts' Evaluations and
            Conclusions Lack Reliability...........................................................52

            a.   Automobile Accident at Two Years Old....................................59

            b.   Testing Does Not Reveal Severe Brain Damage ........................69

                i.   Psychological Battery.............................................................70

                ii.  Neurological Battery ..............................................................80

            c.   Clinical Interview and Life History.............................................86

        2.   When The Record Is Viewed As A Whole, There Is No
            Reasonable Probability Of A Different Outcome ............................98

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **LAWRENCE JOSEPH JEFFERSON,** | \* | **CIVIL ACTION NO.** |
| | \* | **1:96-CV-989-CC** |
| **Petitioner,** | \* | |
| | \* | |
| **v.** | \* | **HABEAS CORPUS** |
| | \* | |
| **WARDEN STEVE UPTON,** | \* | |
| **Georgia Diagnostic and** | \* | |
| **Classification Center,** | \* | |
| | \* | |
| **Respondent.** | \* | |

## RESPONDENT'S BRIEF IN OPPOSITION TO PETITIONER'S POST-HEARING BRIEF

### I.    STATEMENT OF THE CASE

The crimes for which Petitioner was convicted were committed on May 1, 1985.  Stephen Schuster was appointed to represent Petitioner on May 9, 1985. (Respondent's Exhibit 1, p. 8).  Mark Cella was appointed to represent Petitioner on July 22, 1985.  (Respondent's Exhibit 1, p. 10).  Petitioner was indicted in the Superior Court of Cobb County, Georgia, on August 8, 1985 for the offenses of malice murder and armed robbery of victim Edward Taulbee.  (Respondent's Exhibit 1, pp. 3-5).

**Approximately ten months after Mr. Schuster was appointed,** Petitioner was tried before a jury on February 24 through March 9, 1986, and was convicted

of felony murder, with the underlying felony being armed robbery.  Following the penalty phase of trial, the jury found the existence of the following statutory aggravating circumstances: (1) that the murder of Edward Taulbee was committed by the defendant while the defendant was engaged in the commission of a capital felony, to-wit: armed robbery; and (2) that the murder of Edward Taulbee was outrageous, wantonly vile, horrible and inhuman in that it involved aggravated battery.  (Respondent's Exhibit 2).  On March 9, 1986, Petitioner was sentenced to death for felony murder.  (Respondent's Exhibit 2).  Petitioner filed a motion for a new trial and an amendment thereto, which were denied on June 20, 1986.

Petitioner then appealed to the Supreme Court of Georgia, which affirmed Petitioner's conviction and death sentence on March 3, 1987.  Jefferson v. State, 256 Ga. 821, 353 S.E.2d 468 (1986).  Petitioner's motion for reconsideration was denied on March 24, 1987.  Petitioner then filed a petition for writ of certiorari in the United States Supreme Court, which was denied on October 5, 1987.  Jefferson v. Georgia, 484 U.S. 872 (1987).

On December 23, 1987, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, challenging his convictions and sentences imposed in the Superior Court of Cobb County.  (Respondent's Exhibits 37-38).  Petitioner filed an amended state habeas corpus petition on September 1, 1989, and a second amended petition on April 21, 1991.  (Respondent's Exhibits

37-38). A state habeas corpus evidentiary hearing was held on April 22-23, 1991. (Respondent's Exhibits 39-40). The state habeas corpus court denied relief to Petitioner on September 30, 1992. (Respondent's Exhibit 38).

On November 16, 1992, Petitioner filed an application for certificate of probable cause to appeal in the Georgia Supreme Court. (Respondent's Exhibit 41). The Georgia Supreme Court granted Petitioner's application for certificate of probable cause to appeal on December 18, 1992. (Respondent's Exhibit 44). The Georgia Supreme Court affirmed the ruling of the state habeas corpus court denying relief to Petitioner on June 28, 1993. Jefferson v. Zant, 263 Ga. 316, 431 S.E.2d 110 (1993). In affirming the denial of relief on Petitioner's sentencing phase ineffective assistance claim, the Georgia Supreme Court also made its own findings of facts regarding trial counsel's investigation of Petitioner's mental health. See Jefferson v. Zant, 263 Ga. at 319-320.

Petitioner's motion for reconsideration was denied by the Georgia Supreme Court on July 27, 1993. On December 23, 1993, Petitioner filed a petition for writ of certiorari in the United States Supreme Court which was denied on April 18, 1994. Jefferson v. Zant, 511 U.S. 1046 (1994).

On April 23, 1996, Petitioner filed an application for federal habeas corpus relief in this Court. (Doc. 1). On May 10, 2007, this Court granted in part and denied in part Petitioner's "corrected amended petition for a writ of habeas

corpus." (Doc. 143). This Court granted Petitioner relief as to "Petitioner's claim that trial counsel was ineffective during the penalty phase of trial," while denying all of the other claims raised in the petition. (Doc. 143).

Respondent filed a notice of appeal on May 29, 2007. (Doc. 145). Petitioner filed a notice of cross appeal on June 7, 2007, (Doc. 148), and also filed a motion for certificate of appealability on June 19, 2007. (Doc. 154). This Court granted Petitioner/Cross-Appellant's certificate of appealability as to "all remaining claims and issues" on July 12, 2007. (Doc. 155).

On June 12, 2009, the Eleventh Circuit reversed the grant of federal habeas relief to Petitioner as to his sentence and affirmed the denial of federal habeas relief as to Petitioner's conviction.

On January 25, 2010, Petitioner filed a petition for writ of certiorari in the United States Supreme Court. Respondent filed his brief in opposition on February 10, 1985 and Petitioner replied on February 23, 2010. On May 24, 2010, the United States Supreme Court vacated the decision of the Eleventh Circuit Court of Appeals. Jefferson v. Upton, 560 U.S. 284 (2010). Petitioner alleged the state habeas court's factual findings in its final order were not entitled to deference because the order was allegedly ghostwritten by Respondent. The Supreme Court held, "Accordingly, we believe it necessary for the lower courts to determine on remand **whether the state court's factual findings warrant a presumption of**

**correctness**, and to conduct any further proceedings as may be appropriate in light of their resolution of that issue." Jefferson, 560 U.S. at 294 (emphasis added).

The case was remanded to this Court on July 21, 2010. (Doc. 176). The issue was briefed by both parties, (Docs. 201, 202). On December 8, 2013, this Court issued its oral ruling that Petitioner was denied a full and fair hearing in the state habeas proceeding as mandated by pre-AEDPA 28 U.S.C. § 2254(d). (Doc. 208). The Court also held that an evidentiary hearing would be held on Petitioner's ineffective assistance of trial counsel claim regarding Petitioner's mental health. (Doc. 208).

Following that decision, the Court allowed Respondent to conduct discovery regarding Petitioner's mental health. (Doc. 223). The Court held an evidentiary hearing on November 11, 2014 and December 19, 2104. Petitioner filed his post-hearing brief on March 9, 2015. This response follows.

## II.    STATEMENT OF THE FACTS

The Eleventh Circuit Court of Appeals summarized the facts as the following:

> The facts of the murder, as elicited from the trial testimony and not disputed here, are these. On May 2, 1985, the body of the victim, Edward Taulbee, was spotted lying in the woods near Lake Allatoona by two men driving along the highway. Ex. 20 at 217-18, 227-28. Responding to the report, the Cobb County Police found Taulbee's body face down in the underbrush. Ex. 20 at 235-36. Taulbee was dressed in a yellow shirt, overalls, and boots. Ex. 20 at 219, 229, 235. A large log with blood on it was lying across Taulbee's head. Ex. 20 at 220, 229, 236. Near the body, the police found two sticks or

5

clubs, and one of the sticks, which later was determined to have some of Taulbee's blood and hair on it, appeared to have been shattered in several places. Ex. 21 at 270-71; Ex. 23 at 802. The police observed that Taulbee's head had been driven into the ground, apparently by the force of the log. Ex. 21 at 274-75.

An autopsy revealed that Taulbee suffered approximately two lacerations above his left eyebrow, one laceration above his forehead, one laceration above his right ear, and five lacerations on the back of his scalp. Ex. 23 at 822. Taulbee also had several fractured teeth, an abrasion across his face, an abrasion across his back, skull fractures, brain bruises, and brain hemorrhaging. Ex. 23 at 822-24. The medical examiner opined that Taulbee's injuries were consistent with those caused by being struck with the wooden sticks or clubs found near his body, that Taulbee was probably knocked to the ground by the blows to his head, and that the log was then dropped on Taulbee's head, driving his face into the ground. Ex. 23 at 822, 828-29, 831-32. The medical examiner further opined that these head and brain injuries caused Taulbee's death, which occurred some time on May 1, 1985, between 5:00 p.m. and 11:00 p.m. Ex. 23 at 833-35. On cross-examination, the medical examiner said that Taulbee probably did not struggle significantly, and that death "most probably" was instantaneous. Ex. 23 at 837-39.

The medical examiner did not find a wallet on Taulbee's body, but the victim did have a still-ticking Timex watch, a pocket knife, and a small amount of cash on him. Ex. 21 at 277; Ex. 23 at 820-21, 840. Also found in Taulbee's belongings was a pay stub from Zenith Construction Company ("Zenith"). Ex. 21 at 357-58. Upon finding the pay stub, Cobb County Police Lt. Carlton Morris telephoned the company and ascertained that the pay stub number corresponded to Taulbee. Ex. 21 at 358. Brad Stewart, Zenith's construction superintendent, informed Lt. Morris that the Petitioner, Jefferson, worked with Taulbee, and upon Lt. Morris's request, Stewart and Jefferson came to the station and identified Taulbee from pictures of the body. Ex. 21 at 329, 358, 374-75.

During Lt. Morris's interview with Jefferson, Jefferson said that he had seen Taulbee leave the Zenith site alone around 5:30 p.m. on the day of the murder and head north in his automobile to go fishing. Ex. 21 at 376-78. Jefferson explained that he knew Taulbee was going fishing because earlier that day, Taulbee had dug up some worms to use as bait. Ex. 21 at 376.

Jefferson also offered that he did not join Taulbee that afternoon because "he didn't have the patience to fish." Ex. 21 at 377-78. Jefferson said that after Taulbee left work, Jefferson rode his bicycle home, where he lived alone, watched television, drank beer, and stayed in that evening. Ex. 21 at 378-79.

Jefferson also told the police that Taulbee had loaned him $ 120 that was due on May 2, 1985, the day after the murder. Ex. 21 at 380. Jefferson said that he had not yet paid Taulbee because he did not receive his paycheck on May 1 from Stewart, as he had expected. Ex. 21 at 380. Stewart independently informed Lt. Morris that he had given both Taulbee and Jefferson their paychecks on the day of the murder. Stewart also said that Taulbee and Jefferson had never had any money problems, and got along well with each other. Ex. 21 at 322, 325-26, 383.

As Jefferson's interview progressed, Jefferson became more nervous. Ex. 21 at 381. Nevertheless, Jefferson consented to a search of his apartment. Ex. 21 at 381. Jefferson cooperated with the police, opening drawers and closet doors while the police searched the apartment. Ex. 21 at 388. Lt. Morris did not find anything connecting Jefferson to the murder of Taulbee. Ex. 21 at 312, 388-90. The police did find, however, a straw hat and sunglasses in Jefferson's closet. Ex. 22 at 654.

During the investigation, the police learned that Taulbee kept money with him so that he could lend it to co-workers and others, and charge interest. Ex. 21 at 383. Stewart also informed the police that Taulbee carried large sums of money on his person, and that Stewart had told him to keep it in a more secure location. Ex. 21 at 323.

On May 7, 1985, while the investigation was still underway, the police spoke with Jefferson's neighbors, Rhonda Glade, her brother Ronald Glade, and Dwayne Mitchell. Ex. 21 at 390. At trial, Ms. Glade testified that she saw Jefferson, Taulbee, and Mitchell talking outside of Jefferson's apartment at approximately 4:15 p.m. on the day of Taulbee's murder. Ex. 21 at 400. She testified that she had seen Jefferson and Taulbee leave from Jefferson's apartment to go fishing, and later on the night of the killing, she saw Jefferson return to his apartment on foot and heard no car arrive. Ex. 21 at 399-400, 408. Ms. Glade further testified that Jefferson came to her apartment on May 2, 1985, gave her an automated teller bank card (an "ATM card") and asked her to get rid of it. Ex. 21 at 412, 414-15. She said that she then hid it in an air conditioning vent. Ex. 21 at 417. Jefferson also

gave her a fishing tackle box, which she put under her brother's bed. Ex. 21 at 412.

On cross-examination, Ms. Glade admitted she had originally told the police she heard a car arrive and two doors slam when Jefferson returned home on May 1. Ex. 21 at 427. She also admitted that she had told the police that she was "sure" her brother and Mitchell had not gone to the lake that night because they spent the evening of May 1, 1985 with her, even though at trial, she testified that both her brother and Mitchell had left the apartment during the course of the evening. Ex. 21 at 434-36.

Ronald Glade testified that on May 1, 1985, he had gone to Jefferson's apartment at around 6:00 p.m. Ex. 21 at 453. He said that Jefferson had locked the door to his apartment, although Jefferson was inside, which Glade thought was unusual. Ex. 21 at 453-54. Glade further testified that Jefferson was acting funny and that his chest looked red. Ex. 21 at 456-59. He testified that Jefferson had, prior to Taulbee's murder, made a statement about the money Taulbee had and how Jefferson "ought to knock him on the head," and that, after the murder, Jefferson had said that his "little fat buddy was dead." Ex. 21 at 463.[1] Glade further testified that on the evening of May 1, 1985, Jefferson said he had lost his wallet and went out with Dwayne Mitchell to look for it, although Glade later found the wallet in Jefferson's apartment with approximately $ 100 in it. Ex. 21 at 465, 467.

fn.1 On cross-examination, Glade admitted he had originally told the police that Jefferson informed him that Taulbee was dead on May 2, not May 1. Ex. 21 at 473-74, 479. Glade explained that he changed his mind about the date when he discussed it with his sister and Mitchell "as a group." Ex. 21 at 480. Glade also admitted that he had told the police he wanted to "get" the money in Jefferson's wallet, because Glade was broke. Ex. 21 at 482.

Dwayne Mitchell testified that he took Jefferson to buy marijuana and liquor on the night of May 1, 1985. Ex. 21 at 499-500. He further testified that Jefferson asked him to drive Jefferson to Lake Allatoona that night, purportedly to find his wallet, which Jefferson claimed was missing. Ex. 21 at 501. Mitchell said that when they arrived at Lake Allatoona, Jefferson left the car for five to ten minutes and returned with a fishing pole and a tackle box. Ex. 21 at 502, 505. According to Mitchell, Jefferson discarded the fishing pole and gave the tackle box to him. Ex. 21 at 505-06. Mitchell further testified that, on the way back from the lake, Jefferson asked

Mitchell to take him to a bank with an ATM, where Jefferson disguised himself with a straw hat and sunglasses and attempted unsuccessfully to make a cash withdrawal. Ex. 21 at 506-07. Prior to going to the ATM, Jefferson asked Mitchell if the machine took pictures of those people who used it. Ex. 21 at 507.[2]

fn.2 On cross-examination, Mitchell testified that Ms. Glade was mistaken when she said that Mitchell had been talking with Jefferson and Taulbee on the afternoon of May 1. Ex. 22 at 529-30. Mitchell also admitted that Jefferson had denied killing Taulbee to him. Ex. 22 at 535.

Following the initial conversations with Jefferson's neighbors, the police located Taulbee's car in the parking lot of a food store about eight-tenths of a mile from Jefferson's residence. Ex. 22 at 586, 589. Inside the car, the authorities found the keys to the car, and in the glove compartment, they found an ATM receipt, dated May 2, 1985, at approximately 1:07 a.m. Ex. 22 at 591, 634. Back at Jefferson's apartment complex, the police recovered the victim Taulbee's ATM card that Rhonda Glade had stashed in the air conditioning unit outside her apartment. Ex. 22 at 594, 598-99. The police also recovered some of Taulbee's other fishing gear that Jefferson had attempted to discard. Ex. 22 at 656, 663. Specifically, Mitchell directed the police to Taulbee's fishing tackle box, which Jefferson had given him, and Glade and Mitchell went with the police to Lake Allatoona so that they could point out where Jefferson had thrown some of the fishing gear into the woods and along the side of the road. Ex. 22 at 656, 663.

The authorities analyzed the evidence, but did not find any latent prints, other than Taulbee's, either on the car, the receipt, the ATM card or the fishing gear. Ex. 22 at 644, 646; Ex. 23 at 796, 789-95. Nor did they find any of Jefferson's hair on any of the evidence. Ex. 23 at 805.

Jefferson was arrested on the evening of May 7, 1985. Ex. 22 at 665. A smoking marijuana cigarette was found on the coffee table in Jefferson's living room at the time of his arrest. Ex. 22 at 665. After administering multiple Miranda warnings, the police asked Jefferson why he had killed Taulbee. Ex. 22 at 667-78. According to the testimony of Detective B.J. Banks, Jefferson said that "he didn't need to be around other people, that he wanted to be executed, and that he wanted to be put to sleep." Ex. 22 at 678. Lt. Morris likewise testified that Jefferson said: I don't need to be around people . . . . I talk to myself. I ain't crazy. I don't know nothing. I got hit by

an auto when I was a kid. I had another dream and saw the man in my dream. I call myself Tony. I don't think I am two people. How quick can I be put to sleep? I don't feel anything about this. Do you believe in heaven and hell? . . . I want to be put to sleep . . . . I want to be executed. Ex. 22 at 699-700. During the penalty phase of the trial, Jefferson testified that he was threatened with the death penalty during the interrogation. Ex. 25 at 1306. Jefferson said that he had replied: "Well, yeah, man, do what up [sic] want to do, if you want to execute me. Let me go over to the jail and go to sleep." Ex. 25 at 1307.

The authorities later determined that Taulbee had cashed his paycheck on May 1, and had received $ 223.15. Ex. 22 at 717-18. Jefferson, who received his paycheck on May 1, did not cash it until May 3, and received approximately $ 136.21. Ex. 22 at 686. The police also learned that in the early morning hours of May 2, 1985, someone attempted to use Taulbee's ATM card to make a withdrawal. Ex. 22 at 728-34.

Jefferson v. Hall, 570 F.3d at 1287-1290.

## III.   **STANDARD OF REVIEW**

As Petitioner's federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, this Court reviews Petitioner's claims under the pre-AEDPA statute. As Petitioner's ineffective assistance of counsel claim is a mixed question of law and fact it is reviewed de novo. However, factual findings are "subject to the presumption of correctness." Freund v. Butterworth, 165 F.3d 839, 861 (11th Cir. 1999).

This Court has determined that Petitioner was not afforded a full and fair hearing during his state habeas proceedings. (Doc. 208). Therefore, this Court will not be giving any deference to the state habeas court's findings. However, the Georgia Supreme Court also made findings of fact when it granted Petitioner's

application for certificate of probable cause to appeal.  As held by the Eleventh

Circuit Court of Appeals:

> In addition, the state court's findings of fact are entitled to a presumption of correctness and may be ignored only if the petitioner shows by clear and convincing evidence that the state court's determination was not "'fairly supported by the record.'" <u>Griffin v. Wainwright</u>, 760 F.2d 1505, 1511 (11th Cir. 1985) (quoting pre-AEDPA § 2254(d)(8)). **This presumption is equally applicable to the state appellate court's findings of fact.** <u>See</u>, <u>e.g.</u>, <u>Sumner v. Mata</u>, 449 U.S. 539, 549, 101 S. Ct. 764, 770, 66 L. Ed. 2d 722 (1981). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 432, 103 S. Ct. 843, 850, 74 L. Ed. 2d 646 (1983) (internal quotation marks and alteration omitted); <u>see</u> <u>Brownlee</u>, 306 F.3d at 1059.

<u>Turner v. Crosby</u>, 339 F.3d 1247, 1273 (11th Cir. 2003) (emphasis added).  <u>See</u>

<u>also</u>, <u>Provenzano v. Singletary</u>, 148 F.3d 1327, 1330 (11th Cir. 1998) ("deference

is owed to state appellate court findings based upon statements in the trial record

even when those statements were not made under oath").

There has been no evidence or finding that Petitioner was not afforded a full

and fair hearing in his proceeding before the Georgia Supreme Court.  The United

States Supreme Court's opinion remanding the case only addresses the order of the

state habeas court.  The Court held that "on remand" it was to be determined

"whether state court's factual findings warrant a presumption of correctness."

<u>Jefferson v. Upton</u>, 560 U.S. at 294 (emphasis added).  The Court did not designate

multiple state courts in its remand order.

The Georgia Supreme Court had the entire record before it and the briefs of the parties. In recent decisions by the Eleventh Circuit Court of Appeals, the Court found a denial of a petitioner's application for certificate for probable cause to appeal, (CPC), by the Georgia Supreme Court was a denial on the merits of a petitioner's claim. See Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014); Hittson v. GDCP Warden, 759 F.3d 1210 (11th Cir. 2014); Lucas v. Warden, Ga. Diagnostic & Classification Prison, 771 F.3d 785 (11th Cir. 2014), Wilson v. Warden, Ga. Diagnostic Prison, 774 F.3d 671 (11th Cir. 2014). The Court went on to hold that, "The Georgia Supreme Court's denial of the application for a certificate of probable cause to appeal was the final state-court determination of Jones's Strickland claim. '[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision.' Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008)." Jones, 753 F.3d at 1182. Consequently, deference was given to the Georgia Supreme Court's denial of CPC, not the state habeas court's order.

Although the cases cited directly above concern deference afforded under AEDPA, it is clear that the Eleventh Circuit has designated the decision of the Georgia Supreme Court as the final decision on the merits.

Therefore, as the Georgia Supreme Court granted Petitioner's application for certificate of probable cause to appeal and issued an opinion with findings of fact, those findings are entitled to a "presumption of correctness."

## IV.   ARGUMENT AND CITATION TO AUTHORITY

Petitioner alleges trial counsel were ineffective during the sentencing phase of trial for not presenting evidence of Petitioner's mental health.  Petitioner alleges trial counsel's performance was deficient for not obtaining further psychological evaluation following the evaluation performed pre-trial by his retained psychologist, Dr. Dudley.  Additionally, Petitioner claims further mental health evaluation would have revealed he allegedly suffers from organic brain damage and the presentation of this evidence would have created a reasonable probability of a different outcome at the sentencing phase of his trial.  For the reasons that will be shown below, Petitioner has failed to show either deficiency or prejudice. Accordingly, this claim should be denied.

To prevail on his ineffectiveness claims, Petitioner must demonstrate that he has met the two prongs of Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
>
> Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

> Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland, 466 U.S. at 687. See also Wiggins v. Smith, 539 U.S. 510 (2003) (reaffirming Strickland as governing ineffective assistance of counsel claims). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

In Strickland, the Court established a deferential standard of review for judging ineffective assistance claims by directing that "judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 688.

As the Strickland Court acknowledged, "there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. 668, 689 (1984). "We do not measure counsel against what we imagine some hypothetical 'best' lawyer would do[.]" LeCroy v. United States, 739 F.3d 1297, 1313 (11th Cir. 2014).

Crucially,

> Strickland permits attorneys to choose between viable avenues of defense, and attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another, or for selecting a reasonable course without considering some other, equally reasonable course. "If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And, our inquiry is limited to whether that strategy, that is, course A, might have been a reasonable one."

LeCroy, 739 F.3d at 1313 (quoting Chandler v. United States, 218 F.3d 1305, 1315 at n.16 (11th Cir. 2000) (en banc)).

Further, Strickland established a strong presumption in favor of effective assistance of counsel, and the Court instructed that a reviewing court must "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 688. And although any one of counsel's decisions "could later be pinned beneath the appellate microscope, dissected, and made to look foolish by collateral counsel, who – unlike trial attorneys – have years and sometimes decades to craft dazzling new theories of defense ... '[a reviewing court's] task is not to grade counsel's performance.'" Bates v. Sec'y, Fla. Dep't of Corr., 768 F.3d 1278, 1299 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 697).

Regarding Strickland's second prong, "we ask whether there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Padilla v. Kentucky, 559 U.S. 356, 366 (2010) (quotation marks omitted). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In assessing whether there is a reasonable probability of a different result, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453-454 (2009) (quotation omitted and alteration adopted); see also Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.").

Applying the appropriate standards, it is clear that trial counsel performed effectively and Petitioner's claim should be denied.

## A. Trial Counsel's Investigation Was Reasonable.

Petitioner alleges trial counsel's investigation was deficient because they did not follow up on two sentences in a report from the pre-trial mental health expert. The record is clear that trial counsel conducted a reasonable investigation of Petitioner's background and mental health. As will be shown below, trial counsel, despite the fact that there was no evidence that Petitioner suffered from a mental

health illness, had Petitioner evaluated by an expert. In addition, trial counsel spent considerable time with Petitioner, interviewed his family and had Petitioner write a biography of his life. Trial counsel was aware prior to trial that Petitioner sustained a head injury from an automobile accident at the age of two but there are no records even suggesting Petitioner suffered brain damage from that accident. Moreover, trial counsel was not provided any information from Petitioner's family that he evidenced signs of mental illness growing up or as an adult. Additionally, trial counsel did communicate with the mental health expert about his report suggesting further neurological evaluation and understood that further examination would not be profitable. Reviewing the record as a whole, and giving proper deference to trial counsel, Petitioner has failed to prove that no reasonable attorney would have performed as trial counsel did. Therefore, Petitioner has failed to prove that trial counsel's investigation of Petitioner's mental health was deficient.

### 1. Trial Counsel's Background Investigation

Both of Petitioner's trial attorneys, Stephen Schuster and Marc Cella, were experienced criminal attorneys, both of whom had been Assistant Solicitors in Cobb County; with lead counsel Schuster having prosecuted many major felonies, including murder cases and death penalty cases. (Respondent's Exhibit 39, pp. 34-60; 158-161). The indictment was returned on August 8, 1985, charging Petitioner with the crimes which occurred on May 1, 1985. (Respondent's Exhibit 1, pp. 3-5).

Mr. Schuster was appointed on May 9, 1985, one day after the indictment was returned, and Mr. Cella was later appointed to assist on July 22, 1985. Id. at 8, 10. The trial occurred in March 1986. Id. at 327-28. Thus, counsel had approximately ten months to prepare for trial.

Mr. Schuster conferred with Petitioner "fairly frequently." (Respondent's Exhibit 39, pp. 162). Mr. Schuster testified that, "Petitioner consistently and 'adamantly' maintained that he was innocent, so that the defense which was adopted 'was that Lawrence did not do it. We took what he gave to us and pursued our investigation on that basis.'" (Respondent's Exhibit 39, pp. 162-164).

As found by the Eleventh Circuit, trial counsel conducted a reasonable investigation into Petitioner's innocence:

> Jefferson's counsel conducted an extensive investigation into his claims of innocence. Ex. 39 at 162-63. They visited the crime lab, the medical examiner's office, and Jefferson's apartment complex, and interviewed the detectives on the case, Stewart, the Glades, and the employer for Glade and Mitchell. Ex. 39 at 62-64, 166-70. They sought information from the trust company regarding Taulbee's bank account and how the ATM worked. Ex. 39 at 169. They went to the campground to find witnesses, and spoke to the beat officer on duty the night of the crime and to the people who ran the campground. Ex. 39 at 177-78. Although they failed to uncover any helpful information at the crime scene, they recognized that the area was highly transient. Ex. 39 at 177-78. Ultimately, they learned that there was no physical or scientific evidence against Jefferson. Ex. 39 at 64.
>
> Based on their investigation and Jefferson's adamant assertion that "he did not do it," Jefferson's counsel decided to argue at trial that the State could not prove beyond a reasonable doubt that he had murdered Taulbee. Ex. 39 at 62-63, 81, 171, 182. Schuster believed that "we had

a good shot at winning [since] . . . there were a number of ambiguities . . . ." Ex. 39 at 171. Schuster further thought they could show that Taulbee was "worth more to Lawrence [Jefferson] alive than dead," since Taulbee lent Jefferson money, drove him around, and helped him on the job. Ex. 39 at 171. According to Schuster, "Lawrence [Jefferson] did not do it and that was the strategy all the way through. It wasn't one he wavered from." Ex. 39 at 182.

Jefferson v. Hall, 570 F.3d 1283, 1292-1293. As shown in the Eleventh Circuit's finding of facts, residual doubt was part of trial counsel's strategy through the entire trial from guilt/innocence to sentencing. Trial counsel's investigation of innocence was important and as found by the Eleventh Circuit, was time consuming:

> First, as the record shows, Jefferson's counsel spent a significant amount of time traveling and interviewing witnesses in building their strategy of innocence. Because it is undeniable that attorneys in these cases have finite resources to expend, seeking funds for and gathering additional mental health evidence may have hampered the ability of Jefferson's counsel to work on establishing his innocence. Housel, 238 F.3d at 1296.

Id. at 1306. Trial counsel only had ten months to prepare for Petitioner's death penalty trial, and trial counsel had to make decisions regarding how to spend that limited time. It was clearly no unreasonable for trial counsel to focus more attention on a strategy that could yield the best results.

During a pre-trial hearing, trial counsel stated that there was no issue as to Petitioner's competency to stand trial and "the trial court personally asked Petitioner if he had any mental problems at the time of the crime, and Petitioner

replied no." (Respondent's Exhibit 13, pp. 84-87). Nevertheless, trial counsel

requested a psychiatric evaluation of Petitioner and an independent evaluation was

granted. (Respondent's Exhibit 20, p. 165; Respondent's Exhibit 6, pp. 20-24).

Mr. Cella had obtained the names of three suggested psychologists from the

American Civil Liberties Union and they selected Dr. Richard Dudley to examine

Petitioner. (Respondent's Exhibit 39, pp. 66-68, 172-75). Dr. Dudley met with

Petitioner on four occasions in December of 1985 and submitted a written report to

trial counsel dated February 10, 1986. (Respondent's Exhibit 40, pp. p. 277).

In addition to having Petitioner evaluated, trial counsel investigated

Petitioner's neighborhood, place of employment and hometown of Louisville,

Kentucky. (Respondent's Exhibit 39, pp. 62-64; 162, 166-170). The Eleventh

Circuit found the record showed the following regarding trial counsel's

investigation of Petitioner's background:

> While investigating Jefferson's claim of innocence, his counsel also
> sought information about his life history. They asked him to write
> down a biography, in which he listed his family members and
> discussed his upbringing, discharge from the Navy, schooling, and
> jobs. Ex. 26 at Def.'s Ex. 16; Ex. 39 at 207. Jefferson did not mention
> a head injury in the biography. Ex. 26 at Def.'s Ex. 16. At some point
> during their investigation, however, Jefferson's counsel learned that
> he had suffered a head injury at the age of two. Ex. 39 at 43-44.
>
> To flesh out his life history, Jefferson's counsel obtained court funds
> to travel to his hometown of Louisville, Kentucky. Ex. 39 at 82-83,
> 169, 178; Ex. 40 at 457. They asked Jefferson for possible witnesses
> who could provide mitigating evidence, and then met with Jefferson's
> mother and the family members she had gathered, securing a history

from each of them. Ex. 39 at 83-85, 178-79, 181. They were able to meet with most of the people Jefferson recommended. Ex. 39 at 84-85, 201-02. While in Kentucky, Jefferson's counsel also visited the gas station where he allegedly had committed a prior robbery, the courthouse for his prior records, and his probation officer. Ex. 39 at 178, 181, 199-200.

Jefferson v. Hall, 570 F.3d 1283, 1293 (11th Cir. 2009).

To the extent Petitioner is alleging trial counsel did not inquire from family and friends about Petitioner's mental health, there is no testimony from counsel to support that allegation. Mr. Schuster testified before this Court that in speaking with Petitioner's family they were "looking for everything" and were not focused on the "good guy" defense. (Doc. 240, p. 131). Trial counsel testified before this Court that they were aware that mental health evidence was important. (Doc. 238, pp. 17-18). As held by the Eleventh Circuit, where the record is "admittedly ambiguous" as Petitioner "has the burden of proof and persuasion" and "cannot benefit from those ambiguities or from trial counsel's lack of recollection years after the fact." Gissendaner v. Seaboldt, 735 F.3d 1311 (11th Cir. 2013). In addition, as held by the Eleventh Circuit Court of Appeals, Lambrix v. Singletary, 72 F.3d 1500, 1505-06 (11th Cir. 1996), trial counsel is not ineffective for failing to discover evidence of abuse, or in this case mental health evidence, when defendant and his relatives gave counsel no reason to believe that such evidence existed.

## 2. Trial Counsel's Decision to Forgo Further Mental Health Evaluations Was Reasonable.

As stated above, in addition to researching Petitioner's background, trial counsel also had Petitioner evaluated. Dr. Dudley made the following findings after conducting his evaluation:

> Cognitively, Mr. Jefferson obtains a Verbal I.Q. of 94, Performance IQ. of 109, for a Full Scale I.Q. of 100. This places him at the middle of the average range in overall intelligence. His pattern of subtest results are consistent with that seen in persons diagnosed with attention deficit disorder, and is common among children who are described as learning disabled. **The magnitude of his deficiencies is quite mild, and in no way impair his judgment or decision-making capacity.**

> Analysis of thematic material reveals preoccupation with romanticized ideas, adolescent excitement, and general ego immaturity. **He is likely to be an impulsive individual, not prone to give forethought to the consequences of his actions. Thematic material is not suggestive of a chronically aggressive individual.** Rorschach data also suggest his ego immaturity, poor impulse control and the likelihood that he would pursue immediate gratification without properly considering possible consequences.

> * * * *

> In summary, this is an individual of average intelligence, apparently from a family environment that was involved in some violence (father reportedly killed in an argument) and whose adulthood has included participation in a robbery at gunpoint. His psychologic status at the time of my evaluation is non- psychotic, but he does present with very immature ego functions and tenuous ego integration. His major personality deficits seem centered around identity issues and the failure to achieve a coherent sense of self. **This, in conjunction with great immaturity of ego functions generally, renders him prone to various forms of acting out, with very little mitigating personality structures and dynamics.** There is no evidence in the test record to

suggest that he has experienced a previous level of psychotic impairment. **One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology.** Because he denies the alleged crime, exploration of explosive personality disorder is not pursued. However, he denies a history involving significant amounts of violence.

DIAGNOSTIC IMPRESSION:

| DSM--III AXIS I | | Attention Deficit Disorder, residual |
| --- | --- | --- |
| | II | Developmental Arithmetic Disorder |
| | | R/0 Borderline Personality Disorder |

(Respondent's Exhibit 40, pp. 278-279) (emphasis added).

Much has been found and pontificated about whether trial counsel followed up with Dr. Dudley after the report was issued. However, the actual testimony is the best evidence of this issue. The following is the actual testimony from the state habeas evidentiary hearing by Mr. Schuster:

MR. SCHUSTER: As to whether or not he could help us in the sentencing phase, basically, he said, "No, I cannot help you in the sentencing phase. There is nothing I could testify to that would help you, if you get to the sentencing phase in Lawrence's case." So we did not use him in the sentencing phase.

BY MS. SMITH:

Q      Did he give you any further explanation?

A      **My recollection is that Dr. Dudley told me that he had worked in prison psychology in Florida and that Lawrence**

23

**was just a criminal. I forget the term he used. There was no sense putting him up to say that.** That didn't leave me with anything I could use, so we didn't use him any further. He wrote a report letter that pretty much explains in technical terms how he felt.

MS. SMITH: May I approach the witness, Your Honor?

THE COURT: (Nods head affirmatively).

MS. SMITH: Please let the record show, I am referring him to supplemental index pages 376 of the Dudley report that is in the record three times.

THE COURT: Mr. Desmond, I'm sure you have no objection to him referring to this report?

MR. DESMOND: As long as it is noted on the record that he is reading it when he reads it, Your Honor.

BY MS. SMITH:

Q     If I could refer you to the last page of that report.

A     Yes.

Q     Beginning with the sentence, "In my opinion, it would be worthwhile to conduct a neuro-psychological evaluation of this individual to rule out an organic etiology." Did you ever discuss with Dr. Dudley what he meant?

A     I asked him when I talked to him that day on the phone, which would have been according to my records on the 10th of December, which was before the actual report was written. I talked to him after that again. He basically said it may be a waste of time because the rest of the report – I've got a copy of it from my records. It said that he was non psychotic, that he was intelligent, he had a fairly high I.Q., and I think he said in his report, if I can read it -- can I read it?

Q       Okay.

A       "Because he denies the alleged crime exploration of explosive personality disorder is not pursued." Dr. Dudley didn't pursue it and we saw no reason to further pursue it. Lawrence was not telling us that he did it but couldn't help himself. He was adamant that he didn't do it. That was the basis of our defense was that he did not do it.

Q       If I understand your testimony, after receiving the report and consulting again with Dr. Dudley, his statements -- you basically saw no need to investigate it further?

A       Well, we based it also on our dealings with Lawrence. I mean, we met with him on a regular basis. He was always very calm and always extremely helpful. I think we put in the record a biography that he did for us. He pretty much listed everything for us. He kept good notes. He was very workable within the sense that he helped us in any way he could to prepare the defense. We had no indication, through our dealings with him, that there were any problems with explosive personality or anything like that. He was very good to work with. He helped us line up talking to his family. He gave us information about who had supervised his work at Zenith, other people he worked with. He told us a lot of stuff without the -- Duane Mitchell and the two Glades. I mean, there was nothing in our day-to-day relationship with Lawrence that would lead us to go further with that. We didn't have any problem. He kept good notes and helped us out. If there was something, I must have missed it.

(Respondent's Exhibit 39, pp. 174-177).

During the federal evidentiary hearing before this Court, Mr. Schuster testified to the following regarding Dr. Dudley's evaluation:

Q.      And, okay. So do you recall that you had Mr. Jefferson evaluated by Dr. Dudley?

A.      Yes.

25

Q.    And that was for a mental health evaluation; correct?

A.    Yes.

Q.    Following the evaluation by Dr. Dudley, did you have a conversation with Dr. Dudley about that evaluation?

A.    I recollect we did.

Q.    Do you recall any of the substance of that conversation?

A.    We were trying to decide what to do next with the evaluation. And based on our conversation with Dr. Dudley we made a decision that there was no sense pursuing any further evaluation of Mr. Jefferson.

Q.    And why did you not want to pursue further evaluation?

A.    Just told us -- I figured when he told us he was a sociopath or a psychopath and not to worry about it.

Q.    And do you recall Dr. Dudley's report?

A.    I have not read it in decades.

Q.    Do you recall there was a portion of that report that stated that further evaluation needed to happen?

A.    And we asked him about that.

Q.    And what did he say about that part of the report?

A.    That Mr. Jefferson was the way Mr. Jefferson was.

Q.    And did he think that he needed further evaluation?

A.    We would have asked to do it if we had been told by Dr. Dudley, you need to do this, seriously need to do this, as opposed to, a throw-out in the report.

Q.     So why do you think he put that into the report?

A.     You'll have to ask Dr. Dudley. I mean, we pursued many
       avenues to -- and we didn't have anything in discussing the case
       with Mr. Jefferson to indicate that there was a need.

(Doc. 240, pp. 120-121).

On cross-examination, Mr. Schuster was questioned about his interactions

with Dr. Dudley:

Q.     Okay. And do you recall did you meet with Dr. Dudley in
       person, or was it on the phone? Do you recall?

A.     I don't recall.

Q.     So the conversation you had with him – I'll take that back
       unless you

A.     No, no. That's yours. I have some recollection of having met
       with him, but it may have been on the phone. I just don't recall.

Q.     So the meeting would be, for whatever it was, whether it was a
       phone call or a meeting, it was to be to explain –

A.     I'm sure we talked to him prior to the examination so that we
       could retain him and make the arrangements, and then we let
       him do what he does, and then afterwards we had him walk us
       through the report.

(Doc. 240, pp. 124-125).

Petitioner alleges that this Court should "doubt the accuracy of Mr.

Schuster's testimony."  (Doc. 246, p. 7).  In support of that, Petitioner alleges that

Mr. Schuster's billing records do not show that he phoned Dr. Dudley after

receiving the report. First, when asked at the state habeas evidentiary hearing if his billing records accurately reflected his time, Mr. Schuster testified that "It is relatively accurate. If anything, it under values the amount of time that we put in, but it is probably 80 to 90 percent of the work that we did in the case, at least from September 20th on." (Respondent's Exhibit 39, p. 190). Thus, as Mr. Schuster did not include everything he did in his billing records, it is inappropriate to draw that the absence of evidence is proof of false testimony. As repeatedly explained by the Eleventh Circuit, a petitioner cannot benefit from a "silent record." See Williams v. Allen, 598 F.3d 778, 794 (11th Cir. 2010) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.") (quotation marks and brackets omitted); see also Gissendaner v. Seaboldt, 735 F.3d 1311, 1331 (11th Cir. Ga. 2013)("[Petitioner],who has the burden of proof and persuasion, cannot benefit from those ambiguities or from trial counsel's lack of recollection years after the fact."); Reaves v. Sec'y, Fla. Dep't of Corr., 717 F.3d 886, 901 n.9 (11th Cir. 2013) ("[C]ounsel's understandable lack of memory" when testifying years later about his actions at and before trial should not be equated with deficient performance). Simply because counsel failed to record in his billing records this

conversation is not proof that counsel testified falsely before the state habeas court and this Court.

Petitioner also alleges that Mr. Schuster's testimony is not to be trusted because he testified in state habeas that Dr. Dudley called Petitioner a "criminal" and in federal habeas he testified that Dr. Dudley referred to Petitioner as a "sociopath or psychopath." (Doc. 246, pp. 8-9). Actually as shown above, Mr. Schuster testified in state habeas, "My recollection is that Dr. Dudley told me that he had worked in prison psychology in Florida and that Lawrence was just a criminal. **I forget the term he used**." (Respondent's Exhibit 39, p. 174) (emphasis added). Consequently, he was not testifying that Dr. Dudley used the term "criminal."[1] The fact that Mr. Schuster, twenty-four years later, provided different but similar terminology is hardly evidence of false testimony. Moreover, the gist of his testimony is nearly identical, that further evaluation of Petitioner would not be helpful.

---

[1] Moreover, the fact that no other expert has diagnosed Petitioner as a sociopath or psychopath does not disprove Mr. Schuster's memory of his conversation with Dr. Dudley.

Mr. Cella testified to the following during the state habeas proceeding regarding Dr. Dudley:

BY MS. SMITH:

Q      Given Mr. Jefferson's statements and given the report of Dr. Dudley, did you see a basis on which to pursue an insanity defense?

A      An insanity defense, no. I never saw any factual basis for an insanity defense at all.

Q      What about in terms of presenting Dr. Dudley as a mitigating witness?

A      Dr. Dudley's report concludes and he suggested that he would hurt us more than help us if we did call him. But he concluded that –

MR. DESMOND: I'm sorry, Your Honor. I have to object on hearsay grounds and move to strike that.

MR. CELLA: Judge that was – I'm sorry.

THE COURT: I believe that is included in this report, is it not?

MR. CELLA(sic): Your Honor, his testimony was that Dr. Dudley purportedly told them that he would hurt them more than help them and that is clearly hearsay. We would object to it and move to strike that testimony.

THE COURT: Response?

MS. SMITH: Your Honor, it is the course of conduct. This is information supplied to the attorneys. They are making the decisions on what to present, what witnesses to call, why, what they acted upon. We submit that it is relevant to show the course of conduct.

THE COURT: We will allow it.

MR. CELLA: Dr. Dudley concluded that the magnitude of whatever Lawrence's deficiencies were was quite mild and in no way had impaired his judgment or decision-making capacity.

MR. OLIVE: Again, Your Honor, the witness is reading from the document.

MS. SMITH: Your Honor, I would ask Mr. Olive to keep –

THE COURT: Let's not double team. Whoever is lead counsel, and according to the record Mr. Desmond is lead counsel, Mr. Desmond will have to conduct the cross examination and make the objections.

MR. DESMOND: Your Honor, for the record, Ms. Westmoreland has been making objections and statements as we go here, too.

THE COURT: I don't recall Ms. Westmoreland having participated at all in any of this except at the very outset she did make some earlier statement. I don't recall what it was.

MS. WESTMORELAND: Regarding Lonchar, Your Honor.

THE COURT: Mr. Cella is reading from a report of Dr. Gary Dudley which has been tendered and admitted by the Petitioner twice this morning. It is attached as a part of the Petitioner's either first amendment or second amendment petition and is a part of the trial transcript in this case. Now, if you don't want him to testify from your own document, we will withdraw all of these exhibits.

MR. DESMOND: Not at all, Your Honor. The objection is that --

MR. OLIVE: I have no objection. I just wanted the record to fairly reflect what is occurring in the courtroom. This person is not testifying from memory, he is reading from a document. That is all I wanted. It wasn't an objection, it was to make the record clear.

MS. SMITH: If I might note for the record. Your Honor, he interrupted the witness and I did not hear his response. And that was part of my objection as well.

THE COURT: Let's put this whole proceeding back on a professional level to which it is entitled. I'm going to instruct all attorneys to act in the professional manner in which you are supposed to act as counsel in any legal proceeding.
Proceed.

BY MS. SMITH:

Q     Did you ever speak with Dr. Dudley and discuss his report?

A     Yes.

Q     Was there any information that he relayed to you that was not contained in the report?

MR. DESMOND: The same objection, Your Honor.

THE COURT: What objection? We've had so many here lately, I don't know what same objection you are referring to.

MR. DESMOND: The question calls for hearsay testimony. She has asked what did Dr. Dudley tell him. Now, the State could have subpoenaed Dr. Dudley but they didn't.

THE COURT: Ask the question again. Let me understand the question, and then we'll rule on the objection.

MS. SMITH: I asked him if there was information that Dr. Dudley told him that was not contained in the report.

THE COURT: What was your answer?

MR. CELLA: I haven't answered it yet. We had a conversation. As far as whether he communicated any of what they are referring to as information, further information about his conclusions, I

don't think so. I think the conversation related to whether he would help or hurt us on the stand and whether we should call him to help our case, but I don't believe he gave anymore information that he garnered from his contacts with Lawrence.

BY MS. SMITH:

Q      And what would the contacts –

MR. DESMOND: I'm sorry, Your Honor. The same objection, and we move to strike. He still has indicated that there was a conversation and the substance of the conversation, specifically whether it would help or hurt,

THE COURT: The objection is overruled.

BY MS. SMITH:

Q      What were the contents of that conversation?

MR. DESMOND: The same objection. Your Honor.

THE COURT: I think he just testified, there may have been a discussion as to whether or not calling him as a witness would help or hurt but there was nothing else in the conversation other than was contained in his report. I thought that was the way he answered the question.

MR. CELLA: Yes, sir.

BY MS. SMITH:

Q      Why did you not call him as a witness for the defense?

A      Because I didn't think he had anything to say that would help our defense.

Q      Why not?

A        Because of his conclusion that Lawrence's mental deficiencies did not prevent him from understanding right from wrong, did not impair his judgment or his decision-making capabilities, and that he was non psychotic.

Q        Did you consider having additional testing done based upon the subject about conducting any further neuro-psychological evaluation?

A        I don't believe so.

Q        Why not?

A        Because we were proceeding on the defense that Lawrence gave us, which was that he was an eyewitness to this incident.

Q        And so, if I understand your testimony, any defense regarding brain damage would have been inconsistent with your client's version of events that he didn't do it; is that correct?

A        That is correct. And also, based on his course of conduct with Dr. Dudley, I didn't have any reason to expect that he would cooperate with anymore mental health experts either. In fact, in Dr. Dudley's report, there is a reference to the fact that he was - -I don't want to misquote it again, he responded in a highly self-protective manner. And in fact in one case refused to see Dr. Dudley because Dr. Dudley hadn't made an appointment with Lawrence. So it was a combination of those things.

Q        How many times did you consult with Mr. Jefferson? Do you have a ballpark figure?

A        Somewhere between a half a dozen and a dozen.

Q        Did you ever see any evidence of any sort of brain damage or inability to control his impulses?

A        No, I never had any problems communicating with Lawrence, He had what appeared to be a very good was a little bit evasive with me, too, I thought. But I never saw any evidence that

Lawrence was brain damaged. Like I said, he used words like house of ill repute. He appeared to have a vocabulary that was way above what I would have associated with brain damage and he knew how to use the words. He told us he paid child support periodically. Just not the kind of vocabulary you would expect from someone who had brain damage.

Q     So your testimony is, based on your investigation, you saw no reason to pursue this line further?

A     I didn't see a factual basis for it.

(Respondent's Exhibit 39, pp. 73-80).

During the federal evidentiary hearing before this Court, Mr. Cella testified to the following regarding his recollection of Dr. Dudley's communication with trial counsel:

Q.     After Dr. Dudley evaluated Petitioner, do you recall what information he relayed to you and Mr. Schuster regarding Petitioner's mental health?

A.     Generally speaking, I recall that the gist of his communication with us was that he didn't feel like he would be particularly helpful as far as being a mitigating witness in a trial.

Q.     And why was that?

A.     Well, mainly because we were not [in] a posture where we were admitting the crime. We were in a posture where we were, based on what Lawrence told us, denying that he committed it.

(Doc. 238, pp. 18-19). Mr. Cella then testified that he did not speak with Dr. Dudley about whether there should be further evaluation of Petitioner after receiving the report and his failure to do so was based upon inexperience. (Doc.

238, pp. 19-20). Additionally, he testified that did not recall if he and Mr. Schuster discussed further evaluation and was not aware if Mr. Schuster had a conversation with Dr. Dudley about further evaluation. (Doc. 238, p. 20).

Dr. Dudley testified before this Court that he did not recall whether he had a conversation with trial counsel after he wrote his report but that he would not have informed counsel not to pursue further evaluation and he would not have called Petitioner a "criminal." (Doc. 238, pp. 104-106).

It's clear from Dr. Dudley's testimony that he does not recall Petitioner or his interactions with trial counsel. This is understandable given the lapse in time. Trial counsel's memory has also clearly been affected by the near three decade delay as well. What is clear though from the state and federal habeas testimony of Mr. Schuster, is that he does recall following up with Dr. Dudley after the report was given to counsel and he does recall being provided information that further evaluation would not be helpful. Perhaps that was not what Dr. Dudley intended to convey in their conversation but that is what Mr. Schuster understood him to say and this was not unreasonable.

Other than the car accident at age two, Petitioner has absolutely no history of mental health issues. There are no mental health records, no medical records, no school records, no prison records, and no military records showing that Petitioner suffered from mental health difficulties prior to his crime. Additionally, trial

counsel saw nothing in their many interactions with Petitioner to suggest he had mental health problems. Petitioner's family did not provide any information that would have prompted a reasonable attorney to investigate mental health further.

Mr. Shuster testified that in his frequent conversations with Petitioner he was "always very calm and always extremely helpful;" Petitioner "kept good notes," "was very good to work with," and "helped us line up talking to his family." (Respondent's Exhibit 39, pp. 176-177). Mr. Cella testified that Petitioner had "a good vocabulary" and that they never had any problems communicating with him. (Respondent's Exhibit 39, p. 79). Mr. Schuster also testified that as a reason for not seeking further evaluation was Petitioner's Navy service and employment history:

Q      What about Mr. Jefferson having served in the Navy?

A      We explored all of that. He did three and a half years in the Navy. He didn't leave under an honorable discharge, but it was a good discharge. His mother—one of the family members indicated, and I think Lawrence also in his history indicated, that one of the reasons he joined the Navy was so that he could help out the family, send an allotment to them. We explored that. He had a good record in the Navy. And that goes back to why we didn't follow up with Dr. Dudley because he did have three and a half years in the Navy. He also had his job with a scale company where he was certified. He had a certification in making sure the scales were fixed and that they weighed properly. So he actually had a pretty good work history that we used, too. I believe we used it in the sentencing phase, his work history and his Naval history.

(Respondent's Exhibit 39, pp. 179-180). Mr. Schuster also testified before this

Court that Petitioner spoke with Petitioner's family and they described his

background as "relatively normal." (Respondent's Exhibit 39, p. 121).

Additionally, Petitioner's family gave no indication that Petitioner had mental

health problems growing up. (Respondent's Exhibit 39, pp. 121-122).

The Georgia Supreme Court found the following regarding trial counsel's

decision not to pursue further mental health evaluation:

> The report did suggest that a neuropsychological evaluation might be "worthwhile . . . to rule out an organic etiology." However, in subsequent telephone conversations with Jefferson's attorneys, the psychologist indicated that further examination would not likely be beneficial because Jefferson did not have serious mental problems and was of normal intelligence. Counsel explained that in light of this advice, as well as their own observations of Jefferson and Jefferson's adamant assertion that he had not committed the crime, they concluded that there was no reason to explore further any mental issue, or to call the psychologist to testify in mitigation. Counsel must investigate defendant's background before sentencing. [Cit.] The adequacy of the scope of an attorney's investigation is to be judged by the standard of reasonableness. [Cit.] After an adequate investigation, counsel may reasonably decide not to present mitigating character evidence at sentencing. [Cit.] Bush v. Singletary, 988 F2d 1082, 1091 (11th Cir. 1993).
>
> Jefferson's counsel investigated the possibility of mental mitigation and concluded that there was nothing substantive to develop. The record supports the finding that Jefferson's counsel did not believe, and had no reason to believe, that Jefferson suffered mental deficiencies that could have been exploited in mitigation.

Jefferson v. Zant, 263 Ga. 316, 319-320 (1993). As stated above, these findings of

fact are entitled to a presumption of correctness. As explained by the Eleventh

Circuit:

> A presumption of correctness applies to factual findings made by state
> trial and appellate courts. "'This deference requires that a federal
> habeas court more than simply disagree with the state court before
> rejecting its factual determinations. Instead, it must conclude that the
> state court's findings lacked even fair support in the record.'"

Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir. 2011) (citations omitted).  There

is obviously "fair support in the record" that trial counsel understood from Dr.

Dudley that further mental health evaluation would not be productive.

Additionally, trial counsel had many other valid reasons for not pursuing further

evaluation.  Petitioner has failed to show how this Court is not bound by these

factual findings.

It would be easy to come now and second guess trial counsel's decision,

indeed even trial counsel applies improper hindsight analysis to their own

performance.[2]  But that is not the task before this Court.  The task is to determine if

---

[2] As found by the Eleventh Circuit:

> In his post-conviction affidavit, produced over five years after the
> penalty phase of Gissendaner's trial, Reilly attempted to concede
> deficient performance, explaining that he "should have more
> thoroughly investigated" the allegations of sexual abuse and that he
> "had no tactical nor strategy reason for failing to pursue further
> investigation" of such abuse. Nevertheless, because Strickland's
> standard for deficient performance is an objective one, trial counsel's
> hindsight assessment of the adequacy of his penalty phase
> investigation is entitled to little, if any, weight. See Windom, 578 F.3d
> at 1246 n.11 ("Because the adequacy of an attorney's performance is
> measured against an objective standard of reasonableness, the fact that
> trial counsel admits that his performance was lacking is of little, if
> any, consequence."); Jennings v. McDonough, 490 F.3d 1230, 1247

trial counsel's performance in 1985 was reasonable.  Petitioner was thirty years old

when he murdered Mr. Taulbee.  He had a criminal history, he had served for

 almost four years in the Navy, he had a decent employment history, he had two

children and, he did not have any history of mental illness.  Additionally, Petitioner

was adamant, and never wavered, to trial counsel that he did not commit the crime.

Other than the two sentences in Dr. Dudley's report, which trial counsel testified

they followed up on; there was nothing in Petitioner's background that suggested

he had mental health problems that led to his crime.

This Court has previously found that trial counsel did not understand the

importance of mental health issues, specifically brain damage.  Jefferson v. Hall,

570 F.3d 1283, 1299.  However, trial counsel clearly understood the significance

of mental health evidence for mitigation, otherwise they would not have had

Petitioner evaluated. Trial counsel did not know the specific effects of certain types

of brain damage, but they were not required to be mental health experts.  They may

not have understood frontal lobe damage or organic brain disorders but the law

does not require any such understanding prior to diagnosis.  The law requires a

reasonable investigation.  Trial counsel had Petitioner evaluated and relied upon

---

(11th Cir. 2007) ("The Strickland standard of objective
reasonableness does not depend on the subjective intentions of the
attorney, judgments made in hindsight, or an attorney's admission of
deficient performance.").

Gissendaner v. Seaboldt, 735 F.3d at 1330.

that expert, in addition to their own investigation of Petitioner's background, to determine what actions were necessary. There is no precedent which states that in determining whether to seek mental health evaluations trial counsel cannot rely upon their interactions and communication with their client to make that determination.

Petitioner alleges trial counsel were wrong to confuse the ability to communicate well with no executive functioning problems. (Doc. 246, p. 10, fn. 5). It is Petitioner that is confused. In fact, there is ample precedent that holds trial counsel's decision not to pursue mental health evaluation to be reasonable based, in part, on trial counsel's interactions with petitioners. For example, the Eleventh Circuit found the following in a factually similar case:

> *Intoxication and mental health evidence.* The reasons why we reject Housel's ineffective-assistance-of-counsel claim on the upbringing evidence apply equally to evidence of Housel's intoxication on the night of Drew's murder and to the evidence of brain damage and hypoglycemia. Housel said nothing to Britt about hypoglycemic episodes, and the record gives us no reason to believe that hypoglycemia was on the "ask about" list of all reasonable lawyers in 1985. And even though Britt knew that Housel had suffered a head injury in an automobile accident, Britt observed nothing unusual about Housel's behavior, and indeed testified that Housel was one of his most intelligent clients. Britt had before him, moreover, two psychological evaluations, neither of which offered any encouragement to proceed further. In these circumstances, Britt's decision not to expend finite resources developing psychological evidence in mitigation or defense was not unreasonable. Cf. Baldwin v. Johnson, 152 F.3d 1304, 1314 (11th Cir. 1998) (decision not to pursue psychological testing reasonable when petitioner appeared normal to counsel), cert. denied, 526 U.S. 1047, 119 S. Ct. 1350, 143

L. Ed. 2d 512 (1999); <u>Stephens v. Kemp</u>, 846 F.2d 642, 653 (11th Cir. 1988) (counsel could reasonably stop investigation after one unfavorable psychiatric evaluation).

<u>Housel v. Head</u>, 238 F.3d 1289, 1296 (11th Cir. 2001). Likewise in Petitioner's case, trial counsel had: a client with a head injury from an automobile accident; a psychological evaluation that was not favorable; an understanding after speaking with their mental health expert that further evaluation would not be helpful; and an intelligent client. In addition, this case speaks directly to what was reasonable for trial counsel in 1985.

Additionally, in <u>Holladay v. Haley</u>, the Eleventh Circuit held:

[C]ounsel is not required to seek an independent evaluation when the defendant **does not display strong evidence of mental problems**. Additionally, the choice not to seek out such an evaluation is a tactical decision, which "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. Whether the tactical decision is reasonable is a question of law.

\*\*\*\*

The conduct of the counsel here did not fall below the professionally competent standard. While the Warrens did not discover the records from Holladay's stay at Central State Hospital in Milledgeville, Georgia or records from other psychiatrists who treated Holladay, there is no evidence in the record, nor does Holladay allege, that he told them of his prior treatment. As in *Funchess*, the report of the lunacy commission that Holladay was sane and competent combined **with counsel's impression of Holladay as cooperative, articulate, and affable** did not put Mrs. Warren on notice that there were or might be psychiatric records that she needed to find.

<u>Holladay v. Haley</u>, 209 F.3d at 1250, 1252 (emphasis added). In Petitioner's case trial counsel observed much of the same qualities as those in the <u>Holladay</u> case. Petitioner was cooperative with counsel, intelligent and attentive to this case. (Respondent's Exhibit 39, pp. 175-176). It was not unreasonable for trial counsel to rely upon those traits in assessing whether further evaluation of Petitioner's mental health was necessary.

In another Eleventh Circuit case, <u>Williams v. Head</u>, 185 F.3d 1223, 1239 (11th Cir. 1999), the Court explained the appropriate standard for evaluating trial counsel's performance:

> Other attorneys might have gone further in the investigation, but that is not the test. As we have explained: "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." <u>Waters</u>, 46 F.3d at 1512 (quoting <u>White v. Singletary</u>, 972 F.2d 1218, 1220-21 (11th Cir.1992)).

Relying on this standard, the Court evaluated trial counsel's decision not to have Williams evaluated by a mental health expert:

> The principles of law that we have been discussing apply with equal force to the claim of Williams' present counsel that Allen was ineffective for failing to develop facts relating to Williams' mental state and not requesting a mental evaluation of him. Nothing that Allen learned from talking to Williams indicated that he was suffering from any mental disorder or disease. **To the contrary, Allen found Williams to be intelligent, attentive, cooperative and polite. Williams was interested in what was happening, asked intelligent questions, and responded intelligently to Allen's questions. They had no problem communicating.** <u>See</u>, <u>e.g.</u>, <u>Baldwin v. Johnson</u>, 152

> F.3d 1304, 1314-15 (11th Cir.1998) (failure to request a psychiatric examination not ineffective where nothing the defendant did or said indicated he had any mental problem), cert. denied, 526 U.S. 1047, 119 S. Ct. 1350, 143 L. Ed. 2d 512 (1999).

Williams, 185 F.3d at 1239. Additionally, counsel discovered that Williams had been admitted to Georgia Regional by his mother. Counsel went to Georgia Regional and consulted with the superintendent who relayed to counsel that further evaluation would not be helpful because "Williams was just a sociopath." Id. See also, Callahan v. Campbell, 427 F.3d 897, 934 (11th Cir. 2005) (noting that, when a defendant "does not display strong evidence of mental problems," counsel is not even "required to seek an independent evaluation") (quotation marks omitted).

Petitioner alleges that his refusal to consult with Dr. Dudley on one occasion was evidence of mental health issues. This is proof of nothing except an individual awaiting a death penalty trial may not at all times be cooperative. A similar claim was made in Williams based upon William's request to conduct a religious ritual and vow of silence and the Court refused to credit as evidence of mental health problems:

> At the time Allen made the strategic decision not to have Williams evaluated, he was aware of something about Williams wanting to conduct a religious ritual at the jail, and his having taken a temporary vow of silence. As it turns out, neither episode actually involved bizarre behavior. [11] In any event, Allen was also thoroughly familiar with the transcript of the trial, which contains abundant evidence that Williams was not suffering from a serious mental disorder. For example, it shows that shortly after he was arrested on March 12, 1986, Williams repeatedly tried to cut a deal with the investigating

officer in which he would get a lesser sentence in return for information about the still missing girl. He wanted a written deal, but the officer refused to negotiate. Williams made up a story about how he had come to have the victim's purse and credit cards, saying that he had stolen them out of her car in the mall parking lot when she was not there. As the officer's questions became more pointed, Williams was wise enough to refuse to say any more until he had an attorney. He also refused to sign a written waiver. See Williams v. State, 258 Ga. at 283, 368 S.E.2d at 745-46.

n11 The "religious ritual episode" had to do with the request for some candles and a towel or tablecloth for a religious ceremony to celebrate the anniversary of Williams' christening. Collins and Williams' mother--not Williams himself--asked the assistant jailer to let Williams have those materials for that ceremony, but the jailer refused permission. Collins then asked Reverend Holmes, the counselor at the jail, to arrange the ceremony for Williams, but the record does not indicate whether it ever happened. There does not appear to have been anything bizarre about it.

The "vow of silence episode" stemmed from Williams' sometimes contentious relationship with Collins. They had more than twenty conferences together, but with one exception Williams adamantly refused to discuss the crime with Collins. Williams was convinced that his friends would not testify against him and the State could never prove its case. On one of the many occasions when Collins went to see him, Williams refused to talk at all, saying that he had taken a vow of silence. The next time Collins visited him, Williams talked freely about everything except the case. Collins was convinced Williams was very stubborn, liked to be the center of attention, and had to have his way about everything.

Williams v. Head, 185 F.3d 1223, 1240.

Therefore, as trial counsel reasonably investigated Petitioner's background, their strategic decision not to pursue further evaluation is reasonable. Strategic decisions are "virtually unchallengeable." "As the Supreme Court emphasized in

Strickland, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' while 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' Id. at 690-91, 104 S. Ct. at 2066." Gissendaner v. Seaboldt, 735 F.3d at 1323. Petitioner can point to no evidence in Petitioner's background that shows Petitioner suffered from a mental illness that was overlooked or not uncovered in their investigation.

As stated above, residual doubt was part of trial counsel's strategy during the sentencing phase. Petitioner argues that there was not any evidence presented on this topic and trial counsel did not spend much time on this topic in closing argument. (Doc. 246, p. 11). Respondent is unclear what evidence Petitioner is alleging should have been presented to support this theory as he does not identify any. Moreover, as stated by Mr. Schuster, trial counsel began their residual doubt theory in the guilt/innocence phase. Evidence from guilt/innocence phase is also considered part of mitigating evidence for the sentencing phase. See Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-788 (11th Cir. 2003) ("In cases like this, when guilt is in fact denied and counsel reasonably employs a lingering doubt strategy at sentencing, a 'lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing

phase.' Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999).").  Petitioner does complain that he was never asked to deny his guilt during his testimony but that argument fails for several reasons.  First, Petitioner could have testified to this without trial counsel asking him, but he chose not to do so.  Secondly, Mr. Schuster directly refuted the helpfulness of such testimony:

> Q.  And Mr. Jefferson testified during the sentencing phase of trial; is that correct?
>
> A.  Yes, he did.
>
> Q.  And is there any reason why when Mr. Jefferson was on the stand you didn't ask him whether or not he committed the crime?
>
> A.  We did not ask him whether he committed the crime. We didn't --he was already found guilty of the crime.
>
> Q.  Do you think it's good trial strategy to ask a client whether or not they committed a crime?
>
> A.   I think that if we had made a pivot like that, that would not have been to his benefit. And Mr. Jefferson had always told us even after the verdict he didn't commit the crime, so I -- I did not want to insult the jury by putting him up there after they returned a verdict saying, no, I didn't do it.

(Doc. 240, pp. 122-123).  This is an entirely reasonable assessment of the situation at trial.  Trial counsel had thoroughly attacked the State's case in guilt/innocence and the jury found Petitioner was guilty.  Therefore, trial counsel had to strike a balance between still relying upon residual doubt and not insulting the jury's finding of guilty.

### 3. When Viewed As A Whole Trial Counsel's Investigation Was Reasonable.

This is not a case in which trial counsel conducted no investigation. This is not a case in which trial counsel ignored readily available information. And this is not a case in which there was a substantial history of mental health issues not uncovered by trial counsel. Instead, this is a case where trial counsel conducted a reasonable investigation of Petitioner's background, assessed their necessary course of action and strategically chose not to go further down the mental health avenue. When counsel's actions are viewed at the time of their representation in 1985, it is incorrect to find that no reasonable attorney would have acted in the manner chosen by trial counsel. Trial counsel was aware that Petitioner had suffered a head injury at the age of two, but there was no evidence that Petitioner was brain damaged from that accident. Many children suffer head injuries and do not become brain damaged. There were no red flags overlooked by trial counsel in Petitioner's life that suggested he suffered from severe brain damage.

In a similar case to the one at bar, the Eleventh Circuit held the following:

> Strickland requires that counsel either make a reasonable investigation of the law and facts relevant to a case or make a reasonable decision not to carry out a particular investigation. Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066. "Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support limitations on investigation." Id.

Similarly, "no absolute duty exists to introduce mitigating or character evidence." Chandler, 218 F.3d at 1319 (11th Cir. 2002). "Counsel who fail to present any mitigating evidence, even when it is available at sentencing, may still be deemed constitutionally effective, provided that the decision not to present mitigating evidence was a tactical one based on the results of a reasonable investigation." Hubbard v. Haley, 317 F.3d 1245, 1260 (11th Cir. 2003) (citations omitted). "Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." Chandler, 218 F.3d at 1319.

**Parker argues his attorneys were ineffective because they spent virtually all of their time preparing for the guilt phase of the trial, did not adequately prepare for the sentencing phase of the trial, and relied solely on a reasonable doubt argument at sentencing which the jury had already rejected during the guilt phase. Specifically, Parker claims counsel should have presented mitigating evidence of his disadvantaged upbringing, alcohol and substance abuse, psychological disorders, and brain damage. Parker suggests counsel should have presented this evidence through the testimony of his family members, Dr. Stillman, and Dr. Haber.**

**We conclude Parker's attorneys were not deficient in focusing their time and energy on acquittal at trial and focusing their arguments at sentencing on residual doubt (instead of other forms of mitigation).** In cases like this, when guilt is in fact denied and counsel reasonably employs a lingering doubt strategy at sentencing, a "lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase." Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999). Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but "is perhaps the most effective strategy to employ at sentencing." See Chandler, 218 F.3d at 1320; Tarver, 169 F.3d at 715-16 (citing a comprehensive study on the opinions of jurors in capital cases and other law review articles concluding that raising residual doubt over a defendant's guilt is "the best thing a capital

defendant can do to improve his chances of receiving a life sentence").

Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-788 (11th Cir. 2003)

(emphasis added).  Trial counsel only had ten months to prepare for trial, a client

the was adamant he was innocent, no indication in their interactions that he was

mentally impaired, so, when their actions are viewed in this proper context, their

decisions were clearly reasonable.

As also held by the Eleventh Circuit:

> The Supreme Court has told us that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. The same reasonableness criterion and heavy deference apply to an attorney's decisions concerning the extent to which a possible guilt or sentence stage defense is pursued. See Mills v. Singletary, 63 F.3d 999, 1024 (11th Cir.1995) ("The question is whether … ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (quotation and citation omitted); Gates, 863 F.2d at 1498 ("Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense."). In Rogers v. Zant, 13 F.3d at 387, we rejected the position that strategic decisions can be considered reasonable only if they are preceded by a "thorough investigation." Instead, we explained that the "correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." Id. **We have also put it in other words, saying that to be effective a lawyer is not required to "pursue every path until it bears fruit or until all hope withers."** Foster v. Dugger, 823 F.2d 402, 405 (11th Cir.1987) (quoting Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir.1984)). And we held in Mills, 63 F.3d at 1021, that "[a] decision

to limit investigation is accorded a strong presumption of reasonableness." (quotations and citations omitted).

Williams v. Head, 185 F.3d 1223, 1236-1237 (11th Cir. 1999). Applying this precedent, and the standard announced in Strickland, trial counsel's decision to forgo further mental health evaluation was clearly reasonable. Accordingly this portion of Petitioner's ineffectiveness claim should be denied.

### B. Petitioner's Evidence Of Alleged Severe Brain Damage Would Not Have Created A Reasonable Probability Of A Different Outcome.

Assuming trial counsel's investigation was deficient, Petitioner alleges that if the jury had been presented with evidence that he suffered from organic brain damage there is a reasonable probability that the outcome of his trial would have been different. Petitioner's argument fails for many reasons including is his failure to link this alleged problem to his crimes, the lack of any evidence that Petitioner suffered from the "rage outbursts" allegedly associated with his organic brain damage and the obvious bias of Petitioner's experts. When subjected to cross-examination and critical review, Petitioner's evidence of brain damage fails to present the type of evidence that would create a reasonable probability of a different outcome.

### 1. Petitioner's Mental Health Experts' Evaluations and Conclusions Lack Reliability.

Petitioner was evaluated in 1989 by two mental health experts, Dr. Price and Dr. Merikangas.  They provided affidavits in Petitioner's state habeas proceeding in lieu of live testimony, to support Petitioner's claim of ineffective assistance of counsel claim.  Neither expert has seen Petitioner since the evaluations in 1989. Relying upon their own evaluation and each other's they have diagnosed Petitioner with brain damage, specifically frontal lobe disorder.  However, both evaluations are rife with speculation, obvious bias and scant historical data to support the degree of brain damage from which they allege Petitioner suffers.  In contrast, Petitioner's expert, Dr. Stephen Macchiocchi, who typically testifies for the defense, (Doc. 240, pp. 184-188),  provides a well-reasoned, clearly non-biased evaluation of Petitioner that casts serious doubt on the reliability on the evaluations of Petitioner's mental health experts.  As will be shown below, the State could have easily refuted the allegations of Petitioner's mental health experts.  Therefore, Petitioner has failed to show that his evidence of brain damage would have created a reasonable probability of a different outcome.

Dr. David R. Price evaluated Petitioner on March 22 and 26, 1991 for approximately six hours total. (Respondent's Exhibit 40, p. 326).  He also examined background information that included medical and school records and affidavits from family members.  (Respondent's Exhibit 40, pp. 326-327).  Dr.

Price concluded in his affidavit that Petitioner had frontal lobe damage and this damage "causes spontaneous behavior with no or significantly reduced cognitive component, and that Mr. Jefferson's ability to learn from past mistakes is significantly compromised by his disability, through no fault of Mr. Jefferson." (Respondent's Exhibit 40, p. 336).

Dr. Merikangas also diagnosed Petitioner with brain damage. Dr. Merikangas evaluated Petitioner on May 1, 1989. (Respondent's Exhibit 40, pp. 235, 253, 319). Dr. Merikangas administered several neurological tests to Petitioner, and reviewed records including, but not limited to: Dr. Dudley's report from 1986; school records; medical records, and; affidavits from family members. (Respondent's Exhibit 40, pp. 253-255). Based upon this evaluation, Dr. Merikangas determined that Petitioner was "permanently brain damaged." (Respondent's Exhibit 40, pp. 256). This diagnosis was based upon the fact that the circumference of Petitioner's head was in the 98 percentile, which may mean fluid on the brain, alleged loss of strength on his left side and peripheral nerve damage. (Respondent's Exhibit 40, p. 256). This alleged brain damage was supposedly caused by Petitioner's head injury from age two when his head run over by a vehicle. Dr. Merikangas opines that the brain damage Petitioner suffered would have cause the following:

> The damage produces features including attention deficit disorder, learning disabilities, affective instability, markedly diminished

impulse control, transient outburst of rage which are totally inconsistent with his normal behavioral pattern, impaired social judgment, significant cognitive impairment, apathy, indifference, suspicion and paranoid ideation.

(Respondent's Exhibit 40, p. 257).

Dr. Merikangas then testified that the most relevant portion of this diagnosis with regard to any allegations that Petitioner has committed a violent crime would be Petitioner's alleged "markedly impaired impulse-control capacity" because he lacked a "normal person's ability to premeditate, deliberate and to distinguish right from wrong." (Respondent's Exhibit 40, pp. 257-258).

Dr. Stephen Macchiocchi, a well-credentialed expert in the field of brain damage, evaluated Petitioner on April 13, 2014. (Doc. 242-1, p. 1). As can be seen from his report, Dr. Macchiocchi reviewed the same materials as those of Petitioner's experts, with the added exception of documents from Petitioner's prison file, and the affidavits and depositions of Drs. Price and Merikangas. (Doc. 242-1). Additionally, Dr. Macchiocchi had a battery of tests administered to Petitioner and conducted a clinical interview. Based upon this evaluation, Dr. Macchiocchi concluded:

[W]hether Mr. Jefferson did or did not sustain a TBI during an automobile accident at age 2, based on personal history and neuropsychological data, there is no evidence he displayed a "lifelong" "frontal lobe syndrome" as evidenced by orbital frontal neurobehavioral abnormalities beginning in childhood. In other words, Mr. Jefferson does not have history of pervasive neurobehavioral dysfunction. In addition, decades of research has

shown that not everyone who sustains a TBI has a residual "frontal lobe disorder". Nonetheless, Mr. Jefferson self-admittedly has a history of alcohol related impaired judgment and poor decision making, which is often misconstrued as "frontal lobe" behavior problems by some clinicians. In addition, the fact that Mr. Jefferson's history and test findings do not support a TBI related "frontal lobe" disorder does not mean that his judgment, reasoning, self-control and decision making have not been impaired at various points in his life, but such impairment is commonly observed in incarcerated persons as well as the general population.

While there is no historical, clinical and environmental evidence for a diagnosis of major cognitive disorder secondary to TBI, based on Mr. Jefferson's prior psychological and neuropsychological assessments, there is sufficient evidence to support a diagnosis of learning disorder. Mr. Jefferson has average intellectual skills, but he failed to achieve equal levels of academic skills. His failure to acquire academic skills may in part be due to low motivation during schooling, but his arithmetic skills and spelling skills documented during prior assessments suggests at least a 2 standard deviation difference between IQ and academic skills, which is sufficient for a learning disability diagnosis.

DSM-V DIAGNOSTIC CONSIDERATIONS:
ALCOHOL USE DISORDER, MODERATE-SEVERE IN FULL SUSTAINED REMISSION (303.90)
SPECIFIC LEARNING DISORDER (315.1)

(Doc. 242-1, p. 12).

As an initial matter it is important to note Dr. Merikangas's history of testifying for the defense and obvious bias. As found by the Middle District of Tennessee:

[Dr. Merikangas] has assisted 117 death row inmates in their appeals and has been retained by the prosecution in only one case. (Tr. 213-14)

> Given Dr. Merikangas' credentials, his defensiveness and testiness on cross-examination are puzzling. When the state's counsel asked him for help in pronouncing a difficult medical term, Dr. Merikangas responded, "I'm not going to help you, sir." (Tr. 221) See also Tr. 251 ("So ask a question if you want") and Tr. 253-54 ("I think it's bizarre behavior to have a man locked in a little room and just note these things for you to infer that that means something.")
> The trial court found that Dr. Merikangas' inconsistent statements and uncooperativeness on cross-examination "somewhat diminished" his credibility. (Trial Ct. Op. at 3) Under <u>Van Tran</u>, the trial court is mandated to assess the credibility of the expert witnesses. See Van Tran, 6 S.W.3d at 271. Having viewed the videotapes of Dr. Merikangas' testimony and read the transcript of that testimony, this court comes away with a similar impression.

<u>Coe v. Bell</u>, 89 F. Supp. 2d 922, 928-929 (M.D. Tenn. 2000).

In <u>Johnston v. Singletary</u>, 162 F.3d 630, 638-639 (11th Cir. 1998), Dr. Merikangas testified that "Johnston suffered from mental illness and organic brain damage that would have rendered him incompetent to stand trial in May 1984." The State's mental health expert gave "diametrically opposite expert testimony regarding Johnston's competency at the time of trial" and the trial court "decided to 'reject[] the opinion testimony of [Merikangas] because of [his] bias, the fact that [his] evaluations were made long after the events in question, and because [his] opinions are contradicted by other credible evidence and not supported by the law.'" <u>Id.</u> The Eleventh Circuit found the trial court's "finding of competence was supported by the record." <u>Id.</u> Consequently, the Court did not find the evidence supported Dr. Merikangas's opinion. <u>See also</u>, <u>Bertolotti v.</u>

Dugger, 883 F.2d 1503, 1517 (11th Cir. Fla. 1989) ("Dr. Merikangas's testimony is vulnerable to well-considered attack on several fronts and we doubt that a jury would find it convincing."); Maldonado v. Warden-Cheshire, 2002 Conn. Super. LEXIS 4203, 4-5 (Conn. Super. Ct. Dec. 30, 2002) (Rejecting Dr. Merikangas's diagnosis of "extreme emotional disturbance" and finding trial counsel was not ineffective for not presenting this evidence); Wheeler v. State, 124 So. 3d 865 (2013) (Court found the record, specifically the medical records, directly refuted Dr. Merikangas's opinion that the defendant was "in a state of delirium" when he made statements to law enforcement); Taylor v. State, 87 So. 3d 749, 762 (2012) (Dr. Merikangas testified that defendant had low serotonin levels however he had to admit that he "could not confirm that Taylor ever had low serotonin and admitted that the serotonin levels of Taylor had never been physically tested."); State v. South, 310 S.C. 504, 508 (1993) (The court rejected Dr. Merikangas's outlier diagnosis of insanity, based in part on his testimony that intoxicated individuals are "sometimes relieved" of knowing right from wrong, as it was "not in accord with South Carolina's standard" for legal insanity) .

In People v. Urdiales, 225 Ill. 2d 354, 382-383 (2007), the defendant, a serial killer, had committed a series of rapes and murders against women involving stabbing and shooting. Prior to trial, the trial court held a hearing to determine whether defendant was guilty but mentally ill. During this hearing the State

presented its mental health expert, Dr. Park Dietz, who diagnosed defendant as, in part, a sexual sadist and "had the capacity 'to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law,' and he did not fit within Illinois' statutory definition of guilty but mentally ill." Id. at 378. Dr. Merikangas disagreed and found, contrary to every other expert, including the other defense experts, that the defendant had "an organic brain disease, which rendered him insane at the time of the crime" and "insisted that defendant's actions showed 'an inability to communicate with women in a normal manner.'" Id. at 377. The trial court "rejected the assessments of Merikangas [] that defendant's crimes were not characterized by planning and organization, noting that defendant brought a gun, a knife, duct tape, and handcuffs." Id. at 382. The trial court "also found that defendant's experts had failed to explain how defendant was able to function in society during his seven years in the Marine Corps, or employed as a security guard, while suffering from the diagnosed illnesses."[3] Id. at 433. The

_____

[3] In a most telling example of Dr. Merikangas's refusal to acknowledge obvious facts in contradiction of his diagnosis, is the following reported passage from trial:

Inquiring further about defendant's spontaneous loss of control, his impulse disorder, and his intermittent explosive disorder, the following colloquy ensued between the prosecutor and Merikangas: "PROSECUTOR: You think carrying around knives and a machete in a rental car in California when he picked up [J.A.], you think that showed a disorder of thought or did it show planning?

Illinois Supreme Court upheld the trial court's decision and affirmed the defendant's death sentence.  Id. at 432-435, 452.

Even without consideration of Dr. Merikangas's clear bias for the defense, his findings, and those of Dr. Price, are vulnerable to attack.

### a.     Automobile Accident at Two Years Old

On May 7, 1957, when Petitioner was two years old he was struck by a vehicle and sustained an injury to his head.  (Doc. 242-2, p. 11).  Petitioner's experts read much into Petitioner's medical records of this event but their testimony is entirely speculative.  As correctly found by Dr. Macchiocchi, and as will be shown directly below, the medical records do not contain evidence that Petitioner suffered brain damage from this accident.

The "Operative Record" from this accident reported: This patient was hit by an automobile approximately 3 hours prior to surgery, and suffered a laceration of the scalp and face extending from the left anterior auricular region across the temporal region into the parietal region on the right."  (Doc. 242-20, p. 20).  The record goes on to report that the head was shaved, patient was given "general anesthesia," the laceration was stitched together with "silk sutures" and "[t]he

---

MERIKANGAS: That shows that he was looking for something but also indicates a certain paranoia to be carrying all those weapons."

People v. Urdiales, 225 Ill. 2d 354, 404 (Ill. 2007)

patient withstood the procedure well and returned to the ward in satisfactory

condition." Id. The following was provided in the X-Ray report:

> Skull:
> There are no fractures of the skull. There is a moderate swelling of the scalp over the left parietal region. There is a large triangular radiolucency in the left frontal region, which apparently corresponds to an area of avulsio[n][4] of the scalp. Films taken after suturing of the scalp laceration did not show this area of radiolucency, and show only some swelling in the left parietal area of the scalp.
>
> **Impression: Normal skull with avulsion of the scalp.**

(Doc. 242-11, p. 1) (emphasis added).

**Five days after being admitted**,[5] Petitioner was discharged. (Doc. 242-2,

p. 11). The discharge summary from the hospital treating Petitioner states the

following:

> DIAGNOSIS: Laceration of scalp, large.
>
> PRESENT ILLNESS: This 2 year old, colored male was hit by an automobile and brought to the emergency room of General Hospital and transferred here.
>
> PHYSICAL EXAMINATION: The patient had a large laceration of the left side of the scalp and forehead, the left side of the scalp being practicall[y] avulsed.

---

[4] According to Merriam Webster the medical dictionary meaning of avulsion "is a tearing away of a body part accidentally or surgically."

[5] In Dr. Merikangas testified in his affidavit that Petitioner spent "weeks" in the hospital recovering. (Respondent's Exhibit 40, p. 255). This is clearly a misstatement of the record.

TREATMENT: On 5/7/57, the child had a debridement, irrigation and suture of the laceration of the scalp back into position under general anesthesia.

COURSE: Uneventful: the child had no evidence of slough of any of the scalp flap.

(Doc. 242-2, p. 11).

Both Dr. Merikangas and Dr. Price testified that this accident was the source of Petitioner's alleged severe brain damage. In doing so, each expert speculates a great deal about Petitioner's accident and resulting hospital stay. Such speculation is easily questioned by Dr. Macchiocchi:

A.  First, there is no dispute that Mr. Jefferson was struck by an automobile at age 2 or that he sustained an extensive scalp laceration. In contrast, there is no evidence in the medical record he sustained a brain injury during this accident, especially a brain injury severe enough to cause a "frontal lobe disorder" of the severity described by Drs. Price and Merikangas. While it is clinically plausible Mr. Jefferson sustained mild or even mild complicated cerebral trauma during the accident, records do no document impairment in Mr. Jefferson's mental status, there also was no evidence of a skull fracture or documented changes in behavior that show the medical staff suspected Mr. Jefferson sustained a substantial TBI. In addition, Mr. Jefferson was hospitalized for 5 days, a much shorter period of time than would be expected if there were changes in behavior and cognition consistent with a moderate or severe TBI, so whether Mr. Jefferson actually sustained a brain injury sufficient to produce a frontal lobe disorder is speculative.

(Doc. 242-1, pp.9-10).

Petitioner alleges Dr. Macchiocchi testified that Petitioner did not have brain damage because Petitioner did not fracture his skull. That is a completely inaccurate interpretation of Dr. Macchiocchi's testimony. The following is Dr. Macchiocchi's testimony before this Court regarding Petitioner's accident and what could be reasonably gleaned from the medical records:

> Q. Let's talk about petitioner's accident at age two. What information did you glean from his medical records regarding that injury?

> A. Well, you have to think now back when Mr. Jefferson was injured that medical science was really not – neurological science was really not anywhere near where it is now. So what they basically did, they didn't have C.T. scans or anything that they could image his brain, which they would have done immediately if he had had an accident like that. So what they did was they basically did a clinical examination. They took care of his wound and they observed him and kept him in the hospital for five days. There's no documentation in the records that he was in a coma, that he had protracted lethargy or inability to respond, that he had abnormal reflexes, that his pupils were abnormal. Now, I would be trusting the doctors that they would do a clinical exam like that, and they did a skull film and said he didn't have, you know, a fractured skull. Now, that didn't mean he didn't have a brain injury. I can't say he didn't have a brain injury. **In fact, I think I said in his report it's possible he had a mild or a mild complicated brain injury, but he didn't display the kind of behaviors that you see in moderate to severe brain injuries which result in protracted life-long** persisting inability to function behaviorally and cognitively. I didn't see that in the record. So, you know, if he was in a coma, abnormal pupils, abnormal reflexes, he would have been in the hospital a lot longer than five days.

> Q. Now, is five days an extraordinary long time for a small child to

be in the hospital for that kind of injury?

A.    Well, you don't want a child in the hospital at all, but, I mean, they're in a hospital, there are so many factors that go into that that Mr. Jefferson can't help me understand because he obviously doesn't remember, but he could have, you know, they could have been worried about infection. They could have been worried about the caretakers for him, were they going to be able to take care of him. They --he had a fever. They could have been worried that, you know, they wanted to make sure that he was as healthy as he could be -- which I worked in a children's hospital in Louisville when I was in graduate school. And so it could just be they were being very conservative. I don't know. But I can go by what documentation was in the record, and there wasn't a lot of documentation.

Q.    So you can't really assume one way or the other what the five days meant?

A.    I can't based on what I read.

****

A. …[b]ut even in 1957, clinicians understood brain injury and they would document certain symptoms. So if somebody had -- was withdrawing to pain, was unresponsive or was extending to pain, which is a symptom of a brain injury, or had abnormal pupilary responses or was unresponsive and things like that, they – I'm -- look. I didn't practice medicine in Louisville in 1957, but I -- I have -- I would expect them to document some of those things. And the fact that I didn't see them and they let him go in five days, we know he didn't stay in a coma for two weeks, which is -- you know, that's where -- you know, somewhere between 13 days of confusion and/or coma is where you start to see big changes in life forever going forward.

(Doc. 240, pp. 215-217, 254).   On cross-examination, Dr. Macchiocchi refuted

Petitioner's counsel's attempt to manipulate his report on this issue:

Q.     You mentioned one of the thing -- factors that you talked about in your report that was concerning to you was that there was no fracture that was identified in the medical records when Mr. Jefferson suffered a (sic) injury to his head at two years old?

A.     I wouldn't say -- I don't see it as a concern. The deficiency in the documentation in the medical records due to that science at that time limited them to what they could do. And so I think it's simply a statement of fact. I don't think you need a skull fracture to have a brain injury.

Q.     Precisely because a number of the football players, for example, that you have worked with, people who have suffered severe brain injuries without ever having a fracture?

A.     Well, I think not -- you can broaden it to say people in general who have severe brain injuries don't have fractures.

(225-226)

Q.     First of all, you did mention the fracture at that point as a concern in that sentence, but you're now saying that's not really a concern?

A.     No, I'm not saying it's not a concern. I'm saying it's a positive sign. But a skull film doesn't tell you what's going on inside the brain. So what I'm saying is that's what the documentation says, no skull fracture and there was no documentation of any, like I said before, mental status changes. There was no coma, no abnormal pupils, none of that kind of stuff.

(Doc. 240, p. 228)

Q.     So what we have is a five-day stay --at one point it seemed to me in your report you didn't think that was very long, but today when you were testifying you said, well, they had five days for the nurses to examine him, and you felt that five days was a fairly significant stay in the --in the hospital;
Correct?

A.      I think anytime a child's in the hospital for five days, it's
        serious, but the question is why was he in the hospital. The
        assumption is he was in there for a brain injury. I don't see
        evidence in the record such as it was documented that it was
        due to a brain injury.

(Doc. 240, 229-230) (emphasis added).  Clearly, Dr. Macchiocchi's impression of

Petitioner's medical record is reasonable and not diminished by overindulgent

speculation desperate to create a record that does not exist to support a diagnosis.

        Petitioner's experts also relied upon the affidavits of family members stating

that Petitioner's behavior changed following the accident and that he suffered

headaches, fevers and "black outs."  While these affidavits describe symptoms that

could be associated with brain damage, they could also be symptoms of other

illnesses, as explained by Dr. Macchiocchi:

Q.      Did you have any information from family or friends or any
        other layperson that supported their diagnosis by Drs. Price and
        Merikangas of this pervasive frontal lobe damage?

A.      Well, I only had access to the affidavits that I read, so I quoted
        them as much as I could in there, but I didn't interview anyone
        or have any different information than the affidavits.

Q.      Did the information in the affidavits support their diagnoses?

A.      I don't think -- the problem I have in general with using
        symptoms is that symptoms are non-specific. And if you want
        to say a symptom is caused by one thing -- for example, fevers.
        If you want to say a brain injury caused fevers, the mechanism
        to me is not clear how that happens, but it could be due to a
        whole lot of other things, the flu, you know, colds. Mr. --
        unfortunately Mr. Jefferson was sent to the hospital for
        malnutrition allegedly and poor nutrition, quote, starvation,

unquote. I mean, so there are other things going on in his environment. My impression was his environment when he was being raised was not optimal for him. It wasn't optimized for his health. And so a lot of these symptoms can be due to things that are health problems and not a brain injury. I don't know, but I think you have to consider that just because you have a fever doesn't mean you have a brain injury.

Q.     And could he have had symptoms such as the seizures or the -- what was the other --

A.     I don't think it's entirely clear at all that he had seizures.

Q.     Okay.

A.     Okay. So he had, quote, black-outs. Black-outs can be due to dehydration, they can be due to poor nutrition, they can be due to low blood sugar, they can be due to a whole lot of things. So, again, all I'm raising is the issue is do we -- is there some link that goes beyond just, hey, he had a symptom and it's due to a brain injury. To me that's not scientifically rigorous. I think that's my point.

(Doc. 240, pp. 251-252)

On cross-examination, Dr. Macchiocchi testified:

Q.     And we do have documentation, however, from his mother and his older brother, the affidavits, which noted certain changes in his behavior after this incident; is that not correct?

A.     Again, if you're assuming that that change in behavior's specific to a brain injury, I think it's problematic. If you're a young child, you're injured in a car accident, you're admitted to the hospital, you have a lot of sutures, you're away from your parents for five -- five days, you're probably given instructions in care. I mean, there could be a lot of reasons why his behavior changed.

Q.     Well, behaviors like referring to the affidavit of the -- this is --

of Vera Jefferson, the mother --by the way, she stated, and would you have any reason to doubt this, that the people at the hospital told her that the accident was a very -- that he was hurt very, very badly?

A. I wouldn't disagree with that based on what I read.

Q. And that he would -- acted differently afterwards, that he would have fevers, that -- I think the brother also testifies to this in his affidavit. He had bad headaches, he cried and held his head, those types of incidents. Were those matters that could have been observed by the family which were not necessarily observed by the nurses who were on their rounds at the hospital?

A. Well, I guess I would say two things. One, is you've already excluded me from testifying on medical things.

Q. Okay.

A. But I think you could have fevers for a variety of reasons unrelated to brain injury. You can also cry for various reasons unrelated to brain injury. You can have headaches which would be normal following cranial trauma like that. You have to distinguish between cranial trauma and brain trauma. The two things are not the same. And they may occur together or they may occur separately. There are people who have brain injuries who have no cranial trauma, no lacerations, no swelling outside the skull. And there are people who have cranial trauma and really don't have a brain injury. So I don't know. I mean, I don't know the answer to your question.

(Doc. 240, pp. 230-231). Additionally, there are no medical records that Petitioner suffered from the afflictions described by his family and Petitioner has provided no medical records from his adulthood that he suffered from the constellation of issues described by his family.

Dr. Price alleges in his affidavit that Petitioner treated the "physical pain himself, through the ingestion of alcohol and controlled substances. (Doc. 242-8, p. 14). However, none of Petitioner's experts testified that Petitioner informed them that he still suffered from these "physical" problems. In Dr. Dudley's report the only physical pain Petitioner reported was back pain. (Respondent's Exhibit 40, p. 277). If Petitioner did in fact have the severe brain damage diagnosed by Petitioner's experts, why would he no longer have the symptoms that accompany this mental illness? Neither Petitioner nor his experts provide an explanation for this gaping hole.

Petitioner argues that "commonsense conclusion that a child whose head was run over by a car at the age of two would likely have suffered a brain injury." (Doc. 246, p. 22). Perhaps so, but there are many different types of brain injury, and the severe brain injury Petitioner's experts are alleging he suffers from, the exact type needed to mitigate his crimes, cannot be assumed as a matter of "commonsense." If the type of brain injury Petitioner alleges he suffers from were part of everyone's "commonsense" then there would be no need for mental health experts. Petitioner is attempting to oversimplify brain damage so that any form of brain damage will mitigate his crimes. But the jury is comprised of people with their own "commonsense" and testimony that Petitioner had a learning disability as

opposed to testimony that Petitioner had severe brain damage that resulted in one having diminished capacity to control one's actions are entirely different.

Dr. Macchiocchi's report and testimony from the medical records and the affidavits from family members shows how a reasoned, non-biased expert would view this evidence. Dr. Macchiocchi refuses to draw conclusions that can only be done so by improperly speculating about the facts. Consequently, this portion of the record does not prove the severe brain damage alleged by Petitioner.

### b. Testing Does Not Reveal Severe Brain Damage

Additionally, the testing administered in this case does not prove Petitioner suffers from the degree of brain damage so adamantly alleged by Petitioner's experts. Indeed, it is difficult to determine what the tests show that were administered by Drs. Merikangas and Price. Moreover, the testing performed by Dr. Macchiocchi proved Petitioner was not in the impaired range. Petitioner makes much of the norms used by Dr. Macchiocchi in an attempt to discredit his testing, but as will be shown below, even with the norms suggested by Petitioner he would still not fall within the impaired range. As Petitioner's claim of severe brain damage relies so heavily upon the testing, when critically reviewed, as would have been done at trial by the State, it fails to produce the result Petitioner needs to show a reasonable probability of a different outcome.

###### i. Psychological Battery

Dr. Price testified in his affidavit that he administered to Petitioner the following tests:

> EVALUATION PROCEDURES
> Ammons Quick Picture Vocabulary Test Behavioral Observations
> Clinical Interview
> Denman Neuropsychology Memory Scale
> Halstead-Reitan Neuropsychological Battery - Category
> Test, Booklet Form and Trails A and B
> Luria-Nebraska Neuropsychological Battery Wechsler Adult
> Intelligence Scale - Revised (WAIS-R) Wide Range Achievement
> Test - Revised (WRAT-R)

(Doc. 242-8, p. 5). In paragraph 15 and 16 of Dr. Price's affidavit he provides percentile scores for some of the tests he administered. Id. at 10-11. In paragraph 17 he simply states that Petitioner was in the impaired range without providing any information about Petitioner's scores on these tests. Id. at 11. When deposed in the case at bar, Dr. Price testified that he no longer had his raw data. (Doc. 242-4, p. 19).

In paragraph 15, Dr. Price reports on the Ammons Quick Picture Vocabulary Test, certain findings from subtests of the Wechsler Adult Intelligence Scale-Revised (WAIS-R), but not the entire test, and certain subtests for the Wide Range Achievement Test-Revised (WRAT-R). Dr. Price did not report on the entire subtests in the WAIS-R or the WRAT-R and those missing tests are no longer available. For the tests he does report on he only provides percentile scores, not

scaled scores.  In his deposition Dr. Price testified that "the average range essentially goes from the 17th percentile to the 83rd percentile; 16th to 84" and 16th percentile "would be right on the cusp of mild impairment low average." (Doc. 242-5, p. 3).  Dr. Price did not state this in his affidavit and failed to report in the affidavit that the scores within this range were not in the impaired range but instead made comments such as "only at the 25th percentile" implying Petitioner was impaired.  (Doc. 242-8, p. 10).  On the two WAIS-R findings of 16th percentile and 25th percentile that were reported, Dr. Price testified in his deposition that neither of these was in the impaired range. (Doc. 242-8, p. 10; Doc. 242-5, p. 2, 3).  On the Reading Recognition portion of the WRAT-R, Petitioner was in the 30th percentile placing him in the average range.  (Doc. 242-8, p. 10; Doc. 242-5, p. 3).  On the Ammons test Petitioner received an IQ score that "placed him with a mental age of approximately 18" and Dr. Price testified that it was relevant because it showed Petitioner "had a verbal recognition ability and would reflect his receptive language was reasonably intact."  (Doc. 242-8, p. 10; Doc. 242-5, p. 1).  However, Petitioner was impaired on the spelling and arithmetic portion of the WRAT-R which Dr. Price testified indicated "the presence of learning dysfunction."  (Doc. 242-8, p.10).

In paragraph 16, Dr. Price reports on the Denman Neuropsychology Memory Scale.  (Doc. 242-8, p.10).  On the verbal memory portion Petitioner

scored in the 14th percentile, which is impaired and on the non-verbal memory he scored in the 50th percentile, which is in the average range.  Id.  His Full Scale Memory was in the 25th percentile, which is average.  Id.  In paragraph 17, Dr. Price reports on the Luria-Nebraska Neuropsychological Battery, the Category test and Trails B of the Halstead-Reitan and merely states Petitioner was impaired on these tests and provides no data, scores or percentiles.  Id. at 11.  In his deposition, he had nothing to support these conclusions.

As can be seen above, Dr. Price's reporting in his affidavit on his testing is less than convincing.  Dr. Price seemingly cherry-picks subtests and fails to explain how he scored these tests.  He finally attempts to rectify some of this in the hearing before this Court by stating that he recalled he used the manual for the Luria-Nebraska and sent the test out for scoring to the Western Psychological Services.  (Doc. 240, p. 150).  But he could neither produce the test nor the results from the Western Psychological Services.  (Doc. 240, pp. 175-176).  Indeed, it seems suspect that he reported the percentile scores for the other tests but not for the tests he alleges in his affidavit Petitioner performed in the impaired range on. Moreover, on the majority of the tests he does report on, Petitioner's percentile scores were not in the impaired range.  Dr. Macchiocchi pointed out the problems with this type of reporting:

Dr. Price then described Mr. Jefferson's test findings.

Dr. Price focused on Dr. Dudley's intellectual test findings (WAIS) in his affidavit and deposition, even though he reportedly administered a newer version of the WAIS, the WAIS-R (page 4). According to Dr. Price, Dr. Dudley's intellectual assessment revealed "differences in hemispheric integrity", in other words ["]brain damage", a conclusion which Dr. Price apparently based on differences in Mr. Jefferson's VIQ (94) and PIQ (108). Dr. Price reported several scores from the WAIS-R he administered, but he did not report Mr. Jefferson's WAIS-R VIQ, PIQ or FSIQ obtained during his examination. Dr. Price also did not report or discuss the base rate of Mr. Jefferson's VIQ-PIQ differences in the normal-standardization population or in persons with other disorders such as verbal learning disabilities.

In his affidavit, Dr. Price concluded Mr. Jefferson suffered "damage" to both cerebral hemispheres based on Mr. Jefferson's memory test performance (see page 10). He also concluded that Mr. Jefferson's performance on the Luria-Nebraska, Category Test and Trail Making Test were consistent with the "presence of chronic organic dysfunction". When asked in his deposition what norms he used for test interpretation. Dr. Price did not report the specific norms used to determine Mr. Jefferson's level of impairment and he did not provide the Luria- Nebraska interpretive guidelines used to establish localization of Mr. Jefferson's "brain damage".

**\*\*\*\***

When Dr. Price was deposed on 3/20/2014 by Ms. Burton, he was asked a number of questions related to psychometrics, sources of normative data and the diagnosis of cerebral trauma using neuropsychological tests. Dr. Price continued to assert that differences in intellectual test scores (VIQ-PIQ) can be used to infer "brain damage". When asked about specific norms used to determine performance on various metrics (Trail Making Test), rather than citing normative sources, Dr. Price provided an arbitrary score that he believed reflected impairment (>95 seconds).

**\*\*\*\***

When critically examining Dr. Price's affidavit and testimony, it is difficult if not impossible to determine whether Mr. Jefferson actually

evidenced impairment during Dr. Price's assessment in 1991 for several reasons. First, raw and standard scores were not included in his affidavit for all the tests he administered, but only for selected metrics. For instance, Dr. Price reportedly administered the WAIS-R, but did not report Mr. Jefferson's VIQ, PIQ or FSIQ. He also did not report scores for the Category Test, Trail Making Test and some other measures. Actually, of the scores reported, Mr. Jefferson had only one mildly impaired score (14%). Second. Dr. Price appears to have interpreted several scores as being impaired when they were not (page 9), and third, he appears to have utilized intuitive norms for interpreting tests. As an example, when questioned by Ms. Burton about the Trail Making Test norms he used, Dr. Price did not identify the norms he used or currently uses for interpreting the Trail Making Test, but instead stated that a score >95 seconds on Trails B was an "impaired score". In contrast to Dr. Price's opinion, during the current examination, Mr. Jefferson completed Trails B in 122 seconds, which is an average score based on demographically corrected norms (Heaton, Miller, Taylor, and Grant, 2004). We do not know what Mr. Jefferson's Trails B score was in 1991, but his current Trails B score illustrates the potential for false positive interpretive errors when using subjective, idiosyncratic norms.

(Doc. 242-1, pp. 4-5, 11). Dr. Price's selective reporting and attempts in his affidavit to make the subtest scores appear in the impaired range would have given the State ample opportunity to question Dr. Price's test conclusions.

Dr. Macchiocchi also evaluated Petitioner and had many tests administered to assess Petitioner's psychological functioning. Each test, its score and how it was scored are included in his report. (Doc. 242-1, pp. 6-8). Additionally, the raw test data was provided to Petitioner's mental health experts. Petitioner performed in the low average to high average range on all tests with the exception of three sub-tests. (Doc. 242-1, p. 7).

Petitioner alleges Dr. Macchiocchi used inappropriate norms when scoring his tests by using demographic norms. Dr. Macchiocchi is clearly an expert in the field of brain injury as shown by his curriculum vitae. Despite Petitioner's attempt to undermine his testing with a quote from one source, Respondent has no reason to doubt that Dr. Macchiocchi used the correct norms. However, even assuming the demographic norms were not appropriate, they were only used in four of the sixteen tests, (Finger-tapping test, Grooved pegboard test, Boston Naming test, Controlled Oral Word Association test, (Doc. 240, pp. 206-208)). Moreover, Dr. Macchiocchi testified that: 1) Petitioner would have scored higher on the 1991 tests given by Dr. Price because the norms were more critical; and, 2) even if Dr. Macchiocchi had not used the demographic norms on the four tests listed above, Petitioner would not have been in the impaired range. (Doc. 240, pp. 240-241, 254-255).

Additionally, if Petitioner wanted to prove Dr. Macchiocchi improperly scored his tests, his own experts could have taken the raw data provided to them by Dr. Macchiocchi and scored the tests and shown the difference in scores. They did not do this; instead, they amorphously criticized his methods without proof of actual harm to Petitioner.

Dr. Merikangas also criticized the tests chosen by Dr. Macchiocchi but he failed to provide any support for his criticism other than in his opinion that the tests

were not probative enough of frontal lobe damage.  As pointed out by Dr.

Macchiocchi, and relied upon by Petitioner, different experts will choose different

tests.  (Doc. 240, p. 197).  Moreover, Dr. Macchiocchi did not criticize the choice

of psychological tests administered by Dr. Price he merely took note of the fact

that it was extremely difficult to ascertain what the appropriate scores were from

each of the tests as they were not reported.

Dr. Macchiocchi went through the categories of tests he had administered to

Petitioner in the evidentiary hearing before this Court and explained his findings.

Dr. Macchiocchi explained the results from the Wechsler Adult Intelligence Test-

IV (WAIS-IV) and the scatter between the performance score and the verbal score:

A.     And intelligence is the next one, the next category. And Mr.
       Jefferson had verbal compression index which is verbal skills.
       You know, they test different constructs. His overall I.Q. was a
       93 which is average. And four out of five indicators were
       average and one was low average.

Q.     And was there a scatter between his performance and his verbal
       scores?

A.     Yeah, there's a 16-point difference. Now, the irony here is
       when Dr. Dudley tested Mr. Jefferson, he found the exact
       opposite pattern. And my point in my report was that a
       difference in verbal and performance I.Q., whichever direction
       it is, doesn't – isn't diagnostic of brain injury. It can occur in
       normal populations and it can change. And so he showed the
       exact opposite pattern that was used to argue for the presence of
       brain dysfunction. So things change over time. And you have to
       be careful. I think that's the main thing.

Q.      Let me ask you this. Dr. Price testified that the only -- I think it was five percent of the population have this kind of scatter in their I.Q. testing. And you just stated that normal people can have this scatter.

A.      Well, it's higher than five percent. So what you do is you look in the manual and you look at the --it used to be 25 years ago that if you had this scatter, people would say you have a brain dysfunction. And Joe Matarazzo who's at Oregon went through and gave probabilities that you would have ten-point difference, 15-point, 20-point. I think I said in here -- I can't remember where I said it -- that about -- and I'm talking about Dr. Dudley's data -- that probably 15 to 20 percent of the people had that amount of difference. And this is a 16-point difference, which I don't get worked up about because, number one, I know he had the opposite pattern before. He's had no intervening brain injuries, so he's less proficient now. He's a lot older than he was 25 years ago, so those skills decline more quickly. We're all getting older obviously, but it makes sense to me. I don't make much of it.

(Doc. 240, pp. 200-202). And then when questioned on cross-examination,

he stated:

A.      Well, I think it's a myth that scatter is evidence of brain damage, and I can't say exactly when we knew that, but it's very clear that scatter is normal in normal people and that scatter can be as much as three standard deviations and is actually a very bad assumption that scatter is indicative of brain injury, now, when that was known, Joe Matarazzo published papers – I'd have to go back and look -- probably in the mid '80's.

(Doc. 240, p. 244).

In Dr. Macchiocchi's report he provided even further explanation for the

scatter in scores on the WAIS:

Dr. Price assumed and apparently continues to assume that Mr. Jefferson's cognitive asymmetry observed by Dr. Dudley on the WAIS (PIQ>VIQ)[6] was diagnostic of cerebral dysfunction. In 1991, research demonstrated that a 14 point difference between PIQ and VIQ was statistically significant, but also found such differences occurred in normal populations and persons with conditions other than TBI, such as verbal learning disorders. In other words, there are plausible alternative explanations for such findings. In addition, Dr. Price apparently did not consider psychometric and situational variability in test performance when interpreting Mr. Jefferson's test findings, factors that are well illustrated by Mr. Jefferson's current assessment which showed the precise opposite pattern of cognitive organization based on the WAIS-IV (VIQ>PIQ; see Table 1 versus Table 2).

(Doc. 242-1, p. 10). Dr. Price did not explain how his conclusions were not at

odds with the research in this area.

Next Dr. Macchiocchi addressed his testing of Petitioner's executive

functioning:

A.      Well, you can measure executive functioning a bunch of different ways, so I gave him four tests. One was a Wisconsin Card Sorting Test. His performance was low average. And he had trouble maintaining sav (phonetic) on that test. The trail-making test he was solid on. That's an alternating attention, simultaneous attention test. He was -- scored in the average range. His verbal fluency was high average to average, category fluency, and his working memory was average. So there's a general principle, the more tests you give, the more likely you are to find an impaired score that's basically a false positive. So you have to be careful how many tests you give in any area. So I think this is sufficient in executive functioning. But as I mentioned before, you could give other tests. I mean, I wouldn't really quibble with it if people chose other tests.

---

[6] PIQ is performance I.Q. and VIQ is verbal I.Q.

Q.      So overall in the executive functioning area what was your overall conclusion?

A.      It's between low average and average, aggregated across tests.

(Doc. 240, pp. 202-203).

Dr. Macchiocchi then summarized the remainder of his testing and findings:

A.      He doesn't really have impairment, psychometrically reliable impairment when looking at the total test battery. His visual perceptional functioning is fine. His sensory motor functioning is fine. I didn't find any lateralized impairment in sensory motor functioning. He had no dysgraphesthesia. He had no finger agnosia lateralized. He had --he had normal, fine motor speed in dexterity bilaterally. His memory function was low average to average. His verbal learning was solidly average. I just didn't see much in the way -- I mean, I was encouraged given that he was supposed to have a history of a severe brain injury. This didn't look like it to me. I mean, he's -- his cognition is good.

(Doc. 240, pp. 203-204).Additionally, Dr. Macchiocchi explained that approximately twenty percent of the normal population with no brain damage could obtain impaired scores on psychological tests.  (Doc. 240, p. 204).

Other than complaining about the norms used on four of the sixteen tests, and stating certain test should have been used over another, Petitioner's experts failed to show how the "battery" of tests administered in Dr. Macchiocchi's evaluation presented an inaccurate picture of Petitioner's brain functioning.  As explained by Dr. Macchiocchi in his report:

In addition to Dr. Price's assumptions regarding the significance of cognitive asymmetry on the WAIS, he also appears to believe that impairment on neuropsychological tests is equivalent to and diagnostic of cerebral dysfunction ("brain damage"), even though numerous studies have shown impaired neuropsychological test performance is common in normal-standardization populations. For example, numerous research studies have shown that persons in normative samples (no brain pathology) with average IQ like Mr. Jefferson show wide variation in test performance (3 standard deviations) and may have 20% of their neuropsychological test scores fall in the impaired range (Schretlen et al, 2003; Binder et al, 2009; Iverson and Brooks, 2012). Consequently, just because Mr. Jefferson had several mildly impaired neuropsychological test scores, does mean he has "brain damage". When conducting neuropsychological assessments, the expected number of impaired scores in normal populations must be taken into account. For instance, during the current assessment, Mr. Jefferson had 3 scores that fell in the mildly impaired range, 5 scores that fell in the low average range and 42 scores that fell in the average to high average range based on demographically adjusted normative expectations. His profile does not deviate in any way from persons in the normative-standardization samples. In other words, one cannot conclude he has neuropsychological impairment just because he has 3 mildly impaired scores.

(Doc. 242-1, p. 10).  Unlike Dr. Price, Dr. Macchiocchi did not selectively report his test findings and provide an opinion.  He also did not improperly assume one impaired test was proof of severe brain damage.  Instead, he examined the entire battery of tests and formed a reasoned opinion.  Petitioner has failed to prove that Dr. Macchiocchi's overall conclusions were inaccurate.

## ii.    Neurological Battery

In evaluating Petitioner, Dr. Merikangas administered a battery of neurological tests.  In his affidavit he does not list the results of each test but

merely states that his overall conclusion from the tests supports a diagnosis of severe brain damage. When Dr. Merikangas testified before this Court, he stated each test and the results.[7] They are as follows:

1) Deep Tendon Reflex (test using the hammer)-asymmetrical;

2) Pinpricks-decreased sensitivity;

3) Light touch-did not recall the results;

4) Test of vibration and graphesthesia-normal;

5) Abdominal Reflex-asymmetrical;

6) Babinski test-normal;

7) Myerson test-normal;

8) Glabellar reflex-normal;

9) Test of motor strength-Right hand was stronger, although Petitioner is allegedly left handed-allegedly abnormal[8]

10) Test of coordination-clumsy on left side

11) Test of muscular tone-normal

12) Test of balance-normal

---

[7] Dr. Merikangas also testified that Petitioner's blood pressure was high but there is no evidence in the record that Petitioner suffers from high blood pressure. Petitioner has been incarcerated at the Georgia Diagnostic and Classification Prison for nearly thirty years and Petitioner did not present any evidence from his medical records that he has never been diagnosed as having high blood pressure.

[8] No explanation as to whether Petitioner wrote left-handed but performed majority of actions with right hand, Dr. Merikangas just stated Petitioner was left-handed.

13) Exam of cranial nerves-normal

14) Test of optic nerve-gave no opinion

15) Test of trochlear and adbucens nerves (nerves that move the eyes)-normal

16) Test of rectus nerve (orbital nerve)-normal

17) Test of acoustical nerve-normal

18) Test of hypoglossal nerve-normal

19) Test of laryngeal and pharyngeal nerve-normal

(Doc. 238, pp. 33-39). Dr. Merikangas also testified that Petitioner's head measured 58 centimeters in circumference putting him in the 98 percentile. Dr. Merikangas provided no information regarding Petitioner's family history on head circumference. Dr. Merikangas opined this could mean he had hydrocephalus, fluid on his brain. However, Dr. Merikangas omitted the Petitioner suffered any of the myriad of physical symptoms that accompany this condition or that such a disease is "usually fatal" if left untreated, which he is alleging occurred as Petitioner was two when this alleged problem occurred and he was thirty when Dr. Merikangas diagnosed him. See http://www.nlm.nih.gov/medlineplus/hydrocephalus.html.

As can be seen above, Petitioner tested normal on a majority of the tests. As pointed out by Dr. Macchiocchi, Dr. Merikangas stated in his affidavit that this was a "comprehensive battery of neurological tests" but really it is just a "standard

neurological examination."   (Doc. 242-1, p. 5).  Additionally, Dr. Merikangas used "subjective interpretative methods."  Id.  Dr. Merikangas disputes that his testing was subjective because the tests have been "around for hundreds of years" and the physical response to, for example, a hammer hitting a body part it is not subjective.  (Doc. 238, p. 49).  Dr. Merikangas is obfuscating the point.  The report of the physical response may not be subjective but his conclusions from those responses and how it relates to Petitioner's brain functioning is subjective. Respondent is not advocating that these methods are incorrect but merely that they are subjective.  As explained by Dr. Macchiocchi:

> A.      Well, it's a clinical examination, so anytime -- I think I would defer to a neurologist, but neurologists check strength, so you might be three out of five or four out of five. And the reliability of that has been shown to be problematic in research. So when I say subjective, I mean that it wasn't a test that actually has standardized administration and has norms. So I – it's not a disparaging comment. It's just a factual comment.

(Doc. 240, p. 198).

Dr. Macchiocchi had neurological tests with "standardized administration" given to Petitioner.  (Doc. 240, p. 198).  Unlike Dr. Merikangas's tests results, these were all within normal limits.  (Doc. 242-1, p. 12). Petitioner complains, based upon the testimony of Dr. Merikangas, that the person administering the tests on behalf of Dr. Macchiocchi was not qualified to administer the tests. However, Dr. Macchiocchi directly refuted this allegation.

To similarly assess Petitioner's motor and sensory skills Dr. Macchiocchi testified that he had a psychometrist, Rachel Evans, administer two motor tests and he administered a sensory perception examination. (Doc. 240, pp. 189, 198). Ms. Evans was not informed of Petitioner's legal history so that she would not form a bias against him. (Doc. 240, pp. 189-190). Dr. Macchiocchi testified there was a standardized procedure for administering these tests. (Doc. 240, pp. 197-198). He also testified about Ms. Evans's qualifications for administering the tests and the common practice of psychometrists administering such tests:

By Ms. Graham:

Q.   So what type of training has she had to administer those particular tests?

A.   Well, she goes to school, takes classes, she does practicum, she's trained by other psychologists, she's supervised by a neuropsychologist, videotaped to make sure the administration is right. The instructions are standardized. She went and got certified by a board who have examined her and evaluated her ability to administer the test.

Q.   And have you seen other psychometrists administer those motor tests, motor skills tests?

A.   Oh, yeah. Nationally there's probably thousands of psychometrists who give those tests every day.

(Doc. 240, pp. 199-200).

There is no evidence before this Court, other than the unsubstantiated observations of Dr. Merikangas, that Ms. Evans was not qualified to administer the

tests chosen by Dr. Macchiocchi. (Doc. 240, pp. 199-200). Likewise with Dr. Macchiocchi, he testified that he has spent the last twenty–five years specializing and doing grant funded research in the area of brain injury. (Doc. 240, pp. 184-185). The test he administered was, according to his testimony, a standardized test. Consequently, there is no evidence that Dr. Macchiocchi was not qualified to administer that test.

As a side note, there are no images of Petitioner's brain in the record to show brain damage. Although Dr. Merikangas requested a Magnetic Resonance Imaging (MRI) and blood testing to determine if Petitioner hypoglycemia during Petitioner's state habeas proceeding, (Respondent's Exhibit 40, p. 260), (it was denied by the habeas court), none was requested in this proceeding. In a federal habeas action that was filed in Kentucky on August 15, 1994, to challenge a prior conviction used in aggravation at Petitioner's trial, Petitioner was ordered to submit to testing for the Respondent in that action. Jefferson v. A.G. Thomas, Warden, et. al., Case No. 3:94-cv-505. Petitioner refused and in his motion objecting to the magistrate judge's order for this testing stated:

> Respondent Gorman indicated that he intended, inter alia, to take blood samples from petitioner and have them examined and to have petitioner undergo some sort of "brain scan", although the exact type of brain scan was never identified. Neither of these tests is a "mental" examination, and in petitioner's opinion these tests are **invasive** procedures.

(See Attachment A) (emphasis in original). Petitioner was thereafter precluded by the magistrate judge from presenting evidence from his mental health experts and Petitioner's case was eventually dismissed with prejudice. (See Attachment B, Docs. 63, 83).

When the testing is viewed as a whole, it is difficult to see the level of severe brain impairment alleged by Petitioner's mental health experts. Perhaps there are some functioning issues such as a learning disorder, as opined by the experts, but that is not near the level of severe brain damage described by Petitioner's experts. It is not difficult to comprehend that the State could have highlighted for the jury the numerous inaccuracies in the conclusions of Drs. Price and Merikangas. Dr. Macchiocchi's testimony regarding his testing provides a much more comprehensive and reliable picture of Petitioner's brain functioning as shown through psychological testing and would have directly refuted the testimony of Drs. Price and Merikangas.

### c. Clinical Interview and Life History

All experts reported that they conducted a clinical interview of Petitioner. Although Drs. Price and Merikangas report information regarding Petitioner's background that Petitioner reported to them, neither provided any observations or impressions in their affidavits regarding these interviews to support their diagnosis of severe brain damage other than Dr. Merikangas stating in his affidavit Petitioner

did not "display" signs of psychopathy which "substantially" increased the likelihood that any violence Petitioner committed was due to "brain damage." (HT 258). Neither of Petitioner's experts testified that about their observations in the clinical interview in this proceeding. If Petitioner was as severely brain damaged as alleged, it seems odd that his own experts could report nothing in their observations of his one-on-one behavior to support this diagnosis.

In contrast, Dr. Macchiocchi reported observations from his clinical interview. These observations do not evidence severe brain damage:

Behavioral Observations and Clinical interview:

During testing, Mr. Jefferson was easily engaged and actively participated in all the tasks administered. He cooperated fully and exerted optimal effort based on behavioral observations. He worked in a planned and deliberate manner. On 2 occasions he had difficulty understanding task instructions. When tasks were difficult he did become briefly frustrated. Nonetheless, he persisted on tasks despite having difficulty. He did not evidence emotional lability, disinhibited behavior or aggressive responses during testing.

During interview, Mr. Jefferson was alert, oriented, co-operative and affable. He was able to ambulate normally and had normal upper extremity motor function. Mr. Jefferson did have a visible scar on his left frontal and parietal region, but there was no evidence of a "cranial indentation" based on behavioral observation.

Mr. Jefferson's narrative and discourse were logical and coherent. He did not discuss his current legal circumstances, but he did discuss current events. **Mr. Jefferson did not evidence any neurobehavioral problems such as aggression, disinhibition, impulsivity or emotional lability typically observed in persons with histories of TBI.** He also did not evidence any neuropsychiatric symptoms such as hallucinations, delusions, compulsions or suicidal ideation.

> While discussion of his criminal history was avoided, Mr. Jefferson
> was able to describe his time serving in the Navy and the problems
> that lead up to his premature discharge. He related a history of chronic
> alcohol abuse which led to him being late for duty on a number of
> occasions. At one point he was an E-3 and had deck responsibilities
> such as painting and generally cleaning quarters on the Saratoga. He
> denied any discipline for aggressive behavior or improper conduct
> other than minor alcohol related offenses for which he was principally
> fined. He also discussed various jobs he held including one that ended
> prematurely due to his employer going out of business.
>
> Mr. Jefferson denied any history of behavior problems while
> incarcerated which is corroborated by his prison records. He admitted
> to filing grievances periodically when he felt he was being mistreated
> by staff. These grievances are also part of his prison records.

(Doc. 242-1, pp. 8-9) (emphasis added).

The summary of Petitioner's work and criminal history by each of the experts, including Dr. Macchiocchi, are fairly identical. Petitioner grew up in an impoverished family, he joined the Navy but was generally discharged, under honorable conditions, had several jobs, had a history of alcohol and marijuana use, had a criminal history that was devoid of aggressive violence, and had two children. (See Doc. 242-1, pp. 242-1, p. 3, 5-6, , Doc. 242-8, pp. 6-9, Respondent's Exhibit 40 , p. 255). Additionally, Petitioner had no history of being diagnosed with any type of psychiatric disorder prior to his crimes. (Doc. 242-1, p. 3).

Dr. Price testified that Petitioner's social history was proof of brain damage. However, his testimony contradicts Dr. Merikangas's and is so loaded with

speculation it strains all credibility.  For example, Dr. Price testified that

Petitioner's time in the Navy is proof of his brain damage:

> Mr. Jefferson's military career and its "aggravating" nature is a
> similar reflection of his inherent neurological defects. Going AWOL
> in Mr. Jefferson's case was a silly, spontaneous, counterproductive
> action. Going AWOL is almost by definition an action taken without
> thought, in many situations, and it certainly was in Mr. Jefferson's
> case, who says he was just "home." Mr. Jefferson cannot be expected
> to know, much less explain, how his disabled brain causes such
> senseless and unacceptable behavior, and so when he is questioned
> about it he can only speculate as to why it and similar acts occurred.

(Doc. 242-8, p. 15).  Being absent without leave from the military is hardly a

"silly" action.  As for spontaneous, that would depend on the exact circumstances

of the absence.  If, for example, Petitioner was absent because he was too drunk to

report or made the decision he would rather be at home with his family that is

hardly spontaneous.  This observation is patently absurd and fails to consider

relevant evidence, as pointed out by Dr. Macchiocchi:

> Regardless, Dr. Price assumes Mr. Jefferson sustained a brain injury
> sufficient to produce a "lifelong" frontal lobe (dysexecutive)
> syndrome and he provides several examples of "frontal behavior",
> such as Mr. Jefferson evidencing agitation during Dr. Dudley's
> psychological examination and Mr. Jefferson allegedly being AWOL
> while in the Navy. However, Dr. Price does not discuss possible
> alternative explanations for these behaviors other than a "frontal lobe
> disorder". For instance, incarcerated persons frequently refuse to
> comply with examinations for various reasons and military personnel
> are often late for duty for a variety of reasons, which in Mr.
> Jefferson's case, principally involved his alcohol use. Alcohol abuse
> is frequent in young members of the military and is universally known
> to impair reasoning and judgment in the absence of a frontal lobe

disorder, although intoxicated persons often act as if they have an
acquired frontal lobe disorder.

(Doc. 242-1, p. 10).

Moreover, Dr. Price's opinion seems to be at odds with Dr. Merikangas's

testimony that in a structured environment such as the Navy, Petitioner's mental

condition would be better:

> A.    … he's been in a very structured environment for the last 25
> years and was in a structured environment when he was in the
> Navy. And then he had a period of time when he wasn't, and
> that apparently is when he had the problems. I testified to that.

(Doc. 238, p. 77).  Dr. Merikangas also testified:

> There are lots of problems in that family. All seven children have
> different fathers. They grew up in poverty. **He actually, considering
> his background, was doing pretty well, being in the Navy and
> becoming an E3.**

(Doc. 238, p.78) (emphasis added).  Of course Dr. Merikangas attempts to explain

away the fact that Petitioner has nothing in his records from the military or his

criminal files to suggest he suffers from impulsive, violent behavior. (Doc. 238, pp.

50, 77-78, 81-82).  However, Dr. Macchiocchi briefly explained why this was a

fallacious conclusion:

> A.    …I think the issue has been raised about are you less likely to
> show these behaviors in a structured setting. Okay. So -- and I
> think that's a reasonable thing to raise. The answer is -- I think
> there are several answers, but one answer is it depends on what
> the structure is. Now, if -- for the people who have never been
> in the military, I don't - - I consider the military a structured
> environment, but I also consider it very provocative. And I

consider it to be hostile and demanding, critical, and an environment that would precipitate disinhibition. I think you can make -- you know, you can make an argument for or against being incarcerated as a similar more or less type of environment where you're provoked by fellow inmates or other people or -you know, so I think just saying people with frontal lobe disorders respond better to structured environments is really almost like you can't disconfirm it, but it's like a Barnham (phonetic) statement. You know, it depends on the environment, not –

Q.     So structure -- I think everybody's taking the term "structure" and we're using it sort of as a -- in a general manner, and you're saying you need to be more specific about the structure in order to determine how they would react?

A.     Having someone screaming at your face at 5 in the morning that you're doing something wrong among throwing pejoratives in your face, I mean, making you do push-ups, I mean, I don't know what it was like when you went to boot camp, but I just don't think of that as a structured environment that is unlikely to provoke disinhibited behavior. So -- and I think Mr. Jefferson is proud of his service in the military and he's proud that he got a honorable discharge under general conditions and that he didn't have any -- now, this is based on what he told me. I don't have the records -- that he didn't have a captain's mask (sic) or aggression towards other, never assaulted fellow seamen, he never, you know, was charged with a crime outside base, you know, and things like that. So to me I just don't see the evidence being there based on my access to information.

(Doc. 240, pp. 210-211). Viewed in the most logical manner, Petitioner's expert's testimony that a "structured" setting without in any way defining the "structure" would inhibit Petitioner's behavior lacks credibility. Moreover, the structure of the military, with its many requirements to perform and its dense requirements of

constant social interaction, is ill designed to impede impulsive, aggressive or violent characteristics of brain damage.

In addition, Dr. Merikangas readily admitted on cross-examination that there was no history of Petitioner behaving impulsively or violently, the two hallmarks of the alleged brain damage which the experts claim would explain his crimes:

Q. You stated a lot he has this impulse control disorder from the brain damage?

A. I said that people with brain damage can often have impulse control disorder. I don't see evidence in his case of impulse control disorder because we don't see a lot of behavior of that.

Q. So, then, he doesn't suffer from impulse control disorder.

A. No. That's not what I said. You're not listening.

Q. Okay. Would you repeat that, then?

A. What I said was — I was asked, do people with brain damage have impulse control disorders. I said generally they do. But I have not seen in the case of Mr. Jefferson a long history of violent impulsive behavior. We have this one episode for which he has been convicted. And I was asked to give an opinion whether someone with brain damage might have that as an occurrence, and the answer was yes.

Q. And you said — I'm not understanding your overall testimony regarding brain damage. So you're saying that you could have brain damage and just have one instance of this violence, and that's it?

A. Yes.

Q. So it's not something that would affect him his whole life.

A.    It may. But it depends on the level of provocation and other circumstances. Human behavior is very complex.

Q.    So he could have committed this crime and it could have nothing to do with this brain damage because he could have just been angry with this person for very legitimate reasons.

A.    Perhaps.

Q.    I mean, so, again, you don't know whether or not it was the brain damage or something else that caused it.

A.    I don't know if he committed the crime.

Q.    So there's no — there's nothing in his past, in his school records or in the affidavits with his family showing him to be a very impulsive person or a person with impulse control problems.

A.    Not specifically.

(Doc. 238, pp. 74-75).

Q.    You also testified on direct that people with brain damage generally are short-tempered, temperamental, things of that nature. Did you see any evidence of that in Petitioner's past?

A.    No.

Q.    Just so I understand in sum what you're saying about the brain damages, you're stating that he has frontal lobe damage, and part of a person who has frontal lobe damage, they can be impulsive, but you don't see that in this case.

A.    I said that that is a fact that people with frontal lobe damage can be impulsive. But I also have not seen evidence from a behavioral record that he's had a lot of that in his past. He's been in a very structured environment for the last 25 years and was in a structured environment when he was in the navy. And

then he had a period of time when he wasn't, and that apparently is when he had the problems. I testified to that.

Q.   Just to be clear, he was, he was 30 when he committed this crime. Do you recall that?

A.   He was 30 when this crime occurred. He may have committed

Q.   And he had only been in the navy for two years. Is that correct?

A.   Yes.

Q.   So absent that two years, from the time he was two until he was 30, did you see any evidence of impulsive behavior?

A.   I don't have any chart of that time.

Q.   Is it — would it not have been important to know what happened during that time?

A.   It would be very nice to know that, but I don't know how I would find that out.

Q.   Could you not have spoken to his family or his friends?

A.   I did speak to his family and his friends. They didn't comment to try to say that he was a bad person.

Q.   Well, did you ask them any questions about his behavior, whether he was impulsive?

A.   Let me correct what I said. Somebody interviewed them. I didn't. That was affidavit information.

Q.   Correct.

(Doc. 238, pp. 77-78)

Q.   So back to my question, from those affidavits or from any of that, was there evidence that he was impulsive during that time?

A.      I didn't see any, but I didn't see anyone that asked that question.

Q.      And you did not ask that question?

A.      I did not.

Q.      Did you ask to meet them?

A.      No.

Q.      Okay. Regarding violence, is violence synonymous with brain damage?

A.      No.

Q.      Okay. Regarding violence, is violence synonymous with brain damage?

A.      No.

Q.      So people can be brain damaged and not be violent?

A.      Yes.

Q.      And what in Petitioner's history showed him to be a violent person. Other than this crime, assuming it happened, what, what evidence did you have?

A.      We didn't have any.

(Doc. 238, p. 79).

Therefore, according to Dr. Merikangas, Petitioner has no history of violent

or impulsive behavior that would be a symptom of frontal lobe damage.  But if he

did commit the crime, then it was an impulsive fit of violence that was the product

of his brain damage, maybe.  Or maybe his crime has nothing to do with his alleged brain damage.  Dr. Merikangas's testimony is perched on a very thin tight rope and seems more likely to frustrate a jury than provide a reasonable probability of a different outcome.

The testimony above is precisely the type expected of biased expert attempting to turn every negative into a positive for a death row inmate while purposively failing to give an accurate opinion on the alleged mental deficiency being alleged.  As explained by Dr. Macchiocchi, the type of brain damage Petitioner's experts are diagnosing is not as simple as stating he has frontal lobe damage, and if Petitioner suffered from the disorder alleged by this experts there would be a lifelong history of behavior:

> A.     …It's really – that's a passé terminology, frontal lobe disorder. It's really more of a disexecutive (sic) disorder. And I don't want to go off and bore people to death here, but there are various -- there are permutations of disexecutive (sic) frontal, subcortical disorders. And only one of those, orbital frontal, is where you get disinhibited, inappropriate social behavior, and it's a lot less likely that you get aggressive behavior, although it does -does happen. And -- but you can have cognitive problems associated with it. You can have apathy where you're inert. So it's a complicated thing. You just can't say somebody has a frontal lobe disorder. I mean, it's way more complicated than that. So I didn't see evidence of a disinhibited disorder that could be attributed to a brain injury at age two. Because if that's the case, that manifests itself continuously throughout development. If the argument is it's a neurodevelopmental disorder caused by trauma, you're going to see disinhibition, you're going to see school classmates being injured, you're going to see a variety of disinhibited behavior along the way.

It's a permanent condition, and the environment may provoke it more or less depending on the environment.

(Doc. 240, pp. 212-213).

The disorder alleged by Petitioner's experts would be in evidence throughout his life. As explained by Dr. Macchiocchi, there simply is no evidence of this:

> Q.    And during that interview did he provide you any information that supported a lifelong frontal lobe problem?
>
> A.    Well, the short answer is no, and that's not to say that Mr. Jefferson didn't have episodes of disinhibition in his life or poor judgment at times. But I looked at really some pretty significant factors, and that is that he really didn't have a history of aggressive disinhibited aggressive behavior towards others systematically, and that included when he was young, when he was in the military, and especially when he was incarcerated. What I saw in Mr. Jefferson -- and Mr. Jefferson had a capacity to respond to things that he perceived as being disrespectful or not considering his well being. And the way he would do that is he would write complaints, and they were, quite frankly, articulate. And so I didn't see it in his records while he was incarcerated. I did see it based on what he told me about when he was in the Navy, and I base that on his self-report. And so I didn't really see it.

(Doc. 240, pp. 209-210). In his report, Dr. Macchiocchi explained further:

> ...whether Mr. Jefferson did or did not sustain a TBI during an automobile accident at age 2, based on personal history and neuropsychological data, there is no evidence he displayed a "lifelong" "frontal lobe syndrome" as evidenced by orbital frontal neurobehavioral abnormalities beginning in childhood. In other words, Mr. Jefferson does not have history of pervasive neurobehavioral dysfunction. In addition, decades of research has

shown that not everyone who sustains a TBI has a residual "frontal lobe disorder". Nonetheless, Mr. Jefferson self-admittedly has a history of alcohol related impaired judgment and poor decision making, which is often misconstrued as "frontal lobe" behavior problems by some clinicians. In addition, the fact that Mr. Jefferson's history and test findings do not support a TBI related "frontal lobe" disorder does not mean that his judgment, reasoning, self-control and decision making have not been impaired at various points in his life, but such impairment is commonly observed in incarcerated persons as well as the general population.

(Doc. 242-1, p. 12). Given the dearth of any evidence in Petitioner's history of mental illness, and the highly speculative nature of the opinions offered by Petitioner's experts regarding Petitioner suffering a "frontal lobe disorder", Dr. Macchiocchi's opinion that Petitioner is merely a person suffering from poor judgment strikes a much more credible note.

> **2.  When The Record Is Viewed As A Whole, There Is No Reasonable Probability Of A Different Outcome.**

Although any evidence of mental health can be presented in mitigation, that does not necessarily mean it mitigates a petitioner's crime and creates a reasonable probability of a different outcome. In other words, the diagnosis of a mental health disorder is not per se mitigating. By their own admission, Petitioner's mental health experts did not question Petitioner about the crime and could only speculate as to how his alleged disorder affected him. In addition, there is credible evidence from another mental health expert that Petitioner does not suffer from severe brain

damage that would have negatively affected his ability to control his actions or caused him to have fits of rage.

Dr. Merikangas testified on cross-examination before this Court that he did not question Petitioner about his crime because, in his words, he thought it would be "pointless" and it was not his job to link Petitioner's mental health to the crime. (Doc. 238, pp. 62-65). Yet on direct examination he had no problem speculating that, if Petitioner had murdered Mr. Taulbee, it was most likely the result of an impaired ability to control himself and done in a momentary fit of rage. (Doc. 238, p. 48). The fact that Dr. Merikangas was derisive of questions by counsel for Respondent on the same topic and so willing to accommodate counsel for Petitioner with contradictory testimony is further proof of his bias.

Dr. Merikangas also had to admit that the there was no history of Petitioner being temperamental. He also had to admit that there was no evidence of impulsivity in Petitioner's past that he was aware of. (Doc. 238, p.78). Other than Dr. Merikangas repeatedly stating Petitioner does better in a structured setting, in an ill-disguised attempt to explain away the fact that Petitioner has never evidenced the signs of brain damage he alleges he suffers from, Dr. Merikangas could point to no evidence in Petitioner's past that showed the impulsivity or rage outbursts.

Petitioner would have this Court believe that if there is any evidence of mental health, no matter how tenuous or lacking in reliability, it would automatically create a reasonable probability of a different outcome. However, the Eleventh Circuit routinely rejects such evidence as proof of prejudice. See Kokal v. Sec'y, Dep't of Corr., 623 F.3d 1331, 1348 (11th Cir. 2010) (trial counsel not ineffective for not presenting weak evidence of brain damage); Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1249-1250 (11th Cir. 2009) (trial counsel not ineffective for not presenting evidence of head trauma and mental illness); McClain v. Hall, 552 F.3d 1245, 1253 (11th Cir. 2008) (trial counsel were not ineffective for not presenting evidence of frontal lobe disorder); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-788 (11th Cir. Fla. 2003) (trial counsel not ineffective for concentrating on residual doubt instead of investigating and presenting evidence of mental health issues). As held by the Eleventh Circuit in a case in which Petitioner's mental health expert's testimony was less than reliable:

> That Gissendaner, years after the fact, was able to locate and hire three mental health experts willing to testify that she suffers from frontal lobe brain damage, PTSD, and submissive personality traits does not demonstrate that trial counsel's mental health investigation was unreasonably curtailed or otherwise deficient. See Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1242 (11th Cir. 2010) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (quotation marks omitted); Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997) (same); Horsley v. State of Ala., 45 F.3d 1486, 1495 (11th Cir. 1995) (same). That is especially true because, as the

state habeas court noted, the conclusions of Gissendaner's mental
health experts are unreliable and lack even a modicum of credibility.

Gissendaner v. Seaboldt, 735 F.3d 1311, 1332.

It is hard to see how the testimony from Drs. Price and Merikangas

countered by Dr. Macchiocchi and the record would have created a reasonable

probability of a different outcome. As found by the Eleventh Circuit, trial

counsel's presentation during sentencing was the following:

> In light of their investigation into the murder and Jefferson's life
> history, Jefferson's counsel decided to approach the penalty phase of
> the trial by minimizing Jefferson's past offenses and emphasizing his
> good qualities, including the relationships he had with his family. Ex.
> 39 at 96-97. And in addition to offering Jefferson's character as a
> mitigating factor at the penalty phase, they also presented a residual
> doubt defense. As Cella described it, Jefferson's counsel sought, "in
> an indirect way, to point out to the jury that they were taking the word
> of three fairly unreliable witnesses and coming to the conclusion that
> he was guilty in the first place." Ex. 39 at 97. In doing so, Jefferson's
> counsel emphasized during the closing argument of the penalty phase
> that there were no eye witnesses to the crime, no guilty plea, and "no
> evidence of any consciousness of guilt." Ex. 25 at 1380.

Jefferson v. Hall, 570 F.3d 1283, 1298. Given this strategy, presenting evidence of

an alleged brain disorder that could be so readily discredited by the State, would

itself have been unreasonable.

Accordingly, for all of the reasons argued above, there is no reasonable

probability when the record is viewed as a whole that Petitioner's unreliable

evidence of severe brain damage would have created a different outcome at

Petitioner's trial.  Consequently, Petitioner's ineffective assistance of counsel

claim should be denied.

# CONCLUSION

WHEREFORE, having answered the allegations of Petitioner's petition for federal habeas corpus relief and there being no cause why the writ should issue, Respondent prays that this Court deny Petitioner habeas corpus relief and remand Petitioner to the custody of Respondent.

Respectfully submitted,

SAMUEL S. OLENS                 551540
Attorney General

BETH ATTAWAY BURTON      027500
Deputy Attorney General

s/Sabrina D. Graham _____
SABRINA D. GRAHAM           305755
Assistant Attorney General

Please serve:

SABRINA D. GRAHAM
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone:  (404) 656-7659

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day electronically filed this pleading with the

Clerk of Court using the CM/ECF system which will automatically send e-mail

notification of such filing to the following attorney of record:

John Richard Martin
Martin Brothers, P.C.
202 The Grant Building
44 Broad Street, N.W.
Atlanta, Georgia 30303

Jeff Ertel
Federal Defender Program, Inc.
1500 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

This <u>10th</u> day of April, 2015.

s/Sabrina D. Graham
SABRINA D. GRAHAM
Assistant Attorney General