IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LAWRENCE JOSEPH JEFFERSON,      :
                                :
      Petitioner,               :
                                :
                                :      CIVIL ACTION
v.                              :      NO. 1:96-CV-989-CC
                                :
                                :      HABEAS CORPUS
Bruce Chatman, Warden           :
Georgia Diagnostic and          :
Classification Center,          :
                                :
      Respondent.               :

**PETITIONER'S REPLY TO RESPONDENT'S BRIEF IN OPPOSITION TO
PETITIONER'S POST-HEARING BRIEF**

## I.    Introduction

Petitioner Lawrence Joseph Jefferson (hereinafter referred
to as "Petitioner" or "Mr. Jefferson") hereby responds to
Respondent's Brief in Opposition to Petitioner's Post-Hearing
Brief ("Respondent's Brief")(Doc. 250). Petitioner, of course,
relies primarily upon his previously filed Post-Hearing Brief
Regarding Ineffective Assistance of Counsel ("Petitioner's
Brief")(Doc. 246) as the overall statement of Petitioner's
factual and legal contentions. Petitioner herein will only
respond to specific points raised in the Respondent's Brief. In
particular, Respondent's Brief misinterprets applicable case
law, mischaracterizes or ignores compelling evidence contrary to

1

its contentions, and fails to address directly the dispositive credibility choice between Petitioner's trial counsel, Mr. Schuster, and the psychologist who specifically recommended neuropsychological testing which would have revealed evidence of brain damage and never retreated from that recommendation.

## II. The Claimed "Fact Findings" Made by the Georgia Supreme Court

In a section of Respondent's Brief titled "Standard of Review" (Respondent's Brief, pp. 10-13), Respondent claims for the first time that even though this Court has already concluded that Petitioner was not afforded a full and fair hearing during state habeas corpus proceedings (Doc. 208), the claimed "findings of fact" made by the Georgia Supreme Court in affirming the Superior Court should nevertheless be "entitled to a 'presumption of correctness.'" (Respondent's Brief, p. 13). The Government's argument ignores the fact that under O.C.G.A. §9-11-52(a) an appellate court in Georgia reviewing a non-jury decision of a lower court must defer to the fact findings of the lower court, whose "[f]indings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

Indeed, although Petitioner raised the issue of the "ghost written" order of the Superior Court in the appeal to the

Georgia Supreme Court, specifically and expressly declined "Jefferson's invitation to accord the order less deference than mandated by O.C.G.A. §9-11-52." Jefferson v. Zant, 263 Ga. 316, 317 (1993). Simply put, because the Georgia Supreme Court applied O.C.G.A. §9-11-52 to its review of the Superior Court, as required by Georgia law, there was no independent "full and fair hearing" by the Georgia Supreme Court where it made its own independent factual determinations. Quite to the contrary, under applicable Georgia law, it simply deferred to the fact findings of the Superior Court, which this Court has already determined were not the result of a full and fair hearing. See, e.g., Godinger Silver Art Company, Ltd. v. Olde Atlanta Marketing, Inc., 269 Ga.App. 386, 387 (2004)("In bench trials, the judge sits as trier of fact and the Court's findings are analogous to a jury's verdict and should not be disturbed if there is any evidence to support them."); Wolfe v. Rhodes, 166 Ga.App. 845, 847 (1983)("When a non-jury judgement by a trial court is reviewed by an appellate court in Georgia, we will not interfere with the findings of fact by the trial tribunal if there is 'any evidence' to support it.").

Turner v. Crosby, 339 F.3d 1247, 1273-1275 (11th Cir. 2003), cited by Respondent (Respondent's Brief, p. 11), not only applied Florida not Georgia procedures, but, more importantly, involved the unusual situation where the State of Florida did

not "challenge, rebut or dispute" any of the factual assertions made by the habeas petitioner. Id. at 1274. As the Court explained, all of the facts alleged by the petitioner in support of his ineffective assistance of counsel claim were "undisputed and uncontroverted." Id. There were "no historical facts in dispute." Id. at 1275. Accordingly, the deference to the appellate court that the Eleventh Circuit was considering in Turner was deference to the Florida Supreme Court's conclusion that these undisputed facts did not nevertheless constitute ineffective assistance of counsel.[1]

Similarly, the United States Supreme Court case cited in Turner, Sumner v. Mata, 449 U.S. 539 (1981), arose out of a claim of an impermissibly suggestive identification in California, and involved a unique situation where the issue was never even raised in the lower court and was first addressed at the request of the habeas petitioner in the California Court of Appeals based upon the trial record. Id. at 546-547. The Supreme Court based its decision to defer to the state appellate

---

[1] Provenzano v. Singletary, 148 F.3d 1327, 1300 (11th Cir. 1998), cited by Respondent (Respondent's Brief, p. 11), is also similarly distinguishable. Not only does Florida allow an original habeas corpus petition to be filed in the Supreme Court, as happened in Provenzano, but as with Turner the "fact" found was the undisputed fact that trial counsel stated on the record a tactical reason for not seeking a change of venue. The issue before the Florida Supreme Court was simply whether this was reasonable, a legal conclusion.

court's findings because of the unusual situation in that case, as "there was no reason for the state trial court to consider the issue because Respondent failed to raise the issue at that level." Id. These circumstances are nothing like the circumstances in this case.

There is no basis in law or logic for the rather unusual and extreme position asserted by Respondent. This Court has already held, based upon a fully developed record, that Petitioner did not receive a full and fair hearing during the Superior Court habeas corpus proceedings when the actual fact findings were made in this case, especially the conclusion that Mr. Schuster should be believed over Dr. Dudley. All the Georgia Supreme Court did was to defer to those fact findings under applicable Georgia law and never engaged in its own independent fact finding. Instead, it merely accepted the Superior Court's conclusion that while Dr. Dudley had recommended a neuropsychological evaluation in order to "rule out an organic etiology," he nevertheless "in subsequent telephone conversations with Jefferson's attorneys . . . indicated that further examination would not likely be beneficial." 263 Ga. at 319. We now know that that factual conclusion by the Superior Court to which the Georgia Supreme Court deferred under the command of O.C.G.A. §9-11-52(a) was not the result of a full and fair hearing. The Georgia Supreme

Court's deference to that flawed conclusion does not change anything.

## III. Respondent's Attempts to Bolster the Testimony of Mr. Schuster

Much of Respondent's Brief is devoted to an attempt to shore up the claim of Mr. Schuster that Dr. Dudley had discounted the need for further neuropsychological testing in a telephone conversation subsequent to his evaluation of Petitioner, despite the fact that he had specifically recommended it in his written report. (Respondent's Brief, e.g., pp. 17, 23-24, 26). Petitioner has already addressed in some detail the reasons why Dr. Dudley should be credited over Mr. Schuster. (Petitioner's Brief, pp. 6-14), and there is no need to repeat that argument herein. But a few remarks regarding specific claims made by Respondent in Respondent's Brief on this issue may be helpful.

Respondent makes much of the fact that Mr. Jefferson was often calm and cooperative in his dealings with counsel, thereby discounting a suspicion that he suffered from any type of mental illness. (Respondent's Brief, e.g., pp. 21, 25, 34, 37). But, based upon the testimony of the experts that the Court has heard, we know that it is not unusual for a person who suffers from brain injury to appear to be calm and collected in circumstances that are non-stressful. (Doc. 238 at 52, 80). But,

more important, neither Schuster nor his co-counsel Mark Cella were experts in mental illness and would know this. That is the reason they hired Dr. Dudley, who specifically recommended neuropsychological testing.

While in no way the end all and be all of Petitioner's argument, the fact that there is no entry in Mr. Schuster's billing records of any telephone communications with Dr. Dudley after his evaluation of Petitioner cannot be ignored, as Respondent contends. (Petitioner's Exhibits 18 and 19). First of all, this is not a case where there is a "silent" record. (Respondent's Brief, p. 28). To the contrary there is a specific and affirmative record of Ms. Schuster's billing records. In those records, where Mr. Schuster with significant detail lists time spent on the mundane as well as the complex,[2] there is no entry documenting any conversation with Dr. Dudley after Dr. Dudley's evaluation. Just like the absence of an entry in a business record is affirmative and admissible evidence that something did not occur, Federal Rule of Evidence 803(7), the absence of any entry documenting a claimed phone call when you would expect one to be present especially a phone call as

---

[2] For instance, on 11/6/85, Mr. Schuster lists a brief phone call with Diane Arnold concerning what he references as "verdict" (the mundane) as well as a twelve hour entry for investigation conducted in Louisville Kentucky on 2/20/86 (the complex). Surely Mr. Schuster would have recorded an phone conversation wherein his expert detailed and explained the testing he performed, the results of that testing, and a game plan for further mental health testing (a call which would have lasted longer than that to Ms. Arnold).

significant at the one in question here which Schuster claimed cut off what would otherwise be a fruitful avenue in developing mitigation evidence, is compelling evidence that the claimed call never occurred contrary to Schuster's testimony.

Nor can Schuster's assertion that Dr. Dudley simply said that Mr. Jefferson was either "just a criminal," as Mr. Schuster originally testified, or was a "sociopath or psychopath" as he now testifies, be dismissed as unimportant, as claimed by Respondent in a footnote. (Respondent's Brief, p. 29 & fn. 1). The point that Respondent misses is that none of the experts who have evaluated Mr. Jefferson, including the three experts who testified on behalf of Petitioner and Respondent's own expert, diagnosed Mr. Jefferson as a sociopath or a psychopath, much less "just a criminal." (Doc. 238 at 41, 45, 48; Doc. 240 at 124, 145, 245). Schuster's statement simply does not ring true and smacks of an after the fact rationalization for not doing what he should have done. It is as Dr. Dudley testified, he would have never said because it was something neither he, nor any of the experts, believed.

Nor does the Respondent provide any consistent or cohesive argument to support the contention that an informed decision was made to present a lingering doubt defense over a brain damage mitigation case. As counsel has previously argued, if this were true, why even have the Petitioner's mother talk about

Petitioner's brain injury at sentencing?  And why concede Mr. Jefferson's guilt in closing argument, much less fail to ask Mr. Jefferson whether he was guilty when he called as a sentencing witness?

As to the last point, Respondent makes the incredible argument that Petitioner is somehow to blame for not being asked about his guilt at sentencing, because he "could have testified to this without trial counsel asking him, but he chose not to do so." (Respondent's Brief, p. 47). It is counsel's job to prepare and shape a defendant's testimony, not the defendant's job to decide how and what he should say.

Nor does it make any sense to claim that for Mr. Jefferson to deny his guilt would have been "to insult the jury by putting him up there after they returned a verdict." (Respondent's Brief, p. 37). If this was a real concern, why call Mr. Jefferson to testify at all? If lingering doubt was the sentencing theme, once Mr. Jefferson took the stand the jury was sitting there waiting to hear a denial.  When he was never asked whether he was guilty or innocent, this sealed the fate on any lingering doubt sentencing defense.

Finally, the failures of counsel cannot be excused because of their lack of expertise in mental health. (Respondent's Brief, p. 40). It took no expertise to understand that Mr. Jefferson's skull had been run over by an automobile when he was

only two years old. But more importantly, given their lack of expertise, counsel retained an expert, Dr. Dudley, who specifically recommended neuropsychological testing to rule out brain injury, a recommendation he understandably never retracted. Dr. Dudley did not believe that Petitioner was "just a criminal," nor did he or anybody who has evaluated Mr. Jefferson conclude that he was a "sociopath or psychopath." Petitioner had suffered an injury likely to cause brain injury and there was a specific recommendation by an expert retained by the defense that this be further investigated. While Respondent may try to discount this specific recommendation as just "two sentences in a report" (Respondent's Brief, p. 16), those two sentences were specific and unequivocal. No other "red flags" were needed. (Respondent's Brief, p. 48).

Nor, as Respondent claims, was this a case where counsel simply did not "pursue every path until all hope withers." (Respondent's Brief, p. 50). Here there was a specific and clear path never taken, which, had it only been pursued, would have resulted in significant mitigation evidence of brain injury. Contrary to cases cited by Respondent[3] where the lawyers had no specific notice of a potential head injury that needed to be investigated (Respondent's Brief, p. 41-44), counsel was on

---

[3] House v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001); Holladay v. Haley, 209 F.3d 1243, 1252 (11th Cir. 2000); Williams v. Head, 185 F.3d 1223, 1239 (11th Cir. 1999),

specific notice of a likely avenue of substantial mitigation evidence but neglected to follow it.

This cannot be chalked up to second guessing trial counsel or simply a misunderstanding or miscommunication between Schuster and Dr. Dudley. (Respondent's Brief, pp 36, 39). The language in Dr. Dudley's report was specific, unambiguous and consistent with what counsel already knew about Defendant's injury as a child. (Respondent's Brief, p. 36). Nor has Dr. Dudley's memory somehow faded about a conversation **he never had**. (Respondent's Brief, p. 36). Dr. Dudley gave the same testimony before this Court that he gave years ago during the state habeas corpus proceedings. (Petitioner's Exhibit 7). That testimony is consistent with all the evidence in the case, including the Government's own expert. There is no question about the deficient performance of Mr. Jefferson's trial counsel.

**IV. The Expert Testimony**

Respondent goes on for 50 pages in an attempt to doubt about the conclusions of Petitioner's three experts that Mr. Jefferson suffers from brain damage. (Respondent's Brief, pp. 52-102). While counsel will address a number of the specific points raised by Respondent below in this Reply, no matter how deep you get into the weeds of the expert testimony one overarching consideration cannot be ignored. It is not necessary for Petitioner to show that the jury would necessarily

have credited every assertion made by his expert witnesses, nor is Petitioner required to prove that the jury would have necessarily rejected all of the assertions made by Respondent's expert. All Petitioner must prove is that there is a "reasonable probability" that, had the jury heard the evidence they did not hear, "the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). As the Court in Strickland further explained, "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. And that confidence is undermined if there is "a reasonable probability" that, had the evidence not presented been presented, at least one juror would have returned a verdict other than death. Wiggins v. Smith, 539 U.S. 510, 537 (2003).

It is not required that Petitioner show beyond all doubt that the jury would have preferred his mental health experts over the Respondent's mental health expert, although Petitioner believes that they would. All Petitioner must show is that there is a "reasonable probability" that, based upon the totality of the expert evidence and the fact that Petitioner's head had been run over by a car when he was only 2 years old, at least one juror would have had sufficient concern about the possibility that brain injury explained the aberrant conduct of Petitioner in this case to insist upon a life verdict. Whatever you make of

all the expert testimony in this case, Petitioner has satisfied that burden.

**A.  Respondent Concedes Petitioner Suffers from Brain Damage**

First, it is important to note that Respondent concedes Petitioner suffers from brain damage.  Respondent only contends he does not suffer brain damage to the degree Petitioner's experts assert.  <u>See</u> Respondent's Brief at 52 (evaluations are insufficient "to support <u>the degree</u> of brain damage from which they allege Petitioner suffers.").  <u>see also</u>, Respondent's Brief at 68 (noting Petitioner likely suffered brain injury as a result of auto accident "but there are many different types of brain injury, and the severe brain injury Petitioner's experts are alleging he suffers from, . . . cannont be assumed . . ."); Respondent's Brief at 69 ("testing does not prove Petitioner suffers from the degree of brain damage . . ."); Respondent's Brief at 70-72 (noting testing by Dr. Price indicated deficits in functioning).

**B. Respondent's Assertion Petitioner's Experts Claim the Brain Damage was "Severe" is not Supported by the Record**

Respondent's assertion that Petitioner's experts concluded Petitioner suffered from "severe" brain damage is simply not a fair reading of the record.  Dr. Merikangas submitted three affidavits during the state evidentiary hearing and Dr. Price submitted one.  Each expert was deposed by Respondent and each

expert was called to the hearing before this Court by Mr. Jefferson. In essence, Dr. Merikangas has testified five times and Dr. Price three. While in two instances Dr. Merikangas makes passing reference to "severe" brain damage (Petitioner's Exhibit 2, paragraph 2; Petitioner's Exhibit 3, paragraphs 2 & 4), 99% of his testimony never qualified the degree of brain damage. See Petitioner's Exhibit 1,¶3, ("brain damage exists and that it is most pronounced in the right hemisphere of the brain, including the frontal lobe."), ¶4 ("the brain damage is clearly of the acquired, post traumatic type"); Petitioner's Exhibit 2, ¶4 ("rendered him permanently brain damaged . . . brain damage exists"); ¶6 (Mr. Jefferson's brain damage is clearly the acquired, post-traumatic type . . . the symptoms of his brain damage . . . in addition to his brain damage . . ."); ¶8 ("due to his brain dysfunction . . . due to the effects of his brain damage . . ."); ¶9 ("aforementioned brain damage"); Petitioner's Exhibit 3, ¶6 ("previous diagnosis of brain damage . . . quite consistent with brain damage . . ."). During his deposition testimony, as well as the testimony before this Court, Dr. Merikangas never claimed the brain damage was "severe." (Respondent's Exhibit 4, Doc. 240 at 24-88). Similarly, Dr. Price never referred to the brain damage Petitioner suffered as being severe." See Petitioner's Exhibit 8, Respondent's Exhibit 3, Doc. 240 at 154-183). A fair reading

14

of the testimony of Dr. Price and Dr. Merikangas demonstrates that their diagnosis of Petitioner was that he suffered from brain damage of the frontal lobe, not that he suffered from "severe" brain damage and Respondent's attempt to paint a different and inaccurate picture should be rejected.[4]

## C. Petitioner's Experts' Opinions are not Premised on Speculation or Bias

Respondent asserts the opinions of Petitioner's experts (Dr. Merikangas and Dr. Price) are not worthy of belief because the experts were biased and their conclusions were based on speculation. See Respondent's Brief at 52. Merely because Respondent and/or his expert say it is so does not make it true. Indeed, Respondent relies, almost exclusively on the testimony of his own expert to conclude Dr. Price and Dr. Merikangas relied on speculation and were biased. However, objective evidence establishes that it is Respondent's expert, Dr. Macchocchi who was biased and engaged in speculation.

### 1. Dr. Merikangas's Evaluation Involved no Speculation

Dr. Merikangas, a medical doctor specializing in neurology, conducted a battery of neurological measures that are widely accepted in the scientific community. These tests measure

---

[4] Respondent also seems to assert that because Dr. Price's testing indicated Petitioner was functioning in the low average to average range in a number of areas he did not have brain damage. See e.g., Respondent's Brief at 76. However, someone suffering from frontal lobe brain damage will not perform deficiently across the board. As Dr. Price noted, "Mr. Jefferson is [not]

neurological responses to stimuli; the reaction of the patient (often merely the involuntary movement of various body parts) reveal the presence or absence of neurological impairment. The results are reached by observing the body's involuntary reactions to the stimuli and applying decades of scientific data as to their meaning. In short, there is no subjectivity involved in the interpretation of the results of the neurological tests administered by Dr. Merikangas.

### 2. Respondent's Assertion Dr. Merikangas is Defense Biased is Unavailing

Respondent notes that Dr. Merikanagas, in 2000, had testified for 117 death row inmates. Respondent's Brief at 55. Assuming that is true (and Petitioner does not contest it) he has clearly testified in a considerably larger number of cases presently. Yet Respondent can only point to potentially five (5) of the more than one hundred cases in which Dr. Merikangas has testified where courts may have discounted his testimony. Even then, the cases cited by Respondent hardly establish Dr. Merikangas is defense biased.[5]

---

totally dysfunctional as a result of his disability." Petitioner's Exhibit 8, at pg. 3, paragraph 4.

[5] One of the cases cited by Respondent, People v. Urdiales, 225 Ill. 2d 354 (2007) the court credited the state expert, Park Deitz, who has presented knowingly false testimony in a death penalty case (Yates v. State, 171 S.W. 2d 215). The finding by the Urdiales court is suspect and provides no basis for Respondent's assertion Dr. Merikangas is defense biased. See also, 39 TXTL R67, 68 (Fall 2006), The Time is Right to Revise the Texas Insanity Defense, an Essay, Shannon, Brian D. (". . . the state's expert, Park Dietz, provided false testimony . . .").

For instance, in Cone v. Bell, cited by Respondent, the district court there found that Dr. Merikangas's credibility was only "somewhat diminished" and then, only because of his demeanor while testifying. The court did not find his conclusions were suspect. In Maldanado v. Warden, the court did not find Dr. Merikangas incredible. Rather, the court merely found that trial counsel were not ineffective for failing to call Dr. Merikangas as a witness at trial. In Taylor v. State, the court actually credited Dr. Merikangas's testimony, finding he was truthful when he said he could not confirm certain facts to establish a low level of serotonin. (87 So. 3d at 762). Finally, in State v. South, the court did not find Dr. Merikangas incredible. Instead, the court found that Dr. Merikangas's diagnosis did not amount to a defense as a matter of law.

In one of the cases cited by Respondent, Johnson v. Singletary, the court rejected the testimony of Dr. Merikangas because, among other things, his evaluations were made long after the events in question, and because "[his] opinions are contradicted by other credible evidence and not supported by the law." Respondent's Brief at 56. That is not the situation presented here. First, Dr. Merikangas's evaluations were made much closer in time than those Respondent's expert performed (1989 vs. 2014). Second, Dr. Merikangas's opinion is not

contradicted by other credible evidence, as the results of Dr. Macchiocchi's evaluation are not credible because they are premised on norms that are not to be applied in cases such as Petitioner's. See fn. 10, infra. Third, Dr. Merikangas's opinions are not contrary to any law applicable in Georgia.[6]

### 3. The Testing Conducted by Respondent's Expert Does Not Undermine the Results of Dr. Merikangas's Evaluation

Respondent asserts that Dr. Merikangas used "subjective interpretive methods" and, as proof, offers the results of testing performed by an associate of Dr. Macchiocchi. Respondent's Brief at 83. Respondent goes on to outline the qualifications of Rachel Evans, a psychometrist who was used by Dr. Macchiocchi. Id. at 84. However, Ms. Evans never testified and Dr. Macchiocchi's testimony about her qualifications is merely hearsay that does not establish her qualifications. Thus, Respondent puts the cart before the horse when he claims "there is no evidence before this Court . . . that Ms. Evans was not qualified to administer the tests chosen by Dr. Macchiocchi. Id. at 84-85. Instead, there is no competent evidence before the Court to establish Ms. Evans was, in fact, qualified.[7]

---

[6] Florida, where Johnson originated, has statutory mitigating factors that mitigation is often pigeonholed into. Georgia has no such procedure. In fact, Georgia's law on mitigation evidence is expansive, allowing virtually any factor to be considered mitigating. See e.g., Blankenship v. State, 251 Ga. 621 (1983). Thus, Dr. Merikangas's opinion, by definition, can not have been "contrary to law."

[7] Ms. Evans was not brought before this Court by Respondent. Had she been produced, she could have established her credentials.

Furthermore, administering the tests are one thing; interpreting the results of those tests are another. Whether Ms. Evans was qualified to administer the tests is irrelevant to the interpretation of the results. It was established that Dr. Macchiocchi was not a medical doctor. He did not attend medical school and was not trained at interpreting the results of neurological evaluations. Thus, Dr. Merikangas, who is a medical doctor, specifically trained in neurology, is the only one in this case qualified to assess neurological deficits based on neurological testing. His opinion, based on his interpretation of the results of neurological testing is entitled to belief.

### 4. Dr. Price is Credible

Respondent asserts Dr. Price should not be believed because his original affidavit, submitted in 1991, does not contain all of the raw data or scaled scores, and that because Dr. Price, upon being deposed in 2014, no longer had the raw data nor recalled many of the specifics related to his evaluation of Petitioner. Respondent's brief at 70-73. Respondent should not be heard to complain as it is Respondent's own fault the raw data no longer exists and that Dr. Price's memory has faded. Dr. Price was retained in 1991 and conducted his evaluation that same year, a mere 5 years from the date of the offense. His affidavit was prepared and submitted at a state habeas corpus

evidentiary hearing in April of 1991. At that hearing Respondent was represented by counsel and had the right to subpoena Dr. Price so that he could have been cross-examined about any alleged deficiency in his affidavit. In addition, Respondent had the right to demand Dr. Price provide all of the raw data from his testing. Respondent failed to do so. It is understandable that, a quarter century later, Dr. Price has no specific recollection of his evaluation of Petitioner. Similarly, 24 years after he completed his evaluation, and after moving his office a number of times, he no longer has the raw data from the testing he performed on Petitioner. The fact is that Respondent did not deem it important to depose or otherwise question Dr. Price in 1991. Rather, Respondent sat on his hands for almost a quarter of a century and now challenges Dr. Price's credibility because he no longer possesses the raw data or memory. This would not be the case had Respondent questioned Dr. Price at the first opportunity.[8]

---

[8] Respondent also takes issue with the fact that "there are no images of Petitioner's brain in the record." Respondent's Brief at 85. However, this is because Respondent opposed Petitioner's Motion for an MRI made in the state habeas court. Thus, the absence of images, like the absence of raw data is directly attributable to conduct (or lack thereof) on the part of Respondent. The fact that Petitioner opposed testing in an action arising out of Kentucky is irrelevant to the evidence before this Court.

### 5. Dr. Price Conducted a State-of-the Art Neuropsychological Battery of Tests Whose Scoring Was Conducted Pursuant to Scientifically Acceptable Norms

In 1991, Dr. Price conducted a battery of Neuropsychological tests that was widely accepted as state-of-the art.[9] After administering these tests, Dr. Price used the scoring methodology suggested by the manufacturer. Based on the results of that scoring, Dr. Price concluded Mr. Jefferson suffered from organic brain damage centered in the frontal lobe of the brain. Further, Dr. Price testified that he recalled sending the results from Petitioner's testing to the manufacturer for scoring and the manufacturer scored it identically to Dr. Price. Thus, the results obtained by Dr. Price, and confirmed by the manufacturer, were appropriate and state of the art at the time Dr. Price did his testing and at the time Petitioner was tried.

### a. Dr. Macchiocchi's Results are Not Credible as He Chose to use Norms that Were Not Appropriate and had a Demonstratable Bias for Finding Petitioner not to be Brain Damaged

Some twenty five years after-the-fact, Respondent retained an expert to contradict Dr. Price's results. That expert, Dr. Macchiocchi, eschewed the norms suggested by the manufacturers of the tests he administered in favor of norms that were not in

---

[9] Indeed, Respondent's expert seems to admit this when he testified that psychology has progressed since the time of Dr. Price's evaluation. See Respondent's Exhibit 1 at page 10.

existence at the time of the crime or at the time of Dr. Price's evaluation.[10]  Moreover, the person who developed the norms utilized by Dr. Macchiocchi, Robert Heaton, has opined that those norms should not be utilized in cases like Petitioner's.[11] The selection of improper norms alone makes Dr. Macchiocchi's testing invalid and is evidence of his bias.  Indeed, when examining the literature on the use of the Heaton norms, it becomes evident Dr. Macchiocchi chose them with a mind toward disproving Dr. Price's results.  Experts have found that using the Heaton norms to determine the existence of brain damage is less accurate than using the general norms because the Heaton norms will falsely find people normal when in fact they actually suffer brain damage.  For instance, one publication notes:

> the [Heaton] method, which is based only on a neurologically-normal group, transforms raw scores into scaled scores that tend to fall in the normal range especially for brain-damaged persons . . . the consequent result of the adjustments, in this case, would be to produce normal scores for tests that were designed, developed, and validated as measures of

---

[10] Respondent asserts that "if Petitioner wanted to prove Dr. Macchiocchi improperly scored his tests, his own experts could have taken the raw data provided."  Respondent's Brief at 75.  Respondent misapprehends the argument. Petitioner does not assert Dr. Macchiocchi mis-scored the tests.  Rather, Petitioner asserts Dr. Macchiocchi utilized norms for scoring that were inappropriate in the instant case.  <u>See</u> Note 10, <u>infra</u>.

[11] Respondent attempts to make light of this critical fact by asserting Petitioner "attempts to undermine {Macchiocchi's] testing with a quote from one source."  Respondent's Brief at 75.  Respondent fails to recognize that the "one source" is the person who developed the norms, Robert Heaton, who has specifically indicated that his norms should not be used in a case where there is a known history of head injury.  <u>See</u>, <u>Demographic Influences and Use of Demographically Corrected Norms In Neuropsychological Assessment</u>, Robert Heaton, Lee Ryan and Igor Grant (Found in Chapter Seven of Neuropsychological Assessment of Neuropsychiatric and Neuromedical Disorders*,* third Edition, Igor Grant and Kenneth Adams, August 2009, at page 147).

brain impairment - - defeating the very purpose of the
                    tests as neuropsychological measures

See, Reitan, Ralph, M., and Wolfson, Deboraha, <u>Clinical and
Forensic Issues Regarding Age, Education, and the Validity of
Neuropsychological Test Results: A review and Presentation of a
New Study</u>, Journal of Forensic Neuropsychology (2004). Still
other experts believe the ***Heaton "norms underestimate brain
damage*** as compared to Reitan and Wolfson norms." <u>See</u> Yantz,
Christine, Gavett, Brandon E., Lynch, Julie K., and McCaffrey,
Robert J., <u>Potential for Interpretation Disparities of Halstead-
Reitan Neuropsychological Battery Performances in a Litigating
Sample</u>, Archives of Clinical Neuropsychology (2006) (emphasis
added). Choosing to use the Heaton norms knowing they are
likely to make brain damaged individuals appear "normal"
demonstrates Dr. Macchiocchi's bias. This Court should not
credit his testimony.

### 6. Petitioner's Experts Did Not Speculate

Respondent asserts Dr. Price and Dr. Merikangas
"speculated" they are, therefore, not credible. This is
patently false as both experts gave opinions based on the
information that obtained from their testing as applied to
symptoms and observations.

First, Respondent misrepresents the record when he asserts
Dr. Merikangas and Dr. Price conclusively claim Petitioner

suffered brain damage solely as a result of having his head run over by a car. Dr. Merikangas, in direct response to a question posed by this Court, said the brain damage was "likely" caused by the accident but noted Petitioner had a number of illness which could also have been the cause. (Doc. 240 at 44). Similarly, Dr. Price testified the frontal lobe damage his testing revealed "likely result[ed] from trauma to the frontal lobe." Petitioner's Exhibit 8, page 11, paragraph 19.

Further, Respondent asserts Petitioner mis-represents Dr. Macchiocchi's reasons for discounting the likelihood of brain injury. See Respondent's Brief at 62. Regardless of how Respondent tries to spin it, the fact remains that in his report, Dr. Macchiocchi unequivocally said he doubted Petitioner suffered brain injury to the degree[12] Dr. Price and Dr. Merikangas opined because, (1) there was no skull fracture; (2) there was no documented impairment noted in the hospital records; (3) the medical staff did not note any change in behavior; and (4) Petitioner was hospitalized for only five (5) days. Each of Dr. Macchiocchi's premises are flawed.[13]

---

[12] Again, Respondent's own expert concedes there was brain injury.
[13] Dr. Macchiocchi also testified he did not see consistent signs of impulsive behavior in Petitioner's past which he believed supported his contention Petitioner was not as brain damaged as portrayed. However, Dr. Macchiocchi had to admit the absence of evidence did not equate to evidence of absence. Doc. 240 at 229. In other words, just because there is not an extensive documented history of impulsive behavior does not mean Petitioner did not have a history of impulsive behavior. The simple truth is that Petitioner's life history was not well documented.

First, as Dr. Macchiocchi admitted, the skull need not be fractured for an individual to suffer brain damage. Second, it would be difficult if not impossible to note an impairment of a two year old unless it was a profound. Brain damage of the kind diagnosed by Dr. Price and Dr. Merikangas would go unnoticed by even trained medical professionals unless specific neuropsychological testing was performed. Third, hospital staff would not be able to detect, much less document, any change in Petitioner's behavior as they had no baseline behavior to compare to the post-accident behavior. Only his family knew Petitioner before and after the accident, and they did make observations that indicated Petitioner changed. Last, Dr. Macchiocchi conceded Petitioner was hurt very badly (Doc. 240 at 231) but still believed a five (5) day stay was shorter than would have been expected if there was a change in behavior or cognition consistent with moderate to severe traumatic brain injury. See Respondent's Exhibit 1, page 10. However, as noted above, the medical staff would not have been able to discern a change in behavior or in cognition because they had no baseline for comparison.

Respondent also makes much of the fact that Dr. Price and Dr. Merikangas interpreted Petitioner's behaviors and observations as being associated with brain damage. Respondent asserts this demonstrates "speculation" because his expert, Dr.

Macchiocchi, testified the behaviors and observations could be
explained "by a whole lot of other things." (Doc. 240. pp 251-
52).  Putting aside the speculative nature[14] of Dr. Macchiocchi's
assertion, Dr. Price and Dr. Merikangas are doing what doctors
do all the time, inferring an explanation for an event based on
all of the information they have before them.  Like all
scientists, Psychiatrists and Psychologists have to make
determinations based on testing and observations.  When testing
confirms the presence of frontal lobe damage and a behavior can
best be interpreted as having a root in frontal lobe syndrome,
doctors are not speculating when they testify accordingly.  They
are making a scientific judgement based on all of the available
information.

### D. Petitioner has Established that, but for Trial Counsel's Deficient Performance There is a Reasonable Probability at Least One Juror Would Have Struck a Different Balance

Respondent asserts that Petitioner has not established
prejudice under Strickland and that, at trial, the state could
have easily refuted Petitioner's evidence of brain damage.
(Respondent's Brief at 98-101; 52).  Neither premise is correct.
First, and as noted above, the state could not have refuted at

_____

[14] For instance, Dr. Macchiocchi speculated the black outs Petitioner suffered
after the accident could be due to dehydration, poor nutrition or low blood
sugar.  (Doc. 240 at 252).  It is interesting to note that all three of those
conditions can also lead to brain damage.  For instance, it is reported that
"fetuses and infants are especially susceptible to brain damage cause by
malnutrition."  See, http://www.brain-guide.org/nutrition.html.  Mr.
Jefferson was once hospitalized as an infant for "starvation."

trial evidence that Petitioner suffered from frontal lobe brain damage. The testing conducted by Dr. Price in 1991 was state-of-the-art, as was the scoring method he employed. Similarly, Dr. Merikangas conducted neurological tests that led to objective conclusions premised on objective observations. Respondent did not contest the findings or the methods employed by Dr. Price and Dr. Merikangas at the state habeas corpus evidentiary hearing. Rather, Respondent waited almost twenty five years to hire an expert who  - - with a desire to refute the earlier findings, and armed with a scoring method that did not exist at the time of trial and which is designed to exclude people legitimately suffering from brain damage - - conducted testing that revealed brain damage, just not to the degree asserted by Dr. Price and Dr. Merikangas. Thus, rather than refuting Petitioner suffered brain damage, Respondent's expert confirmed it. Accordingly, Respondent cannot refute Petitioner has brain damage.

Respondent cites a number of cases purportedly to support his assertion Petitioner failed to establish prejudice. Those cases cited are unavailing. First, all of the cases cited by Respondent are governed by the Anti-terrorism and Effective Death Penalty Act (AEDPA) of 1996. This case is not. The AEDPA sets forth rigorous standards capital habeas petitioners must satisfy before relief can be granted. Namely they must show the

decision of the state courts were either a "contrary to or an unreasonable application of clearly established" Supreme Court law.  See 28 U.S.C. § 2254(d) (as amended in 1996).  This is a standard that calls for federal courts to give considerable deference to the fact-finding and legal conclusions of the state court.  Under this standard, federal courts can find that the state court committed an error of constitutional dimension and still deny relief if the error was not "unreasonable."  This standard does not apply to Petitioner's case.  Thus, this Court, because of its earlier finding of no full and fair state court hearing, reviews both the facts and the law de novo.

Second, the cases cited by Respondent are easily distinguishable.  In Kokal v. Secretary Dept. of Corrections, 623 F.3d 1331 (11th Cir. 2010) the state courts found trial counsel did not perform deficiently in failing to present evidence of brain damage because the petitioner's own expert admitted the brain damage alone was not severe enough to have impaired him at the time of trial, and therefore did not establish a statutory mitigating circumstance under Florida law. 623 F.3d at 1347-48.  The Eleventh Circuit found this was not an unreasonable application of Strickland. In contrast, Georgia law does not set out statutory mitigating circumstances but holds that ***anything*** can be mitigating.  See Blankenship v. State, 251

Ga. 621 (1983). Moreover, the evidence of brain damage in this case is not trivial as was the evidence in <u>Kokal</u>.

In <u>Windom v. Secretary Dept of Corrections</u>, 578 F.3d 1227 (11th Cir. 2009) the state court found trial counsel was not ineffective for failing to present evidence of moderate brain dysfunction. Specifically, the state court found, even if trial counsel performed deficiently, the petitioner could not establish prejudice because, among other things, the opinions of petitioner's doctors was inconsistent with the record, lacked a medically verifiable foundation and presenting the evidence of brain dysfunction would have opened the door to incredibly damaging testimony in aggravation. 578 F.3d at 1249-50. The Eleventh Circuit found the state court's resolution of the issue was not objectively unreasonable. <u>Id</u>. at 1251. None of the problems associated with the mental health evidence in <u>Wisdom</u> are present in the instant case. Introducing evidence Petitioner suffered from frontal lobe brain damage would not have opened the door to other damning evidence in aggravation. Additionally, the opinions of Dr. Price and Dr. Merikangas has a scientific and medical foundation, and there is nothing inconsistent in the record with the conclusions drawn by Petitioner's experts.

In <u>McClain v. Hall</u>, 552 F.3d 1245 (11th Cir. 2008) the evidence was that the petitioner suffered from frontal lobe

brain damage as a result of his voluntary substance abuse.  Id.
at 1253.  The state habeas court found trial counsel did not
perform deficiently for failing to discover evidence of a
neurological disorder.  The court did not engage in a prejudice
analysis.  Id.  Further, the state court found that the evidence
of neurological disorder was "not entirely favorable" to the
petitioner.  Id.  The Eleventh Circuit, under the AEDPA, found
the state court's decision was not objectively unreasonable.
Id.  First, the McClain courts only addressed the deficient
performance prong of the Strickland analysis and never reached
the prejudice argument.  As Respondent is citing McClain for the
proposition that Petitioner failed to establish prejudice,
McClain is irrelevant.  Second, the evidence of Petitioner's
frontal lobe brain damage was not unfavorable in any manner.

     In another Florida case,  Parker v. Secretary Dept.
Corrections, 331 F.3d 764 (11th Cir. 2003), trial counsel was
found not have been ineffective for failing to present evidence
of brain damage where the petitioner's own expert testified he
only saw "soft signs" of brain damage and those "soft signs"
could have been just as easily explained by fatigue.  Id. at
783.  Further, the petitioner in Parker retained two experts one
of whom refuted the testimony of the other on the issue of
mental impairment.  Id. at 789.  Further, the state court found
that the facts of the crime indicated the petitioner had "good

30

cognitive control." Id. at 783. The Eleventh Circuit found the state court's findings were not contrary to or an unreasonable application of Strickland. Id. at 789-90. Again, none of the problems associated with Parker are present here. Dr. Price and Dr. Merikangas were united in opining Petitioner suffered from frontal lobe brain damage. There were no "soft signs" and they did not believe the symptoms and results they saw could have been better explained. Finally, the facts surrounding the crime in Petitioner's case were not indicative of good cognitive control. Just the opposite.

Lastly, Respondent cites to Gissendaner v. Seabolt, 735 F.3d 1311 (11th Cir. 2013). However, Gissendaner does not support Respondent's position as the Gissendaner Court did not engage in a prejudice analysis and is therefore inapplicable here.

## V. Conclusion

Had trial counsel not performed deficiently in failing to follow up on Dr. Dudley's recommendation for neuropsychological testing, which would have produced evidence Petitioner suffered from frontal lobe brain damage, there is a reasonable probability that at least one juror would have voted for a sentence of less than death. Therefore, Petitioner has established trial counsel rendered ineffective assistance of

counsel that prejudiced him. This Court should grant the writ and vacate Petitioner's death sentence.

This 4th day of May, 2015.

Respectfully submitted,

s/John R. Martin
JOHN R. MARTIN
Counsel for Petitioner
MARTIN BROTHERS, P.C.
44 Broad St., N.W.
Suite 202
Atlanta, GA  30308
(404) 522-0400
jack@martinbroslaw.com

s/Jeffrey Ertel
Jeffrey Ertel
Federal Defender Program, Inc.
101 Marietta Street, N.W.
Suite 1500
Atlanta, GA  30303
(404) 688-7530
Jeff_Ertel@fd.org

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served Sabrina D. Graham, Assistant Attorney General, 40 Capitol Square, S.W., Atlanta, GA 30334 with a copy of the within and foregoing **Post-Hearing Brief** by e-mail via the CM/ECF system.

This 4th day of May, 2015.

s/John R. Martin
John R. Martin